## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY;<br><br>KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security;<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;<br><br>TODD LYONS, in his official capacity as Acting Director of United States Immigration and Customs Enforcement;<br><br>STUDENT AND EXCHANGE VISITOR PROGRAM;<br><br>JOHN DOE, in their official capacity as Director of the Student and Exchange Visitor Program;<br><br>JAMES HICKS, in his official capacity as Deputy Assistant Director of the Student and Exchange Visitor Program;<br><br>UNITED STATES DEPARTMENT OF JUSTICE;<br><br>PAMELA BONDI, in her official capacity as Attorney General of the United States;<br><br>UNITED STATES DEPARTMENT OF STATE;<br><br>MARCO RUBIO, in his official capacity as Secretary of the United States Department of State,<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT** |

1.      For more than 70 years, Harvard University ("Harvard" or the "University") has been certified by the federal government to enroll international students under the F-1 visa program, and it has long been designated as an exchange program sponsor to host J-1 nonimmigrants. Harvard has, over this time, developed programs and degrees tailored to its international students, invested millions to recruit the most talented such students, and integrated its international students into all aspects of the Harvard community. Yesterday, the government abruptly revoked that certification without process or cause, to immediate and devastating effect for Harvard and more than 7,000 visa holders.

2.      This revocation is a blatant violation of the First Amendment, the Due Process Clause, and the Administrative Procedure Act. It is the latest act by the government in clear retaliation for Harvard exercising its First Amendment rights to reject the government's demands to control Harvard's governance, curriculum, and the "ideology" of its faculty and students. The government's actions are unlawful for other equally clear and pernicious reasons. They disregard the government's own regulations—under which Harvard should remain certified to host F-1 and J-1 visa holders. They depart from decades of settled practice and come without rational explanation. And they were carried out abruptly without any of the robust procedures the government has established to prevent just this type of upheaval to thousands of students' lives.

3.      With the stroke of a pen, the government has sought to erase a quarter of Harvard's student body, international students who contribute significantly to the University and its mission. Harvard's certification is essential for each of Harvard's thousands of international students to lawfully remain in this country while they complete coursework, obtain degrees, and continue critical research. Effective immediately, most of Harvard's thousands of enrolled F-1 and J-1 visa students (and their more than 300 dependents) will have little choice but to secure transfer to

another school or risk being rendered without lawful status in the United States. Effective immediately, Harvard can no longer sponsor F-1 and J-1 visa holders for its upcoming summer and fall terms, despite having admitted thousands. Effective immediately, countless academic programs, research laboratories, clinics, and courses supported by Harvard's international students have been thrown into disarray. The government's actions come just days before graduation. Without its international students, Harvard is not Harvard.

4.     Harvard therefore brings this action under the United States Constitution, the Administrative Procedure Act (APA), and the equitable authority of this Court to vacate, set aside, and enjoin the government's unlawful acts.

## INTRODUCTION

5.     For more than 70 years, Harvard has continuously hosted international students with so-called F-1 visas on its campus in coordination with the government under a program currently called the Student and Exchange Visitor Program (SEVP) and overseen by the U.S. Department of Homeland Security (DHS). Harvard has also long been designated as an exchange program sponsor to host J-1 nonimmigrants. These visa programs, which allow international students to enter the United States on nonimmigrant visas to enroll at Harvard and thousands of other schools,[1] have boosted America's academic, scientific, and economic success and its global standing.

6.     Tens of thousands of international students have studied at Harvard under the F-1 visa program. Additional international students and scholars have come to Harvard under the J-1 visa program. These students have contributed to the University's research advancements in

---

[1] U.S. Immigr. & Customs Enfor., *SEVP Certified Schools* (updated Apr. 28, 2021), https://studyinthestates.dhs.gov/assets/certified-school-list-04-28-21.pdf.

immeasurable ways. They do so by (among other things) publishing pioneering scholarship, supporting scientific research, inventing groundbreaking technologies, and starting thriving businesses here in America.

7.      Building the international program that sponsors these students did not happen overnight. It has been a painstaking, decades-long project to cultivate the programs, opportunities, personnel, and reputation that allow Harvard to attract the most qualified international students, vet those students in partnership with the government to ensure they can obtain and maintain the necessary visas to complete their course of study, and integrate them into the Harvard community. Harvard's robust and thriving visa programs have inured to the benefit of Harvard's entire population and the United States.

8.      Since the inception of the F-1 visa program more than 70 years ago, Harvard and the government have worked cooperatively to advance these goals. Harvard has been continuously certified to host F-1 visa holders since 1954. Under the modern program established in 2003, certified schools must comply with specified recordkeeping, retention, and reporting requirements and renew their F-1 certification every two years. And, since then, Harvard has complied with all applicable reporting requirements and renewed its certification without incident. For more than 70 years, the government has never threatened Harvard's certification.

9.      All of that changed on April 16, 2025, when the Secretary of Homeland Security, Kristi Noem, sent Harvard's International Office (HIO) a letter (the "Records Request") criticizing Harvard for "fail[ing] to condemn antisemitism." The Records Request demanded that HIO produce wide-ranging information for "each student visa holder" across Harvard's 13 schools within ten business days and further stated that failure to do so "within the timeframe provided"—

that is, by April 30, 2025—would be "treated as a voluntary withdrawal" from the F-1 program and "not … subject to appeal."

10.     Despite the unprecedented nature of this demand, HIO immediately began collecting responsive records from the information it maintains or keeps "accessible," 8 C.F.R. § 214.3(g)(1), and, on April 30, Harvard produced that information to DHS. On May 14, Harvard also produced additional information in response to a follow-up request from DHS. Yet, on May 22, 2025, DHS deemed Harvard's responses "insufficient"—without explaining why or citing any regulation with which Harvard failed to comply—and revoked Harvard's SEVP certification "effective immediately."

11.     The government's termination of Harvard's SEVP certification is the culmination of its unprecedented and retaliatory attack on academic freedom at Harvard:

a.     In recent weeks and months, through a multi-agency Task Force to Combat Anti-Semitism ("Federal Task Force"), the government has conditioned Harvard's continued receipt of numerous federal benefits, including billions of dollars of federal funding, on accepting sweeping changes to Harvard's governance, admissions, hiring, and academic programs.

b.     The government enumerated these demands in extensive detail in an April 11, 2025, letter to Harvard's President. The government demanded (among other things) that Harvard hire a third-party to "audit" the viewpoints of its students, faculty, and staff; depending on the results of the audit, hire and admit a "critical mass" of people to achieve the government's preferred level of "viewpoint diversity" in "each department, field, or teaching unit"; refuse admission to international students "hostile to [] American values"; "exclusively" "empower" faculty supportive of the government's action and "reduce[] the power" of those opposed; allow the government to review its faculty hires; expel or suspend specific sets of students; disband

disfavored student clubs; and establish mechanisms for Harvard community members to report on one another and send those reports to the government.

c.    When, on April 14, 2025, Harvard refused to accede to these demands, the government's retribution was swift. Hours later, the government froze more than $2.2 billion in federal funding critical to the support of ongoing cutting-edge research at Harvard—research with the potential to improve the health and safety of millions of Americans through better cancer treatments, model and manage the spread of infectious disease outbreaks, produce vital innovations in quantum computing and artificial intelligence, and reduce the short- and long-term consequences of battlefield-related injuries, among myriad other developments and discoveries.[2]

d.    The next day, on April 15, 2025, President Trump posted on Truth Social suggesting that "Harvard should lose its Tax-Exempt Status" as a not-for-profit educational institution under Section 501(c)(3) of the Internal Revenue Code, "if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness.'" But Harvard is not a commercial business and does not seek investors to fund its activities and then share in their proceeds. So, maintaining Section 501(c)(3) status—which permits the University to receive tax-deductible gifts, raise capital from investors on affordable terms, and provide access to federal student aid programs—is vital to Harvard's existence as a modern research university dedicated to serving the public.

e.    The following day, the President doubled down, asserting in a post on Truth Social that "Harvard has been hiring almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE to students" and that "Harvard can no longer be considered

---

[2] Harvard has challenged the government's freeze order and subsequent terminations of billions of dollars in multi-year grants to Harvard in *President and Fellows of Harvard College v. U.S. Dep't of Health and Human Services et al.*, No. 25-cv-11048 (D. Mass. Apr. 21, 2025) (the "Funding Case").

even a decent place of learning, and should not be considered on any list of the World's Great Universities or Colleges." On April 16, Secretary Noem sent her letter to HIO, seeking eight broad categories of information on *every* international student studying at Harvard under an F-1 visa, threatening that failure to comply would be deemed a "voluntary withdrawal" of Harvard's SEVP certification, and warning that "[t]he withdrawal will not be subject to appeal." This demand was unprecedented, seeking information far beyond what DHS's regulations require Harvard to maintain and report, and far beyond any request Harvard has received in its more than 70 years hosting foreign students under the F-1 visa program.

f.      Just hours later, DHS issued a press release announcing both its cancellation of "two DHS grants totaling over $2.7 million to Harvard" as well as the Secretary's "scathing letter demanding detailed records on Harvard's foreign student visa holders' illegal and violent acts." The press release asserted that Harvard has allowed "anti-American, pro-Hamas ideology [to] poison[] its campus and classrooms" and "undermine America's values." It added that DHS's demand for records encompassing thousands of student visa holders "follows President Donald J. Trump's decision to freeze $2.2 billion in federal funding to Harvard University, proposing the revocation of its tax-exempt status over its radical ideology." And it concluded by stating that "if Harvard cannot verify it is in full compliance with its reporting requirements, the university will lose the privilege of enrolling foreign students."

g.      Despite the unprecedented nature and scope of the April 16 demand, and the lack of any clear authority for most of the requests, Harvard worked diligently to collect and produce the information it is required to maintain and report under the SEVP program. On April 30, 2025, Harvard produced responsive information falling within 8 C.F.R. § 214.3(g)(1).

Specifically, Harvard produced to DHS thousands of data points concerning its entire F-1 visa student population.

h.    Then, on May 7, 2025, DHS notified Harvard that DHS believed Harvard's initial production was incomplete and—now invoking all of its authority under 8 C.F.R. Part 214— asked for four of the eight categories of information referenced in the initial request. This request continued to be both unprecedented and well beyond the scope of the authority invoked by DHS. But in response, Harvard again conducted a search and again produced additional responsive information.

i.    In the wake of Harvard's productions, DHS summarily revoked Harvard's SEVP certification on the basis that Harvard's responses were "insufficient." But it did not explain why that was so, let alone identify any actual noncompliance with the governing regulations or follow any of the detailed processes required under the regulations prior to revoking a school's certification.

j.    DHS's revocation letter leaves no doubt that the revocation is part of DHS's campaign to coerce Harvard into surrendering its First Amendment rights. The letter declares: "Consequences must follow to send a clear signal to Harvard and all universities that want to enjoy the privilege of enrolling foreign students, that the Trump Administration will enforce the law and root out the evils of anti-Americanism and antisemitism in society and campuses." Or put another way: because the Administration perceives that members of Harvard's community have the wrong viewpoints, Harvard will be punished until it alters its viewpoints to satisfy the Administration's demands.

12.    The surrounding events, and Defendants' express statements, make clear that DHS took these actions not for any valid reason, but purely as punishment for Harvard's speech, its

perceived viewpoint, and its refusal to surrender its academic independence or relinquish its constitutional rights. A central tenet of our constitutional system is that the government cannot "invok[e] legal sanctions and other means of coercion" to micromanage private speech. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). And it is bedrock law that the viewpoint-based justifications the government has repeatedly and publicly invoked as a basis for its campaign against Harvard are a particularly "egregious form of content discrimination," subject to the strictest scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (quotation marks omitted). Those First Amendment concerns are heightened here, as "academic freedom" is "a special concern of the First Amendment," *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967). The government's actions violate Harvard's rights under the First Amendment several times over.

13.    Compounding these First Amendment infirmities, the government's retaliatory revocation of Harvard's certification is the very definition of arbitrary and capricious agency action proscribed by the APA. DHS provided no coherent reason for taking these actions, and its revocation fully bypassed the detailed statutory and regulatory framework governing the F-1 and J-1 visa programs, which specify procedures and standards for revoking a school's certification— all of which the government ignored. And the government's actions run roughshod over the procedural due process protections of fair notice and an opportunity to respond owed to Harvard under the U.S. Constitution and the APA as the holder, for more than 70 years, of a government license to participate in the F-1 visa program.

14.    There is no lawful justification for the government's unprecedented revocation of Harvard's SEVP certification, and the government has not offered any. DHS's actions go well beyond terminating the visa of any individual student—or even a category of students—for

noncompliance with immigration laws. They target Harvard itself, and for no remotely cognizable purpose. Harvard is fully committed to ensuring the integrity of its SEVP certification. Indeed, the government has continuously certified Harvard to host F-1 visa students for more than seven decades across 14 presidential administrations.

15.     The government has casually discarded core First Amendment protections, the protections of procedural due process, and DHS's own regulations to immediate and devastating effect for Harvard and its community. Harvard's more than 7,000 F-1 and J-1 visa holders—and their dependents—have become pawns in the government's escalating campaign of retaliation. Effective immediately, Harvard may no longer sponsor or host F-1 or J-1 visa students. It cannot issue Form I-20s to new students, including those who have been admitted for the upcoming summer and fall terms. The thousands of international students who are scheduled to come to campus for the summer and fall terms will no longer be able to enter the country. And the several thousand international students currently present in the United States—who constitute more than a quarter of Harvard's student population—are subject to immediate removal from the United States just days before many are to graduate with degrees.

16.     Immediate relief is necessary to restore Harvard's SEVP certification and to stop the government's arbitrary, capricious, unlawful, and unconstitutional action.

## JURISDICTION AND VENUE

17.     This action arises under the Administrative Procedure Act (APA), 5 U.S.C § 551 *et seq.*; the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, and its implementing regulations; and the United States Constitution.

18.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. Because this suit seeks relief other than money damages and instead challenges Defendants' unlawful actions, the United States has waived sovereign immunity from this suit. 5 U.S.C. § 702.

19.    The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702, 703, 705, and 706; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1988; and through the equitable powers of this Court.

20.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, and a substantial part of the events or omissions giving rise to the claims occurred in this District, and Harvard resides in this District.

21.    Harvard has standing to bring this case. Defendants' actions—unless halted by this Court—will cause an imminent, concrete, and irreparable injury to Harvard, its students and faculty, and its ability to achieve its educational mission.

## PARTIES

22.    Plaintiff President and Fellows of Harvard College is a non-profit corporation that is the senior governing board of the organization known as Harvard University. Harvard is a private research university and the oldest institution of higher learning in the United States. Harvard's 13 schools provide undergraduate and graduate instruction and degree programs to more than 24,000 enrolled students annually, including more than 5,000 international students who study in the United States on F-1 visas. Additionally, Harvard sponsors approximately 2,000 recent graduates who are working in jobs across the country on F-1 visas as part of the Optional Practical Training (OPT) and STEM OPT programs. And Harvard also hosts several hundred individuals who hold J-1 visas.

23.     Defendant United States Department of Homeland Security (DHS) is a cabinet-level Department of the federal government. DHS is responsible for overseeing enforcement and implementation of certain provisions of the Nation's immigration laws by all DHS subagencies and personnel.

24.     Defendant Kristi Noem is the Secretary of DHS. Defendant Noem is sued in her official capacity.

25.     Defendant United States Immigration and Customs Enforcement (ICE) is a component of DHS. ICE is responsible for administering SEVP and overseeing proceedings to grant, recertify, and withdraw an institution's SEVP certification.

26.     Defendant Todd Lyons is the Acting Director of ICE. Defendant Lyons is sued in his official capacity.

27.     Defendant Student and Exchange Visitor Program (SEVP) is a component of ICE. SEVP is responsible for administering the F-1 visa program and proceedings to grant, recertify, and withdraw an institution's SEVP certification.

28.     Defendant John Doe is the Director of SEVP. Director Doe is sued in his official capacity.

29.     Defendant James Hicks is the Deputy Assistant Director of SEVP. Defendant Hicks is sued in his official capacity.

30.     Defendant United States Department of Justice is a cabinet-level Department of the federal government. The Department of Justice is charged with overseeing domestic enforcement of federal laws.

31.     Defendant Pamela Bondi is the Attorney General of the United States. Defendant Bondi is sued in her official capacity.

32.     Defendant United States Department of State is a cabinet-level Department of the federal government. The State Department is responsible for conducting American foreign policy and diplomacy, and relevant here, for administering the J-1 Exchange Visitor Program.

33.     Defendant Marco Rubio is the Secretary of State. Defendant Rubio is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     The F-1 Visa Program and SEVP Certification

34.     SEVP is a federally regulated program that recognizes the inherent value in bringing the best and brightest students—wherever they are found—to the United States, to study and contribute to American academic institutions.

35.     Under the INA, certain international students are permitted to attend American universities on nonimmigrant F-1 visas. An F-1 visa permits international students to enter and be lawfully present in the United States to complete their courses of study, among other things.

36.     Eligibility to maintain F-1 status is governed by 8 U.S.C. § 1101(a)(15)(F)(i) and 8 C.F.R. § 214.2(f).

37.     As relevant here, in order to qualify for an F-1 visa, a noncitizen must: (1) "hav[e] a residence in a foreign country which he has no intention of abandoning"; (2) be "a bona fide student qualified to pursue a full course of study"; and (3) "seek[] to enter the United States temporarily and solely for the purpose of pursuing such a course of study … at an established college, university, … or other academic institution … particularly designated by him *and approved by the Attorney General*." 8 U.S.C. § 1101(a)(15)(F)(i) (emphasis added).

38.     The statutorily mandated process by which schools are "approved by the Attorney General" to host students who hold F-1 visas is administered by SEVP, a subcomponent of ICE (within DHS).[3]

39.     The process for seeking the required approval is known as "SEVP certification," *see, e.g.*, 8 C.F.R. § 214.3(f), and a school that receives that approval is said to be "SEVP-certified," *see, e.g.*, *id.* § 214.2(f)(4).

40.     The requirements for obtaining SEVP certification are set out in 8 C.F.R. § 214.3.

41.     To begin the SEVP certification process, a school must "file a petition for certification" with DHS using an online portal known as "the Student and Exchange Visitor Information System," or SEVIS, and pay a filing fee. *Id.* §§ 214.3(a)(1), 103.7(d)(2)(i).

42.     The requirements for obtaining initial SEVP certification (the "Initial Certification Criteria") are enumerated in the governing regulation. The school "must establish at the time of filing" that it: (A) "[i]s a bona fide school"; (B) "[i]s an established institution of learning or other recognized place of study"; (C) "[p]ossesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses"; and (D) "[i]s, in fact, engaged in instruction in those courses." *Id.* § 214.3(a)(3)(i)(A)-(D).

43.     After receiving its initial certification, a school must petition to renew that certification every two years, *see id.* § 214.3(h)(2); 8 U.S.C. § 1762(a).

44.     To "be eligible for recertification," the school must establish that: (A) it "[r]emains eligible for [initial] certification in accordance with paragraph (a)(3)(i) of this section" (that is, it

---

[3] For ease of reference, Harvard refers to Defendants collectively as "DHS" from this point forward. References in the INA to the Attorney General are generally understood also to refer to the DHS Secretary. *See* 6 U.S.C. § 236(b) (transferring many functions relating to federal immigration law to the Secretary of Homeland Security).

continues to satisfy the four Initial Certification Criteria); and (B) the school and its Designated

School Officials (DSOs) have "complied during its previous period of certification … with

recordkeeping, retention, and reporting requirements and all other requirements of paragraphs (g),

(j), (k), and (l) of this section" (the "Compliance Criteria"). 8 C.F.R. § 214.3(a)(3)(ii)(A)-(B); *see

also id.* § 214.3(h)(2)(iii)(B) (stating that individual DSO compliance may be considered).

45.    Section 214.3(g) of the regulations enumerates the Compliance Criteria relating to

a school's recordkeeping, retention, and reporting obligations. It requires schools to "keep records

containing certain specific information and documents relating to each F-1 … student" and to

"furnish the[se records] to DHS representatives upon request." *Id.* § 214.3(g)(1).

46.    DHS defined and limited this "specific information" by regulation. The information

includes the student's name, "date and place of birth, [and] country of citizenship"; the "[c]urrent

address where the student and his or her dependents physically reside"; the student's "[r]ecord of

coursework"; his "[a]cademic status," including "the effective date or period if suspended,

dismissed, placed on probation, or withdrawn"; and, if applicable, a "[t]ermination date and

reason." *Id.* § 214.3(g)(1)(ii)-(iv), (vi), (ix). These categories largely track the information that the

school is required to maintain by statute. *See* 8 U.S.C. § 1372(c)(1).

47.    Sections 214.3(j)-(*l*) of the regulations set forth the additional Compliance Criteria

a school seeking recertification must satisfy. Section 214.3(j) limits schools to certain specified

language when discussing their SEVP certification in advertising or promotional materials. *See* 8

C.F.R. § 214.3(j). Section 214.3(k) provides that the school may only issue a Form I-20—a critical

document in the noncitizen's F-1 visa application—to foreign students who have applied to the

school in writing and have been accepted on the merits. *See id.* § 214.3(k). And Section 214.3(*l*)

requires schools to designate one Principal Designated School Official (PDSO) and any number

of additional DSOs, "whose compensation does not come from commissions for recruitment of foreign students," to advise F-1 students "regarding maintenance of nonimmigrant status and to support timely and complete recordkeeping and reporting to DHS." *Id.* § 214.3(*l*)(1)(ii)-(iii). These are the only recertification eligibility requirements specified in DHS's regulations.

### B.     Withdrawal of SEVP Certification

48.     In addition to the ordinary biennial recertification process described above, the regulations provide that DHS may review and (if warranted) withdraw a school's certification "in accordance with the provisions of [8 C.F.R. § 214.4]," *id.* § 214.3(f)(1). The regulations refer to this alternative means of withdrawing a school's certification as an "out-of-cycle review" leading to "[w]ithdrawal on notice." *Id.* § 214.4(b).

49.     SEVP may initiate an out-of-cycle review of a school's certification "to verify the school's compliance with the recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section to verify the school's continued eligibility for SEVP certification pursuant to paragraph (a)(3) of this section." *Id.* § 214.3(h)(3)(iii).

50.     As part of this out-of-cycle review process, "SEVP may request a school to electronically update all Form I-17 fields[4] in SEVIS and provide "documentation supporting the update" and "[t]he school must complete such updates in SEVIS and submit the supporting documentation to SEVP within 10 business days of the request from SEVP." *Id.* § 214.3(h)(3)(ii).

51.     If DHS identifies any non-compliance during the out-of-cycle review process, the regulations give the agency only two options for taking adverse action against the school: it may (1) "initiate remedial action with the school, as appropriate," or (2) "initiate withdrawal

---

[4] The Form I-17 is a form the school fills out in connection with its petition for certification, providing information such as the school's address and disciplines taught. *See, e.g.*, 8 C.F.R. § 214.3(h)(3)(i)(A)-(T).

proceedings against the school pursuant to [8 C.F.R. § 214.4.(b)] if noncompliance or ineligibility of a school is identified." *Id.* § 214.3(h)(3)(iii); *see also id.* § 214.3(h)(3)(vi) (providing that "SEVP will institute withdrawal proceedings in accordance with [8 C.F.R. § 214.4(b)] if, upon completion of an out-of-cycle review, SEVP determines that a school or its programs are no longer eligible for certification").

52. The regulations do not create any mechanism for summary withdrawal of a school's certification after an out-of-cycle review has been conducted. Instead, DHS's authority to revoke a certification is limited both substantively and procedurally.

53. Substantively, DHS may seek to withdraw a school's certification if (after conducting this out-of-cycle review process) it determines that the school "has failed to sustain eligibility or has failed to comply with the recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section," *id.* § 214.3(e)(4)(ii) & (f)(1)— in other words, if it fails to satisfy either the Initial Certification Criteria or the Compliance Criteria.

54. Section 214.4 likewise provides that SEVP certification may be withdrawn under this out-of-cycle review mechanism only "if the school … is determined to no longer be entitled to certification for any valid and substantive reason." *Id.* § 214.4(a)(2); *see* 8 U.S.C. § 1762(c) (stating that "[m]aterial failure … to comply with the [specified] recordkeeping and reporting requirements to receive nonimmigrant students" is grounds for withdrawal of certification).

55. The regulation lists 19 "valid and substantive reason[s]" for withdrawing certification. One such reason is "[f]ailure to comply with [8 C.F.R. § 214.3(g)(1)] without a subpoena." 8 C.F.R. § 214.4(a)(2)(i). Others include failure to adhere to the Initial Certification Criteria, *id.* § 214.4(a)(2)(xii)-(xiii), (xv)-(xvii); failure to comply with the Compliance Criteria,

*see id.* § 214.4(a)(2)(i)-(iv), (viii)-(x), (xiv), (xviii)-(xix); and misconduct by or lack of qualification of the school's DSOs, *see id.* § 214.4(a)(2)(v)-(vii).

56.     Procedurally, even where DHS identifies a "valid and substantive reason" for withdrawing a school's certification, the regulations do not permit DHS to summarily decertify a school as DHS did here. Instead, Section 214.4 establishes a detailed set of procedures that DHS must follow if it wishes to withdraw certification pursuant to out-of-cycle review (i.e., outside the biennial recertification process).

57.     The process for withdrawal of certification following out-of-cycle review is governed by 8 C.F.R. § 214.4(b), which is entitled "Withdrawal on notice." As the name reflects, DHS may initiate withdrawal-on-notice proceedings only by serving the school with a notice known as a "Notice of Intent to Withdraw" or NOIW. *Id.* § 214.3(e)(4). The NOIW must "inform the school" of "[t]he grounds for withdrawing SEVP certification." *Id.* § 214.4(b)(1).

58.     The issuance of a NOIW is the first step in what the regulations elsewhere refer to as "withdrawal proceedings." *Id.* § 214.3(h)(3)(iii). Those proceedings involve detailed procedural protections—including administrative appeals—prior to effectuating a withdrawal of certification.

59.     Upon receipt of a NOIW, the school has 30 days to submit an answer either admitting or denying the allegations in the NOIW and supporting its position with "sworn statements, and documentary or other evidence, to rebut the grounds for withdrawal of certification." *Id.* § 214.4(b)(2); *see id.* § 214.4(d)-(e). The school may also submit "a written request … for a telephonic interview in support of its response to the NOIW." *Id.* § 214.4(b)(3). And the school is permitted to be represented by counsel during these proceedings. *See id.* § 214.4(c).

60.     If DHS wishes to proceed with withdrawing the school's certification following this period of review, it must issue a written decision explaining "the specific reasons for" its decision. *Id.* § 103.3(a)(1)(i); *see id.* § 214.4(g).

61.     The regulations also provide that "[a] school can voluntarily withdraw from SEVP … in lieu of complying with an out-of-cycle review or request." *Id.* § 214.3(h)(3)(vii). To do so, the school generally must "*initiate* voluntary withdrawal by sending a request for withdrawal on official school letterhead to SEVP." *Id.* (emphasis added). The regulations also state that "[f]ailure of a school to comply with an out-of-cycle review or request by SEVP will be treated as a voluntary withdrawal." *Id.* This voluntary withdrawal procedure can only be read as applying in cases where no out-of-cycle review in fact occurs, despite the agency's desire to conduct such a review, because of the school's decision to withdraw from the program *in lieu of* compliance.

62.     In sum, the regulations provide DHS with only two means of terminating a school's existing F-1 visa program outside of the normal biennial recertification process: *First*, DHS can withdraw a certification only by issuing a NOIW and initiating "withdrawal proceedings" pursuant to 8 C.F.R. § 214.4(b). *Second*, if DHS initiates an out-of-cycle review and the school wishes to acquiesce in the withdrawal of its certification, it can "voluntarily withdraw" its certification either by submitting a letter to that effect or simply by declining to engage with the out-of-cycle review process.

63.     Upon information and belief, prior to the decertification decision in this case, no school had ever had its SEVP certification revoked for any reason other than failure to meet the eligibility criteria for certification or failure to comply with the recordkeeping, retention, reporting, and other requirements set out in the federal regulations governing certification.

**C.    The Administrative Appeals Process for Challenging Revocation of SEVP Certification**

64.    The regulatory scheme also entitles a school whose certification is withdrawn to file an administrative appeal of that decision. Specifically, the regulations authorize the school to "file an [administrative] appeal of a … withdrawal [of certification] no later than 15 days after the service of the decision by ICE." *Id.* § 214.4(h).

65.    Publicly available guidance documents promulgated by DHS and ICE describe the multi-step appeal process.[5]

66.    In the first instance, an administrative appeal is assigned to the same "adjudicator who originally adjudicated the case to determine whether to uphold or overturn the original decision." Ex. 2.

67.    If the original adjudicator affirms his earlier decision, the case proceeds to the Administrative Appeals Team, or AAT, which "reviews the case and all the evidence relating to the petition" and "draft[s] a preliminary appeal decision." *Id.*

68.    That preliminary decision is then subject to "[l]egal and [r]egulatory [r]eview" to "ensure regulatory compliance and legal sufficiency." *Id.*

69.    From there, a different body known as the Final Appeals Authority, or FAA, "reviews the entire case proceedings to ensure understanding of [the] case, including both comments from the AAT adjudicator and from the legal entity" that performed the legal and regulatory review. Ex. 1.

---

[5]  *See* DHS, *General Appeals Process Information* (attached as **Exhibit 1**) (describing administrative appeals process); ICE, *Appeal Processing Steps* (attached as **Exhibit 2**) (same). The processes outlined in these two documents are substantively identical.

70.    The AAT adjudicator then reviews the FAA's comments and makes any necessary changes. *See id.*

71.    Afterward, the decision is returned to the FAA for approval of a final, signed appellate decision. *See id.* That "final decision is then issued to the petitioner and [its] attorney, if applicable, via email." Ex. 2.

72.    This administrative appeals process "takes roughly 60 business days." Ex. 1.

**D.    Consequences of Withdrawing SEVP Certification**

73.    The consequences of withdrawing SEVP certification are drastic—for the school that loses certification, for its students, and for its broader community.

74.    Effective immediately upon DHS's decision, the school may no longer issue new Forms I-20 to foreign students as needed to allow them to obtain F-1 visas and therefore admission into the United States. 8 C.F.R. § 214.4(*i*)(1). The effect is to preclude the school from accepting any new foreign students to its programs.

75.    With respect to current students with F-1 status, students whose school is decertified are, necessarily, no longer "pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students," *id.* § 214.2(f)(5)(i), and thus are at immediate risk of losing their F-1 status.

76.    A student who remains in the United States after his or her F-1 status is terminated is unlawfully present and may be placed in removal proceedings. *See* 8 U.S.C. § 1227(a)(1)(C)(i). A noncitizen who remains unlawfully present for more than 180 days is thereafter rendered inadmissible for a period of three years. *See id.* § 1182(a)(9)(B)(i)(I), (ii).

77.    As a practical matter, the regulations and publicly available guidance indicate that loss of a student's F-1 status is triggered not on the date of the school's decertification, but rather

on the later date when the school's access to the online SEVIS portal is terminated—known as its "SEVIS access termination date." 8 C.F.R. § 214.4(*i*)(2). On this date, DHS "will automatically terminate any remaining Active SEVIS records for that school." *Id.*[6]

78.    Termination of SEVIS records presents student visa holders whose school loses its certification with two bad choices: (a) attempt the uncertain path of securing immediate "[t]ransfer to another SEVP-certified school," which typically will not be feasible—much less guaranteed— in the middle of an academic year (particularly when thousands of students are seeking transfers *en masse*), or (b) "[d]epart the United States." Ex. 3 at 2.

79.    Although termination of SEVIS access eventually follows from withdrawal of certification, DHS must make an independent determination as to *when* it occurs—and thus when to terminate the status of its F-1 visa students. "In most situations," and unless the school is "suspected of criminal activity or poses a potential national security threat," DHS "will not determine a SEVIS access termination date for that school until the [administrative] appeals process has concluded and the … withdrawal has been upheld." 8 C.F.R. § 214.4(*i*)(2). In determining the SEVIS access termination date, DHS "will consider the impact that such date will have upon SEVP, the school, and the school's nonimmigrant students." *Id.*

80.    A school whose certification is withdrawn is ineligible to petition again for SEVP certification until one year after withdrawal, and even then, "[e]ligibility to re-petition will be at the discretion of the Director of SEVP." *Id.* § 214.4(a)(2).

---

[6] *See* U.S. Dep't of Homeland Sec., *Loss of SEVP Certification* (Dec. 19, 2024) (attached as **Exhibit 3**).

### E.     The J Visa Program

81.     The J visa is the nonimmigrant visa class for foreign citizens who are approved to participate in an exchange visitor program in the United States, 8 U.S.C. § 1101(a)(15)(J), including as students, professors, and research scholars. 22 C.F.R. § 62.4.

82.     To host individuals on J-1 visas, an institution must be designated as an "Exchange Visitor Program sponsor" by the Department of State. 22 C.F.R. § 62.3, 62.5.

83.     Revocation of a sponsor's Exchange Visitor Program designation is governed by 22 C.F.R. § 62.50(d). The provision authorizes the Department of State's Office of Exchange Coordination and Designation (the "Office") to serve a sponsor with written notice of its intent to revoke the sponsor's Exchange Visitor Program designation "[u]pon a finding of any act or omission set forth in [paragraph (a) of the regulation]." 22 C.F.R. § 62.50(d). Paragraph (a), in turn, provides notice of intent to revoke may be issued upon a finding that the sponsor has violated one or more provisions of 22 C.F.R. Part 62; evidenced a pattern of failure to comply with one or more provisions of 22 C.F.R. Part 62; committed an act of omission or commission, which has or could have the effect of endangering the health, safety, or welfare of an exchange visitor; or otherwise conducted its program in such a way as to undermine the foreign policy objectives of the United States, compromise the national security interests of the United States, or bring the Department or the Exchange Visitor Program into notoriety or disrepute. 22 C.F.R. § 62.50(a).

84.     Upon such a finding, the regulations afford sponsors notice and an opportunity to be heard before the revocation takes effect:

        a.     The Office must provide at least 30 days' written notice of its intent to revoke. 22 C.F.R. § 62.50(d)(1).

b.      That notice must "specify the grounds for the proposed sanction and its effective date, advise the sponsor of its right to oppose the proposed sanction, and identify the procedures for submitting a statement of opposition thereto." *Id.*

c.      The sponsor is then afforded the opportunity to submit a statement in opposition to or mitigation of the proposed sanction, the submission of which serves to stay the effective date of the proposed sanction pending decision of the Principal Deputy Assistant Secretary for Educational and Cultural Affairs. 22 C.F.R. § 62.50(d)(2)(i)-(ii). The Principal Deputy Assistant Secretary is then responsible for reviewing the submissions of both the sponsor and the Office and either modifying, withdrawing, or confirming the proposed sanction by serving the sponsor a written decision that specifies the grounds for the sanction, identifies its effective date, advises the sponsor of its right to request a review, and identifies the procedures for requesting such review. 22 C.F.R. § 62.50(d)(2)(v).

85.     The effect of an order of revocation is outlined in 22 C.F.R. § 62.50(i). A sponsor against which an order of revocation "has become effective may not thereafter issue any Certificate of Eligibility for Exchange Visitor (J-1) Status (Form DS-2019) or advertise, recruit for, or otherwise promote its program." 22 C.F.R. § 62.50(i). And even where the sponsor has already issued a Form DS-2019, the sponsor may not under any circumstances "facilitate the entry of an exchange visitor into the United States" after revocation. *Id.* The regulation also expressly states that an order of revocation "will not in any way diminish or restrict the sponsor's legal or financial responsibilities to existing program applicants or participants." *Id.*

## FACTUAL BACKGROUND

### A.    Harvard's Participation in the F-1 Visa Program

86.    Harvard first became certified to host students with F-1 visas in 1954 and has continuously maintained its certification for the 70-plus years since. Throughout that period, all of Harvard's required biennial petitions for recertification have been approved without issue.

87.    The seamless recertification across this period—spanning more than 14 presidential administrations—reflects a determination by DHS and SEVP (and their predecessor agencies) that the University has remained eligible for certification. In other words, Harvard is a bona fide and established institution of learning; possesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses and is in fact engaged in instruction in those courses; and has continuously complied with applicable recordkeeping, retention, and reporting requirements and all other requirements of the governing regulations.

88.    International students who hold F-1 visas, as well as students and scholars visiting on J-1 visas, form a vital part of Harvard's academic community. Over 5,000 F-1 visa holders are currently enrolled at Harvard, representing approximately 26% of the total student body across Harvard's 13 schools. These students hail from 143 different countries, contributing unique social, cultural, and intellectual perspectives that enrich classroom discussions, research endeavors, and campus life. Among other activities, they run labs, teach courses, assist faculty members, drive innovative research, and participate across a wide range of athletic programs and 42 varsity sports.

89.    Harvard's ability to enroll international students directly affects its global rankings and reputation as an institution of higher learning. Harvard fills its classes with the most qualified applicants from around the world.

90.     For some disciplines, this results in classes with large shares of international students. For example, at the Harvard Kennedy School, the mission of which depends on providing students with the perspectives of current and future policymakers from around the world, 49% of students hold F-1 visas. One third of Harvard Business School students are F-1 visa holders. And nearly all—94%—of the students in Harvard Law School's LL.M. program on comparative law are international students with F-1 visas.

91.     Leading scholars often consider a university's international profile, the caliber of its students, and its research and teaching support resources in deciding where to teach and conduct research.

92.     The many notable alumni who have enrolled at Harvard as student visa holders— including Benazir Bhutto, the former Prime Minister of Pakistan, Ellen Johnson Sirleaf, the former President of Liberia, Empress Masako of Japan, and countless corporate executives, university professors, and high-ranking government officials across the world—amplify and enhance the profile that attracts top talent to the University.

**B.     Harvard's Response to Antisemitism on its Campus**

93.     On October 7, 2023, the terrorist organization Hamas conducted a surprise attack on Israeli citizens. This began an ongoing war between Israel and Hamas. The escalating conflict in the Middle East dominated headlines around the globe. In the United States, protests erupted on university campuses across the country. Like other schools, Harvard experienced increased tensions among members of its campus community, including students. Members of the Jewish and Israeli communities at Harvard reported treatment that was vicious and reprehensible.

94.     In the aftermath of these events, Harvard made substantial changes aimed at ensuring its campus is safe, fair, and welcoming to Jewish and Israeli students. Harvard has

adopted new accountability procedures and clarified policies; imposed meaningful discipline for those who have violated applicable policies; enhanced programs designed to address bias and promote ideological diversity and civil discourse; hired staff to support these programs and impacted students; and enhanced safety and security measures. Harvard's work is ongoing, and it continues to update and enforce its policies and procedures to protect Jewish and Israeli members of the Harvard community while permitting the free and open exchange of ideas.

**C.    The Government's Attack on Harvard and Retaliatory Funding Freeze**

95.    Following President Trump's inauguration, on February 3, 2025, the government announced the formation of its Federal Task Force, led by Senior Counsel to the Assistant Attorney General for Civil Rights, Leo Terrell.[7] On February 26, 2025, a news article reported Terrell as saying, "When you see universities start losing millions of dollars in federal funding, you're going to see a change in their behavior."[8]

96.    A few days later, Terrell stated in a Fox Business clip he later shared on X, "I've targeted ten schools. Columbia, Harvard, Michigan, UCLA, USC. Let me tell you what we're going to do. We're going to take away your funding."[9]

97.    On February 28, 2025, the Federal Task Force issued a press release announcing its plans to visit ten university campuses, including Harvard, to gather information about allegations of antisemitic incidents.[10]

---

[7] *See* Press Release, U.S. Dep't of Just., Off. of Pub. Affs., *Justice Department Announces Formation of Task Force to Combat Anti-Semitism* (Feb. 3, 2025) (attached as **Exhibit 4**).

[8] Andrew Bernard, "Head of DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years'," *Jewish News Syndicate*, at 2 (Feb. 26, 2025) (attached as **Exhibit 5**).

[9] @TheLeoTerrell, X (Feb. 28, 2025, 11:48 AM ET), https://x.com/TheLeoTerrell/status/1895516455392985171.

[10] Press Release, U.S. Dep't of Just., *Federal Task Force to Combat Antisemitism Announces Visits*

98.     On March 31, 2025, the Federal Task Force sent Harvard a memorandum announcing its intent to conduct a review of more than $8.7 billion in federal research grants to Harvard and "its affiliates."[11] This memorandum stated that Harvard was "being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment." *Id.*

99.     On April 3, 2025, the government sent Harvard a letter (the "April 3 Letter") conveying a list of "broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars," which went far beyond concerns regarding antisemitism.[12]

100.     On April 11, 2025, the government sent another letter to Harvard that went even further (the "Demand Letter").[13] The Demand Letter superseded the April 3 Letter, enumerating detailed conditions for "maintain[ing] Harvard's financial relationship with the federal government." *Id.* at 1. These conditions sought to regulate or put under direct government control a slate of core university functions, including regulation of the viewpoints of Harvard's students and faculty. Among the conditions were the following (emphases added):

- **Viewpoint Diversity in Admissions and Hiring.** … [T]he University shall commission an external party … to *audit the student body, faculty, staff, and leadership for viewpoint diversity*, such that *each department, field, or teaching unit must be individually viewpoint*

---

*to 10 College Campuses that Experienced Incidents of Antisemitism* (Feb. 28, 2025) (attached as **Exhibit 6**).

[11] Memorandum from Josh Gruenbaum, U.S. Gen. Servs. Admin., to Alan M. Garber, Harvard Univ., and Penny Pritzker, Lead Member, Harvard Corp., *Re: Review of Federal Government Contracts*, at 1 (Mar. 31, 2025) (attached as **Exhibit 7**).

[12] Letter from Josh Gruenbaum, U.S. Gen. Servs. Admin., Sean R. Keveney, U.S. Dep't of Health & Hum. Servs., and Thomas E. Wheeler, U.S. Dep't of Educ., to Alan M. Garber, Harvard Univ., and Penny Pritzker, Lead Member, Harvard Corp., at 1-2 (Apr. 3, 2025) (the "April 3 Letter") (attached as **Exhibit 8**).

[13] Letter from Josh Gruenbaum, U.S. Gen. Servs. Admin., Sean R. Keveney, U.S. Dep't of Health & Hum. Servs., and Thomas E. Wheeler, U.S. Dep't of Educ., to Alan M. Garber, Harvard Univ., and Penny Pritzker, Lead Member, Harvard Corp. (Apr. 11, 2025) (the "Demand Letter") (attached as **Exhibit 9**).

*diverse.* … Harvard must *abolish all criteria, preferences, and practices, whether mandatory or optional, throughout its admissions and hiring practices*, that function as ideological litmus tests. Every department or field found to lack viewpoint diversity *must be reformed by hiring a critical mass of new faculty* within that department or field who will provide viewpoint diversity; every teaching unit found to lack viewpoint diversity *must be reformed by admitting a critical mass of students* who will provide viewpoint diversity.

- **Governance and leadership reforms.** … Harvard must make meaningful governance reform and restructuring … [including] empowering tenured professors and senior leadership, and, from among the tenured professoriate and senior leadership, exclusively those most devoted to the scholarly mission of the University and committed to the changes indicated in this letter; *reducing the power held by students and untenured faculty*; [and] *reducing the power held by faculty (whether tenured or untenured) and administrators more committed to activism than scholarship*.

- **International Admissions Reform.** … [T]he University must reform its recruitment, screening, and admissions of international students to *prevent admitting students* hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence, including students supportive of terrorism or anti-Semitism. Harvard will immediately report to federal authorities, including [DHS] and [the] State Department, any foreign student, including those on visas and with green cards, who commits a conduct violation. … [T]hese reforms must be durable and demonstrated through *structural and personnel changes*.

- **Student Discipline Reform and Accountability.** … In the future, funding decisions for student groups or clubs *must be made exclusively by a body of University faculty accountable to senior University leadership*. In particular, Harvard must end support and recognition of those student groups or clubs that engaged in anti-Semitic activity since October 7th, 2023, including the Harvard Palestine Solidarity Committee, Harvard Graduates Students 4 Palestine, Law Students 4 Palestine, Students for Justice in Palestine, and the National Lawyers Guild, and discipline and render ineligible the officers and active members of those student organizations.

- **Transparency and Monitoring.** … The University shall … , [n]o later than June 30, 2025, and every quarter thereafter … at least until the end of 2028, … submit to the federal government a report—certified for accuracy—that documents its progress on the implementation of the reforms detailed in this letter …. [and] must also, to the satisfaction of the federal government, disclose the source and purpose of all foreign funds; cooperate with the federal government in a forensic audit of foreign funding sources and uses, including how that money was used by Harvard, its agents, and … third parties acting on Harvard's campus.

*Id.* at 1-5.

101.    The Demand Letter reiterated the government's expectation of "immediate cooperation in implementing these critical reforms." *Id.* at 5. It cited no authority for that demand or any other.

102.    On April 14, 2025, Harvard declined to accept the government's demands. President Garber, in a letter to the Harvard Community, wrote: "Although some of the demands outlined by the government are aimed at combating antisemitism, the majority represent direct governmental regulation of the 'intellectual conditions' at Harvard."[14] President Garber added that "[n]o government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue." *Id.* at 2.

103.    In a separate April 14, 2025 letter to the government, attorneys for Harvard stated that "[n]either Harvard nor any other private university can allow itself to be taken over by the federal government."[15]

104.    The government's response was swift and punishing. The same day, the Federal Task Force responded by "announcing a freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University" (the "Freeze Order").[16] The Freeze Order cited "[t]he harassment of Jewish students" and "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." *Id.*

---

[14] Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ., Office of the President (Apr. 14, 2025) (the "Garber Letter") (attached as **Exhibit 10**).

[15] Letter from William A. Burck & Robert K. Hur, Counsel for Harvard Univ., to Josh Gruenbaum, U.S. Gen. Servs. Admin., Sean R. Keveney, U.S. Dep't of Health & Hum. Servs., and Thomas E. Wheeler, U.S. Dep't of Educ., at 2 (Apr. 14, 2025) (attached as **Exhibit 11**).

[16] Press Release, U.S. Dep't of Educ., *Joint Task Force to Combat Anti-Semitism Statement Regarding Harvard University* (Apr. 14, 2025) (the "Freeze Order") (attached as **Exhibit 12**).

105. The government immediately began implementing the Freeze Order. Within hours of the Freeze Order, Harvard began receiving stop work orders.

106. The next morning, on April 15, 2025, President Trump published the following post on his social media website, Truth Social:[17]



Donald J. Trump ✔
@realDonaldTrump

Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting "Sickness?" Remember, Tax Exempt Status is totally contingent on acting in the PUBLIC INTEREST!

7.98k ReTruths   34.3k Likes                Apr 15, 2025, 10:09 AM

107. The following day—April 16, 2025—President Trump again targeted Harvard in a Truth Social post:[18]



Donald J. Trump ✔
@realDonaldTrump

Everyone knows that Harvard has "lost its way." They hired, from New York (Bill D) and Chicago (Lori L), at ridiculously high salaries/fees, two of the WORST and MOST INCOMPETENT mayors in the history of our Country, to "teach" municipal management and government. These two Radical Left fools left behind two cities that will take years to recover from their incompetence and evil. Harvard has been hiring almost all woke, Radical Left, idiots and "birdbrains" who are only capable of teaching FAILURE to students and so-called "future leaders." Look just to the recent past at their plagiarizing President, who so greatly embarrassed Harvard before the United States States Congress. When it got so bad that they just couldn't take it anymore, they moved this grossly inept woman into another position, teaching, rather than firing her ON THE SPOT. Since then much else has been found out about her, but she remains in place. Many others, like these Leftist dopes, are teaching at Harvard, and because of that, Harvard can no longer be considered even a decent place of learning, and should not be considered on any list of the World's Great Universities or Colleges. Harvard is a JOKE, teaches Hate and Stupidity, and should no longer receive Federal Funds. Thank you for your attention to this matter!

9.91k ReTruths   41.7k Likes                Apr 16, 2025, 7:05 AM

---

[17] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 15, 2025, 10:09 AM) (attached as **Exhibit 13**); *see also* Tyler Pager et al., *Trump Threatens Harvard's Tax Status, Escalating Billion-Dollar Pressure Campaign*, N.Y. Times (Apr. 15, 2025) (attached as **Exhibit 14**).

[18] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 16, 2025, 7:05 AM) (attached as **Exhibit 15**).

**D.      The April 16, 2025 Records Request**

108.    Within hours of the President's April 16 Truth Social post, Secretary Noem sent HIO a letter entitled "Student and Exchange Visitor Program Records Request."[19] The Records Request demanded voluminous documents, including those not contemplated by any of the applicable statutes or regulations, and threatened to withdraw Harvard's certification in the event of noncompliance:

a.      The Records Request began by stating that Harvard's foreign student program "is a privilege[,] … not a guarantee" and that "[t]he United States Government understands that Harvard University relies heavily on foreign student funding from over 10,000 foreign students to build and maintain their substantial endowment." *Id.* at 1. The Request offered no basis for this claim, though its reference to "foreign student funding," *id.*, echoes language in the April 11 Demand Letter seeking to require Harvard to permit the government to inspect all "foreign funding sources and uses," Ex. 9 at 5.

b.      The Records Request continued: "At the same time, your institution has created a hostile learning environment for Jewish students due to Harvard's failure to condemn antisemitism." Ex. 16 at 1. Quoting Executive Order 14188, the letter stated that it is "the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence.'" *Id.* Again, the Request offered no basis for the claim that Harvard "created a hostile learning environment for Jewish students," *id.*, which paralleled claims made in the government's March 31, April 3, and April 11 communications to Harvard. *See* Ex. 7 at 1

---

[19] Letter from Kristi Noem, U.S. Dep't of Homeland Sec., to Maureen Martin, Harvard Univ., *Student and Exchange Visitor Program Records Request* (Apr. 16, 2025) (the "Records Request") (attached as **Exhibit 16**).

(asserting that Harvard has neglected its "dut[y] to curb or combat anti-Semitic harassment"); Ex. 8 at 1 (asserting that Harvard operates "biased programs that fuel antisemitism"); Ex. 9 at 3 (asserting that some Harvard programs have "[e]gregious [r]ecords of [a]ntisemitism").

      c.     The Records Request then shifted gears, stating that the SEVP "regularly monitors SEVP-approved schools to determine their compliance with governing regulations," and the "accuracy of information in" SEVIS. *Id.* It went on: "Your continued SEVP certification is contingent upon meeting the requirements of the U.S. Department of Homeland Security (DHS), set out in *Title 8 Code of Federal Regulations (8 CFR)*." Ex. 16 at 1.

      d.     Pointing to one of the provisions contained in the referenced regulations, the Records Request then stated that "SEVP may request information regarding nonimmigrant students from certified schools under *8 CFR § 214.3(g)(1)*." *Id.* Invoking the government's authority under that provision, the Records Request stated that Harvard's PDSO "must submit the following information to our office on or before April 30, 2025," *id.* at 1-2:

       1.   Provide relevant information regarding each student visa holder's known illegal activity, and whether the activity occurred on campus.

       2.   Provide relevant information regarding each student visa holder's known dangerous or violent activity, and whether the activity occurred on campus.

       3.   Provide relevant information regarding each student visa holder's known threats to other students or university personnel, and whether the activity occurred on campus.

       4.   Provide relevant information regarding each student visa holder's known deprivation of rights of other classmates or university personnel, and whether the activity occurred on campus.

       5.   Provide relevant information on whether any student visa holders have left Harvard University due to dangerous or violent activity or deprivation of rights, and whether the activity occurred on campus.

       6.   Provide relevant information on whether any student visa holders have had disciplinary actions taken as a result of making threats to other students or

populations or participating in protests, which impacted their nonimmigrant student status.

7. Provide relevant information regarding each student visa holder's obstruction of the school's learning environment.

8. Provide relevant information regarding each student visa holder's maintenance of at least the minimum required coursework to maintain nonimmigrant student status.

109.     Despite the letter's invocation of Section 214.3(g)(1), much of the information listed above is not information that HIO is required to maintain or report to DHS under that provision.

110.     The Records Request did not define any terms in these requests—such as "known," "illegal," "dangerous or violent," "deprivation of rights," "threats," or "obstruction of the school's learning environment"—and did not specify a time period for which the specified information was requested. Yet it threatened serious consequences for noncompliance, for both the PDSO who would be responsible for submitting the responsive documents and Harvard itself:

a.     As to the PDSO, attached to the Records Request was an "Evidence Attestation Statement" to be completed and signed by the PDSO and submitted in connection with the production of documents. This Attestation asked the PDSO to personally attest to her understanding that "willful misstatements may constitute perjury (18 USC § 1621)"; that "providing materially false, fictitious, or fraudulent information may subject me to criminal prosecution under 18 USC § 1001"; and that "[o]ther possible criminal and civil violations may also be applicable[.]" Ex. 16 at 3; *see also id.* at 2 (also invoking 8 U.S.C. § 1001 and "[o]ther possible criminal and civil violations").

b.     The Evidence Attestation Statement also asked the PDSO to attest to her understanding that "SEVP may review my institution's certification at any time and may request

documentation to establish my institution's eligibility for certification as well as review evidence and records for compliance with the regulations." *Id.* at 3.

        c.     Finally, the Records Request warned Harvard that "[f]ailure to comply with this Records Request will be treated as a voluntary withdrawal, per *8 CFR § 214.3(h)(3)(vii)*." *Id.* at 2. It concluded: "Therefore, in the event the school fails to respond to this request [by April 30, 2025], SEVP will automatically withdraw the school's certification. The withdrawal will not be subject to appeal." *Id.*

111.    Shortly after DHS sent HIO the Records Request, it publicized the Request—as well as DHS's cancellation of "two DHS grants totaling over $2.7 million to Harvard"—in a press release (the "Press Release").[20] The Press Release referred to the Records Request as a "scathing letter demanding detailed records on Harvard's foreign student visa holders' illegal and violent acts." *Id.* The Press Release asserted that Harvard has "ben[t] the knee to antisemitism," adopted a "radical ideology," and allowed "anti-American, pro-Hamas ideology [to] poison[] its campus and classrooms," such that "Harvard's position as a top institution of higher learning is a distant memory." *Id.* It concluded by stating that "if Harvard cannot verify it is in full compliance with its reporting requirements, the university will lose the privilege of enrolling foreign students." *Id.*

112.    Over the last twelve years, HIO has received only a handful of requests for information about its F-1 visa students. These requests have generally sought straightforward information plainly contemplated by the applicable regulations, such as the student's email, physical addresses, and phone number, about a single student at a time. No prior request has asked for information as broad or open-ended—or covering as many students—as the Records Request.

---

[20] Press Release, U.S. Dep't of Homeland Sec., *Secretary Noem Terminates $2.7 Million in DHS Grants; Orders Harvard to Prove Compliance with Foreign Student Requirements* (Apr. 16, 2025) (the "Press Release") (attached as **Exhibit 17**).

No prior request, moreover, has ever come directly from the Secretary of Homeland Security. Nor has any prior request ever been accompanied by a Press Release calling the request "scathing" or citing Harvard's so-called "radical ideology"; included an "Evidence Attestation Statement" suggesting that any misstatement may subject Harvard's PDSO or anyone else to criminal liability; or threatened Harvard with "voluntary withdrawal" for less-than-perfect compliance.

**E.    Subsequent Developments Prior to April 30**

113.    In the run-up to the April 30 deadline for Harvard's response to the Records Request, the Administration continued its public attack on Harvard.

114.    On April 17, 2025, Secretary of Education Linda McMahon sent Harvard a letter accusing the University of "incomplete and inaccurate disclosures" of foreign gifts and contracts pursuant to Section 117 of the Higher Education Act of 1965. Secretary McMahon demanded that Harvard release a list of gifts, grants, and contracts from foreign sources, communications between Harvard and foreign governments, and internal correspondence about expelled foreign students and faculty affiliated with foreign countries.

115.    On April 20, 2025, the Administration threatened to pull an additional $1 billion in Harvard's federal funding that had been allocated for health research.

116.    On April 24, 2025, President Trump posted the following message on Truth Social:[21]



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> Harvard is an Anti-Semitic, Far Left Institution, as are numerous others, with students being accepted from all over the World that want to rip our Country apart. The place is a Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE. It is truly horrific! Now, since our filings began, they act like they are all "American Apple Pie." Harvard is a threat to Democracy, with a lawyer, who represents me, who should therefore be forced to resign, immediately, or be fired. He's not that good, anyway, and I hope that my very big and beautiful company, now run by my sons, gets rid of him ASAP!
>
> **4.74k** ReTruths  **22k** Likes                    Apr 24, 2025, 9:33 AM

117.    On April 25, 2025, the Acting Chair of the Equal Employment Opportunity Commission, Andrea Lucas, filed a charge that launched an investigation in Harvard's employment practices.[22]

118.    On April 30, 2025, President Trump, Secretary Noem, and Secretary McMahon discussed Harvard at a public Cabinet meeting.[23] At the conclusion of Secretary McMahon's remarks, President Trump offered his view that Harvard was "scamming the public and hiring people like [former New York City Mayor Bill] DeBlasio and [former Chicago Mayor] Lori Lightfoot who are certainly two of the worst mayors in the history of our country, paying them a fortune on salary, and having them teach our children how to manage cities and how to manage

---

[21] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 24, 2025, 9:33 AM) (attached as **Exhibit 18**).

[22] In addition, on May 13, 2025, the Department of Justice issued a civil investigative demand to the University, purporting to investigate False Claims Act violations related to Harvard's compliance with the U.S. Supreme Court's 2023 decision in *Students for Fair Admissions v. President and Fellows of Harvard College.*

[23] The White House, *President Trump Participates in a Cabinet Meeting, Apr. 30, 2025*, YouTube (Apr. 30, 2025), available at https://www.youtube.com/watch?v=wn2XtufOAHc.

government." *Id.* at 1:21:50-1:22:20. President Trump then asked Secretary McMahon for an update on Harvard specifically, which led to the following colloquy:

> **Secretary McMahon:** We're negotiating with them. When we went back to them to say we'd welcome them back to the negotiating table, their response was a lawsuit. So [Attorney General] Pam [Bondi] and her team are helping work with that. … We're staying tough with them. The other thing we're looking at also are the [Section] 117[24] violations of these big universities, like Harvard and others, who are not reporting, as they're required to do by law, foreign money that comes in and how much that is and where it comes from.

> **President Trump:** And students, where are these people coming from?

> **Secretary Noem:** So, we've pulled back their grants because Harvard isn't responding to us [about] criminal activity by their students. And until they give us that list they're not getting any more grants from Homeland Security.

> **President Trump:** Good, I think we should pull it back. *The students they have, the professors they have, the attitude they have, is not American* and I think you should—a grant is a grant, we don't have to give grants.

> **Secretary Noem:** Exactly right.

> **President Trump:** So we'll pull back the grant.

*Id.* at 1:22:21-1:23:33 (emphasis added).

## F.    Harvard's Compliance With the Records Request

119.    Despite the scope and context of the Records Request, HIO worked diligently to comply and produce responsive information that it maintains under the governing statute and regulations.

120.    To that end, within the 10 working days DHS allotted for compliance, HIO collected and produced thousands of pages of records responsive to the Records Request maintained by or accessible to HIO as required by 8 C.F.R. § 214.3(g)(1).

---

[24] Secretary McMahon's reference was likely to Section 117 of the Higher Education Act of 1965, 20 U.S.C. § 1011f.

121.   The production was accompanied by a cover letter (the "First Production Letter") explaining the scope of Harvard's responsive production and responding to the allegations in the Demand Letter.[25]

122.   The First Production Letter noted that "portions of the [Records Request] seek categories of information using terms not defined in the regulation." *Id.* at 1. But it explained that, because "Harvard is committed to good faith compliance," it was "producing responsive materials that [it] believe[s] are reasonably required by 8 C.F.R. § 214.3(g)(1)." *Id.*

123.   Accordingly, the First Production Letter explained that Harvard had produced the following categories of "information relevant to F-1 status" in response to the Records Request: (1) "[r]ecords that reflect student enrollment information, by SEVIS ID Number, for each F-1 visa holder enrolled at Harvard throughout the duration of the program in which that student is presently enrolled"; and (2) "SEVIS termination and cancellation data that include SEVIS ID Number, SEVIS Status, Education Level, Major/Academic Program, Date of Termination or Cancellation, Termination or Cancellation Reason, and Program Start and End Date." *Id.* at 2. This latter category of data, the First Production Letter explained, "reflect[s] changes to nonimmigrant status for a range of reasons, including but not limited to disciplinary action," though "[t]he basis for any such disciplinary action is not covered by 8 C.F.R. § 214.3(g)(1)." *Id.*

124.   Since the Records Request did not specify a time period, Harvard produced this information for "academic year 2023-2024 and academic year 2024-2025 (through and including April 30, 2025)," though the student enrollment records produced as to some students cover shorter or longer periods, depending on the duration of the student's academic program. *Id.* at 1.

---

[25] Letter from Steve Bunnell, Counsel for Harvard Univ., to SEVP, *Re: Harvard University – BOS214F00162000* (April 30, 2025) (the "First Production Letter") (attached as **Exhibit 19**).

125.    The First Production Letter noted that "Harvard's production reflects its best effort to meet [the Records Request's April 30] deadline notwithstanding the scope of the requests in the [Records Request], which cover more than 5,200 students." *Id.* And it explained that "[i]f Harvard discovers additional information falling into the categories listed above, it will promptly produce that information as a supplement." *Id.*

126.    The First Production Letter emphasized, in bold and underlined font, that "**Harvard is complying with the [Records Request's] lawful requests in lieu of voluntary withdrawal from SEVP certification. Harvard does not seek to withdraw from SEVP. Any withdrawal of Harvard's certification would be involuntary and would cause immediate harm and disruption to Harvard, its mission, and its thousands of international students who hail from over 140 countries and enrich the University community immeasurably with their presence and contributions.**" *Id.*

127.    The First Production Letter went on to state, also in bold and underlined font, that "**[i]f any aspect of this production raises questions or is deemed incomplete or insufficient in any respect, and *before* DHS takes any steps adverse to Harvard due to any perceived deficiency in Harvard's response, Harvard respectfully requests that DHS notify Harvard's counsel in writing and provide an opportunity to discuss, to be heard, and to cure.**" *Id.* at 2-3.

128.    Finally, the First Production Letter addressed the Records Request's allegations "that Harvard has 'created a hostile learning environment for Jewish students' due to a purported 'failure to condemn antisemitism,' and that Harvard 'relies heavily on foreign student funding … to build and maintain [its] substantial endowment.'" *Id.* at 3. The Production Letter explained that "[t]hese assertions have no basis in fact, and [the Records Request] suggests none." *Id.* And it affirmed that, "[t]o the contrary, Harvard has strongly and repeatedly condemned antisemitism and

has undertaken substantial efforts to ensure that its campus is safe, fair, and welcoming to Jewish and Israeli students—including those who attend Harvard on F-1 visas." *Id.*

129.    The First Production Letter concluded: "In short, Harvard denies the [Records Request's] assertions and any suggestion that they justify actions by DHS in contravention of the statutes and regulations governing SEVP." *Id.*

## G.    Developments from April 30 to May 7

130.    In the days after Harvard responded to the Records Request, Harvard received no outreach from DHS. But the Administration continued to target Harvard in other ways.

131.    On May 2, 2025, the President posted the following on Truth Social:[26]



132.    Then, on May 5, 2025, Secretary of Education Linda McMahon sent Harvard a letter (the "McMahon Letter") informing the University that "Harvard should no longer seek GRANTS from the federal government, since none will be provided."[27] The McMahon Letter stated that Harvard has "invited foreign students" who "show contempt for the United States of America[] to its campus." *Id.* at 1. And it asked: "Where do many of these 'students' come from, who are they, how do they get into Harvard, or even into our country—and why is there so much HATE?" *Id.* at 1. The McMahon Letter also criticized Harvard's hiring decisions and its

---

[26] President Donald J. Trump (@realDonaldTrump), Truth Social (May 2, 2025, 7:25 AM) (attached as **Exhibit 20**).

[27] Letter from Linda E. McMahon, Sec. of Educ., to Dr. Alan Garber, Harvard Univ., at 2 (May 5, 2025) (the "McMahon Letter") (attached as **Exhibit 21**).

"management" and asserted that Harvard "teach[es] [its] students to despise" the "free-market system." *Id.* at 1-2.

133.    In a May 7, 2025 television interview, Secretary McMahon reiterated these statements, stating about Harvard: "[A]re they vetting students who are coming in from outside of the country to make sure they're not activists? Are they vetting professors that they're hiring to make sure that they're not teaching ideologies, but that they're teaching subject matter? …. They've taken a very hard line, so we took a hard line back."[28]

## H.    DHS's Second Information Request and Harvard's Second Document Production

134.    On May 7, 2025, Acting General Counsel of the Department of Homeland Security, Joseph Mazzara, sent an email to Harvard's counsel (the "Mazzara Email") indicating that DHS had reviewed Harvard's initial document production and "concluded that it does not completely address the Secretary's request."[29]

135.    The Mazzara Email reiterated DHS's request for four of the eight categories of information referenced in the Records Request—those relating to student visa holders' "known illegal activity," "known dangerous or violent activity," "known threats to other students or university personnel," and "known deprivation of rights of other classmates or university personnel"—and indicated that Harvard's response should "likely include the disciplinary records for student visa holders." *Id.*

136.    The Mazzara Email gave Harvard until the close of business on May 14, 2025, to respond.

---

[28] CNBC Television, *Education Secretary Linda McMahon to Harvard: Obey the law and you can be eligible for funding*, YouTube, at 1:04-31 (May 7, 2025), available at https://www.youtube.com/watch?v=bb6YJUHMqc4.

[29] Email from Joseph Mazzara, DHS, to Steve Bunnell, Counsel for Harvard Univ. (May 7, 2025) (the "Mazzara Email") (attached as **Exhibit 22**).

137.    On May 12, 2025, Harvard's counsel sent Acting General Counsel Mazzara an email observing that the Mazzara Email, like the Records Request before it, "ask[ed] for information outside of 8 C.F.R. § 214.3(g)(1), which was cited in the [Records Request]."[30] The email asked if Harvard should construe the Mazzara Email "as requesting information under 8 C.F.R. § 214.3(g)(2)." *Id.* On May 13, 2025, Harvard had not yet heard back from Mr. Mazzara, so its counsel sent Mr. Mazzara a follow-up email again asking whether Harvard should construe the request as one under § 214.3(g)(2). *See id.*

138.    On the morning of May 14, 2025, Mr. Mazzara wrote back, stating: "While many of the records we are seeking and have received may be required to be kept by Harvard pursuant to 8 C.F.R. § 214.3(g)(1), our authority to request information is broader. We are requesting records pursuant to all our authorities contained in 8 C.F.R.§ 214 (many of which are also refenced in the letter)." *Id.*

139.    On May 14, 2025, Harvard sent DHS a letter (the "Second Production Letter") responding to the additional requests made in the Mazzara Email.[31] As the Second Production Letter explained, Harvard identified three F-1 visa students who were subject to discipline that resulted in a change of academic status as defined in 8 C.F.R. § 214.3(g)(1)(vi) where the discipline was based on one of the four categories of conduct identified in the Mazzara Email. *Id.* at 1. For each of these three students, Harvard provided information about the conduct that led to discipline. *Id.* The Second Production Letter explained that, as to the request for conduct that involved "known deprivation of rights," Harvard interpreted the phrase in line with federal

---

[30] Email Exchange between Joseph Mazzara, DHS, and Steve Bunnell, Counsel for Harvard Univ., at 1 (May 7 to May 14, 2025) (attached as **Exhibit 23**).

[31] Letter from Steve Bunnell, Counsel for Harvard Univ., to SEVP, *Re: Harvard University – BOS214F00162000* (April 30, 2025) (the "Second Production Letter") (attached as **Exhibit 24**).

statutes that "use[d] similar formulations [to] refer to rights secured by the Constitution or statute" and found no students who received discipline on the basis of having "deprived a classmate or university personnel of such rights." *Id.* at 2. But the Second Production Letter stated that, if DHS meant "something else" by this phrase, DHS should "let [Harvard] know, and, upon receipt of clarification, [Harvard] will promptly reply in accordance with applicable law." *Id.*

140.    The Second Production Letter reiterated that Harvard did not wish to voluntarily withdraw its SEVP certification, and asked for notice and an opportunity to be heard before DHS took any adverse action stemming from perceived noncompliance. *Id.*

## I.    DHS's Revocation of Harvard's Certification

141.    After submitting the Second Production Letter, Harvard did not hear from DHS for more than a week.

142.    Then, on May 22, 2025, Secretary Noem sent Harvard a letter entitled "Harvard's Student and Exchange Visitor Program Decertification" (the "Revocation Notice") stating that, "effective immediately, Harvard University's Student and Exchange Visitor Program certification **is revoked**."[32]

143.    The Revocation Notice, like the Records Request before it, stated that "it is a privilege to enroll foreign students." The Notice added that "it is also a privilege to employ aliens on campus." *Id.* at 1. It asserted that, as a result of Harvard's "refusal to comply with multiple requests to provide [DHS] pertinent information while perpetuating an unsafe campus environment that is hostile to Jewish students, promotes pro-Hamas sympathies, and employs racist 'diversity, equity, and inclusion' policies, [Harvard] ha[s] lost this privilege." *Id.*

---

[32] Letter from Kristi Noem, U.S. Dep't of Homeland Sec., to Maureen Martin, Harvard Univ., *Harvard's Student and Exchange Visitor Program Decertification* (May 22, 2025) (the "Revocation Notice") (attached as **Exhibit 25**).

144.    The Revocation Notice acknowledged the profound consequences of decertification. It stated that, effective immediately, "Harvard is prohibited from having any aliens on F- or J- nonimmigrant status for the 2025-2026 academic school year." *Id.* It also stated that "[t]his decertification also means that existing aliens on F- or J- nonimmigrant status must transfer to another university in order to maintain their nonimmigrant status." *Id.*

145.    The Revocation Notice stated that this action was "the unfortunate result of Harvard's failure to comply with simple reporting requirements." *Id.* But the Revocation Notice did not identify any specific "reporting requirements" with which Harvard had failed to comply, and did not cite any of the regulatory provisions governing an SEVP-certified school's reporting requirements. *Id.* Instead, the Revocation Notice stated that Harvard had failed to comply with the demands in the Records Request and the Mazzara Email for "information regarding misconduct and other offenses that would render foreign students inadmissible or removable." *Id.* But, as explained above, the regulations governing schools' eligibility for SEVP certification do not require Harvard to maintain records on such information or report it to DHS.

146.    The Revocation Notice stated that DHS had revoked Harvard's certification "to send a clear signal to Harvard and all universities that want to enjoy the privilege of enrolling foreign students, that the Trump Administration will enforce the law and root out the evils of anti-Americanism and antisemitism in society and campuses." *Id.*

147.    The Revocation Notice offered Harvard no opportunity to defend itself against the withdrawal of its certification, including to present evidence or be heard on its argument that it has complied with the law. *See* 8 C.F.R. § 214.4(b)-(f). Nor did the Revocation Notice offer Harvard any opportunity to cure the supposed noncompliance prior to revocation of its certification. *See* 5 U.S.C. § 558(c).

148.    The Revocation Notice also provided Harvard no avenue for seeking administrative review of the withdrawal of its certification. *See* 8 C.F.R. § 214.4(h).

149.    Having summarily revoked Harvard's SEVP certification, the Revocation Notice went on to state that "[i]f Harvard would like the opportunity of regaining [SEVP] certification before the upcoming academic school year, [it] must provide all of the information requested below **within 72 hours**":

1. Any and all records, whether official or informal, in the possession of Harvard University, including electronic records and audio or video footage, regarding illegal activity whether on or off campus, by a nonimmigrant student enrolled in Harvard University in the last five years.

2. Any and all records, whether official or informal, in the possession of Harvard University, including electronic records and audio or video footage, regarding dangerous or violent activity whether on or off campus, by a nonimmigrant student enrolled in Harvard University in the last five years.

3. Any and all records, whether official or informal, in the possession of Harvard University, including electronic records and audio or video footage, regarding threats to other students or university personnel whether on or off campus, by a nonimmigrant student enrolled in Harvard University in the last five years.

4. Any and all records, whether official or informal, in the possession of Harvard University, including electronic records and audio or video footage, regarding deprivation of rights of other classmates or university personnel whether on or off campus, by a nonimmigrant student enrolled in Harvard University in the last five years.

5. Any and all disciplinary records of all nonimmigrant students enrolled in Harvard University in the last five years.

6. Any and all audio or video footage, in the possession of Harvard University, of any protest activity involving a nonimmigrant student on a Harvard University campus in the last five years.

150.    These demands seek different—and a broader set of—information than what the Records Request sought. And the Revocation Notice cited no statutory or regulatory authority for these additional demands.

151.    Shortly after she sent Harvard the Revocation Notice, Secretary Noem posted an image of the Revocation Notice on X (the "Noem Post"), along with a message stating that "[t]his Administration is holding Harvard accountable for fostering violence, antisemitism, and coordinating with the Chinese Communist Party on its campus."[33]

152.    DHS also issued a press release (the "Revocation Press Release") proclaiming: "Harvard University Loses Student and Exchange Visitor Program Certification for Pro-Terrorist Conduct."[34] The Revocation Press Release began by asserting: "Harvard's leadership has created an unsafe campus environment by permitting anti-American, pro-terrorist agitators to harass and physically assault individuals, including many Jewish students, and otherwise obstruct its once-venerable learning environment. Many of these agitators are foreign students. Harvard's leadership further facilitated, and engaged in coordinated activity with the CCP, including hosting and training members of a CCP paramilitary group complicit in the Uyghur genocide." *Id.* at 1. The Revocation Press Release then quoted the Noem Post in its entirety, adding boldfaced emphasis to the Noem Post's reference to "the **Chinese Communist Party**." *Id.*

153.    The Revocation Press Release stated that, "[o]n April 16, 2025, Secretary Noem demanded Harvard provide information about the criminality and misconduct of foreign students on its campus." *Id.* And it asserted that "Harvard University brazenly refused to provide the required information requested and ignored a follow up request from the Department's Office of General Council. [sic] Secretary Noem is following through on her promise to protect students and prohibit terrorist sympathizers from receiving benefits from the U.S. government." *Id.* The

---

[33] @Sec_Noem, X (May 22, 2025, 2:01 PM ET) (the "Noem Post") (attached as **Exhibit 26**).

[34] Press Release, U.S. Dep't of Homeland Sec., *Harvard University Loses Student and Exchange Visitor Program Certification for Pro-Terrorist Conduct* (May 22, 2025) (the "Revocation Press Release") (attached as **Exhibit 27**).

Revocation Press Release also did not identify any specific reporting requirements with which Harvard allegedly failed to comply.

154.    The Revocation Press Release stated that "[t]his action comes after DHS terminated $2.7 million in DHS grants for Harvard last month." *Id.*

155.    The Revocation Press Release then went on to list a number of purported "[f]acts about Harvard's toxic campus climate," including allegations of "pervasive race discrimination and anti-Semitic harassment plaguing [Harvard's] campus." *Id.* The Revocation Press Release also stated that, "[i]nstead of protecting its students, Harvard has let crime rates skyrocket, enacted racist DEI practices, and accepted boatloads of cash from foreign governments and donors." *Id.* at 2.

156.    None of the factual allegations levied against Harvard in the Revocation Notice, Noem Post, and Revocation Press Release have been subjected to the opportunity for rebuttal required under DHS's process for withdrawal of SEVP certification.

## J.    The Immediate and Irreparable Harm to Harvard

157.    The government's unlawful revocation of Harvard's longstanding SEVP status is already causing the University immediate and irreparable harm and will lead to a cascade of negative consequences affecting Harvard and its community.

158.    First, the government's actions seriously and immediately disrupt the University's ongoing, day-to-day operations. International students play vital roles on campus, including as instructors, academic and residential advisors, lab managers, and medical providers. Eliminating the population of F-1 and J-1 students fulfilling these functions will halt important research, hamper the educational experience for students left without teachers or advisors, and deprive the community of medical care. This is particularly true in the STEM fields, where international

students contribute significantly to Harvard's critical research enterprise. The sudden inability to maintain these students' enrollment jeopardizes ongoing research projects, damages Harvard's reputation as a world-class research institution, and deprives our nation of the benefits of these vital research projects.

159.    Second, the loss of certification irreparably harms Harvard's ability to compete with other institutions for the most qualified applicants at home and abroad. In our interconnected global economy, a university that cannot welcome students from all corners of the world is at a competitive disadvantage. Harvard's F-1 and J-1 visa programs are therefore a key factor in maintaining its standing in academia. If DHS's action is permitted to stand, Harvard will not be able to offer admission to *any* new visa holder students for *at least* the next two class years, *see* 8 C.F.R. § 214.4(*i*)(1)-(2), and perhaps longer, since once DHS takes the drastic action of withdrawing certification, it forever retains discretion whether to allow Harvard *ever* to petition for renewed certification, *id.* § 214.4(a)(2). Even if Harvard were ever to regain certification, future applicants may shy away from applying out of fear of further reprisals from the government.

160.    Third, the abrupt revocation of certification impairs the educational experience of *all* Harvard students by diminishing the global character and overall strength of the institution. This is particularly true for specific programs that offer richer experiences when they feature dialogue between students from different backgrounds. For instance, the Harvard Kennedy School curriculum focuses on global politics, international systems of governance, and similar topics on which F-1 and J-1 visa holders can provide unique and direct commentary. Similarly, Harvard Law School's LL.M. program is enhanced by the participation of F-1 and J-1 visa holders, who help deepen the community's understanding of comparative law and foreign legal systems. The

loss of these international students materially diminishes the breadth of discussion and debate across the entire Harvard community and further irreparably damages Harvard and its reputation.

161.    Fourth, the government's actions irreparably damage HIO as an institution. Given the importance of the F-1 and J-1 visa programs to Harvard's educational mission, Harvard has invested substantial resources in HIO programs and personnel to attract and enroll top-tier international students, integrate them into the broader Harvard community, and comply with SEVP requirements. HIO employs 25 professionals with specific expertise in supporting these processes, and many are likely to go elsewhere if DHS's actions are sustained. That office has an annual budget of $3.44 million, a substantial portion of which is devoted to facilitating the admission of international students and success of Harvard's visa programs. The revocation of SEVP certification renders much of Harvard's investment in that office and the visa programs effectively worthless, undermining years of careful institutional planning and resource allocation.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### CONTRARY TO CONSTITUTIONAL RIGHT
### FIRST AMENDMENT RETALIATION

162.    Harvard incorporates by reference the allegations of the preceding paragraphs.

163.    Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

164.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." *Id*. § 706(2)(B).

165.    The First Amendment provides that the federal government "shall make no law … abridging the freedom of speech." U.S. Const. amend. I. The First Amendment also "prohibits government officials from relying on the threat of invoking legal sanctions and other means of

coercion … to achieve the suppression of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (ellipses in original) (internal quotation marks omitted).

166.    Academic freedom is "a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967). Colleges and universities have a constitutionally protected right to manage an academic community and evaluate teaching and scholarship free from governmental interference. This right protects "not only students and teachers, but their host institutions as well." *Asociación de Educación Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007) (quotation marks omitted).

167.    Harvard has long exercised its academic freedom by "determin[ing] for itself on academic grounds who may teach" and what they teach. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 47 (2d Cir. 2000) (quotation marks omitted).

168.    "As a general matter the First Amendment prohibits government officials from subjecting an [entity] to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (internal quotation marks omitted). To succeed on a First Amendment retaliation claim, a plaintiff must prove that: (1) it "engaged in constitutionally protected conduct"; (2) it "was subjected to an adverse action by the defendant"; and (3) "the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012).

169.    Each of these elements is satisfied here.

170.    The demands in the April 11 Demand Letter go to the core of Harvard's constitutionally protected academic freedom by seeking to assert governmental control over Harvard's teaching, community, and governance. Accepting these demands would restrict Harvard's academic "programs," Ex. 9 at 3, thereby constraining the content Harvard's faculty

may teach students. The demands also require that Harvard modify its hiring and admissions practices to achieve the government's preferred balance of viewpoints in every "department," "field," and "teaching unit." *Id.* And they seek to restrict Harvard's ability to manage its own internal "governance" and "leadership," requiring Harvard to engage in a "governance reform and restructuring" that "exclusively" "empower[s]" those faculty members who are "most … committed to the changes" outlined in the Demand Letter and "reduc[es] the power held by faculty … and administrators" who are "committed to activism." *Id.* at 1.

171.    Adhering to the demands would amount to relinquishing control over Harvard's core academic functions, thereby ceding Harvard's constitutionally protected academic freedom. Harvard's refusal to do so, as stated by President Garber in his April 14 Letter to the Harvard Community, is protected by the First Amendment. *See* Ex. 10.

172.    Defendants then subjected Harvard to an adverse action by issuing the Revocation Notice and revoking Harvard's SEVP certification. That action was adverse: it deprives Harvard of its constitutionally protected property interest in continued certification; prevents Harvard from continuing its robust F-1 and J-1 visa programs, which have long inured to the benefit of the broader Harvard community; damages Harvard's reputation as a global research institution by preventing the university from attracting top students and faculty from around the world; renders meaningless years of careful institutional planning and resource allocation with respect to its F-1 and J-1 programs; and causes immediate chaos by potentially rendering over a quarter of Harvard's student body unlawfully present in the United States just days before the end of the spring term and the start of the summer term, without regard to the vital role these students play on campus.

173.    Harvard's protected conduct—the exercise of its academic prerogatives and the refusal to relinquish that freedom—was a substantial or motivating factor for this adverse action.

The causal link is clear from the broader context in which the decertification occurred—a series of unprecedented adverse actions, each in contravention of governing statutes and regulations, that began mere hours after Harvard announced it would not comply with the demands.

174.    The link between Harvard's protected conduct and the government's adverse actions is also clear from the government's own statements. In the April 16 Press Release, DHS explained that it had issued a "scathing letter"—the Records Request—to Harvard demanding "detailed records on Harvard's foreign student visa holders' illegal and violent activities," because of what the government views as Harvard's tolerance for "anti-American, pro-Hamas ideology poisoning its campus and classrooms." The May 22 Revocation Notice makes similar statements, accusing Harvard of "perpetuating an unsafe campus environment that is hostile to Jewish students, promotes pro-Hamas sympathies, and employs racist "'diversity, equity, and inclusion' policies" and stating that the Administration will "root out the evils of anti-Americanism and antisemitism in society and campuses." And in the May 22 Revocation Press Release, DHS stated that Harvard had lost its SEVP certification "for Pro-Terrorist Conduct" and its "toxic campus climate," not for any regulatory violations, and further stated that the revocation of Harvard's certification "comes after DHS terminated $2.7 million in DHS grants for Harvard last month," Ex. 27, at 1—all demonstrating that the revocation of Harvard's certification is simply one part of the government's larger scheme of retaliation against Harvard.

175.    The surrounding circumstances also make plain that Defendants have withdrawn Harvard's SEVP certification not for any valid reason, but because they seek to punish the University for its courage in refusing to surrender its independence or relinquish its constitutional rights under the First Amendment.

**COUNT II**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)**
**CONTRARY TO CONSTITUTIONAL RIGHT**
**FIRST AMENDMENT VIEWPOINT DISCRIMINATION**

176.    Harvard incorporates by reference the allegations of the preceding paragraphs.

177.    Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

178.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." *Id*. § 706(2)(B).

179.    The First Amendment prohibits the regulation or censure of speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Such government action is a "'blatant' and 'egregious form of content discrimination'" and is subject to strict scrutiny. *Id.* at 168, 171 (citation omitted). A finding that the government has discriminated based on viewpoint is "all but dispositive" in a First Amendment challenge. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

180.    The series of retaliatory actions against Harvard impermissibly seeks to employ viewpoint-based distinctions as a means of correcting the University's perceived "ideological capture." Ex. 9 at 1. The Demand Letter expressly classifies Harvard's community members on the basis of their actual or perceived viewpoints, requiring differential treatment along ideological lines. Defendants' actions designed to coerce Harvard's compliance with these demands, including the summary decertification, similarly aim to bring Harvard's expressive activity (and the expression of Harvard's community members) more closely in line with the government's preferred viewpoints. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First

Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976), *superseded by statute as stated in McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003).

181.    Defendants' campaign of retribution against Harvard is expressly viewpoint-based, both in its motivation and its demanded effects. The Demand Letter itself makes plain that its demands are premised on the administration's perception of Harvard as an institution in the grips of "ideological capture," whose leadership, faculty, and students lack sufficient "viewpoint diversity." Ex. 9 at 1-2. And the Press Release, which links those demands to what it touts as a "scathing letter" threatening Harvard's SEVP certification, doubles down—citing Harvard's "anti-American … ideology," its research that supposedly "brand[s] conservatives as far-right dissidents," and its "public health propaganda." Ex. 17. And the Revocation Notice and the Revocation Press Release make many of the same points, while failing to identify any failure by Harvard to comply with the regulations governing SEVP certification. In other words, Defendants expressly attribute perceived viewpoints to Harvard and have targeted the University (including its SEVP certification) on that basis.

182.    Viewpoint discrimination that is retaliatory cannot be jusified by any government interest. After all, the "bare ... desire to harm a politically unpopular group" is not a "*legitimate* state interest[]," much less a compelling one. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985) (ellipsis in original) (internal quotation marks omitted) (emphasis added).

183.    In any event, even supposing the revocation of Harvard's certification served some compelling governmental interest, Defendants cannot reasonably argue that summary withdrawal is the "least restrictive means of achieving" it. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quotation marks omitted). Defendants' own regulations supply, and indeed *require*, a less restrictive means of ensuring compliance by SEVP-certified institutions: namely, by following

a detailed set of procedures for resolving alleged noncompliance that present opportunities for the institution to cure prior to withdrawal. Defendants failed to follow those procedures and instead summarily revoked Harvard's certification.

184.    These constitutional violations cause immediate, ongoing, and irreparable harm to Harvard.

## COUNT III
## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2) CONTRARY TO CONSTITUTIONAL RIGHT UNCONSTITUTIONAL CONDITION

185.    Harvard incorporates by reference the allegations of the preceding paragraphs.

186.    Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

187.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." *Id*. § 706(2)(B).

188.    Although the government generally may "impose limits on the use of [government] funds to ensure they are used in the manner Congress intends," the government cannot "leverage funding to regulate speech" or other protected conduct "outside the contours of the [government] program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213-15 (2013).

189.    The First Amendment forbids the government from conditioning access to government benefits on the relinquishing of constitutional rights or adherence to the government's viewpoint. That is true even where the speaker "has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (quotation marks omitted).

190. SEVP certification is a government benefit and thus cannot be conditioned on an institution's relinquishing its academic freedom or adopting the government's preferred viewpoints.

191. Here, the government made clear that Harvard would face significant consequences unless it agreed to conform the content of its teaching, the composition of its community, and the structure of its governance to align with the government's agenda—that is, if it conformed its own speech to the government's preferred message. Those conditions are plainly unconstitutional.

192. Harvard complied with the lawful inquiries in the Records Request and the Mazzara Email by producing requested documents that fell within the scope of the University's recordkeeping obligations as a SEVP-certified institution. Yet DHS summarily deemed these responses "insufficient," Ex. 25 at 1, without identifying any actual regulatory requirement with which Harvard had failed to comply, and revoked Harvard's certification "effective immediately," *id.*, without providing Harvard an opportunity to cure any purported noncompliance or otherwise following the usual, required procedures.

193. By threatening to revoke Harvard's SEVP certification in retaliation for constitutionally protected conduct, and then following through on that threat without any legitimate regulatory basis for doing so, Defendants effectively conditioned Harvard's SEVP certification on the University's relinquishing of its constitutional rights. Put otherwise, Harvard's SEVP certification was effectively conditioned not on Harvard's compliance with its obligations as a SEVP-certified institution, but instead on its compliance with the administration's impermissible ideological demands. That condition violates the First Amendment.

194. This constitutional violation causes immediate, ongoing, and irreparable harm to Harvard.

**COUNT IV**
**VIOLATION OF THE FIRST AMENDMENT**
**(EQUITABLE CAUSE OF ACTION – *ULTRA VIRES*)**

195.    Harvard incorporates by reference the allegations of the preceding paragraphs.

196.    Even if the prerequisites for review under the Administrative Procedure Act were not satisfied, federal courts have the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015); *see also R.I. Dep't of Envtl.. Mgmt. v. United States*, 304 F.3d 31, 42-43 (1st Cir. 2002) (stating that "[d]istrict court[s]" retain the "nonstatutory" power "to review agency action that is ultra vires" and provide equitable relief unless Congress precludes that review).

197.    As alleged in Counts I, II, and III, Defendants' action to revoke Harvard's SEVP certification constitutes impermissible First Amendment retaliation and viewpoint discrimination and involved the imposition of unconstitutional conditions. The Constitution forecloses any lawful authority for Defendants' actions.

198.    Because Defendants' actions are unconstitutional and *ultra vires*, this Court should enjoin Defendants in their official capacities from withdrawing Harvard's SEVP certification.

199.    If Defendants' actions are not declared unlawful, set aside, and enjoined as unconstitutional and *ultra vires*, Harvard will suffer substantial injury, including irreparable injury.

**COUNT V**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)**
**CONTRARY TO LAW**
**VIOLATION OF 8 C.F.R. § 214.4(b)-(h)**

200.    Harvard incorporates by reference the allegations of the preceding paragraphs.

201.    Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

202.    The APA directs courts to hold unlawful and set aside agency action that is not in accordance with law, *id*. § 706(2)(A), or that fails to observe "procedure required by law," *id*. § 706(2)(D).

203.    Under applicable regulations, if DHS wishes to withdraw a school's certification out-of-cycle, it must provide the school with a NOIW stating "[t]he grounds for withdrawing SEVP certification." 8 C.F.R. § 214.4(b)(1). After receiving a NOIW, the school has 30 days to submit an answer either admitting or denying the allegations in the NOIW and supporting its position with "sworn statements, and documentary or other evidence, to rebut the grounds for withdrawal of certification." *Id*. § 214.4(b)(2); *see id* § 214.4(d)-(e). The school must be given the opportunity to request "a telephonic interview in support of its response to the NOIW," *id*. § 214.4(b)(3), and it must be permitted to be "represented by counsel of its choice" during these proceedings, *id*. § 214.4(c).

204.    If DHS intends to proceed with withdrawing a school's certification, it must consider the school's evidentiary submissions and issue a decision "explain[ing] in writing the specific reasons for" withdrawing the certification. *Id*. § 103.3(a)(1)(i); *see id*. § 214.4(g). It must also provide the school with the opportunity to take an administrative appeal of the decertification decision. *See id*. § 214.4(h).

205.    In addition, under 22 C.F.R. § 62.50(d)(1), only the Department of State can revoke a school's designation to sponsor J-1 students and only then with 30 days' notice. That notice must "specify the grounds for the proposed sanction and its effective date, advise the sponsor of its right to oppose the proposed sanction, and identify the procedures for submitting a statement of opposition thereto." *Id*.

206. The government did not provide Harvard with any of these procedural protections prior to summarily revoking Harvard's certification to host F-1 students and designation to sponsor J-1 students. That is unlawful: "An agency may not … simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

207. Because Defendants failed to withdraw Harvard's certification "in accordance with" 8 C.F.R. § 214.4(b), *id.*, the revocation of Harvard's certification must be set aside.

208. The summary revocation of Harvard's SEVP certification, without the benefit of codified procedural protections, causes immediate, ongoing, and irreparable harm to Harvard.

### COUNT VI
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### CONTRARY TO LAW
### VIOLATION OF 5 U.S.C. § 558

209. Harvard incorporates by reference the allegations of the preceding paragraphs.

210. Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

211. The APA directs courts to hold unlawful and set aside agency action that is not in accordance with law, *id.* § 706(2)(A), or which fails to observe "procedure required by law," *id.* § 706(2)(D).

212. The APA defines "licenses" to include "the whole or part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id*. § 551(8).

213. SEVP certification is a "license" within the meaning of the APA. *See Blackwell Coll. of Bus.*, 454 F.2d at 933-35. Thus, in order to revoke that license, the government was required to comply with the strictures of Section 558(c)(1)-(2).

214.    Section 558 provides that "[e]xcept in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefore, the licensee has been given" both (1) "notice by the agency in writing of the facts or conduct which may warrant the action" and (2) "opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c)(1)-(2).

215.    DHS violated Section 558(c) because it failed to "institut[e] … agency proceedings" for the revocation of Harvard's SEVP certification, *id.* § 558(c), instead purporting to summarily revoke Harvard's certification by issuing the Revocation Notice.

216.    DHS also violated Section 558(c)(1) because the Revocation Notice failed to provide the required "notice … in writing of the facts or conduct which may warrant the action." *Id.* § 558(c)(1). The Revocation Notice does not identify any regulatory provision with which Harvard failed to comply, instead purporting to revoke Harvard's certification based on its failure to comply with demands that exceeded the scope of its reporting requirements. Failure to comply with such demands is not conduct that "may warrant" revocation of Harvard's certification.

217.    Relatedly, DHS also violated Section 558(c)(2). That provision requires DHS, "*before* the institution of [revocation] proceedings," to give schools an "opportunity to demonstrate or achieve compliance with all *lawful* requirements" of licensure. *Id.* § 558(c)(2) (emphases added). The "lawful requirements" of continued SEVP certification, *id.*, are those specified by the regulations. DHS has not identified any such lawful requirements with which Harvard has failed to comply. Nor has it given Harvard the required chance to "demonstrate or achieve compliance with" any such requirements. *Id.* § 558(c)(2).

218.    These violations of Section 558 cause immediate, ongoing, and irreparable harm to Harvard by depriving the University of its property interest without required procedure.

## COUNT VII
## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
## CONTRARY TO CONSTITUTIONAL RIGHT
## PROCEDURAL DUE PROCESS

219.    Harvard incorporates by reference the allegations of the preceding paragraphs.

220.    Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

221.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." *Id*. § 706(2)(B).

222.    As a license, SEVP certification is a protected property interest subject to the procedural due process requirements of the Fifth Amendment to the U.S. Constitution. *See Blackwell Coll. of Bus. v. Att'y Gen.*, 454 F.2d 928, 933 (D.C. Cir. 1971) (holding that "withdrawal of [certification]" is permitted "only in accordance with procedural due process").

223.    Due process requires the government to provide "fair notice of conduct that is forbidden or required" before depriving private parties of their property. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment," and "[i]t requires the invalidation of laws [and regulations] that are impermissibly vague." *Fox Television Stations*, 567 U.S. at 253.

224.    Due process also requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner" before the government may deprive a person of a protected interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation marks omitted).

225.    Defendants violated Harvard's right to procedural due process by (a) failing to provide adequate notice of the grounds for withdrawal of Harvard's SEVP certification and opportunity to avoid those grounds; (b) failing to disclose the evidence upon which SEVP relied in making its decision; and (c) denying Harvard a meaningful opportunity to respond to the allegations and evidence before the adverse action was taken, including but not limited to a pre-deprivation hearing.

226.    The revocation also violated due process because the Records Request and the Mazzara Email both "fail[ed] to provide a person of ordinary intelligence fair notice of what [was required]" and was "so standardless that it authorize[d] or encourage[d] seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). DHS demanded information that HIO is not required to maintain under the applicable regulations, did not specify the time period for which it sought information, and employed hopelessly vague descriptions of the information sought. DHS did not define what it considers to be "dangerous" conduct, or "obstruction of the school's learning environment," within the meaning of the Records Request, and those terms are not defined in the regulations. DHS then summarily stated that Harvard's responses were "insufficient." Ex. 25 at 1.

227.    Subjecting Harvard to deprivation of its protected property based on failure to comply with this "impermissibly vague" request, *Fox Television Stations*, 567 U.S. at 253, plainly designed to authorize "seriously discriminatory enforcement," *Williams*, 553 U.S. at 304, violated Harvard's rights under the Due Process Clause.

228.    Defendants' actions deprive Harvard of its constitutionally protected property interest in continued certification; prevent Harvard from continuing its robust F-1 visa program, which has long inured to the benefit of the broader Harvard community; damage Harvard's

reputation as a global research institution; and disrupt years of careful institutional planning and resource allocation with respect to its F-1 program.

229.    The harm caused by the improper revocation of Harvard's SEVP certification is immediate and severe, while the additional burden on the government of providing constitutionally adequate procedures would be minimal.

## COUNT VIII
## PROCEDURAL DUE PROCESS
## (EQUITABLE CAUSE OF ACTION – *ULTRA VIRES*)

230.    Harvard incorporates by reference the allegations of the preceding paragraphs.

231.    Even if the prerequisites of review under the Administrative Procedure Act were not satisfied, federal courts have the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." *Armstrong*, 575 U.S. at 327-28.

232.    As alleged in Count VII, Defendants' revocation of Harvard's SEVP certification deprived Harvard of protected property interests without due process.

233.    The Constitution forecloses any lawful authority for Defendants' actions, and this Court should declare them unconstitutional and *ultra vires*.

## COUNT IX
## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
## CONTRARY TO LAW
## 8 C.F.R. §§ 214.3(e)(4)(ii) & 214.4(a)(2)

234.    Harvard incorporates by reference the allegations of the preceding paragraphs.

235.    Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

236.    The APA directs courts to hold unlawful and set aside agency action that is arbitrary and capricious and not in accordance with law. *Id*. § 706(2)(A).

237.    8 C.F.R. § 214.4(a)(2) permits DHS to withdraw certification but only for a "valid and substantive reason." A "valid and substantive reason" must be understood in context to mean a violation of the regulations governing SEVP-certified institutions, for two reasons.

238.    First, to withdraw a school's certification out of cycle, the government must issue a NOIW. But it can only issue a NOIW under the narrow circumstances specified in Section 214.3(e)(4)(ii) of the regulation: if the university "has failed to sustain eligibility" under Section 214.3(a)(3)(i) (which requires that the school is "bona fide," an "established institution of learning or other recognized place of study," possesses "the necessary facilities, personnel, and finances to conduct instruction in recognized courses," and "engage[s] in instruction in those courses"), or if it "has failed to comply with the recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l)." 8 C.F.R. § 214.3(a)(3)(i), (e)(4)(ii). If the alleged violation is something other than ineligibility or the specified regulatory requirements, the government cannot issue a NOIW, and therefore cannot withdraw a school's certification.

239.    Second, and confirming the point, all examples of "valid and substantive reason[s]" for withdrawing a certification enumerated in 8 C.F.R. § 214.4(a)(2) are regulatory violations. Under those examples, decertification must be tied either to failure to maintain eligibility or failure to comply with regulations governing the program.

240.    Indeed, the Evidence Attestation Statement attached to the Records Request confirmed this understanding of the permissible reasons for decertification. That document stated that "SEVP may review [a school's] certification at any time and may request documentation to establish [the school's] *eligibility for certification* as well as *review evidence and records for compliance with the regulation*." Ex. 16 at 3 (emphasis added).

241. Here, DHS's revocation of Harvard's certification was not based on a determination that Harvard was no longer eligible for certification, and it was not based on a determination that Harvard had failed to comply with the regulations. While the Revocation Notice asserts that Harvard's responses to the Records Request and the Mazzara Email were "insufficient," Ex. 25 at 1, DHS has not identified any actual regulatory requirement with which Harvard has failed to comply.

242. The Records Request exceeded the scope of 8 C.F.R. § 214.3(g)(1). That provision specifies nine categories of information that a school "must keep on each [F-1] student" and "furnish … to DHS representatives upon request." 8 C.F.R. § 214.3(g)(1). Not among the listed categories of information: conduct of F-1 students that constitutes "illegal," "dangerous," or "violent" conduct; "deprivation of rights"; "threats"; or "obstruction of the school's learning environment," Ex. 16 at 1-2, particularly where such conduct did not result in disciplinary action that altered the student's academic status.

243. To the extent Defendants have revoked Harvard's SEVP certification for failure to comply with a request made pursuant to Sections 214.3(g)(1) and 214.3(g)(2) for information not required to be maintained or produced to DHS under those provisions, Defendants have failed to base the revocation of Harvard's certification on a "valid and substantive reason," 8 C.F.R. § 214.4(a)(2), and the revocation must be set aside.

244. The improper revocation of Harvard's certification causes immediate, ongoing, and irreparable harm to Harvard.

## COUNT X
## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2) ARBITRARY AND CAPRICIOUS

245. Harvard incorporates by reference the allegations of the preceding paragraphs.

246.    Defendants have taken final agency action by revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

247.    The APA directs courts to hold unlawful and set aside final agency actions that are arbitrary and capricious or an abuse of discretion. *Id*. § 706(2)(A).

248.    Under the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quotation marks omitted), consider all "important aspect[s] of the problem" when setting forth that explanation, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43), and, if the agency's action represents a change in positions, "be cognizant that longstanding policies may have engendered serious reliance interests" and ensures that those reliance interests are "taken into account." *Id.* (quotation marks omitted).

249.    Defendants' decision to revoke Harvard's SEVP certification failed each of these requirements. That action was therefore arbitrary and capricious and an abuse of discretion.

250.    The Revocation Notice asserts that DHS is revoking Harvard's certification because of "Harvard's failure to comply with simple reporting requirements." Ex. 25 at 1. But Defendants have not identified any actual "reporting requirements" with which Harvard has failed to comply.

251.    Defendants' decision to revoke Harvard's SEVP certification on those grounds was arbitrary and capricious because it reflects an unacknowledged and unexplained change in the agency's policy. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (stating that agencies must both "acknowledge" and "offer a reasoned explanation for" deviations from past agency practice). Upon information and belief, prior to the decertification

decision in this case, no school had ever had its SEVP certification revoked for any reason other than failure to meet the eligibility criteria for certification or failure to comply with the recordkeeping, retention, reporting, and other requirements set out in the federal regulations governing certification. In revoking Harvard's certification, Defendants did not acknowledge, much less provide a reasoned explanation for, that change in policy.

252.    Defendants also have not articulated any rational explanation for revoking Harvard's certification. Harvard complied with the lawful requests within the Records Request and the Mazzara Email. In response, Defendants summarily deemed Harvard's document production noncompliant without providing a cogent reason for that determination, and without explaining why the noncompliance—if any—warranted revocation of Harvard's certification. Indeed, the revocation letter was wholly irrational. It states that Harvard failed to comply with reporting requirements, without explaining what those reporting requirements were and why Harvard did not comply with them. It states that Harvard failed to provide a sufficient response to DHS's records request, without articulating why the response was insufficient, why DHS's records request complied with DHS's regulations, or why Harvard's purportedly insufficient response was a basis to revoke Harvard's statements. And it makes generalized statements about campus environment and "anti-Americanism," again without articulating any rational link between those statements and the decision to retaliate against international students. Accordingly, Defendants failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

253.    The decertification decision was arbitrary and capricious because it was not supported by any evidence. The revocation letter stated that Harvard violated "reporting

requirements" and that its response to DHS's record requests were "insufficient." It failed to substantiate these statements.

254.    The decertification decision was also arbitrary and capricious because it fails to explain why wholesale decertification—rather than some lesser "remedial action" to cure any noncompliance, 8 C.F.R. § 214.3(h)(3)(iii)—was the appropriate remedy here.

255.    The decertification decision was also arbitrary and capricious because the penalty imposed—wholesale decertification of a program that has been continuously certified for over 70 years—was entirely disproportionate to the alleged noncompliance identified: failure to supply information that the regulations do not require Harvard to maintain or report as a condition of its continued SEVP certification.

256.    The decertification decision was also arbitrary and capricious because it ignores Harvard's and its students' reliance interests and does not provide an explanation that accounts for those reliance interests. Decertification directly impacts both Harvard and its many international students. The decision thus lacks a rational connection between the facts found and the choice made.

a.    Harvard invests in recruitment, housing, support services, and specialized programs designed specifically for its international student populations. The Harvard International Office, with its 25 full-time staff members and annual budget of $3.44 million, is the hub of this investment. It represents decades of accumulated expertise and systems for recruiting and enrolling students through the F-1 visa program.

b.    Harvard relies on its ability to enroll international students to enrich its student population and to attract other students and faculty. Harvard's dual mission of teaching

and research relies on its global character and its ability to attract students wishing to participate in an intellectual community populated by the brightest minds it can recruit to Massachusetts.

c.    Harvard relies on its SEVP certification in admitting its incoming summer students and its incoming fall class. Reconfiguring these admitted classes in both the undergraduate and graduate schools is not practically possible given that the admissions cycle is nearly concluded.

d.    Students, likewise, rely on Harvard's SEVP certification to legally enter and remain in the United States. Students make significant financial and time commitments based on a school's certification. Students build academic and career plans around specific programs at certified institutions. Interruptions in academic plans can derail degree completion. Students make major life and professional decisions based on their educational plans, including to pursue a program on the understanding that they will be able to access pre- and post-graduate pathways to employment like the Optional Practical Training and Curricular Practical Training Visas. They transplant themselves, and often their families, too, to come to Cambridge and Boston to study.

e.    Students also make practical decisions in reliance on Harvard's SEVP certification. Students do not prepare for the costly travel and moving arrangements needed to return home abruptly upon revocation of an F-1 visa, nor do they prepare for facing return to a home country where they may face violent or dangerous circumstances.

257.    Defendants' arbitrary decertification decision causes immediate, ongoing, and irreparable harm to Harvard.

## REQUEST FOR RELIEF

WHEREFORE, Harvard respectfully requests the following relief:

A.    Declare that Defendants' actions to revoke Harvard's SEVP certification through

the Revocation Notice are unconstitutional and/or unlawful because they violate the First Amendment, the Due Process Clause, and the APA;

B.      Preliminarily and permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the unlawful revocation of Harvard's SEVP certification;

C.      Preliminarily and permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from giving any force or effect to the Department of Homeland Security's May 22, 2025 Revocation Notice;

D.      Permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from issuing a NOIW or otherwise initiating proceedings to withdraw Harvard's SEVP certification in retaliation for Harvard's exercise of its rights under the First Amendment, or because of the viewpoint of Harvard's First Amendment protected speech, or because of Harvard's refusal to comply with the April 11 Demand Letter.

E.      Award Harvard its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

F.      Grant other such relief as this Court may deem equitable, just, and proper.

Dated: May 23, 2025

JENNER & BLOCK LLP

Ishan Bhabha*
Ian Heath Gershengorn*
Lauren J. Hartz*
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
IGershengorn@jenner.com
LHartz@jenner.com

Andrianna Kastanek*
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
AKastanek@jenner.com

William A. Burck*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com

Respectfully submitted,

LEHOTSKY KELLER COHN LLP

By: */s/ Steven P. Lehotsky*

Steven P. Lehotsky (BBO # 655908)
Scott A. Keller*
Serena M. Orloff*
Shannon G. Denmark*
Jacob B. Richards (BBO # 712103)
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com
scott@lkcfirm.com
serena@lkcfirm.com
shannon@lkcfirm.com
jacob@lkcfirm.com

Katherine C. Yarger*
700 Colorado Blvd., #407
Denver, CO 80206
katie@lkcfirm.com

Joshua P. Morrow*
408 W. 11th Street, 5th Floor
Austin, TX 78701
josh@lkcfirm.com

Danielle K. Goldstein*
3280 Peachtree Road NE
Atlanta, GA 30305
danielle@lkcfirm.com

*Pro Hac Vice Applications Forthcoming*