## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRESIDENT AND FELLOWS OF<br>HARVARD COLLEGE,<br><br>       Plaintiff,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND<br>SECURITY;<br><br>KRISTI NOEM, in her official capacity as Secretary of the<br>United States Department of Homeland Security;<br><br>UNITED STATES IMMIGRATION AND CUSTOMS<br>ENFORCEMENT;<br><br>TODD LYONS, in his official capacity as Acting Director of<br>United States Immigration and Customs Enforcement;<br><br>STUDENT AND EXCHANGE VISITOR PROGRAM;<br><br>JOHN DOE, in their official capacity as Director of the<br>Student and Exchange Visitor Program;<br><br>JAMES HICKS, in his official capacity as Deputy Assistant<br>Director of the Student and Exchange Visitor Program;<br><br>UNITED STATES DEPARTMENT OF JUSTICE;<br><br>PAMELA BONDI, in her official capacity as Attorney<br>General of the United States;<br><br>UNITED STATES DEPARTMENT OF STATE;<br><br>MARCO RUBIO, in his official capacity as Secretary of the<br>United States Department of State,<br><br>       Defendants. | Case No. 1:25-cv-11472-ADB<br><br>**Leave to File Granted<br>on May 23, 2025** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION
## FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

LEGAL BACKGROUND ...................................................................................................... 4

    A.    The Statutory and Regulatory Framework for SEVP Certification ................ 4

    B.    Regulations Governing "Withdrawal" of SEVP F-1 Certification. ................ 6

    C.    Regulations Governing the J Visa Program. .................................................... 8

FACTUAL BACKGROUND ............................................................................................... 10

    A.    Harvard's Longstanding Participation in the F-1 and J-1 Visa
        Program. ......................................................................................................... 10

    B.    The Government's Assault on Academic Freedom at Harvard. .................... 11

    C.    DHS's Unprecedented and Retaliatory Demand and Harvard's
        Initial Document Production ........................................................................... 13

    D.    Subsequent Developments, DHS's Second Information Request,
        and Harvard's Second Document Production ................................................. 16

    E.    DHS's Revocation of Harvard's Certification ............................................... 19

    F.    The Immediate and Irreparable Harm Inflicted by This Lawless
        Action ............................................................................................................. 21

LEGAL STANDARD ........................................................................................................... 22

ARGUMENT ......................................................................................................................... 23

I.    Harvard Has a Strong Likelihood of Success on the Merits. ............................... 23

    A.    DHS's Revocation of Harvard's SEVP Certification Was
        Unlawful. ........................................................................................................ 24

        1.    The Revocation Violated the First Amendment (Counts I,
            II, III, IV, and IX). ............................................................................ 24

            a.    Defendants Unlawfully Retaliated Against
                Harvard for Its Refusal to Cede Control Over Its
                Academic Decisionmaking (Counts I and IV) ....................... 25

|   | b. | Defendants Engaged in Impermissible Viewpoint Discrimination (Counts II and IV)..........................................29 |

|   | c. | Defendants Imposed an Unconstitutional Condition (Counts III and IV). ...............................................31 |

| 2. | | The Revocation Also Violated the APA and the Fifth Amendment (Counts V, VI, VII, VIII, IX, and X). ..........................31 |

|   | a. | The Revocation Deprived Harvard of Required Process (Counts V, VI, VII, and VIII)...................................32 |

|   | b. | The Revocation Was Not Done for a Permissible Reason (Count IX). .................................................38 |

|   | c. | The Revocation Was Arbitrary and Capricious (Count X). ....................................................................41 |

**II.    The Government's Lawless Revocation of Harvard's SEVP Certification Inflicts Irreparable Harm. ..................................................46**

**III.    The Balance of the Equities and Public Interest Overwhelmingly Favor Relief. ........................................................................48**

**CONCLUSION ........................................................................49**

# TABLE OF AUTHORITIES

### CASES

*178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47 (D. Mass. 2016) ................................................................................................................22–23

*American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ...............................................................................................................42, 43

*Amsden v. Moran*, 904 F.2d 748 (1st Cir. 1990).................................................................32

*Anchustegui v. Department of Agriculture*, 257 F.3d 1124 (9th Cir. 2001) .................................35

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1 (1st Cir. 2007) ...............................................................................................25, 26

*Atlantic Richfield Co. v. United States*, 774 F.2d 1193 (D.C. Cir. 1985)....................................32

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)...........................................................2

*Blackwell College of Business v. Attorney General*, 454 F.2d 928 (D.C. Cir. 1971) ..............................................................................................8, 33, 35, 36, 42

*Blasdel v. Northwestern University*, 687 F.3d 813 (7th Cir. 2012) .......................................25, 26

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020)...........................................................49

*Club Misty, Inc. v. Laski*, 208 F.3d 615 (7th Cir. 2000) .......................................................33

*Department of Commerce v. New York*, 588 U.S. 752 (2019).................................................43

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) ...........................41, 42, 45–46

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ..................................................................23

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26 (1st Cir. 2012) ...........................................26

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)....................................................36

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)................................................38, 45

*Fischer v. United States*, 603 U.S. 480 (2024) ..............................................................40, 41

*Goldstein v. Batista Contracting LLC*, 671 F. Supp. 3d 68 (D. Mass. 2023) ..............................23

*Hartman v. Moore*, 547 U.S. 250 (2006).......................................................................26

*Herguan University v. Immigration & Customs Enforcement*, 258 F. Supp. 3d 1050 (N.D. Cal. 2017)........................................................................................................8, 42

*Hodgens v. General Dynamics Corp.*, 144 F.3d 151 (1st Cir. 1998)............................................28

*Horn Farms, Inc. v. Johanns*, 397 F.3d 472 (7th Cir. 2005) ...........................................32, 33

*Iancu v. Brunetti*, 588 U.S. 388 (2019)............................................................................29, 30

*Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14 (D.D.C. 2014)........................................43

*Johnson v. United States*, 576 U.S. 591 (2015) ............................................................................37

*Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951) ....................................30, 31

*Keyishian v. Board of Regents of University of New York*, 385 U.S. 589 (1967)..........2, 24, 25, 26

*Massachusetts v. National Institutes of Health*, No. 25-CV-10338, __ F. Supp. 3d __, 2025 WL 702163 (D. Mass. Mar. 5, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025)..........................................................................................................48

*Matal v. Tam*, 582 U.S. 218 (2017) .................................................................................29, 30

*Mathews v. Eldridge*, 424 U.S. 319 (1976)......................................................................35, 36

*Medina v. Rudman*, 545 F.2d 244 (1st Cir. 1976).......................................................................32

*Michigan v. EPA*, 576 U.S. 743 (2015) ....................................................................................42

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)....................................................41, 42

*National Environmental Development Ass'n's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ............................................................................................................34

*National Rifle Ass'n of America v. Vullo*, 602 U.S. 175 (2024) ..............................................2, 24

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................48

*NuVasive, Inc. v. Day*, 954 F.3d 439 (1st Cir. 2020) ..............................................................23

*Ohio v. EPA*, 603 U.S. 279 (2024).............................................................................................41

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) .............................49

*Papachristou v. Jacksonville*, 405 U.S. 156 (1972)....................................................................36

*President and Fellows of Harvard College v. U.S. Dep't of Health and Human Services et al.*, No. 25-cv-11048 (D. Mass. Apr. 21, 2025)....................................................1

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ...................................................................29, 30

*Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985)...................................25, 25

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)................................................46

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8 (1st Cir. 2000) ..............................47

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006)....................31

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ...............................................................................42

*Shelton v. Tucker*, 364 U.S. 479 (1960) ....................................................................................26

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ......................................................................29

*United States v. American Library Ass'n*, 539 U.S. 194 (2003)...................................................31

*United States v. Williams*, 553 U.S. 285 (2008) ........................................................................37

*Weinstock v. Columbia University*, 224 F.3d 33 (2d Cir. 2000)...................................................27

**STATUTES**

5 U.S.C. § 558...........................................................................................................................32

5 U.S.C. § 558(c).......................................................................................................20, 33, 35

5 U.S.C. § 558(c)(1)...................................................................................................................33

5 U.S.C. § 558(c)(2)..................................................................................................33, 33, 34

5 U.S.C. § 706(2)(A)............................................................................................................24, 41

5 U.S.C. § 706(2)(B)..................................................................................................................24

5 U.S.C. § 706(2)(D)..................................................................................................................24

8 U.S.C. § 1101(a)(15)........................................................................................................5, 8, 33

8 U.S.C. § 1372.....................................................................................................................5, 6

8 U.S.C. § 1762(a) ....................................................................................................5, 39–40, 42

8 U.S.C. § 1762(a)(1) ...................................................................................................................5

8 U.S.C. § 1762(a)(2) ...................................................................................................................5

8 U.S.C. § 1762(c) ....................................................................................................7, 39–40, 42

26 U.S.C. § 7217 ....................................................................................................27

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 .........................5

**REGULATIONS**

8 C.F.R. § 103.3(a)(1) ....................................................................................6, 7, 34

8 C.F.R. § 214.2(a)(2) .............................................................................................39

8 C.F.R. § 214.2(f) ...............................................................................................4, 5

8 C.F.R. § 214.2(f)(4) ...............................................................................................5

8 C.F.R. § 214.2(f)(5) .............................................................................................21

8 C.F.R. § 214.3(a)(1) ...............................................................................................5

8 C.F.R. § 214.3(a)(3) ..................................................................................6, 39, 42

8 C.F.R. § 214.3(e)(4) ..................................................................................6, 7, 39

8 C.F.R. § 214.3(f) ...................................................................................................5

8 C.F.R. § 214.3(g) ......................................................................................6, 36, 40

8 C.F.R. § 214.3(g)(1) ...............................................................................15, 16, 18, 37

8 C.F.R. § 214.3(g)(2) .............................................................................................18

8 C.F.R. § 214.3(h)(2) ......................................................................................5, 6, 17

8 C.F.R. § 214.3(h)(3) ..................................................................................6, 15, 38, 44

8 C.F.R. § 214.3(j) ......................................................................................6, 40

8 C.F.R. § 214.3(k) ...................................................................................................6

8 C.F.R. § 214.3(*l*) ...................................................................................................6

8 C.F.R. § 214.4(a) .................................................................................................42

8 C.F.R. § 214.4(a)(2) ..........................................................6, 7, 8, 33, 39, 40, 42, 45

8 C.F.R. § 214.4(b) ..........................................................................7, 20, 33, 38, 39

8 C.F.R. § 214.4(b)(1) ...............................................................................7, 33, 34

8 C.F.R. § 214.4(b)(2) ...............................................................................33, 34

8 C.F.R. § 214.4(b)(3) ...........................................................................................33, 34

8 C.F.R. § 214.4(c) ........................................................................................7, 20, 33

8 C.F.R. § 214.4(d) ...................................................................................7, 20, 33, 34

8 C.F.R. § 214.4(e) ...................................................................................7, 20, 33, 34

8 C.F.R. § 214.4(f) ...................................................................................................20

8 C.F.R. § 214.4(g) ...............................................................................................7, 34

8 C.F.R. § 214.4(h) .........................................................................................7, 20, 34

8 C.F.R. § 214.4(*i*)(1) ..........................................................................................7, 18

8 C.F.R. § 214.4(*i*)(2) ...............................................................................................21

22 C.F.R. § 62.3 .........................................................................................................8

22 C.F.R. § 62.5 .........................................................................................................8

22 C.F.R. § 62.50 .......................................................................................................4

22 C.F.R. § 62.50(a) ...........................................................................................8, 9, 34

22 C.F.R. § 62.50(d) ...........................................................................................8, 9, 34

22 C.F.R. § 62.50(i) ..............................................................................................9, 10

## OTHER AUTHORITIES

CNBC Television, *Education Secretary Linda McMahon to Harvard: Obey the law and you can be eligible for funding*, YouTube, at 1:04-31 (May 7, 2025), available at https://www.youtube.com/watch?v=bb6YJUHMqc4 ..........................................17

Dep't of State, 9 *Foreign Affairs Manual* 402 ............................................................22

The White House, *President Trump Participates in a Cabinet Meeting, Apr. 30, 2025*, YouTube, at 1:21:50-1:23:33 (Apr. 30, 2025) ("Cabinet Meeting Tr."), available at https://www.youtube.com/watch?v=wn2XtufOAHc ....................................16, 31

## INTRODUCTION

For more than 70 years, Harvard University ("Harvard" or the "University") has been certified by the federal government to enroll international students under the F-1 visa program, and it has long been designated as an exchange visitor program sponsor to host J-1 nonimmigrants. Harvard has, over this time, developed programs and degrees tailored to its international students and invested millions to recruit the most talented such students and integrate them into all aspects of the Harvard community. Yesterday, the government abruptly revoked Harvard's certification to host F-1 and J-1 students[1] without process or cause, to devastating effect for Harvard and more than 7,000 Harvard students and affiliates on F-1 and J-1 visas.

The government's revocation of Harvard's certification was not a product of the ordinary review process set out in detailed regulations that define the limited circumstances under which a school's certification may be revoked and put a premium on the due process rights of institutions and students. On its face, the revocation is part of the government's broader effort to retaliate against Harvard for its refusal to surrender its academic independence.[2] In response to the government's disagreement with the perceived viewpoints of Harvard, its faculty, and its students, the government issued a series of demands requiring Harvard to submit to government oversight

---

[1] Scholars and others at the University also could have J-1 visa status and thus be affected by the revocation.

[2] This case stems from the same campaign of retaliation as described in *President and Fellows of Harvard College v. U.S. Department of Health and Human Services et al.*, No. 25-cv-11048 (D. Mass. Apr. 21, 2025) (the "Funding Case"), in which Harvard has challenged the government's freeze and terminations of billions of dollars in multi-year grants to Harvard. DHS's revocation of Harvard's longstanding certification to enroll international students involves a different adverse action against Harvard, but like the Funding Case, this case involves a coordinated effort to retaliate against Harvard for its refusal to accede to government demands about what a private university can teach, whom it can admit and hire, and what areas of study it can pursue. And both adverse actions began in the immediate aftermath of Harvard refusing to accede to the government's April 11, 2025 demands.

of the faculty it hires, the students it admits, and the courses it teaches. When Harvard declined, the Administration unleashed the full power of the federal government, freezing billions in federal grants, proposing to eliminate Harvard's tax-exempt status, opening multiple federal investigations, and—most relevant here—threatening to terminate Harvard's participation in the F-1 and J-1 visa programs.

Yesterday, the government made good on that threat—and it did so via a letter that makes plain that DHS is not even pretending to follow its own regulations, either as to process or as to substance. Instead, DHS all but announced that the revocation is blatantly in retaliation for Harvard's exercise of its academic freedom.

Revoking Harvard's certification is unlawful many times over. It is a pillar of our constitutional system that the government cannot "invok[e] legal sanctions and other means of coercion" to police private speech, especially when the government's treatment is animated by viewpoint discrimination. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). Prohibitions on viewpoint discrimination and on retaliation for protected speech are at the core of the First Amendment's protections. And especially so here, because "academic freedom" is "a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967). The government's effort to punish the University for its refusal to surrender its academic independence and for its perceived viewpoint is a patent violation of the First Amendment.

The government's action also violates the Administrative Procedure Act ("APA") and the Fifth Amendment in ways that underscore that what is really going on here is not a concern that Harvard has a noncompliant F-1 visa program, but rather undisguised retaliation. The revocation is quintessential arbitrary, irrational, and unilateral executive action. The government bypassed its

own regulatory framework, which—recognizing the school's and its students' weighty reliance interests—specifies detailed procedures and standards for withdrawing a school's certification. At the same time, DHS ran roughshod over procedural due process protections, not to mention the procedural protections in its own regulations. DHS imposed a penalty that is wholly unprecedented, and which it has no authority to impose under the circumstances. And DHS's explanation in its letter—which vaguely gestures toward unexplained "reporting requirements" and then declares that DHS will "root out the evils of anti-Americanism"—is the quintessence of arbitrary and capricious agency decisionmaking.

Emergency relief is essential. Effective immediately, Harvard may no longer sponsor or host F-1 or J-1 visa holders. The thousands of international students who were scheduled to arrive on campus for the upcoming summer and fall terms will no longer be able to enter the country. DHS has informed Harvard that the thousands of international students currently on campus—many just days from receiving their degrees—must transfer immediately to another institution to remain in the United States. Countless academic programs, laboratories, clinics, and courses that these students support will be thrown into disarray. Classmates, teammates, and roommates will be immediately separated. All told, the revocation upends Harvard's decades of work and extensive investments to cultivate the programs, opportunities, personnel, and reputation that allow Harvard to attract the most talented international students and integrate them into its community, many of whom will go on to engage in pioneering research, invent groundbreaking technologies, and start thriving businesses here in America. The effects on Harvard's students—all of its students—will be devastating. Without its international students, Harvard is not Harvard.

This Court should immediately grant the motion for a temporary restraining order and enjoin the government from giving effect to the revocation of Harvard's Student and Exchange

Visitor Program ("SEVP") certification.

**LEGAL BACKGROUND**

The SEVP is a federal program—administered by U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS")—that allows international students to study at American colleges and universities on nonimmigrant F-1 visas. A detailed set of DHS regulations, in turn, govern schools' initial eligibility to participate in the F-1 visa program, define the limited set of conditions under which DHS can revoke that certification once granted, and set out the process for doing so. The regulations governing the J-1 exchange program, which is administered by the Department of State rather than DHS, are similarly detailed, including in mandating that the Department of State provide notice and process before a school's sponsorship designation can be revoked.[3]

These detailed regulatory schemes—and, in particular, the restrictions they impose on the government's authority to revoke a school's certification—reflect a recognition of schools' (and their students') significant reliance interests in continued certification. The regulations emphasize continuity and predictability and mandate that certification can be revoked only for a substantial, legitimate reason, and only after notice and an opportunity to be heard.

**A. The Statutory and Regulatory Framework for SEVP Certification.**

The eligibility requirements for obtaining an F-1 visa and maintaining F-1 status are set out in the Immigration and Nationality Act and its accompanying regulations at 8 C.F.R. § 214.2(f). In order to qualify for an F-1 visa, a noncitizen must (1) "hav[e] a residence in a foreign

---

[3] DHS's May 22, 2025 letter states that it revokes Harvard's "certification" to host students on either F-1 or J-1 visas. The applicable State Department regulations refer to revocation of authority to host J-1 students as revocation of the sponsor's SEVP "designation." 22 C.F.R. § 62.50. For ease of reference, however, Harvard will refer to the J-1 revocation, like the F-1 revocation, as decertification.

4

country which he has no intention of abandoning"; (2) be "a bona fide student qualified to pursue a full course of study"; and (3) "seek[] to enter the United States temporarily and solely for the purpose of pursuing such a course of study … at an established college, university, … or other academic institution … particularly designated by him and approved by the Attorney General." 8 U.S.C. § 1101(a)(15)(F)(i). The statute also requires such schools to "agree[] to report to the Attorney General the termination of attendance of each nonimmigrant student." *Id.*

The process for a school to be "approved by the Attorney General" to host F-1 students, *id.*, is known as "SEVP certification," *e.g.*, 8 C.F.R. § 214.3(f),[4] and a school that receives that approval is said to be "SEVP-certified," *e.g.*, *id.* § 214.2(f)(4). To become certified, a school must "file a petition for certification" through an online DHS portal called "the Student and Exchange Visitor Information System" ("SEVIS"). *Id.* § 214.3(a)(1). In that petition, the school "must establish" that it (A) is "a bona fide school"; (B) is "an established institution of learning or other recognized place of study"; (C) "[p]ossesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses"; and (D) "[i]s, in fact, engaged in instruction in those courses." *Id.* § 214.3(a)(3)(i)(A)-(D) (collectively, the "Initial Certification Criteria").

Schools must petition for recertification every two years. *See id.* § 214.3(h)(2). The statute mandating this biennial recertification process, 8 U.S.C. § 1762(a), reflects that the process is compliance-focused: to "determine whether [certified schools] are in compliance with" (1) "recordkeeping and reporting requirements to receive nonimmigrants under [8 U.S.C. § 1101(a)(15)(F)]" and (2) "recordkeeping and reporting requirements under [8 U.S.C. § 1372]." 8 U.S.C. § 1762(a)(1)-(2). Thus, to be recertified, the school must establish that it continues to

---

[4] All references in the INA to the Attorney General are understood to also refer to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.

satisfy the four Initial Certification Criteria and "[h]as complied during its previous period of certification … with … all … requirements of paragraphs (g), (j), (k), and (l) of this section" (the "Compliance Criteria"). *Id.* § 214.3(a)(3)(ii)(A)-(B). The Compliance Criteria consist of recordkeeping and reporting mandates, *see id.* § 214.3(g) (implementing 8 U.S.C. § 1372); advertising and marketing restrictions, *id.* § 214.3(j); eligibility certification requirements, *id.* § 214.3(k); and requirements to appoint qualified Designated School Officials ("DSOs") to serve as SEVP's "point of contact," *id.* § 214.3(*l*). If DHS denies a recertification petition, it must provide its "specific reasons for denial" in writing. 8 C.F.R. §§ 103.3(a)(1)(i), 214.3(h)(2)(v).

### B. Regulations Governing "Withdrawal" of SEVP F-1 Certification.

The regulations permit DHS to assess a school's fitness for continued certification outside the ordinary biennial recertification process through a process known as "withdraw[al] on notice subsequent to out-of-cycle review." *Id.* § 214.4(a)(2). The "out-of-cycle review" process authorizes DHS to request information from the school at any time to verify its continued "compliance with the recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section [*i.e.*, the Compliance Criteria]" and "the school's continued eligibility for SEVP certification." 8 C.F.R. § 214.3(h)(3)(iii). Underscoring the need of both institutions and students for predictability and continuity, "[w]ithdrawal on notice" pursuant to this out-of-cycle review process is the only mechanism in the regulations for terminating a certification outside of the two-year recertification process. *See id.*

If DHS initiates withdrawal proceedings following an out-of-cycle review, it must follow the procedures specified in Section 214.4(b) of the regulations, titled "Withdrawal on notice." To withdraw certification out of cycle, DHS must serve the school with a "Notice of Intent to Withdraw," or NOIW. *Id.* § 214.3(e)(4). The NOIW can only be issued, however, "if SEVP determines that a school reviewed out-of-cycle has failed to sustain eligibility or has failed to

6

comply with the [Compliance Criteria]." *Id.* The NOIW must state "the grounds" for DHS's action. *Id.* § 214.4(b)(1). The school then has 30 days to answer the allegations, submit evidence, and request a "telephonic interview in support of its response." *Id.* § 214.4(b)-(e).

Section 214.4 also imposes an important substantive limit on DHS's authority to withdraw a school's certification. Specifically, DHS must identify a "valid and substantive reason" for determining that the school is no longer entitled to certification. *Id.* § 214.4(a)(2); *see* 8 U.S.C. § 1762(c) (stating that a school's certification shall be revoked for "[m]aterial failure … to comply with the recordkeeping and reporting requirements to receive nonimmigrant students"). DHS regulations list 19 such "valid and substantive" reasons that generally pertain to either failure to maintain the Initial Certification Criteria (such as operating as a "bona fide institution of learning" and maintaining necessary facilities and personnel), 8 C.F.R. § 214.4(a)(2)(xii)-(xiii), (xv)-(xvii), or failure to adhere to the Compliance Criteria (such as reporting requirements, advertising restrictions, and DSO requirements), *id.* § 214.4(a)(2)(i)-(x), (xiv), (xviii)-(xix).

If, at the end of the withdrawal-on-notice process, DHS wishes to withdraw the school's certification, it must issue a written decision explaining "the specific reasons for" its decision. *Id.* § 103.3(a)(1)(i); *see id.* § 214.4(g). DHS regulations then permit the school to appeal that decision, *id.* § 214.4(h), through a multistep process described in public agency guidance.[5] The process "takes roughly 60 business days." Compl., Ex. 1.

A school that loses its SEVP certification is, effective immediately, no longer authorized to issue Form I-20s (a prerequisite to obtaining an F-1 visa) to new international students, *see* 8 C.F.R. § 214.4(*i*)(1), and so cannot permit any new F-1 visa students to come to its campus. The

---

[5] *See* DHS, General Appeals Process Information (Compl., Ex. 1); ICE, Appeal Processing Steps (Compl., Ex. 2).

school is prohibited from reapplying for recertification for a period of one year. *Id.* § 214.4(a)(2). And even then, eligibility to re-petition is "at the discretion of the Director of SEVP." *Id.*

By all accounts, decertification is exceedingly rare. There are only two reported cases in which a school challenged the revocation of its SEVP certification, and each involved repeated or widespread misconduct and noncompliance with the governing regulations. *See Blackwell Coll. of Bus. v. Att'y Gen.*, 454 F.2d 928, 933, 939 (D.C. Cir. 1971) (review of files showed 89 violations of regulatory reporting requirements); *Herguan Univ. v. Immigr. & Customs Enf't*, 258 F. Supp. 3d 1050, 1058-59 (N.D. Cal. 2017) (school engaged in visa fraud scheme). There are no reported cases involving any of the nation's top-ranked institutions or its largest hosts of F-1 visa students. Nor are there reported cases involving religious schools or other schools with a distinct perceived viewpoint.

### C.  Regulations Governing the J Visa Program.

The J visa is another type of nonimmigrant visa for foreign citizens who are approved to participate in an exchange visitor program in the United States, 8 U.S.C. § 1101(a)(15)(J), including as students, professors, and research scholars. 22 C.F.R. § 62.4. To host individuals on J-1 visas, an institution must be designated as a "Exchange Visitor Program sponsor" by the Department of State. 22 C.F.R. §§ 62.3, 62.5.

Revocation of a sponsor's Exchange Visitor Program designation is governed by 22 C.F.R. § 62.50(d). The provision authorizes the Department of State's Office of Exchange Coordination and Designation (the "Office") to serve a sponsor with written notice of its intent to revoke the sponsor's Exchange Visitor Program designation "[u]pon a finding of any act or omission set forth in [22 C.F.R. § 62.50(a)]." 22 C.F.R. § 62.50(d). Paragraph (a), in turn, provides that notice of intent to revoke may be issued upon a finding that the sponsor has:

- Violated one or more provisions of 22 C.F.R. Part 62;

- Evidenced a pattern of failure to comply with one or more provisions of 22 C.F.R. Part 62;

- Committed an act of omission or commission, which has or could have the effect of endangering the health, safety, or welfare of an exchange visitor; or

- Otherwise conducted its program in such a way as to undermine the foreign policy objectives of the United States, compromise the national security interests of the United States, or bring the Department or the Exchange Visitor Program into notoriety or disrepute.

Even upon such a finding, the regulations afford sponsors notice and an opportunity to be heard before the revocation takes effect. The Office must provide at least 30 days' written notice of its intent to revoke. 22 C.F.R. § 62.50(d)(1). That notice must "specify the grounds for the proposed sanction and its effective date, advise the sponsor of its right to oppose the proposed sanction, and identify the procedures for submitting a statement of opposition thereto." *Id.* The sponsor is then afforded the opportunity to submit a statement in opposition to or mitigation of the proposed sanction, the submission of which serves to stay the effective date of the proposed sanction pending a decision of the Principal Deputy Assistant Secretary for Educational and Cultural Affairs. 22 C.F.R. § 62.50(d)(2)(i)-(ii). The Principal Deputy Assistant Secretary is then responsible for reviewing the submissions of both the sponsor and the Office and either modifying, withdrawing, or confirming the proposed sanction by serving the sponsor a written decision that specifies the grounds for the sanction, identifies its effective date, advises the sponsor of its right to request a review, and identifies the procedures for requesting such review. 22 C.F.R. § 62.50(d)(2)(v).

The effect of an order of revocation is outlined in 22 C.F.R. § 62.50(i). A sponsor against which an order of revocation "has become effective may not thereafter issue any Certificate of Eligibility for Exchange Visitor (J-1) Status (Form DS-2019) or advertise, recruit for, or otherwise promote its program." 22 C.F.R. § 62.50(i). And even where a school has already

issued a Form DS-2019 "Certificate of Eligibility for Exchange Visitor Status" indicating its intention to sponsor a J-1 visa for a particular foreign national, the school may not under any circumstances "facilitate the entry of [that] exchange visitor into the United States." *Id.* The regulation also expressly states that an order of revocation "will not in any way diminish or restrict the sponsor's legal or financial responsibilities to existing program applicants or participants." *Id*.

## FACTUAL BACKGROUND

### A.  Harvard's Longstanding Participation in the F-1 and J-1 Visa Program

Congress created the F-1 visa program in 1952, and Harvard has been continuously certified to host F-1 student visa holders since 1954—more than 70 years. *See* Decl. of Maureen Martin ("Martin Decl.") ¶ 10. It has also long been certified to host J-1 students. *See id*. ¶ 17. Today, Harvard hosts more than 5,000 such students hailing from 143 countries, *see id.* ¶¶ 5, 7, and sponsors over 2,000 recent graduates who are on OPT, *see id.* ¶ 6. These students are enrolled across Harvard's 13 schools and make up over one-quarter of Harvard's total student population. *Id.* To date, tens of thousands of international students have studied at Harvard under the F-1 visa program, *see* Decl. of Mark Elliott ("Elliott Decl.") ¶ 6, just as thousands of Harvard's American students have studied abroad through other countries' comparable student visa programs, *see id.* ¶ 22. These international students contribute in immeasurable ways to Harvard's academic environment (including by enriching the experience of their American classmates) and to Harvard's research advancements by (among other things) publishing pioneering scholarship, supporting scientific research, and inventing groundbreaking technologies. Harvard has expended significant resources over decades to enroll and support these international students, *see id.* ¶¶ 8, 28, including through the Harvard International Office (HIO), which has 25 full-time employees and an annual budget of over $3 million. *See* Martin Decl. ¶ 49.

Harvard has maintained an unbroken record of SEVP certification for more than 70 years, across 14 presidential administrations of both political parties. *See id.* ¶ 10. Harvard has petitioned for SEVP recertification biennially, as required by regulation. *See id.* ¶¶ 12-13. And DHS has granted each of those petitions—including during President Trump's first administration, in 2019—reflecting its conclusion that Harvard has continuously maintained compliance with all requirements for maintaining its certification (*i.e.*, the Initial Certification and Compliance Criteria). *See id.* ¶ 13.

### B. The Government's Assault on Academic Freedom at Harvard

On February 3, 2025, the Administration formed a multi-agency Task Force to Combat Antisemitism ("Federal Task Force").[6] On February 28, 2025, the Federal Task Force announced that it was targeting ten major universities for investigation, including Harvard.[7] Then, on March 31, 2025, Harvard received a letter notifying it that the government was investigating Harvard's "potential infractions and dereliction of duties to curb or combat anti-Semitic harassment."[8] The investigation quickly transmogrified from an inquiry into past infractions in responding to anti-Semitic harassment into an unprecedented intrusion into academic freedom.

On April 3 and April 11, 2025, the government sent Harvard long lists of demands Harvard would have to meet to retain $8.7 billion in federal research grants previously awarded to it based on neutral criteria. The April 3 letter demanded broad reforms, including governance reforms "to foster clean lines of authority" and oversight for "biased programs that fuel antisemitism" to

---

[6] *See* U.S. Dep't of Just., Off. of Pub. Affs., Justice Department Announces Formation of Task Force to Combat Anti-Semitism (Feb. 3, 2025) (Compl., Ex. 4).

[7] U.S. Dep't of Just., Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism (Feb. 28, 2025) (Compl., Ex. 6).

[8] Memorandum from Josh Gruenbaum to Alan M. Garber and Penny Pritzker, *Re: Review of Federal Government Contracts*, at 1 (Mar. 31, 2025) (the "March 31 Letter") (Compl., Ex. 7).

"improve viewpoint diversity."[9] The April 11 letter (the "Demand Letter"), which "incorporates and supersedes" the April 3 demands, was even more intrusive.[10] Among its conditions for "maintain[ing] Harvard's financial relationship with the federal government" were:

- ensure that "each department, field, or teaching unit must be individually viewpoint diverse";

- "abolish all criteria, preferences, and practices … that function as ideological litmus tests";

- "hir[e] a critical mass of new faculty" and "admit[] a critical mass of students who will provide viewpoint diversity" in departments and teaching units found to lack viewpoint diversity; and

- "reform its recruitment, screening, and admissions of international students to prevent admitting students hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence."

*Id.* at 2-3.

Harvard rejected these demands. As Harvard's President, Alan Garber, wrote in an April 14, 2025 letter to the Harvard Community: "Although some of the demands outlined by the government are aimed at combating antisemitism, the majority represent direct governmental regulation of the 'intellectual conditions' at Harvard."[11] He added that "[n]o government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue." *Id.* And in a separate April 14 letter to the government, Harvard's lawyers explained that "[n]either Harvard

---

[9] Letter from Josh Gruenbaum, Sean R. Keveney, and Thomas E. Wheeler to Alan M. Garber and Penny Pritzker, at 2-3 (Apr. 3, 2025) (the "April 3 Letter") (Compl., Ex. 8).

[10] Letter from Josh Gruenbaum, Sean R. Keveney, and Thomas E. Wheeler to Alan M. Garber and Penny Pritzker, at 1 (Apr. 11, 2025) (the "Demand Letter") (Compl., Ex. 9).

[11] Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ., Office of the President (Apr. 14, 2025) (the "Garber Letter") (Compl., Ex. 10).

nor any other private university can allow itself to be taken over by the federal government."[12]

The government's retaliation was swift and devastating. The Federal Task Force immediately "announc[ed] a freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University," citing "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges."[13]

The next morning, on April 15, 2025, President Trump himself targeted Harvard in a post on his social media website, Truth Social, that explained the government's actions in ways that lay its retaliatory motivations bare. The President's post suggested that Harvard "should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness[].'"[14] Less than 24 hours later, on April 16, 2025, the President again took aim at Harvard in a Truth Social post, criticizing the University for its hiring decisions, asserting that Harvard has "hir[ed] almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE," and claiming that, as a result, "Harvard can no longer be considered even a decent place of learning."[15]

## C. DHS's Unprecedented and Retaliatory Demand and Harvard's Initial Document Production

That same day, on April 16, 2025, Secretary Noem sent Harvard a letter (the "Records

---

[12] Letter from William A. Burck & Robert K. Hur, Counsel for Harvard Univ., to Josh Gruenbaum, U.S. Gen. Servs. Admin., Sean R. Keveney, U.S. Dep't of Health & Hum. Servs., and Thomas E. Wheeler, U.S. Dep't of Educ., at 2 (Apr. 14, 2025) (Compl., Ex. 11).

[13] U.S. Dep't of Educ., Joint Task Force to Combat Anti-Semitism Statement Regarding Harvard University (Apr. 14, 2025) (Compl., Ex. 12).

[14] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 15, 2025, 10:09 AM) (Compl., Ex. 13).

[15] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 16, 2025, 7:05 AM) (Compl., Ex. 15).

Request") giving Harvard yet another unprecedented ultimatum: either produce eight categories of information on each of Harvard's thousands of F-1 visa students within 10 business days or forfeit Harvard's SEVP certification.[16] The Records Request, which was unlike any information request Harvard had ever received, was accompanied by a DHS press release (the "Press Release") describing it as a "scathing letter" sent because Harvard had allowed "anti-American, pro-Hamas ideology" to "poison[] its campus and classrooms."[17] The Press Release expressly linked the Records Request to the government's string of actions targeting Harvard, stating that the Records Request "follows President Donald J. Trump's decision to freeze $2.2 billion in federal funding to Harvard, proposing the revocation of its tax-exempt status over its radical ideology." *Id.*

Like the government's prior correspondence, the Records Request asserted that Harvard "has created a hostile learning environment" and "fail[ed] to condemn antisemitism." Compl., Ex. 16, at 1; *compare* Compl., Ex. 8, at 1 (asserting that "biased programs" at Harvard "fuel antisemitism"); Compl., Ex. 7, at 1 (similar). The Records Request held itself out as another means by which the Administration sought to carry out the President's "Executive Order 14188," which directed the government to use "all available and appropriate legal tools[] to … hold to account the perpetrators of unlawful anti-Semitic harassment and violence." Compl., Ex. 16, at 1; *compare* Compl., Ex. 7, at 1 (invoking the same Executive Order).

The Records Request then shifted gears, stating that DHS "regularly monitors SEVP-approved schools to determine their compliance with governing regulations, and to ensure the

---

[16] DHS, *Student and Exchange Visitor Program Student Records Request* (Apr. 16, 2025) (the "Records Request") (Compl., Ex. 16).

[17] Press Release, DHS, Secretary Noem Terminates $2.7 Million in DHS Grants; Orders Harvard to Prove Compliance with Foreign Student Requirements (Apr. 16, 2025) (the "Press Release") (Compl., Ex. 17).

accuracy of information in [SEVIS]." Compl., Ex. 16, at 1. Invoking SEVP's authority to request records under 8 C.F.R. § 214.3(g)(1), DHS asked Harvard to submit, by April 30, 2025, eight broad categories of information covering all of Harvard's thousands of F-1 visa students. Many of these requests, however, sought information that HIO is not required to maintain or report to DHS under Section 214.3(g)(1), which instead calls for the school to maintain records on, e.g., academic status and enrollment. The requests also used terms not referenced in Section 214.3(g)(1) or any other relevant regulation nor defined in the Records Request, such as "relevant information" about "known illegal activity," "known dangerous or violent activity," "known threats," "known deprivation of rights of other classmates or university personnel," and "obstruction of the school's learning environment." *Id.* at 1-2. DHS threatened serious consequences for noncompliance, warning that "[f]ailure to comply … will be treated as a voluntary withdrawal, per *8 CFR § 214.3(h)(3)(vii)*." *Id*. at 2. It concluded: "[I]n the event the school fails to respond to this request [by April 30, 2025], SEVP will automatically withdraw the school's certification. The withdrawal will not be subject to appeal." *Id*.

Despite the unprecedented nature of DHS's demands, Harvard worked diligently to collect responsive information within the scope of the governing regulation. As it did so, the government doubled down on its targeting of Harvard's speech and perceived viewpoint. On April 24, 2025, President Trump issued another Truth Social post calling Harvard a "Far Left Institution" that "accept[s] students from all over the World that want to rip our Country apart."[18] On April 30, 2025, during a colloquy with President Trump and Secretary of Education Linda McMahon at a

---

[18] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 24, 2025, 9:33 AM) (Compl., Ex. 18).

Cabinet meeting,[19] Secretary Noem stated that DHS had "pulled back [Harvard's] grants." *Id.* In response, the President agreed that DHS should revoke Harvard's grants, stating: "The students they have, the professors they have, the attitude they have, is not American." *Id.* Of Harvard's foreign students in particular, the President added: "[W]here are these people coming from?" *Id.*

Later on April 30, HIO produced information in response to the Records Request, and submitted along with its production a letter (the "First Production Letter").[20] The First Production Letter explained that Harvard had produced materials encompassed by DHS's requests that the University was required to maintain and report pursuant to 8 C.F.R. § 214.3(g)(1), the sole authority invoked in the Records Request. *Id.* Harvard also emphasized that it "does not seek to withdraw from SEVP," and "[a]ny withdrawal of Harvard's certification would be involuntary and would cause immediate harm and disruption to Harvard, its mission, and its thousands of international students." *Id.* (emphases omitted). To that end, the First Production Letter asked DHS to provide Harvard with notice and an opportunity to cure "any perceived deficiency in Harvard's response" before taking any adverse actions against Harvard. *Id.* at 2-3 (emphases omitted).

### D. Subsequent Developments, DHS's Second Information Request, and Harvard's Second Document Production

In the days following Harvard's April 30 document production, the University received no direct outreach from DHS. But the Administration continued to train its sights on Harvard. On May 2, 2025, the President posted on Truth Social: "We are going to be taking away Harvard's

---

[19] The White House, *President Trump Participates in a Cabinet Meeting, Apr. 30, 2025*, YouTube, at 1:21:50-1:23:33 (Apr. 30, 2025) ("Cabinet Meeting Tr."), available at https://www.youtube.com/watch?v=wn2XtufOAHc.

[20] Letter from Steve Bunnell, Counsel for Harvard Univ., to SEVP, *Re: Harvard University – BOS214F0016200* (April 30, 2025) (the "First Production Letter") (Compl., Ex. 19).

Tax Exempt Status. It's what they deserve!"[21] And on May 5, 2025, Secretary McMahon sent a letter to Harvard stating that the government would no longer award Harvard any federal grants, despite Harvard's decades-long status as among the largest recipients of federal research grants awarded pursuant to a competitive process based on merit.[22] This letter once again took aim at Harvard's hiring decisions, its classroom management, and its alleged "mismanagement" by the Administration's political opponents. *Id.* at 1-2. Echoing the President's remarks at the April 30 cabinet meeting, Secretary's McMahon's letter also criticized Harvard for "invit[ing] foreign students" who "show contempt for the United States of America[] to its campus," and asked "[w]here do many of these 'students' come from, who are they, how do they get into Harvard, or even into our country[?]" *Id.* at 1. Secretary McMahon reiterated these sentiments in a May 7, 2025 interview, stating about Harvard: "[A]re they vetting students who are coming in from outside of the country to make sure they're not activists? Are they vetting professors that they're hiring to make sure that they're not teaching ideologies…? …. They've taken a very hard line, so we took a hard line back."[23]

Also on May 7, 2025, Joseph Mazzara, DHS's Acting General Counsel, sent Harvard's counsel an email (the "Mazzara Email") stating that DHS had "concluded that [Harvard's initial document production] does not completely address the Secretary's request."[24] The Mazzara Email

---

[21]  President Donald J. Trump (@realDonaldTrump), Truth Social (May 2, 2025, 7:25 AM) (Compl., Ex. 20).

[22]  Letter from Linda E. McMahon, Sec. of Educ., to Dr. Alan Garber, Harvard Univ., at 2 (May 5, 2025) (the "McMahon Letter") (Compl., Ex. 21).

[23]  CNBC Television, *Education Secretary Linda McMahon to Harvard: Obey the law and you can be eligible for funding*, YouTube, at 1:04-31 (May 7, 2025) (the "McMahon Interview"), available at https://www.youtube.com/watch?v=bb6YJUHMqc4.

[24]  Email from Joseph Mazzara, DHS, to Steve Bunnell, Counsel for Harvard Univ. (May 7, 2025)

reiterated requests for four of the original eight categories of information—those relating to student visa holders' "known illegal activity," "known dangerous or violent activity," "known threats to other students or university personnel," and "known deprivation of rights of other classmates or university personnel"—and gave Harvard one week, until May 14, 2025, to respond. *Id.*

Because the Mazzara Email again sought information extending well beyond what Harvard is required to maintain or report under Section 214.3(g)(1), Harvard responded by seeking clarification as to the authority for the request.[25] On May 14, 2025, just hours before Harvard's deadline, Acting General Counsel Mazzara responded by stating that the government was requesting records pursuant to "all our authorities contained in 8 C.F.R. § 214." *Id.* The only provision in Chapter 214 that could be read to impose on Harvard an obligation to produce information to DHS of the type requested in the Mazzara Email is Section 214.3(g)(2)(ii)(E), which states that a school must turn over information "not covered by paragraph (g)(1)" in response to "other notification request[s] … made by DHS with respect to the current status of the student." 8 C.F.R. § 214.3(g)(2)(ii)(E). On the assumption that DHS was invoking that provision, Harvard produced additional responsive information by letter dated May 14, 2025 (the "Second Production Letter").[26] The Second Production Letter reiterated that Harvard was seeking to comply with DHS's request and did not wish to voluntarily withdraw its SEVP certification, and asked for notice and an opportunity to be heard before DHS took any adverse action stemming from perceived noncompliance. *Id.* at 2.

---

(the "Mazzara Email") (Compl., Ex. 22).

[25] Email Exchange between Joseph Mazzara, DHS, and Steve Bunnell, Counsel for Harvard Univ., at 1 (May 7 to May 14, 2025) (Compl., Ex. 23).

[26] Letter from Steve Bunnell, Counsel for Harvard Univ., to Joseph Mazzara, DHS, *Re: Harvard University – BOS214F0016200* (May 14, 2025) (the "Second Production Letter") (Compl., Ex. 24).

### E.  DHS's Revocation of Harvard's Certification

On May 22, 2025, and without further engaging with Harvard about its original and supplemental responses, DHS sent Harvard a letter entitled "Harvard's Student and Exchange Visitor Program Decertification" (the "Revocation Notice") stating that, "effective immediately, Harvard University's Student and Exchange Visitor Program certification **is revoked**."[27] The Revocation Notice summarily asserted that, as a result of Harvard's "refusal to comply with multiple requests to provide [DHS] pertinent information while perpetuating an unsafe campus environment that is hostile to Jewish students, promotes pro-Hamas sympathies, and employs racist 'diversity, equity, and inclusion' policies, [Harvard] ha[s] lost this privilege." *Id.*

The Revocation Notice acknowledged the profound consequences of decertification, including that "existing aliens on F- or J- nonimmigrant status must transfer to another university in order to maintain their nonimmigrant status." *Id.* And despite claiming the revocation to be "the unfortunate result of Harvard's failure to comply with simple reporting requirements," *id.*, the Revocation Notice did not identify any specific "reporting requirements" with which Harvard had failed to comply, and did not cite any of the regulatory provisions governing an SEVP-certified school's reporting requirements, *id.* It instead claimed that Harvard had not provided "information regarding misconduct and other offenses that would render foreign students inadmissible or removable." *Id.* But, as explained above, the regulations governing schools' eligibility for SEVP certification do not require Harvard to maintain records on such information or report it to DHS.

The Revocation Notice stated that DHS had revoked Harvard's certification "to send a clear signal to Harvard and all universities that want to enjoy the privilege of enrolling foreign

---

[27] Letter from Kristi Noem, U.S. Dep't of Homeland Sec., to Maureen Martin, Harvard Univ., *Harvard's Student and Exchange Visitor Program Decertification* (May 22, 2025) (the "Revocation Notice") (Compl., Ex. 25) (emphasis in original).

students, that the Trump Administration will enforce the law and root out the evils of anti-Americanism and antisemitism in society and campuses." *Id.*

The Revocation Notice offered Harvard no opportunity to defend itself against the revocation of its certification, including to present evidence or be heard on its argument that it has complied with the law. *See* 8 C.F.R. § 214.4(b)-(f). Nor did the Revocation Notice offer Harvard any opportunity to cure the supposed noncompliance prior to revocation of its certification. *See* 5 U.S.C. § 558(c). And it provided Harvard no avenue for seeking administrative review of the revocation of its certification. *See* 8 C.F.R. § 214.4(h).

Having summarily revoked Harvard's SEVP certification, the Revocation Notice went on to state that "[i]f Harvard would like the opportunity of regaining [SEVP] certification before the upcoming academic school year," it must provide "**within 72 hours**" a host of information about international students that sweeps well beyond what DHS is entitled to under the regulations—and well beyond what DHS demanded from Harvard in its Records Request. For example, DHS now wants "audio or video footage" of nonimmigrant illegal activity, on or off campus, all disciplinary records, and "audio or video footage ... of any protest activity involving a nonimmigrant student on a Harvard University campus in the last five years." *Id.*

Shortly after she sent Harvard the Revocation Notice, Secretary Noem posted an image of the Revocation Notice on X, along with a message stating that "[t]his Administration is holding Harvard accountable for fostering violence, antisemitism, and coordinating with the Chinese Communist Party on its campus."[28]

DHS also issued a press release (the "Revocation Press Release") proclaiming: "Harvard

---

[28]  Secretary Kristi Noem (@Sec_Noem), X (May 22, 2025, 2:01 PM ET) (the "Noem Post") (Compl., Ex. 26).

University Loses Student and Exchange Visitor Program Certification for Pro-Terrorist Conduct."[29] The Revocation Press Release began by asserting that "Harvard's leadership has created an unsafe campus environment by permitting anti-American, pro-terrorist agitators to harass and physically assault individuals, including many Jewish students, and otherwise obstruct its once-venerable learning environment. Many of these agitators are foreign students." *Id.* at 1. The Revocation Press Release then quoted the Noem Post in its entirety, adding boldfaced emphasis to the Noem Post's reference to "the **Chinese Communist Party**." *Id.* It then went on to list a number of asserted "[f]acts about Harvard's toxic campus climate," including allegations of "pervasive race discrimination and anti-Semitic harassment plaguing [Harvard's] campus"—as well as to expressly note that the revocation of SEVP certification "comes after DHS terminated $2.7 million in DHS grants for Harvard last month." *Id.*

### F.  The Immediate and Irreparable Harm Inflicted by This Lawless Action

The government's unlawful revocation of Harvard's SEVP certification, if not immediately enjoined, will lead to a cascade of irreparable harms. It purports to strip legal status from all of Harvard's international students overnight. Each of Harvard's more than 5,000 students studying on F-1 visas, as well as their more than 300 dependents lawfully present in the United States on F-2 visas, will be required either to depart the country or—as DHS expressly told Harvard in the Revocation Notice—transfer to a peer or other institution (for the select few who might be able to secure such a transfer now, when the semester is nearly complete). *See* Martin Decl. ¶¶ 5, 38, 40-41; 8 C.F.R. §§ 214.4(*i*)(2), 214.2(f)(5)(iv). The same is true for F-1 visa holders who have graduated and are participating in OPT or STEM OPT. *See* Martin Decl. ¶ 6. In total, Harvard will

---

[29] Press Release, U.S. Dep't of Homeland Sec., *Harvard University Loses Student and Exchange Visitor Program Certification for Pro-Terrorist Conduct* (May 22, 2025) (the "Revocation Press Release") (Compl., Ex. 27).

lose 26% of its current student body all at once. *See* Martin Decl. ¶ 5.

Without SEVP certification, newly admitted international students will not be able to obtain the F-1 visa stamps needed to enter the country to study at Harvard, including for the upcoming fall semester. *See* Dep't of State, 9 *Foreign Affairs Manual* 402.5-5(D)(1)(a). Harvard also will not be able to host students for the upcoming summer term. This constraint will destroy Harvard's ability to welcome any new international students, including those who have already accepted offers to enroll and are planning their lives accordingly. With summer programs set to begin in June and the admissions cycle for the fall semester complete, Harvard would be forced to dramatically shrink or reconfigure its carefully crafted incoming classes in a matter of weeks. Martin Decl. ¶¶ 39, 44-46.

The immediate consequences are severe. An institution is made up of its members, and the selection of those members is an important component of academic freedom. International students enrich Harvard's learning environment and campus life, including by enriching the academic experiences of their American classmates. Elliot Decl. ¶ 17. They serve as teaching fellows for undergraduate students, and their loss will harm students and the institution alike. *Id.* ¶ 14. As research assistants and clinical trainees, they contribute to important ongoing scientific and medical research and innovation, some of which will grind to a standstill in their absence. *Id.* ¶ 15. Moreover, the decertification, if allowed to take effect, will deter future international faculty and students from applying to the University, even if Harvard is eventually restored to lawful status. *See id.* ¶ 29.

With the stroke of a pen—and without any legal justification—the government has sought to erase a quarter of Harvard's student body. Without those students, Harvard is not Harvard.

## LEGAL STANDARD

The burden of proof for a temporary restraining order is the same as that for a preliminary

injunction under Federal Rule of Civil Procedure 65. *178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47, 53 (D. Mass. 2016). The movant must establish the following requirements: "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Goldstein v. Batista Contracting LLC*, 671 F. Supp. 3d 68, 72 (D. Mass. 2023) (*quoting NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020)). When defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

## ARGUMENT

### I.    HARVARD HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

DHS's actions summarily revoking Harvard's SEVP certification are unlawful many times over. At the outset, there is no serious doubt what motivated the government's actions here. DHS's actions are entirely unprecedented. And the record is clear that DHS revoked Harvard's certification in direct retaliation against Harvard for refusing to cede control of its academic prerogatives to the government and because the government disagrees with Harvard's perceived viewpoints, all in violation of the First Amendment.

While in many cases, one might need discovery to unearth evidence of forbidden motivation, here numerous officials up to and including the President laid their retaliatory motive bare. When purported regulatory inquiries are self-described as "scathing" and directly linked to presidential pronouncements attacking Harvard's perceived viewpoint, success on the merits of a First Amendment retaliation claim is not just likely, but certain.

Defendants also violated the APA and the governing regulations at every turn, which both underscores the improper motivation for all these unprecedented regulatory departures and provides an independent basis for finding the government's action unlawful. Defendants have

revoked Harvard's SEVP certification without even attempting to provide the robust procedural protections owed to Harvard under the governing regulations, the APA itself, and the Fifth Amendment's Due Process Clause. Circumventing those procedures was necessary, moreover, only because the agency had no legitimate substantive basis for revoking Harvard's SEVP certification: its proffered justification for withdrawing Harvard's certification was not a "valid and substantive reason" within the meaning of the regulations. And beyond these statutory and constitutional violations, DHS's action exemplifies arbitrary and capricious agency action, because the penalty DHS imposed on Harvard was unprecedented, unreasoned, and failed to account for the important reliance interests of Harvard and thousands of devastated students.

### A. DHS's Revocation of Harvard's SEVP Certification Was Unlawful.

Courts must hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; that is taken "without observance of procedure required by law"; or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B), (D). Each prohibition applies here.

### 1. The Revocation Violated the First Amendment (Counts I, II, III, IV, and IX).

The record is clear that DHS's actions have nothing to do with any legitimate regulatory inquiry and everything to do with a desire to retaliate against Harvard for its perceived viewpoint and its insistence on maintaining its commitment to academic freedom. "[T]he First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion … to achieve the suppression of disfavored speech," especially when the government targets a perceived viewpoint. *Vullo*, 602 U.S. at 189 (ellipsis in original) (quotation marks omitted). That is all the more true where "academic freedom"—"a special concern of the First Amendment," *Keyishian*, 385 U.S. at 603—is at stake. As part of a campaign of escalating

sanctions against Harvard for exercising its right to academic freedom,[30] DHS has withdrawn Harvard's SEVP certification. That action violates the First Amendment several times over.

### a. Defendants Unlawfully Retaliated Against Harvard for Its Refusal to Cede Control Over Its Academic Decisionmaking (Counts I and IV).

By withdrawing Harvard's certification, DHS has unlawfully retaliated against Harvard for its refusal to allow the federal government to control its academic decisionmaking.

"Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also … on autonomous decisionmaking by the academy itself." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (citations omitted). Universities have a right to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (quotation marks omitted). This right to "academic freedom," *Keyishian*, 385 U.S. at 603, protects "not only students and teachers, but their host institutions as well," *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007) (quotation marks omitted).

The government's April 11 Demand Letter sought to impose the government's preferences over how Harvard operates, the viewpoints of those it admits and hires, and what it teaches. The government's message was simple and unmistakable: Harvard must speak as the government wishes it to or suffer the consequences. On April 14, Harvard made clear through the Garber Letter that it would not accede to government control of its teaching, community, and governance. *See* Compl., Ex. 10. Immediately, and in retaliation for Harvard's refusal to compromise its "autonomous decisionmaking," *Ewing*, 474 U.S. at 226 n.12, the government responded, revoking

---

[30] In addition to the funding freeze being challenged in the Funding Case, the government's campaign of escalating sanctions has included numerous federal investigations launched in the immediate aftermath of April 14. *See* Compl. ¶¶ 113, 114, 117.

billions of dollars in funding, threatening to revoke Harvard's 501(c)(3) status, and initiating the process culminating in decertification, while condemning in the Press Release accompanying the Records Request the supposed "radical" and "Anti-American" ideology that the government believed was "poisoning [Harvard's] campus and classrooms," Compl., Ex. 17, and subsequently highlighting the "hard line" it was taking in response to Harvard's assertion of academic freedom. *See* McMahon Interview, *supra* n. 23. The Revocation Notice—which openly characterizes the revocation as part of Administration's mission to "root out the evils of anti-Americanism" at Harvard—is simply one more step in the Administration's campaign to coerce Harvard into surrendering its First Amendment rights.

Each of the elements for a First Amendment retaliation claim is satisfied here: (1) Harvard engaged in constitutionally protected conduct; (2) it was immediately subjected to a series of adverse actions by the government, including the revocation at issue; and (3) its protected conduct was a substantial or motivating factor in that adverse action. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012); *see Hartman v. Moore*, 547 U.S. 250, 260-61 (2006).

*First*, Harvard's "constitutionally protected conduct" includes its right to engage in "autonomous decisionmaking," *Ewing*, 474 U.S. at 226 n.12, with respect to the "manage[ment]" of its "academic community," *Blasdel*, 687 F.3d at 816 (quotation marks omitted). Harvard enjoys the "constitutional right to determine for [itself], as [an] educational institution[], what to teach and how to teach it." *Garcia-Padilla*, 490 F.3d at 8. The First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom," *Keyishian*, 385 U.S. at 603, and "nowhere" are these First Amendment freedoms "more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). The Demand Letter sought to interfere with these freedoms—to oversee faculty hiring (who may teach); mandate the government's preferred

balance of "viewpoint diversity" in each "department, field, or teaching unit" (what is taught and how); and require admission of a "critical mass of students who will provide viewpoint diversity" (who is admitted). Compl., Ex. 9, at 2-3. It is Harvard's prerogative, not the government's, "to determine for itself on academic grounds" each of these quintessential university functions. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 47 (2d Cir. 2000) (quotation marks omitted).

*Second*, Defendants' revocation of Harvard's certification was adverse action because it precludes Harvard from continuing its robust F-1 and J-1 visa program, damages Harvard's reputation as a leading global research institution, and undermines years of careful planning and resource allocation with respect to its F-1 and J-1 program.

*Third*, Harvard's assertion of academic freedom was a "substantial or motivating factor" in the revocation. Both the Records Request and the Revocation Notice confirm the Administration's retaliatory motive. In the Press Release accompanying the Records Request, DHS explained that Secretary Noem had "wr[itten] a scathing letter" to Harvard "demanding detailed records on Harvard's foreign student visa holders' illegal and violent activities," because of Harvard's purported tolerance for "anti-American, pro-Hamas ideology poisoning its campus and classrooms." Compl., Ex. 17. These statements demonstrate the government's express retaliatory purpose in revoking Harvard's SEVP certification.

The surrounding circumstances confirm that DHS revoked Harvard's SEVP certification to punish the University for refusing to surrender its independence. Hours after Harvard publicly refused to comply with the Demand Letter, the Federal Task Force froze more than two billion dollars in federal research funds—previously awarded via neutral and rigorous processes—and the President called for Harvard to lose its tax-exempt status, citing Harvard's alleged "political" and "ideological" positions (despite a criminal statute, 26 U.S.C. § 7217, expressly barring the

President from asking the IRS to audit or investigate particular taxpayers). The Records Request followed just behind, with the accompanying Press Release that expressly described the request as "scathing" and linked the issuance of the Records Request to those two earlier actions. *See* Compl., Ex. 17 (stating that the Records Request "follows" the freezing of Harvard's grants and the threatened revocation of its tax-exempt status). From there, decertification was an inevitability. And when decertification occurred, the government again cited the same set of retaliatory justifications—Harvard's alleged "environment that is hostile to Jewish students" and its "'diversity, equity, and inclusion' policies." Given the close temporal proximity to Harvard's protected activity, those adverse actions are smoking guns of retaliatory intent. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).

The Revocation Notice leaves no doubt as to DHS's retaliatory motive. The Revocation Notice announces that Harvard's campus is "hostile to Jewish students, promotes pro-Hamas sympathies, and employs 'diversity equity, and inclusion policies,'" and declares that "the Trump Administration will enforce the law and root out the evils of anti-Americanism and antisemitism in society and campuses." Although it contains vague references to regulatory violations, those references are plainly pretextual: DHS says Harvard has "fail[e]d to comply with simple reporting requirements" and provided an "insufficient response" to DHS's record requests, while providing *zero* explanation of what "simple reporting requirements" Harvard has failed to follow and *no* explanation of why DHS's response was "insufficient." This unprecedented and irregular Revocation Notice—particularly viewed in light of the context of the equally unprecedented and irregular Records Request—is part of the Administration's pressure campaign to force Harvard to capitulate to the Administration's unconstitutional demands.

**b. Defendants Engaged in Impermissible Viewpoint Discrimination (Counts II and IV).**

DHS's retaliatory revocation of Harvard's SEVP certification was also unlawful viewpoint discrimination. The First Amendment prohibits the regulation or censure of speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (quotation marks omitted); *see Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys."). Government action that draws "distinctions … based on the message a speaker conveys" is unlawful unless it "survive[s] strict scrutiny," meaning that it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 163-64, 171 (quotation marks omitted). Strict scrutiny in the First Amendment context is so difficult for the government to satisfy that it is "all but dispositive." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

The government's revocation constitutes viewpoint discrimination twice over.

*First*, the government's actions involve viewpoint discrimination in a literal sense. The Demand Letter purports to require Harvard to submit to a "department-by-department" viewpoint "audit," asserting that "[e]very department … found to lack viewpoint diversity must be reformed by hiring a critical mass of new faculty … who will provide viewpoint diversity." Compl., Ex. 9, at 2-3. To perform that inquiry, the government must necessarily examine the viewpoint of each Harvard professor, student, and employee to determine whether the overall mix of "viewpoints" meets with the government's approval. The inevitable effect of the government's "audit" is that Harvard would be penalized *unless* a sufficient number of professors flipped their viewpoints to those the government supported. That is quintessential viewpoint discrimination. Harvard cannot constitutionally be punished for declining to subject itself to such a regime—yet the Revocation Notice does precisely that.

*Second*, and relatedly, the obvious reality is that the government has "singled out" Harvard "for disfavor based on the views expressed" by the University—like those in the April 14 Garber Letter—and for its perceived viewpoints more generally. *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part and concurring in the judgment). The Demand Letter makes plain the government's position that Harvard's "student body, faculty, staff, and leadership" currently lack the requisite "viewpoint diversity." Compl., Ex. 9, at 2. The Revocation Notice similarly assails Harvard for "anti-Americanism"—an open declaration that the Administration is punishing Harvard because it perceives that members of Harvard's community have the wrong ideas. Likewise, in the Press Release, Secretary Noem expressly explained her actions as targeting Harvard's "anti-American" "ideology" and "propaganda," and expressly linked the DHS actions to the President's own repeated attacks on what he perceives to be Harvard's viewpoints—the same claims repeated in the DHS's May 22, 2025 Press Release issued immediately after the SEVP revocation. Compl., Exs. 17, 27.

Given these "'blatant' and 'egregious'" examples of viewpoint discrimination, *Reed*, 576 U.S. at 168 (citation omitted), it is impossible to view the government's actions against Harvard as anything other than "discriminat[ion] against [Harvard's] speech based on the ideas or opinions it conveys." *Iancu*, 588 U.S. at 393.

Indeed, the government's actions to "single[] out" Harvard, *Matal*, 582 U.S. at 248 (Kennedy, J., concurring in part and concurring in the judgment), are so extreme that they "possess almost every quality of [a] bill[] of attainder, the use of which [has been] from the beginning forbidden to both national and state governments." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring). For more than a month, the government has waged an all-out, multi-front attack on Harvard for reasons that are plain: the President believes

Harvard's "students," "professors," and "attitude … [are] not American." Cabinet Meeting Tr. 1:21:50-1:23:33. These actions are nothing more than an "officially prepared and proclaimed governmental blacklist[]" with a single member—Harvard. *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 143 (Black., J., concurring). It cannot be "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Id.* at 144.

### c.  Defendants Imposed an Unconstitutional Condition (Counts III and IV).

The revocation of Harvard's SEVP certification also violates the First Amendment by conditioning government benefits—that is, the certification needed to host F-1 and J-1 visa students—on Harvard's agreement to the government's viewpoint-based demands. The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected" rights, *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (quoting *United States v. Am. Libr. Ass'n*, 539 U.S. 194, 210 (2003)), and that remains true even if, as Defendant Noem asserted, SEVP certification is a "privilege," Revocation Notice 1; *see, e.g.*, *Rumsfeld*, 547 U.S. at 59 (prohibition on unconstitutional conditions applies even if the plaintiff "has no entitlement to th[e] benefit" (quotation marks omitted)).

### 2.  The Revocation Also Violated the APA and the Fifth Amendment (Counts V, VI, VII, VIII, IX, and X).

Defendants pursued their unlawful retaliatory motive unyieldingly, with the result that the revocation of Harvard's SEVP certification violated the APA at every turn. At the outset, the revocation reflects a complete disregard for required procedures—under DHS's own regulations, the APA, and the Fifth Amendment's Due Process Clause. The regulations require a legitimate reason for withdrawing Harvard's certification; there is none. The regulations require notice and an opportunity to cure; none was provided. The regulations allow only the Department of State to

decertify a J-1 sponsor; yet DHS purports to exercise that authority. DHS has imposed a drastic, essentially unprecedented penalty on Harvard—one representing a stark break from past practice and implicating enormous reliance interests—and has utterly failed to justify its decision to do so (because there is no justification).

> **a.  The Revocation Deprived Harvard of Required Process (Counts V, VI, VII, and VIII).**

Applicable DHS regulations, the APA, and the Due Process Clause each impose procedural limitations on the agency's authority to withdraw a school's SEVP certification. State Department regulations impose further procedural limitations on revocation of a school's authority to sponsor J-1 students. By summarily revoking Harvard's certification and purporting to extend that revocation to eliminate both the F-1 and J-1 visa programs at Harvard, DHS violated each of these procedural safeguards.

It is black-letter law that "revocation of [a] plaintiff's [government] license constitute[s] deprivation of a property interest sufficient to animate due process protections," *Amsden v. Moran*, 904 F.2d 748, 752 (1st Cir. 1990), meaning that revoking a government license "require[s] notice and [a] hearing," *Medina v. Rudman*, 545 F.2d 244, 250 (1st Cir. 1976). That is so even where "the [initial] decision to grant a [federal] approval [is] highly discretionary"; "once [such an approval is] granted, the approval[] … [is] a protected property interest." *Atlantic Richfield Co. v. United States*, 774 F.2d 1193, 1202 n.39 (D.C. Cir. 1985) (citation omitted). The APA builds upon that constitutional requirement by enumerating, in 5 U.S.C. § 558, a set of mandatory procedures the government must follow before revoking a license. Section 558 applies in "all situations in which federal approval is required to undertake some act." *Horn Farms, Inc. v. Johanns*, 397 F.3d 472, 478 (7th Cir. 2005). And it requires the government, before "the institution of agency proceedings" to revoke a license, to provide the licensee with (1) "notice … in writing of the facts or conduct

which may warrant the action" and (2) "opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c)(1)-(2).

As the D.C. Circuit has held, SEVP certification, once granted, is a government license the "withdrawal of [which]" is permitted "only in accordance with procedural due process" and the requirements of Section 558. *Blackwell*, 454 F.2d at 933, 936. That conclusion is self-evident. SEVP certification is "federal approval … to undertake [the] act" of hosting F-1 visa students, *Horn Farms*, 397 F.3d at 478; *see* 8 U.S.C. § 1101(a)(15)(F)(i) (schools must be "approved by the Attorney General"), and, once granted, SEVP certification "is revocable (or nonrenewable) only for cause," *Club Misty, Inc. v. Laski*, 208 F.3d 615, 619 (7th Cir. 2000); *see* 8 C.F.R. § 214.4(a)(2) (withdrawal of certification permitted only for a "valid and substantive reason[]").

Recognizing the constitutional and statutory obligations it owes to SEVP-certified schools, DHS has issued a detailed set of regulations governing the process for "withdrawal-on-notice" of a school's certification. 8 C.F.R. § 214.4(b). Those regulations state that DHS may withdraw a school's certification out-of-cycle only by first providing the school a NOIW stating "[t]he grounds for withdrawing SEVP certification." *Id.* § 214.4(b)(1). The NOIW must contain sufficiently concrete "allegations" regarding the bases for withdrawal to permit the school to "admit[]" or "den[y]" them. *Id.* § 214.4(d)-(e). After receipt of a NOIW, the school must be given 30 days "to submit sworn statements, and documentary or other evidence, to rebut the grounds for withdrawal of certification in the NOIW," *id.* § 214.4(b)(2); must have an opportunity to request "a telephonic interview in support of its response to the NOIW," *id.* § 214.4(b)(3); and must receive notice "that it may be assisted or represented by counsel of its choice … in preparation of its answer or in connection with the interview." *Id.* § 214.4(c). If, after considering all the evidence, DHS wishes to proceed with withdrawing the school's certification, it must issue a written decision

"explain[ing] in writing the specific reasons for [that decision]," *id.* § 103.3(a)(1)(i); *see id.* § 214.4(g); and must offer the school the option to take an administrative appeal, *see id.* § 214.4(h).

DHS's actions in this case openly flouted the procedures required by the governing regulations, the APA, and the Due Process Clause.

At the outset, DHS violated the procedures set out in its own regulations. DHS never issued a NOIW, *see* 8 C.F.R. § 214.4(b)(1), or any other document articulating any "grounds for withdrawing SEVP certification," *id.* § 214.4(b)(1), with sufficient specificity to permit Harvard to admit or deny the "allegations," *id.* § 214.4(d)-(e). Having failed to do so, DHS also denied Harvard the required opportunity to marshal evidence in its defense, *see id.* § 214.4(b)(2); and to request a "telephonic interview in support of its response to the NOIW," *id.* § 214.4(b)(3). Nor, of course, did DHS issue a written decision, *see id.* § 214.4(g), or permit Harvard to appeal that decision, *see id.* § 214.4(h). "It is axiomatic[] … that an agency is bound by its own regulations." *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quotation marks and citation omitted). DHS's outright disregard for its own regulations requires that the revocation be set aside.

The story is similar, but even more excessive, for the J-1 visa program. The Department of State can revoke a designation to sponsor J-1 students, but only under limited circumstances. 22 C.F.R. § 62.50(d) (requiring a "finding of any act or omission set forth in [22 C.F.R. § 62.50(a)]"). The regulations require that the Department of State provide notice of intent to revoke. *Id.* § 62.50(d)(1). The regulations require that the Department of State advise the school of the right to contest the revocation and the applicable procedures. *Id.* DHS did none of these things—and indeed, DHS *has no authority to do any of these things*, all of which instead fall within the purview of the Department of State. But the Department of State did not make a finding of a qualifying act

or omission, it did not provide notice, and it did not advise Harvard of its rights, and DHS certainly did none of these things either. Neither can therefore revoke Harvard's designation.

DHS's failure to abide by the regulations that govern its exercise of authority over the F-1 program—and its drastic overreach, in the context of the J visa program—also violated Section 558 of the APA. At a minimum, Section 558 requires DHS to "institut[e] … agency proceedings" before revoking certification, 5 U.S.C. § 558(c), and here, DHS has sidestepped the proceedings its own regulations require. Section 558 also requires DHS, "*before* the institution of [such] proceedings," to give schools an "opportunity to demonstrate or achieve compliance with all *lawful* requirements" of licensure. *Id.* § 558(c)(2) (emphases added). The "lawful requirements" of continued SEVP certification, *id.*, are the Initial Certification and Compliance Criteria set out in the regulations, *see* pp. 5-6, *infra*. Here, DHS has not even identified any "lawful requirements" with which Harvard has failed to comply, let alone given Harvard the required chance to "demonstrate or achieve compliance with" any such requirements. 5 U.S.C. § 558(c)(2). Because DHS's revocation of Harvard's SEVP certification failed to comply with Section 558, the revocation must be set aside. *See Blackwell*, 454 F.2d at 933-35 (holding that withdrawal of school's SEVP certification did not comply with Section 558); *Anchustegui v. Dep't of Agric.*, 257 F.3d 1124, 1129 (9th Cir. 2001) (finding APA violation where permit was cancelled without following Section 558's procedures).

Finally, and for two separate reasons, DHS's revocation also violated Harvard's right to procedural due process. *First*, for the reasons just explained, Harvard was not given "the opportunity to be heard at a meaningful time and in a meaningful manner" before being "finally deprived of a property interest"—"[t]he fundamental requirement of due process." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation marks omitted). The D.C. Circuit's decision in

*Blackwell* is instructive here. In *Blackwell*, the government withdrew a school's certification to host F-1 visa students because of "several claimed failures to comply with the reporting requirements of the regulations," and the withdrawal proceedings it employed largely aligned with the ones prescribed by Section 214.4(b) today. 454 F.2d at 930-31. But the court in *Blackwell* held that, even so, "[t]he formless—and essentially *ex parte*—character of the proceedings" fell "short of meeting the requirements of due process of law in the context of the nature of the interests of the parties involved." *Id.* at 934-35. If the decertification in *Blackwell* was unlawful because the procedures employed "were formless and uncharted," *id.* at 935, the due process violation here—involving no procedures whatsoever—was even more obvious. The process DHS employed here was neither "fair[]" nor "reliab[le]," creating not merely a "risk" but a certainty "of an erroneous deprivation" of property. *Mathews*, 424 U.S. at 335, 343. The Due Process Clause does not tolerate such disregard for required process.

*Second*, DHS also violated the Due Process Clause by failing to provide Harvard "fair notice of conduct that is forbidden or required" before depriving it of its property interest in SEVP certification. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). The Records Request sought an expansive array of documents that no prior DHS has ever required schools to retain and report, using terms not found in any pertinent statute or regulation and wholly untethered from the University's recordkeeping and reporting duties under 8 C.F.R. § 214.3(g) or any other relevant regulation. What is more, these novel categories of requested documents were hopelessly vague. DHS has never defined what it considers to be "dangerous" conduct, "obstruction of the school's learning environment," or "deprivation of rights," Compl., Ex. 16, at 1-2, and the meaning of these terms is in the eye of the beholder. Taken together, the breadth and ambiguity of these demands—together with their

unprecedented nature—left "grave uncertainty," *Johnson v. United States*, 576 U.S. 591, 597 (2015), about what information was being requested and how to satisfy that standard, such that the Records Request and the Mazzara Email both "fail[ed] to provide a person of ordinary intelligence fair notice of what [was required]" and were "so standardless that [they] authorize[d] or encourage[d] seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The government cannot, consistent with the Fifth Amendment, condition the deprivation of property on these sorts of vague, heads-we-win, tails-you-lose requirements.[31]

It is no answer that Harvard purportedly did not comply with the Records Request. To begin, the Revocation Notice offers no explanation of *how* Harvard did not comply. It states that the revocation is "the unfortunate result of Harvard's failure to comply with simple reporting requirements"—but says literally nothing about *which* reporting requirements or *how* Harvard did not comply. It also says that Harvard's response to the Records Request was "insufficient"—but offers no explanation as to why or how.

Even if the Revocation Notice supplied more detail as to why the Administration believes that Harvard's response was "insufficient," it would still be constitutionally infirm. DHS cannot circumvent its own regulations by serving onerous, vague demands untethered to any regulatory record-keeping requirement, unilaterally deciding that Harvard's responses were inadequate, and then declaring that Harvard's certification is revoked.

DHS's position is especially capricious because the Records Request sought information that DHS regulations do not even require HIO to retain or produce. *Compare* 8 C.F.R. § 214.3(g)(1) (defining the "information and documents that the school must keep on each student"

---

[31] The information requests set forth in the Revocation Notice as preconditions for "the opportunity of regaining … certification" are similarly standardless.

to include name, address, data of birth, country of citizenship, identification number, record of coursework, academic status, and termination date and reason), *with* Records Request 2-3 (seeking, *e.g.*, data on "deprivation of rights" and "obstruction of the school's learning environment"). The difference between the information HIO is tasked with compiling under long-established regulations and what the Harvard-specific Records Request demanded is fundamental. The former allows HIO to assemble compliance information while maintaining a supportive and non-adversarial relationship with its international students. The latter creates an adversarial surveillance dynamic and converts HIO (retroactively and without notice) into an arm of law enforcement, punishing Harvard for not producing information it was never required to collect in the first place. And, beyond all that, DHS deemed Harvard's purportedly "insufficient" response to its request to be grounds for summary revocation, wholly outside of the careful review process specified in the regulations. This is the epitome of arbitrary action the APA forecloses.

If DHS genuinely believed Harvard had not complied with its request, it should have done what its own regulations require it to do: "institute withdrawal proceedings in accordance with [8 C.F.R. § 214.4(b)]." *Id.* § 214.3(h)(3)(vi). But DHS did not "institute withdrawal proceedings" of any type, and it did not withdraw Harvard's certification "in accordance with [8 C.F.R. § 214.4(b)]." *Id.* Accordingly, DHS has "disregard[ed]" its own regulations and denied Harvard the ability to avail itself of the extensive set of procedural protections "that are still on the books," *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009), and its actions are plainly unlawful.

### b.  The Revocation Was Not Done for a Permissible Reason (Count IX).

DHS's decision to sidestep its own regulations and deny Harvard any semblance of due process comes as no surprise, because such process would have revealed the substantive failure at the heart of DHS's actions. Section 214.4(a)(2) allows DHS to withdraw a school's certification

*only* for a "valid and substantive reason." In context, the phrase "valid and substantive reason" refers to a reason rooted in a violation of preexisting eligibility and compliance requirements. Because Harvard complied with all preexisting eligibility and compliance requirements, there was no "valid and substantive" reason to withdraw Harvard's certification. The revocation must be set aside for this reason, too.

As discussed, DHS may revoke a school's certification through out-of-cycle review only by first serving a NOIW. *See* 8 C.F.R. § 214.4(b). But the regulations permit DHS to issue NOIWs only under specified circumstances—namely, if DHS obtains "information that [the] school … may no longer be entitled to SEVP certification," *id.*, meaning the school has either (1) "failed to sustain eligibility" as specified in Section 214.3(a)(3)(i) or (2) "failed to comply with the recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section." *Id.* § 214.3(e)(4)(ii). Here, Harvard has satisfied each of these requirements, and the government could not have issued a legitimate NOIW in this case. Although the Revocation Notice adverts vaguely to "Harvard's failure to comply with simple reporting requirements," it identifies no particular "reporting requirements" that Harvard violated, and none exist.

Section 214.3(e)(4)(ii) works in harmony with Section 214.2(a)(2), which says that certification may be revoked when a school is "no longer … entitled to certification for any valid and substantive reason including, but not limited to," a set of enumerated reasons, all of which pertain to violations of eligibility and compliance requirements. *Id.* For example, if the university materially failed to comply with the applicable regulations, it could qualify. But the regulations do not permit DHS to revoke for *any* reason—an important constraint on DHS's authority. A reason for revocation is "valid and substantive" if it is based on a violation of preexisting eligibility and

compliance requirements, *i.e.*, those specified in Section 214.3(e)(4)(ii); *see also* 8 U.S.C. § 1762(a), (c) (school certifications should be revoked only based upon "[m]aterial failure … to comply with the recordkeeping and reporting requirements to receive nonimmigrant students").

Confirming this straightforward interpretation, Section 214.4(a)(2)'s examples of "valid and substantive reason[s]" share one thing in common: all are ways in which a school might fail to operate its F-1 visa program in compliance with the governing regulations. For example, under Section 214.4(a)(2), a school can be decertified if it fails to comply with requests within the scope of Section 214.3(g), *see* 8 C.F.R. § 214.4(a)(2)(i), fails to abide by the advertising requirements of Section 214.3(j), *see id.* § 214.4(a)(2)(xiv), appoints an unqualified individual as a DSO, *see id.* § 214.4(a)(2)(vii), or no longer satisfies the Initial Certification Criteria, *see id.* § 214.4(a)(2)(xii)-(xiii), (xv)-(xvii). The phrase "valid and substantive"—a "'general or collective term'"—is "'given more precise content by the[se] neighboring words with which it is associated,'" particularly when those neighboring words are specific examples. *Fischer v. United States*, 603 U.S. 480, 487 (2024) (citation omitted).

DHS's stated grounds for revoking Harvard's certification were impermissible. DHS did not identify any pre-existing eligibility or compliance requirement that Harvard violated. Instead, DHS revoked Harvard's certification based on its purported concern that Harvard "perpetuat[ed] an unsafe campus environment that is hostile to Jewish students, promotes pro-Hamas sympathies, and employs racist 'diversity, equity, and inclusion' policies." It should go without saying that these sweeping assertions have nothing to do with the eligibility and compliance requirements in DHS's regulations. DHS also cited Harvard's purportedly "insufficient" response to a request for information that Harvard was not required to maintain—let alone to turn over to DHS upon request. Interpreting Section 214.4(a)(2) to permit withdrawal of a school's certification for failure to

comply with such a request for information, the collection and maintenance of which the regulations do not require as a condition of a school's participation in the F-1 visa program, gives the provision "a meaning so broad that it is inconsistent with the company it keeps." *Fischer*, 603 U.S. at 487 (quotation marks omitted).

Because DHS has no authority even to issue a NOIW in these circumstances, revocation itself is off the table. Instead, DHS seeks to skirt *both* limitations on its authority: because Harvard did not violate any regulations, DHS has illegally revoked Harvard's certification while also illegally failing to provide a NOIW, a mandatory prerequisite to withdrawal.

### c.  The Revocation Was Arbitrary and Capricious (Count X).

Constitutional, statutory, and regulatory violations aside, DHS's revocation of Harvard's certification is also a classic case of arbitrary and capricious agency action. *See* 5 U.S.C. § 706(2)(A). The penalty DHS has imposed on Harvard—summary revocation, after more than 70 uninterrupted years of biennial certification, of Harvard's authorization to welcome international students to its campus—is unprecedented, unreasoned, plainly disproportionate to any perceived non-compliance, and untethered to any facts found, and it fails to acknowledge, much less consider, Harvard's weighty reliance interests in the maintenance of its F-1 visa program.

Under the APA, "[a]n agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 48 (1983) ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."). This standard requires that the agency set forth a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (quotation marks omitted), and consider all "important aspect[s] of the problem" in setting forth that explanation, *DHS v. Regents of the*

*Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43). Moreover, when an agency "changes course[] … [,] it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (quotation marks omitted). And courts are limited to judging the agency's rationale based only on "the grounds that the agency invoked when it took the action,'" *id.* at 20 (citing *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), which must be sufficient to enable a court to conclude that it "was the product of reasoned decisionmaking," *State Farm*, 463 U.S. at 52.

At the outset, while the Revocation Notice constitutes a massive change in the agency's views about when denial of certification is permitted. DHS has utterly failed to "acknowledge," let alone "offer a reasoned explanation for," that change in position. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). Here, in line with the text of Sections 214.3 and 214.4, *see* pp. 6-8, *infra*, by all accounts it has been DHS's consistent policy for decades that a certification could be—and was—withdrawn only if the school ceased to satisfy the Initial Certification Criteria or failed to meet the Compliance Criteria. 8 C.F.R. § 214.3(a)(3)(ii), (e)(4)(ii); 8 C.F.R. § 214.4(a)(2); *see also* 8 U.S.C. § 1762(a), (c). Accordingly, to Harvard's knowledge, DHS has rarely decertified bona fide schools—only two instances appear in reported cases—and has done so only for serial violators of the regulations or for visa mills. *See Blackwell*, 454 F.2d at 930 (INS investigation revealed school violated regulations with respect to 77% of files examined); *Herguan*, 258 F. Supp. 3d at 1058-59 (school participated in visa fraud scheme). So far as we know, never before has a reputable academic institution had its certification withdrawn when seeking to meet its reporting obligations in good faith.

Indeed, on its face, the Records Request here appeared to acknowledge that past practice, stating that its purpose was to ensure that Harvard is "meeting the requirements … set out in *Title*

*8 Code of Federal Regulations (8 CFR)*." Records Request 1; *see also* Press Release ("[I]f Harvard cannot verify it is in full compliance with its reporting requirements, the university will lose the privilege of enrolling foreign students."). But the Revocation Notice identified no actual violations of the governing regulations. Instead, it assigns DHS's decision to decertify to Harvard's "refusal to comply with multiple requests to provide … pertinent information" Harvard had no legal obligation to provide, the DHS Secretary's dissatisfaction with Harvard's handling of campus unrest, and Harvard's purported "employ[ment] of racist 'diversity, equity, and inclusion' policies." Compl., Ex. 25, at 1. Thus, for the first time in the history of the F-1 visa program, the government has revoked a school's certification without identifying any failure to comply with any of these regulatory requirements, but rather for reasons entirely divorced from the regulations, and in large part, unrelated to Harvard's F-1 program or its international student population. DHS was required, at a minimum, both to acknowledge that drastic change in position and to provide a reasoned explanation for it. *See Am. Wild Horse*, 873 F.3d at 923. It did neither.

Far from supplying a reasoned explanation for revoking Harvard's certification, DHS has supplied almost no explanation at all. The APA requires agencies to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (citation omitted). Here, DHS's explanation is the quintessence of arbitrariness. First, DHS refers to Harvard's purported "refusal to comply with multiple requests to provide the Department of Homeland Security pertinent information," while omitting any explanation as to *how* Harvard's extensive response was a "refusal to comply." DHS also expresses its purported concerns over the "campus environment," but fails to explain how those concerns justify banning Harvard from enrolling international students. Next, DHS asserts that

the revocation decision is "the unfortunate result of Harvard's failure to comply with simple reporting requirements." In addition to being conclusory, this explanation is entirely different from the previous explanations: the Records Request sought information that went well beyond the "reporting requirements" in DHS's regulations, and DHS's purported concerns regarding the campus environment has nothing to do with "reporting requirements." Then, the Revocation Notice switches gears and returns to Harvard's purportedly "insufficient response" to the Records Request, again without explanation. And finally, the Revocation Notice offers a coda in which DHS offers to restore Harvard's certification if, within 72 hours, Harvard provides "full and complete responses" to wildly overbroad new demands that DHS has no constitutional, statutory, or regulatory right to demand, such as demands for "all audio or video footage … of any protest activity involving a nonimmigrant student on a Harvard University campus in the last five years." It is an understatement to state that DHS failed to provide a cogent reason for its determination, link its conclusion to the regulatory requirements for continued certification, or examine data bearing on Harvard's continued entitlement to SEVP certification. That failure supplies "an independent basis for setting aside [DHS's] action." *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 26 (D.D.C. 2014).

Nor did the Revocation Notice explain why wholesale revocation of Harvard's certification was required on the facts here. The regulations do not require decertification for *any* failure to maintain perfect compliance. To the contrary, they expressly contemplate that, after an out-of-cycle review, "SEVP may initiate remedial action with the school, as appropriate"—that is, SEVP has available to it remedies short of "initiat[ing] withdrawal proceedings." 8 C.F.R. § 214.3(h)(3)(iii). Given the stakes and reliance interests of both Harvard and its thousands of hardworking F-1 and J-1 visa students, it was irrational for DHS to have simply "disregard[ed]"

the express regulatory provision for a lesser alternative remedy to decertification; indeed, it did not provide any explanation of its decision to do so. *Fox Television Stations*, 556 U.S. at 515. If the purported basis for the revocation was that Harvard's efforts to comply with the Records Request and the Mazzara Email were unsatisfactory in some respect, DHS had an obligation under the APA to explain why directing Harvard to cure any noncompliance would not have adequately remedied the problem and why, instead, summary revocation was the appropriate remedy.

DHS's failure to supply such an explanation should come as no surprise, as there is no legitimate explanation for its actions. Even if DHS were correct that Harvard's alleged failure to fully comply with the Records Request and the Mazzara Email were a "valid and substantive reason" permitting revocation of Harvard's certification, 8 C.F.R. § 214.4(a)(2), no reasoned decisionmaker could conclude that imposing that penalty here was proportionate to the alleged noncompliance DHS has identified. For an alleged failure to meet DHS's demands and without any opportunity to cure, Harvard has lost 25% of its student body and been severed from a program it ran without interruption for more than 70 years. That penalty cannot stand.

What is more, DHS has imposed that draconian penalty without even acknowledging—much less genuinely considering—the "serious reliance interests" that the agency's "prior policy had engendered" at Harvard. *Fox Television Stations*, 556 U.S. at 515. Here, Harvard reasonably expected that it would maintain its SEVP certification so long as it complied with all the regulatory requirements for doing so, and it has gone to great lengths to order its affairs accordingly. *See* pp. 10-11, *infra*. DHS's failure to consider Harvard's weighty reliance interests before revoking Harvard's certification—without even bothering to identify any genuine noncompliance—was arbitrary and capricious in the extreme. *See Regents of the Univ. of Cal.*,

591 U.S. at 33 (an agency must "assess whether there [a]re reliance interests, determine whether they [a]re significant, and weigh any such interests against competing policy concerns").

For all these reasons, DHS's revocation of Harvard's SEVP certification must be set aside.

## II.    THE GOVERNMENT'S LAWLESS REVOCATION OF HARVARD'S SEVP CERTIFICATION INFLICTS IRREPARABLE HARM.

Harvard will suffer irreparable harm from the government's unlawful actions. First, to the extent that the Court finds that Harvard is likely to prevail on the merits of its First Amendment claims, then a finding of irreparable harm follows automatically. It is hornbook law that a loss of First Amendment freedoms—and the chilling effect of retaliatory government action—is a quintessential irreparable injury. *See, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (citation omitted)).

Although that First Amendment irreparable harm is sufficient, it is just the tip of the iceberg. Effective immediately, according to DHS's letter, Harvard may no longer sponsor or host F-1 or J-1 visa students as members of its educational community. The human costs of that decision cannot be overstated. Absent preliminary relief, Harvard will suffer an imminent loss of approximately a quarter of its current student body. *See* Martin Decl. ¶ 5. That is so because, in practical terms, Harvard's more than 5,000 current students who hold F-1 visas—and their more than 300 dependents—are now subject to be deemed unlawfully present in the United States, many just days away from receiving their degrees. These students—many of them teaching fellows, research assistants, and clinical trainees; all of them classmates, teammates, roommates, and friends—enrich Harvard's learning environment and campus life in countless ways. *See* Elliot Decl. ¶¶ 14-17, 23. The same is true of the approximately 2,000 international F-1 graduates currently working in jobs across the country through the Optional Practice Training (OPT) and

STEM OPT programs. *See* Martin Decl. ¶ 2.

The harms do not stop there. Harvard has admitted thousands more international students who are scheduled to come to campus for the upcoming summer and fall terms. These students will no longer be able to enter the country, including for summer classes about to commence. Absent preliminary relief, Harvard will thus be forced to dramatically shrink or reconfigure its carefully crafted incoming classes in a matter of weeks. Martin Decl. ¶¶ 39, 44-46.

Even if Harvard ultimately regains its SEVP certification, the loss of its international students, present and future, and their trust and faith in Harvard's certification, will have an irreversible impact on the University's reputation and status as a preeminent institution of learning. *See, e.g.*, *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (explaining that one recognized type of irreparable injury is the "incalculable loss of reputation and prestige" (quotation marks omitted)). Students matriculate at Harvard *because* they want to learn from— and with—the top students Harvard can recruit from around the world. *See* Elliott Decl. ¶¶ 5, 7, 8, 10. By forbidding Harvard from enrolling foreign students and arbitrarily terminating the ability of existing students to complete coursework and degrees, the government does long-lasting harm to Harvard's "goodwill and reputation." *Ross-Simons*, 217 F.3d at 13.

Consider the Harvard Kennedy School, Harvard's school of public policy. Nearly half of Kennedy School students are international. *See* Elliott Decl. ¶ 18. America's future leaders seek out the Kennedy School precisely because of its ability—driven in large part by its large number of F-1 students—to provide an international perspective on different approaches to governance and policy. *See id.* Harvard will not be able to recruit the most gifted *American* students to the Kennedy School if it is forced to shut itself off from the world, yet that is precisely what Defendants' actions require Harvard to do. *See id.* Simply put, if preliminary relief is not granted,

the brightest minds in the United States will enroll in other schools' programs that "do not labor under the same handicap." *Ross-Simons*, 217 F.3d at 13 (quotation marks omitted).

More broadly, the loss of international students is likely to cause a harmful feedback loop affecting students and professors alike. Because the most talented American students will not want to attend a Harvard that is isolated from the world, the most accomplished professors will choose to teach at other schools where the most talented students—international or American—can and will choose to attend. *See* Elliott Decl. ¶ 10. In turn, talented American students will be still less interested in attending a Harvard that loses its most distinguished professors, and the remaining professors will be less interested in staying to teach the remaining students.

Moreover, the government's action will immediately cripple Harvard's day-to-day functioning and ability to both advance academic inquiry and provide an excellent education. *See* Martin Decl. ¶ 45, 55. Without preliminary relief, undergraduates will immediately lose a significant share of their graduate student instructors. *See* Elliott Decl. ¶¶ 13-14. Important scientific research—which continues through the summer—will be halted. *See, e.g.*, *id.* ¶ 15. Teaching hospitals will become understaffed and unable to care for patients. Each of these consequences of decertification—all of which "unquestionably make it more difficult for [Harvard] to accomplish its primary mission"—constitute irreparable harm. *Massachusetts v. Nat'l Insts. of Health*, No. 25-CV-10338, --- F. Supp. 3d ----, 2025 WL 702163, at *30 (D. Mass. Mar. 5, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025).

## III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST OVERWHELMINGLY FAVOR RELIEF.

The balance of the equities and public interest—two factors that "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—favor granting Harvard its requested relief. Revocation of Harvard's certification will burden the University and

grossly impair the public interest.

As discussed, F-1 visa students are an integral part of Harvard's community and mission—and its ability to execute on that mission redounds to the public benefit. Losing the hundreds of F-1 visa students who serve as teaching fellows, *see* Elliott Decl. ¶¶ 13-14, as well as the thousands that serve as fellow classmates, will impair the ability of Harvard's remaining students to master their coursework, hampering their intellectual growth to the detriment of the businesses, hospitals, governments and other organizations they work for now or in the future. And losing the hundreds of F-1 visa students who serve as research assistants, *see id.* ¶ 15, will imperil the success of vital research projects that serve the greater good—pathbreaking research that could cure cancer, reduce the effects of climate change, and improve the quality of human life worldwide.

The government, by contrast, will not suffer any harm if the rescission is enjoined. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quotation marks omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations … that govern their existence and operations." *Id.* (quotation marks omitted). And even aside from the revocation's patent illegality, the government incurs no cognizable harm from the continuation of Harvard's F-1 visa program that has endured for over half a century.

## CONCLUSION

Harvard respectfully urges this Court to enter, pursuant to Federal Rule of Civil Procedure 65(b)(1), a temporary restraining order against the above-named Defendants (A) enjoining Defendants, their agents, and anyone acting in concert or participation with

Defendants from implementing, instituting, maintaining, or giving effect to the revocation of Plaintiff's SEVP certification; and (B) enjoining Defendants, their agents, and anyone acting in concert or participation with Defendants from giving any force or effect to DHS's May 22, 2025 Revocation Notice.

Dated: May 23, 2025

JENNER & BLOCK LLP

Ishan Bhabha*
Ian Heath Gershengorn*
Lauren J. Hartz*
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
IGershengorn@jenner.com
LHartz@jenner.com

Andrianna Kastanek*
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
AKastanek@jenner.com


William A. Burck*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com


Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com

Respectfully submitted,

LEHOTSKY KELLER COHN LLP

By: /s/ Steven P. Lehotsky
Steven P. Lehotsky (BBO # 655908)
Scott A. Keller*
Serena M. Orloff*
Shannon G. Denmark*
Jacob B. Richards (BBO # 712103)
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com
scott@lkcfirm.com
serena@lkcfirm.com
shannon@lkcfirm.com
jacob@lkcfirm.com

Katherine C. Yarger*
700 Colorado Blvd., #407
Denver, CO 80206
katie@lkcfirm.com

Joshua P. Morrow*
408 W. 11th Street, 5th Floor
Austin, TX 78701
josh@lkcfirm.com

Danielle K. Goldstein*
3280 Peachtree Road NE
Atlanta, GA 30305
danielle@lkcfirm.com
*Pro Hac Vice Applications Forthcoming

## CERTIFICATE OF SERVICE

Counsel for Plaintiff certify that they have submitted the foregoing document with the Clerk of Court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

By: <i>/s/ Steven P. Lehotsky</i>

Dated: May 23, 2025