**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

       Plaintiff,

  v.

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY;

KRISTI NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT;

TODD LYONS, in his official capacity as Acting Director of
United States Immigration and Customs Enforcement;

STUDENT AND EXCHANGE VISITOR PROGRAM;

JOHN DOE, in their official capacity as Director of the Student
and Exchange Visitor Program;

JAMES HICKS, in his official capacity as Deputy Assistant
Director of the Student and Exchange Visitor Program;

UNITED STATES DEPARTMENT OF JUSTICE;

PAMELA BONDI, in her official capacity as Attorney General
of the United States;

UNITED STATES DEPARTMENT OF STATE;

MARCO RUBIO, in his official capacity as Secretary of the
United States Department of State,

       Defendants.

Case No. 1:25-cv-11472-ADB

**AMENDED COMPLAINT**

1.      For more than 70 years, Harvard University ("Harvard" or the "University") has enrolled international students under the government's F-1 international student visa program and hosted students and scholars under the government's J-1 exchange visitor program. Harvard has, over this time, developed programs and degrees tailored to its international students, invested millions to recruit the most talented such students, and integrated its international students into all aspects of the Harvard community. Yesterday, the President abruptly put a stop to all of this by proclamation, immediately suspending entry of all foreign nationals "who enter or attempt to enter the United States to begin attending Harvard University," and directing the Secretary of State to consider revoking the visas of "foreign nationals who currently attend Harvard University."

2.      This is not the Administration's first attempt to sever Harvard from its international students. On May 22, 2025, without process or cause, the Secretary of Homeland Security ("DHS Secretary") summarily revoked Harvard's certification to enroll international students under the F-1 visa program, and purported to end Harvard's designation as an exchange program sponsor to host J-1 nonimmigrants, to immediate and devastating effect for Harvard and more than 7,000 visa holders—not to mention all of Harvard's domestic students. Although the revocation was temporarily enjoined by Court order, the DHS Secretary did not withdraw, and has not withdrawn, the revocation letter.

3.      Both the President's proclamation and the DHS Secretary's revocation violate the First Amendment. Each is part of a concerted and escalating campaign of retaliation by the government in clear retribution for Harvard's exercising its First Amendment rights to reject the government's demands to control Harvard's governance, curriculum, and the "ideology" of its faculty and students.

4.      The government's actions, moreover, have no basis in law. The DHS Secretary's revocation disregards the government's own regulations—under which Harvard should remain certified to host F-1 and J-1 visa holders. It departs from decades of settled practice and comes without rational explanation. It was carried out abruptly without any of the detailed procedures the government has established to prevent just this type of upheaval to thousands of students' lives. And it was undertaken to apply leverage to force Harvard to yield to the Administration's unlawful demands.

5.      The President's proclamation lacks a statutory basis. The President invoked 8 U.S.C. § 1182(f), but that statute is plainly inapplicable here. The statute gives the President authority to protect the country from a class of aliens whose entry would be "detrimental to the interests of the United States." But the President is not suspending entry for any "class of aliens"; to the contrary, nonimmigrants may enter the country unabated, as long as they do not attend Harvard. The President's actions thus are not undertaken to protect the "interests of the United States," but instead to pursue a government vendetta against Harvard.

6.      With the stroke of a pen, the DHS Secretary and the President have sought to erase a quarter of Harvard's student body—international students who contribute significantly to the University and its mission and the country.

7.      Harvard's certifications are essential for each of Harvard's thousands of international students to lawfully remain in this country while they complete coursework, obtain degrees, and continue critical research. Without those certifications in place, most of Harvard's thousands of enrolled F-1 and J-1 visa students (and their more than 300 dependents) have little choice but to secure transfer to another school or risk losing lawful status in the United States.

Moreover, Harvard can no longer sponsor F-1 and J-1 visa holders for its upcoming summer and fall terms, despite having admitted thousands.

8.    The President's proclamation has equally harmful and irreparable consequences. Effective immediately, foreign nationals who seek to "begin attending Harvard University" will be denied entry to the United States. What the DHS Secretary has purported to take away on the back end by revoking Harvard's certifications to host foreign students, the President purports to take away on the front end by preventing the students and scholars invited to Harvard from gaining entry into the country in the first place. The proclamation is a patent effort to end-run this Court's order.

9.    The result of the Administration's actions—individually and cumulatively—is devastating. Effective immediately, countless academic programs, research laboratories, clinics, and courses supported by Harvard's international students have been thrown into disarray. The Secretary's action came just days before graduation. The President's action comes just as summer students are arriving on campus and students slated to start in the fall are procuring visas and finalizing their travel arrangements. Both actions are designed to prevent Harvard's international students from attending Harvard, and they fundamentally alter the education that Harvard endeavors to provide to *all* its students—including domestic students—as it prepares them to contribute to and lead in our global society. With no basis in law, the Proclamation denies thousands of Harvard's students the right to come to this country to pursue their education and follow their dreams, and it denies Harvard the right to teach them. Without its international students, Harvard is not Harvard.

10.     Harvard therefore brings this action under the United States Constitution, the Administrative Procedure Act (APA), and the equitable authority of this Court to vacate, set aside, and enjoin the government's unlawful acts.

## INTRODUCTION

11.     For more than 70 years, Harvard has continuously hosted international students on its campus under the F-1 international student visa program. The F-1 program is currently a part of the Student and Exchange Visitor Program (SEVP) overseen by the U.S. Department of Homeland Security. Harvard has also long been designated as an exchange program sponsor to host J-1 nonimmigrants under the U.S. Department of State's Exchange Visitor Program (EVP). The F-1 and J-1 visa programs, which allow international students to enter the United States on nonimmigrant visas to enroll at Harvard and thousands of other schools,[1] have boosted America's academic, scientific, and economic success and its global standing.

12.     Tens of thousands of international students have studied at Harvard under the F-1 visa program. Additional international students and scholars have come to Harvard under the J-1 visa program. These students have contributed to the University's research advancements in immeasurable ways. They do so by (among other things) publishing pioneering scholarship, supporting scientific research, inventing groundbreaking technologies, and, after leaving Harvard, starting thriving businesses here in America.

13.     Building the international program that sponsors these students did not happen overnight. It has been a painstaking, decades-long project to cultivate the programs, opportunities, personnel, and reputation that allow Harvard to attract the most qualified international students,

---

[1] U.S. Immigr. & Customs Enfor., *SEVP Certified Schools* (updated Apr. 28, 2021), https://studyinthestates.dhs.gov/assets/certified-school-list-04-28-21.pdf.

support their visa applications, and integrate them into the Harvard community. Harvard's robust and thriving visa programs have inured to the benefit of Harvard's entire population and the United States.

14.    Since the inception of the F-1 visa program more than 70 years ago, Harvard and the government have worked cooperatively to advance these goals. Harvard has been continuously certified to host F-1 visa holders since 1954. Under the modern program established in 2003, certified schools must comply with specified recordkeeping, retention, and reporting requirements and renew their F-1 certification every two years. And, since then, Harvard has complied with all applicable reporting requirements and renewed its certification without incident. For more than 70 years, the government has never threatened Harvard's certification.

15.    All of that changed on April 16, 2025, when the Secretary of Homeland Security, Kristi Noem, sent Harvard's International Office (HIO) a letter (the "Records Request"). The Records Request demanded that HIO produce wide-ranging information for "each student visa holder[]" across Harvard's 13 schools within ten business days and further stated that failure to do so "within the timeframe provided"—that is, by April 30, 2025—would be "treated as a voluntary withdrawal" from the F-1 program and "not … subject to appeal."

16.    Despite the unprecedented nature of this demand, HIO immediately began collecting responsive records from the information it maintains or keeps "accessible," 8 C.F.R. § 214.3(g)(1), and, on April 30, Harvard produced that information to DHS. On May 14, Harvard produced additional information in response to a follow-up request from DHS. Yet, on May 22, 2025, DHS deemed Harvard's responses "insufficient"—without explaining why or citing any regulation with which Harvard failed to comply—and revoked Harvard's SEVP certification "effective immediately."

17.    The government's termination of Harvard's SEVP certification was, at the time, the culmination of an unprecedented and retaliatory attack on academic freedom at Harvard:

a.    In recent weeks and months, through a multi-agency Task Force to Combat Anti-Semitism ("Federal Task Force"), the government has conditioned Harvard's continued receipt of numerous federal benefits, including billions of dollars of federal funding, on the University's acceptance of sweeping changes to its governance, admissions, hiring, and academic programs.

b.    The government enumerated these demands in extensive detail in an April 11, 2025, letter to Harvard's President. The government demanded (among other things) that Harvard hire a third party to "audit" the viewpoints of its students, faculty, and staff; depending on the results of the audit, hire and admit a "critical mass" of people to achieve the government's preferred level of "viewpoint diversity" in "each department, field, or teaching unit"; refuse admission to international students "hostile to … American values"; "exclusively" "empower[]" faculty supportive of the government's action and "reduce[] the power" of those opposed; allow the government to review its faculty hires; expel or suspend specific sets of students; disband disfavored student clubs; and establish mechanisms for Harvard community members to report on one another and send those reports to the government.

c.    When, on April 14, 2025, Harvard communicated its refusal to accede to these demands, the government's retribution was swift. Hours later, the government froze more than $2.2 billion in federal funding critical to the support of ongoing cutting-edge research at Harvard—research with the potential to improve the health and safety of millions of Americans by bettering cancer treatments, modeling and managing the spread of infectious disease outbreaks, producing vital innovations in quantum computing and artificial intelligence, and reducing the

short- and long-term consequences of battlefield-related injuries, among myriad other developments and discoveries.[2]

       d.     The next day, on April 15, 2025, President Trump posted on Truth Social suggesting that "Harvard should lose its Tax-Exempt Status" as a not-for-profit educational institution under Section 501(c)(3) of the Internal Revenue Code, "if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness.'" But Harvard is not a commercial business and does not seek investors to fund its activities and then share in their proceeds. So, maintaining Section 501(c)(3) status—which permits the University to receive tax-deductible gifts, raise capital from investors on affordable terms, and provide access to federal student aid programs—is vital to Harvard's existence as a modern research university dedicated to serving the public.

       e.     The following day, the President doubled down, asserting in a post on Truth Social that "Harvard has been hiring almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE to students" and that "Harvard can no longer be considered even a decent place of learning, and should not be considered on any list of the World's Great Universities or Colleges." On April 16, Secretary Noem sent her letter to HIO, seeking eight broad categories of information on *every* international student studying at Harvard under an F-1 visa, threatening that failure to comply would be deemed a "voluntary withdrawal" of Harvard's SEVP certification, and warning that "[t]he withdrawal will not be subject to appeal." This demand was unprecedented, seeking information far beyond what DHS's regulations require Harvard to

---

[2] Harvard has challenged the government's freeze order and subsequent terminations of billions of dollars in multi-year grants to Harvard in *President and Fellows of Harvard College v. U.S. Dep't of Health and Human Services*, No. 25-cv-11048 (D. Mass. Apr. 21, 2025) (the "Funding Case").

maintain and report, and far beyond any request Harvard has received in its more than 70 years hosting foreign students under the F-1 visa program.

f.      Just hours later, DHS issued a press release announcing both its cancellation of "two DHS grants totaling over $2.7 million to Harvard" as well as the Secretary's "scathing letter demanding detailed records on Harvard's foreign student visa holders' illegal and violent activities." The press release asserted that Harvard has allowed "anti-American, pro-Hamas ideology [to] poison[] its campus and classrooms" and "undermine America's values." It added that DHS's demand for records encompassing thousands of student visa holders "follows President Donald J. Trump's decision to freeze $2.2 billion in federal funding to Harvard University, proposing the revocation of its tax-exempt status over its radical ideology." And it concluded by stating that "if Harvard cannot verify it is in full compliance with its reporting requirements, the university will lose the privilege of enrolling foreign students."

g.      Despite the unprecedented nature and scope of the April 16 demand, and the lack of any clear authority for most of the requests, Harvard worked diligently to collect and produce the information it is required to maintain and report under the SEVP program. On April 30, 2025, Harvard produced responsive information falling within 8 C.F.R. § 214.3(g)(1). Specifically, Harvard produced to DHS thousands of data points concerning its entire F-1 visa student population.

h.      Then, on May 7, 2025, DHS notified Harvard that DHS believed Harvard's initial production was incomplete and asked for four of the eight categories of information referenced in the initial request. This request continued to be both unprecedented and well beyond the scope of the authority invoked by DHS. Harvard therefore requested clarification of the scope

of the demand and—after DHS invoked a different set of regulatory authority—again conducted a search and produced additional responsive information.

        i.    In the wake of Harvard's productions, DHS summarily revoked Harvard's SEVP certification on the basis that Harvard's responses were "insufficient." But it did not explain why that was so, let alone identify any actual noncompliance with the governing regulations or follow any of the detailed processes required under the regulations prior to revoking a school's certification.

        j.    DHS's revocation letter leaves no doubt that the revocation is part of DHS's campaign to coerce Harvard into surrendering its First Amendment rights. The letter declares: "Consequences must follow to send a clear signal to Harvard and all universities that want to enjoy the privilege of enrolling foreign students, that the Trump Administration will enforce the law and root out the evils of anti-Americanism and antisemitism in society and campuses." Or put another way: because the Administration perceives that members of Harvard's community have the wrong viewpoints, Harvard will be punished until it alters its viewpoints to satisfy the Administration's demands.

        18.    The surrounding events, and Defendants' express statements, make clear that DHS took these actions not for any valid reason, but purely as punishment for Harvard's speech, its perceived viewpoint, and its refusal to surrender its academic independence or relinquish its constitutional rights. A central tenet of our constitutional system is that the government cannot "invok[e] legal sanctions and other means of coercion" to micromanage private speech. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). And it is bedrock law that the viewpoint-based justifications the government has repeatedly and publicly invoked as a basis for its campaign against Harvard are a particularly

"egregious form of content discrimination," subject to the strictest scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (citation omitted). Those First Amendment concerns are heightened here, as "academic freedom" is "a special concern of the First Amendment," *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967). The government's actions violate Harvard's rights under the First Amendment several times over.

19.     Compounding these First Amendment infirmities, the government's retaliatory revocation of Harvard's certification is the very definition of arbitrary and capricious agency action proscribed by the APA. DHS provided no coherent reason for taking these actions, and its revocation fully bypassed the detailed statutory and regulatory framework governing the F-1 and J-1 visa programs, which specify procedures and standards for revoking a school's certification— all of which the government ignored. And the government's actions run roughshod over the procedural due process protections of fair notice and an opportunity to respond owed to Harvard under the U.S. Constitution and the APA as the holder, for more than 70 years, of a government license to participate in the F-1 visa program.

20.     There is no lawful justification for the government's unprecedented revocation of Harvard's SEVP certification, and the government has not offered any. DHS's actions go well beyond terminating the visa of any individual student—or even a category of students—for noncompliance with immigration laws. They target Harvard itself, and for no remotely cognizable purpose. Harvard is fully committed to ensuring the integrity of its SEVP certification. Indeed, the government has continuously certified Harvard to host F-1 visa students for more than seven decades across 14 presidential administrations.

21.     After this Court temporarily restrained the revocation, the President issued a Proclamation purporting to bar the entry of noncitizens with F, M, and J visas who sought to study or conduct research at Harvard, and Harvard alone.[3]

22.     The President's Proclamation is equally unlawful. It escalates and intensifies the campaign of retaliation in violation of the First Amendment. In the wake of the Secretary's revocation and Harvard's successful motion to enjoin that revocation temporarily, the Administration's unconstitutional efforts to increase the pressure on Harvard continued. The White House convened senior Administration officials to, according to media reports, "brainstorm additional punitive measures" to punish Harvard. DHS issued an official notice to move forward with revocation of Harvard's program to host F visa holders even after the Court enjoined the original revocation—and on the eve of the Court's preliminary injunction hearing. The Secretary of State implemented a "pilot" program for "enhanced vetting" of visa applications and chose Harvard's admitted and incoming students as the sole population for that program. The President repeatedly criticized Harvard for exercising its legal rights to challenge unlawful government action in court. And the Proclamation was issued just days later.

23.     Just as the revocation is retaliatory in violation of the First Amendment, the Proclamation is retaliatory too. Just as the revocation unconstitutionally intrudes on academic freedom, the Proclamation unconstitutionally intrudes too.

24.     The Proclamation also lacks any statutory basis. The core of the cited statute is the President's authority to "suspend the entry" of a class of foreign nationals upon a finding that entry of that class would be "detrimental to the interests of the United States." But the Proclamation does not categorically prevent a class of foreign nationals from entering the country at all; it merely

---

[3] Harvard does not host students on M visas, which are intended for students studying at vocational or technical schools.

prevents their entry if they intend to affiliate with Harvard. And the Proclamation does not find that "entry" of the class is "detrimental to the interests of the United States." Instead, it finds at most that having foreign nationals study at Harvard is detrimental to the United States.

25.    Indeed, on its face, the Proclamation clearly reveals that the government is not concerned about the detrimental effects of entry by anyone at all. It is instead (if the Proclamation is to be believed) about Harvard's responsiveness to data requests, Harvard's "discriminatory" policies, and Harvard's contributions from foreign governments.

26.    The Proclamation is also an effort to accomplish by Presidential action what the Secretary was enjoined from effectuating through agency action. When the Court enjoined the Secretary's efforts to revoke Harvard's certifications and force its students to transfer or depart the country, the President sought to achieve the same result by refusing to allow Harvard students to enter in the first place. That was an unlawful evasion of the Court's order.

27.    The government has casually discarded core First Amendment protections, the protections of procedural due process, and DHS's own regulations to immediate and devastating effect for Harvard and its community. Harvard's more than 7,000 F-1 and J-1 visa holders—and their dependents—have become pawns in the government's escalating campaign of retaliation. Based on these actions, Harvard may no longer sponsor or host F-1 or J-1 visa students. It cannot issue Form I-20s to new students, including those who have been admitted for the upcoming summer and fall terms. The thousands of international students who are scheduled to come to campus for the summer and fall terms will no longer be able to enter the country. And the several thousand international students currently present in the United States—who constitute more than a quarter of Harvard's student population—would, without further action of this Court, be subject to immediate removal from the United States.

28.    Immediate relief is necessary to restore Harvard's SEVP certification, to prevent the implementation of the suspension of and limitation on entry, and to stop the government's arbitrary, capricious, unlawful, and unconstitutional action.

## JURISDICTION AND VENUE

29.    This action arises under the Administrative Procedure Act (APA), 5 U.S.C § 551 *et seq.*; the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, and its implementing regulations; and the United States Constitution.

30.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. Because this suit seeks relief other than money damages and instead challenges Defendants' unlawful actions, the United States has waived sovereign immunity from this suit. 5 U.S.C. § 702.

31.    The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702, 703, 705, and 706; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1988; and through the equitable powers of this Court.

32.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacities; a substantial part of the events or omissions giving rise to the claims occurred in this District; and Harvard resides in this District.

33.    Harvard has standing to bring this case. Defendants' actions—unless halted by this Court—will cause an imminent, concrete, and irreparable injury to Harvard, its students and faculty, and its ability to achieve its educational mission.

## PARTIES

34.    Plaintiff President and Fellows of Harvard College is a non-profit corporation that is the senior governing board of the organization known as Harvard University. Harvard is a private

research university and the oldest institution of higher learning in the United States. Harvard's 13 schools provide undergraduate and graduate instruction and degree programs to more than 24,000 enrolled students annually, including more than 5,000 international students who study in the United States on F-1 visas. Additionally, Harvard sponsors approximately 2,000 recent graduates who are working in jobs across the country on F-1 visas as part of the Optional Practical Training (OPT) and STEM OPT programs. And Harvard also hosts several hundred individuals who hold J-1 visas.

35.    Defendant United States Department of Homeland Security (DHS) is a cabinet-level Department of the federal government. DHS is responsible for overseeing enforcement and implementation of certain provisions of the nation's immigration laws by all DHS subagencies and personnel.

36.    Defendant Kristi Noem is the Secretary of DHS. Defendant Noem is sued in her official capacity.

37.    Defendant United States Immigration and Customs Enforcement (ICE) is a component of DHS. ICE is responsible for administering SEVP and overseeing proceedings to grant, recertify, and withdraw an institution's SEVP certification.

38.    Defendant Todd Lyons is the Acting Director of ICE. Defendant Lyons is sued in his official capacity.

39.    Defendant Student and Exchange Visitor Program (SEVP) is a component of ICE. SEVP is responsible for administering the F-1 visa program and proceedings to grant, recertify, and withdraw an institution's SEVP certification.

40.    Defendant John Doe is the Director of SEVP. Director Doe is sued in his official capacity.

41.     Defendant James Hicks is the Deputy Assistant Director of SEVP. Defendant Hicks is sued in his official capacity.

42.     Defendant United States Department of Justice is a cabinet-level Department of the federal government. The Department of Justice is charged with overseeing domestic enforcement of federal laws.

43.     Defendant Pamela Bondi is the Attorney General of the United States. Defendant Bondi is sued in her official capacity.

44.     Defendant United States Department of State is a cabinet-level Department of the federal government. The State Department is responsible for conducting American foreign policy and diplomacy, and relevant here, for administering the J-1 Exchange Visitor Program.

45.     Defendant Marco Rubio is the Secretary of State. Defendant Rubio is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

**A.     The F-1 Visa Program and SEVP Certification**

46.     SEVP is a federally regulated program that recognizes the inherent value in bringing the best and brightest students—wherever they are found—to the United States, to study and contribute to American academic institutions.

47.     Under the INA, certain international students are permitted to attend American universities on nonimmigrant F-1 visas. An F-1 visa permits international students to enter and be lawfully present in the United States to complete their courses of study, among other things.

48.     Eligibility to maintain F-1 status is governed by 8 U.S.C. § 1101(a)(15)(F)(i) and 8 C.F.R. § 214.2(f).

49.     As relevant here, in order to qualify for an F-1 visa, a noncitizen must: (1) "hav[e] a residence in a foreign country which he has no intention of abandoning"; (2) be "a bona fide student qualified to pursue a full course of study"; and (3) "seek[] to enter the United States temporarily and solely for the purpose of pursuing such a course of study … at an established college, university, … or other academic institution … particularly designated by him *and approved by the Attorney General*." 8 U.S.C. § 1101(a)(15)(F)(i) (emphasis added).

50.     The statutorily mandated process by which schools are "approved by the Attorney General" to host students who hold F-1 visas is administered by SEVP, a subcomponent of ICE (within DHS).[4]

51.     The process for seeking the required approval is known as "SEVP certification," *see, e.g.*, 8 C.F.R. § 214.3(f), and a school that receives that approval is said to be "SEVP-certified," *see, e.g.*, *id.* § 214.2(f)(4).

52.     The requirements for obtaining SEVP certification are set out in 8 C.F.R. § 214.3.

53.     To begin the SEVP certification process, a school must "file a petition for certification" with DHS using an online portal known as "the Student and Exchange Visitor Information System," or SEVIS, and pay a filing fee. *Id.* §§ 214.3(a)(1), 103.7(d)(2)(i).

54.     The requirements for obtaining initial SEVP certification (the "Initial Certification Criteria") are enumerated in the governing regulation. The school "must establish at the time of filing" that it: (A) "[i]s a bona fide school"; (B) "[i]s an established institution of learning or other recognized place of study"; (C) "[p]ossesses the necessary facilities, personnel, and finances to

---

[4] For ease of reference, Harvard refers to Defendants collectively as "DHS" from this point forward. References in the INA to the Attorney General are generally understood also to refer to the DHS Secretary. *See* 6 U.S.C. § 236(b) (transferring many functions relating to federal immigration law to the Secretary of Homeland Security).

conduct instruction in recognized courses"; and (D) "[i]s, in fact, engaged in instruction in those courses." *Id.* § 214.3(a)(3)(i)(A)-(D).

55.     After receiving its initial certification, a school must petition to renew that certification every two years, *see id.* § 214.3(h)(2); 8 U.S.C. § 1762(a).

56.     To "be eligible for recertification," the school must establish that: (A) it "[r]emains eligible for [initial] certification in accordance with paragraph (a)(3)(i) of this section" (that is, it continues to satisfy the four Initial Certification Criteria); and (B) the school and its Designated School Officials (DSOs) have "complied during its previous period of certification … with recordkeeping, retention, and reporting requirements and all other requirements of paragraphs (g), (j), (k), and (l) of this section" (the "Compliance Criteria"). 8 C.F.R. § 214.3(a)(3)(ii)(A)-(B); *see also id.* § 214.3(h)(2)(iii)(B) (stating that individual DSO compliance may be considered).

57.     Section 214.3(g) of the regulations enumerates the Compliance Criteria relating to a school's recordkeeping, retention, and reporting obligations. It requires schools to "keep records containing certain specific information and documents relating to each F-1 … student" and to "furnish the[se records] to DHS representatives upon request." *Id.* § 214.3(g)(1).

58.     DHS defined and limited this "specific information" by regulation. The information includes the student's name, "date and place of birth, [and] country of citizenship"; the "[c]urrent address where the student and his or her dependents physically reside"; the student's "[r]ecord of coursework"; his "[a]cademic status," including "the effective date or period if suspended, dismissed, placed on probation, or withdrawn"; and, if applicable, a "[t]ermination date and reason." *Id.* § 214.3(g)(1)(ii)-(iv), (vi), (ix). These categories largely track the information that the school is required to maintain by statute. *See* 8 U.S.C. § 1372(c)(1).

59.    Sections 214.3(j)-(l) of the regulations set forth the additional Compliance Criteria a school seeking recertification must satisfy. Section 214.3(j) limits schools to certain specified language when discussing their SEVP certification in advertising or promotional materials. *See* 8 C.F.R. § 214.3(j). Section 214.3(k) provides that the school may only issue a Form I-20—a critical document in the noncitizen's F-1 visa application—to foreign students who have applied to the school in writing and have been accepted on the merits. *See id.* § 214.3(k). And Section 214.3(*l*) requires schools to designate one Principal Designated School Official (PDSO) and any number of additional DSOs, "whose compensation does not come from commissions for recruitment of foreign students," to advise F-1 students "regarding maintenance of nonimmigrant status and to support timely and complete recordkeeping and reporting to DHS." *Id.* § 214.3(*l*)(1)(ii)-(iii). These are the only recertification eligibility requirements specified in DHS's regulations.

**B.    Withdrawal of SEVP Certification**

60.    In addition to the ordinary biennial recertification process described above, the regulations provide that DHS may review and (if warranted) withdraw a school's certification "in accordance with the provisions of [8 C.F.R. § 214.4]," *id.* § 214.3(f)(1). The regulations refer to this alternative means of withdrawing a school's certification as an "out-of-cycle review" leading to "[w]ithdrawal on notice." *Id.* § 214.4(b).

61.    SEVP may initiate an out-of-cycle review of a school's certification "to verify the school's compliance with the recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section to verify the school's continued eligibility for SEVP certification pursuant to paragraph (a)(3) of this section." *Id.* § 214.3(h)(3)(iii).

62.    As part of this out-of-cycle review process, "SEVP may request a school to electronically update all Form I-17 fields[5] in SEVIS and provide SEVP with documentation supporting the update," and "[t]he school must complete such updates in SEVIS and submit the supporting documentation to SEVP within 10 business days of the request from SEVP." *Id.* § 214.3(h)(3)(ii).

63.    If DHS identifies any non-compliance during the out-of-cycle review process, the regulations give the agency only two options for taking adverse action against the school: it may (1) "initiate remedial action with the school, as appropriate," or (2) "initiate withdrawal proceedings against the school pursuant to [8 C.F.R. § 214.4.(b)] if noncompliance or ineligibility of a school is identified." *Id.* § 214.3(h)(3)(iii); *see also id.* § 214.3(h)(3)(vi) (providing that "SEVP will institute withdrawal proceedings in accordance with [8 C.F.R. § 214.4(b)] if, upon completion of an out-of-cycle review, SEVP determines that a school or its programs are no longer eligible for certification").

64.    The regulations do not create any mechanism for summary withdrawal of a school's certification after an out-of-cycle review has been conducted. Instead, DHS's authority to revoke a certification is limited both substantively and procedurally.

65.    Substantively, DHS may seek to withdraw a school's certification if (after conducting this out-of-cycle review process) it determines that the school "has failed to sustain eligibility or has failed to comply with the recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l) of this section," *id.* § 214.3(e)(4)(ii) & (f)(1)— in other words, if it fails to satisfy either the Initial Certification Criteria or the Compliance Criteria.

---

[5] The Form I-17 is a form the school fills out in connection with its petition for certification, providing information such as the school's address and disciplines taught. *See, e.g.*, 8 C.F.R. § 214.3(h)(3)(i)(A)-(T).

66. Section 214.4 likewise provides that SEVP certification may be withdrawn under this out-of-cycle review mechanism only "if the school … is determined to no longer be entitled to certification for any valid and substantive reason." *Id.* § 214.4(a)(2); *see* 8 U.S.C. § 1762(c) (stating that "[m]aterial failure … to comply with the [specified] recordkeeping and reporting requirements to receive nonimmigrant students" is grounds for withdrawal of certification).

67. The regulation lists 19 "valid and substantive reason[s]" for withdrawing certification. One such reason is "[f]ailure to comply with [8 C.F.R. § 214.3(g)(1)] without a subpoena." 8 C.F.R. § 214.4(a)(2)(i). Others include failure to adhere to the Initial Certification Criteria, *id.* § 214.4(a)(2)(xii)-(xiii), (xv)-(xvii); failure to comply with the Compliance Criteria, *see id.* § 214.4(a)(2)(i)-(iv), (viii)-(x), (xiv), (xviii)-(xix); and misconduct by or lack of qualification of the school's DSOs, *see id.* § 214.4(a)(2)(v)-(vii).

68. Procedurally, even where DHS identifies a "valid and substantive reason" for withdrawing a school's certification, the regulations do not permit DHS to summarily decertify a school. Instead, Section 214.4 establishes a detailed set of procedures that DHS must follow if it wishes to withdraw certification pursuant to out-of-cycle review (i.e., outside the biennial recertification process).

69. The process for withdrawal of certification following out-of-cycle review is governed by 8 C.F.R. § 214.4(b), which is entitled "Withdrawal on notice." As the name reflects, DHS may initiate withdrawal-on-notice proceedings only by serving the school with a notice known as a "Notice of Intent to Withdraw" or NOIW. *Id.* § 214.3(e)(4). The NOIW must "inform the school" of "[t]he grounds for withdrawing SEVP certification." *Id.* § 214.4(b)(1).

70.     The issuance of a NOIW is the first step in what the regulations elsewhere refer to as "withdrawal proceedings." *Id.* § 214.3(h)(3)(iii). Those proceedings involve detailed procedural protections—including administrative appeals—prior to effectuating a withdrawal of certification.

71.     Upon receipt of a NOIW, the school has 30 days to submit an answer either admitting or denying the allegations in the NOIW and supporting its position with "sworn statements, and documentary or other evidence, to rebut the grounds for withdrawal of certification." *Id.* § 214.4(b)(2); *see id.* § 214.4(d)-(e). The school may also submit "a written request … for a telephonic interview in support of its response to the NOIW." *Id.* § 214.4(b)(3). And the school is permitted to be represented by counsel during these proceedings. *See id.* § 214.4(c).

72.     If DHS wishes to proceed with withdrawing the school's certification following this period of review, it must issue a written decision explaining "the specific reasons for" its decision. *Id.* § 103.3(a)(1)(i); *see id.* § 214.4(g).

73.     The regulations also provide that "[a] school can voluntarily withdraw from SEVP … in lieu of complying with an out-of-cycle review or request." *Id.* § 214.3(h)(3)(vii). To do so, the school generally must "*initiate* voluntary withdrawal by sending a request for withdrawal on official school letterhead to SEVP." *Id.* (emphasis added). The regulations also state that "[f]ailure of a school to comply with an out-of-cycle review or request by SEVP will be treated as a voluntary withdrawal." *Id.* This voluntary withdrawal procedure can only be read as applying in cases where no out-of-cycle review in fact occurs, despite the agency's desire to conduct such a review, because of the school's decision to withdraw from the program *in lieu of* compliance.

74.     In sum, the regulations provide DHS with only two means of terminating a school's existing F-1 visa program outside of the normal biennial recertification process: *First*, DHS can

withdraw a certification only by issuing a NOIW and initiating "withdrawal proceedings" pursuant to 8 C.F.R. § 214.4(b). *Second*, if DHS initiates an out-of-cycle review and the school wishes to acquiesce in the withdrawal of its certification, it can "voluntarily withdraw" its certification either by submitting a letter to that effect or simply by declining to engage with the out-of-cycle review process.

75.     Upon information and belief, prior to the decertification decision in this case, no school had ever had its SEVP certification revoked for any reason other than failure to meet the eligibility criteria for certification or failure to comply with the recordkeeping, retention, reporting, and other requirements set out in the federal regulations governing certification.

## C.     The Administrative Appeals Process for Challenging Revocation of SEVP Certification

76.     The regulatory scheme also entitles a school whose certification is withdrawn to file an administrative appeal of that decision. Specifically, the regulations authorize the school to "file an [administrative] appeal of a … withdrawal [of certification] no later than 15 days after the service of the decision by ICE." *Id.* § 214.4(h).

77.     Publicly available guidance documents promulgated by DHS and ICE describe the multi-step appeal process.[6]

78.     In the first instance, an administrative appeal is assigned to the same "adjudicator who originally adjudicated the case to determine whether to uphold or overturn the original decision." Ex. 2.

---

[6] *See* DHS, *General Appeals Process Information* (attached as **Exhibit 1**) (describing administrative appeals process); ICE, *Appeal Processing Steps* (attached as **Exhibit 2**) (same). The processes outlined in these two documents are substantively identical.

79.    If the original adjudicator affirms his earlier decision, the case proceeds to the Administrative Appeals Team, or AAT, which "reviews the case and all the evidence relating to the petition" and "draft[s] a preliminary appeal decision." *Id.*

80.    That preliminary decision is then subject to "[l]egal and [r]egulatory [r]eview" to "ensure regulatory compliance and legal sufficiency." *Id.*

81.    From there, a different body known as the Final Appeals Authority, or FAA, "reviews the entire case proceedings to ensure understanding of [the] case, including both comments from the AAT adjudicator and from the legal entity" that performed the legal and regulatory review. Ex. 1.

82.    The AAT adjudicator then reviews the FAA's comments and makes any necessary changes. *See id.*

83.    Afterward, the decision is returned to the FAA for approval of a final, signed appellate decision. *See id.* That "final decision is then issued to the petitioner and [its] attorney, if applicable, via email." Ex. 2.

84.    This administrative appeals process "takes roughly 60 business days." Ex. 1.

**D.    Consequences of Withdrawing SEVP Certification**

85.    The consequences of withdrawing SEVP certification are drastic—for the school that loses certification, for its students, and for its broader community.

86.    Effective immediately upon DHS's decision, the school may no longer issue new Forms I-20 to foreign students as needed to allow them to obtain F-1 visas and therefore admission into the United States. 8 C.F.R. § 214.4(*i*)(1). The effect is to preclude the school from accepting any new foreign students to its programs.

87.    With respect to current students with F-1 status, students whose school is decertified are, necessarily, no longer "pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students," *id.* § 214.2(f)(5)(i), and thus are at immediate risk of losing their F-1 status.

88.    A student who remains in the United States after his or her F-1 status is terminated is unlawfully present and may be placed in removal proceedings. *See* 8 U.S.C. § 1227(a)(1)(C)(i). A noncitizen who remains unlawfully present for more than 180 days is thereafter rendered inadmissible for a period of three years. *See id.* § 1182(a)(9)(B)(i)(I), (ii).

89.    As a practical matter, the regulations and publicly available guidance indicate that loss of a student's F-1 status is triggered not on the date of the school's decertification, but rather on the later date when the school's access to the online SEVIS portal is terminated—known as its "SEVIS access termination date." 8 C.F.R. § 214.4(*i*)(2). On this date, DHS "will automatically terminate any remaining Active SEVIS records for that school." *Id.*[7]

90.    Termination of SEVIS records presents student visa holders whose school loses its certification with two bad choices: (a) attempt the uncertain path of securing immediate "[t]ransfer to another SEVP-certified school," which typically will not be feasible—much less guaranteed—in the middle of an academic year (particularly when thousands of students are seeking transfers *en masse*), or (b) "[d]epart the United States." Ex. 3 at 2.

91.    Although termination of SEVIS access eventually follows from withdrawal of certification, DHS must make an independent determination as to *when* it occurs—and thus when to terminate the status of its F-1 visa students. "In most situations," and unless the school is

---

[7] *See* U.S. Dep't of Homeland Sec., *Loss of SEVP Certification* (Dec. 19, 2024) (attached as **Exhibit 3**).

"suspected of criminal activity or poses a potential national security threat," DHS "will not determine a SEVIS access termination date for that school until the [administrative] appeals process has concluded and the … withdrawal has been upheld." 8 C.F.R. § 214.4(*i*)(2). In determining the SEVIS access termination date, DHS "will consider the impact that such date will have upon SEVP, the school, and the school's nonimmigrant students." *Id.*

92.      A school whose certification is withdrawn is ineligible to petition again for SEVP certification until one year after withdrawal, and even then, "[e]ligibility to re-petition will be at the discretion of the Director of SEVP." *Id.* § 214.4(a)(2).

**E.      The J Visa Program**

93.      The J visa is the nonimmigrant visa class for foreign citizens who are approved to participate in an exchange visitor program in the United States, 8 U.S.C. § 1101(a)(15)(J), including as students, professors, and research scholars. 22 C.F.R. § 62.4.

94.      To host individuals on J-1 visas, an institution must be designated as an "Exchange Visitor Program sponsor" by the Department of State. 22 C.F.R. § 62.3, 62.5.

95.      Revocation of a sponsor's Exchange Visitor Program (EVP) designation is governed by 22 C.F.R. § 62.50(d). The provision authorizes the Department of State's Office of Exchange Coordination and Designation (the "Office") to serve a sponsor with written notice of its intent to revoke the sponsor's Exchange Visitor Program designation "[u]pon a finding of any act or omission set forth in [paragraph (a) of the regulation]." 22 C.F.R. § 62.50(d). Paragraph (a), in turn, provides that notice of intent to revoke may be issued upon a finding that the sponsor has violated one or more provisions of 22 C.F.R. Part 62; evidenced a pattern of failure to comply with one or more provisions of 22 C.F.R. Part 62; committed an act of omission or commission, which has or could have the effect of endangering the health, safety, or welfare of an exchange visitor;

or otherwise conducted its program in such a way as to undermine the foreign policy objectives of the United States, compromise the national security interests of the United States, or bring the Department or the Exchange Visitor Program into notoriety or disrepute. 22 C.F.R. § 62.50(a).

96.    Upon such a finding, the regulations afford sponsors notice and an opportunity to be heard before the revocation takes effect:

a.    The Office must provide at least 30 days' written notice of its intent to revoke. 22 C.F.R. § 62.50(d)(1).

b.    That notice must "specify the grounds for the proposed sanction and its effective date, advise the sponsor of its right to oppose the proposed sanction, and identify the procedures for submitting a statement of opposition thereto." *Id.*

c.    The sponsor is then afforded the opportunity to submit a statement in opposition to or mitigation of the proposed sanction, the submission of which serves to stay the effective date of the proposed sanction pending decision of the Principal Deputy Assistant Secretary for Educational and Cultural Affairs. 22 C.F.R. § 62.50(d)(2)(i)-(ii). The Principal Deputy Assistant Secretary is then responsible for reviewing the submissions of both the sponsor and the Office and either modifying, withdrawing, or confirming the proposed sanction by serving the sponsor a written decision that specifies the grounds for the sanction, identifies its effective date, advises the sponsor of its right to request a review, and identifies the procedures for requesting such review. 22 C.F.R. § 62.50(d)(2)(v).

97.    The effect of an order of revocation is outlined in 22 C.F.R. § 62.50(i). A sponsor against which an order of revocation "has become effective may not thereafter issue any Certificate of Eligibility for Exchange Visitor (J-1) Status (Form DS-2019) or advertise, recruit for, or otherwise promote its program." 22 C.F.R. § 62.50(i). And even where the sponsor has already

issued a Form DS-2019, the sponsor may not under any circumstances "facilitate the entry of an exchange visitor into the United States" after revocation. *Id.* The regulation also expressly states that an order of revocation "will not in any way diminish or restrict the sponsor's legal or financial responsibilities to existing program applicants or participants." *Id*.

## F.    The President's Authority Over Immigration

98.    Section 212 of the INA, codified at 8 U.S.C. § 1182, is entitled "Inadmissible aliens" and sets forth various grounds of inadmissibility. It "defines the universe of aliens who are admissible into the United States." *Trump v. Hawaii*, 585 U.S. 667, 695 (2018).

99.    Section 212(f) "enabl[es] the President to supplement the other grounds of inadmissibility in the INA." *Id.* at 684 (quoting *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)). It specifies that if the President determines "that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," the President "may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f).

100.    Section 212(f) has been invoked to address noncitizens who risked harm to the United States and as a diplomatic tool to induce cooperation from foreign countries. *Hawaii*, 585 U.S. at 679-80, 692-93. Section 212(f) has never been invoked to target U.S. institutions by barring from the country noncitizens who wish to affiliate with those institutions.

101.    Section 215(a) of the INA makes it unlawful "for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). As the Supreme Court and the government have recognized,

this provision has typically been invoked in conjunction with Section 212(f) and "'substantially overlap[s]' with [Section 212(f)]." *Hawaii*, 585 U.S. at 683 n.1 (quoting Brief for Petitioners 32-33).

## FACTUAL BACKGROUND

### A.    Harvard's Participation in the F-1 Visa Program

102.    Harvard first became certified to host students with F-1 visas in 1954 and has continuously maintained its certification for the 70-plus years since. Throughout that period, all of Harvard's required biennial petitions for recertification have been approved without issue.

103.    The seamless recertification across this period—spanning more than 14 presidential administrations—reflects a determination by DHS and SEVP (and their predecessor agencies) that the University has remained eligible for certification. In other words, Harvard is a bona fide and established institution of learning; possesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses and is in fact engaged in instruction in those courses; and has continuously complied with applicable recordkeeping, retention, and reporting requirements and all other requirements of the governing regulations.

104.    International students who hold F-1 visas, as well as students and scholars visiting on J-1 visas, form a vital part of Harvard's academic community. Over 5,000 F-1 visa holders are currently enrolled at Harvard, representing approximately 26% of the total student body across Harvard's 13 schools. These students hail from 143 different countries, contributing unique social, cultural, and intellectual perspectives that enrich classroom discussions, research endeavors, and campus life. Among other activities, they run labs, teach courses, assist faculty members, drive innovative research, and participate across a wide range of athletic programs and 42 varsity sports.

105.    Harvard's ability to enroll international students directly affects its global rankings and reputation as an institution of higher learning. Harvard fills its classes with the most qualified applicants from around the world.

106.    For some disciplines, this results in classes with large shares of international students. For example, at the Harvard Kennedy School, the mission of which depends on providing students with the perspectives of current and future policymakers from around the world, 49% of students hold F-1 visas. One third of Harvard Business School students are F-1 visa holders. And nearly all—94%—of the students in Harvard Law School's LL.M. program on comparative law are international students with F-1 visas.

107.    Leading scholars often consider a university's international profile, the caliber of its students, and its research and teaching support resources in deciding where to teach and conduct research.

108.    The many notable alumni who have enrolled at Harvard as student visa holders—including Benazir Bhutto, the former Prime Minister of Pakistan, Ellen Johnson Sirleaf, the former President of Liberia, Empress Masako of Japan, and countless corporate executives, university professors, and high-ranking government officials across the world—amplify and enhance the profile that attracts top talent to the University.

## B.    Harvard's Response to Antisemitism on its Campus

109.    On October 7, 2023, the terrorist organization Hamas conducted a surprise attack on Israeli citizens. This began an ongoing war between Israel and Hamas. The escalating conflict in the Middle East dominated headlines around the globe. In the United States, protests erupted on university campuses across the country. Like other schools, Harvard experienced increased

tensions among members of its campus community, including students. Members of the Jewish and Israeli communities at Harvard reported treatment that was vicious and reprehensible.

110.    In the aftermath of these events, Harvard made substantial changes aimed at ensuring its campus is safe, fair, and welcoming to Jewish and Israeli students. Harvard has adopted new accountability procedures and clarified policies; imposed meaningful discipline for those who have violated applicable policies; enhanced programs designed to address bias and promote ideological diversity and civil discourse; hired staff to support these programs and impacted students; and enhanced safety and security measures. Harvard's work is ongoing, and it continues to update and enforce its policies and procedures to protect Jewish and Israeli members of the Harvard community while permitting the free and open exchange of ideas.

## C.    The Government's Attack on Harvard and Retaliatory Funding Freeze

111.    Following President Trump's inauguration, on February 3, 2025, the government announced the formation of its Federal Task Force, led by Senior Counsel to the Assistant Attorney General for Civil Rights, Leo Terrell.[8] On February 26, 2025, a news article reported Terrell as saying, "When you see universities start losing millions of dollars in federal funding, you're going to see a change in their behavior."[9]

112.    A few days later, Terrell stated in a Fox Business clip he later shared on X, "I've targeted ten schools. Columbia, Harvard, Michigan, UCLA, USC. Let me tell you what we're going to do. We're going to take away your funding."[10]

---

[8] *See* Press Release, U.S. Dep't of Just., Off. of Pub. Affs., *Justice Department Announces Formation of Task Force to Combat Anti-Semitism* (Feb. 3, 2025) (attached as **Exhibit 4**).

[9] Andrew Bernard, "Head of DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years'," *Jewish News Syndicate*, at 2 (Feb. 26, 2025) (attached as **Exhibit 5**).

[10]  @TheLeoTerrell,  X  (Feb. 28,  2025,  11:48 AM ET),  https://x.com/TheLeoTerrell/status/1895516455392985171.

113.    On February 28, 2025, the Federal Task Force issued a press release announcing its plans to visit ten university campuses, including Harvard, to gather information about allegations of antisemitic incidents.[11]

114.    On March 31, 2025, the Federal Task Force sent Harvard a memorandum announcing its intent to conduct a review of more than $8.7 billion in federal research grants to Harvard and "its affiliates."[12] This memorandum stated that Harvard was "being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment." *Id.*

115.    On April 3, 2025, the government sent Harvard a letter (the "April 3 Letter") conveying a list of "broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars," which went far beyond concerns regarding antisemitism.[13]

116.    On April 11, 2025, the government sent another letter to Harvard that went even further (the "Demand Letter").[14] The Demand Letter superseded the April 3 Letter, enumerating detailed conditions for "maintain[ing] Harvard's financial relationship with the federal government." *Id.* at 1. These conditions sought to regulate or put under direct government control

---

[11] Press Release, U.S. Dep't of Just., *Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism* (Feb. 28, 2025) (attached as **Exhibit 6**).

[12] Memorandum from Josh Gruenbaum, U.S. Gen. Servs. Admin., to Alan M. Garber, Harvard Univ., and Penny Pritzker, Lead Member, Harvard Corp., *Re: Review of Federal Government Contracts*, at 1 (Mar. 31, 2025) (attached as **Exhibit 7**).

[13] Letter from Josh Gruenbaum, U.S. Gen. Servs. Admin., Sean R. Keveney, U.S. Dep't of Health & Hum. Servs., and Thomas E. Wheeler, U.S. Dep't of Educ., to Alan M. Garber, Harvard Univ., and Penny Pritzker, Lead Member, Harvard Corp., at 1-2 (Apr. 3, 2025) (the "April 3 Letter") (attached as **Exhibit 8**).

[14] Letter from Josh Gruenbaum, U.S. Gen. Servs. Admin., Sean R. Keveney, U.S. Dep't of Health & Hum. Servs., and Thomas E. Wheeler, U.S. Dep't of Educ., to Alan M. Garber, Harvard Univ., and Penny Pritzker, Lead Member, Harvard Corp. (Apr. 11, 2025) (the "Demand Letter") (attached as **Exhibit 9**).

a slate of core university functions, including regulation of the viewpoints of Harvard's students

and faculty. Among the conditions were the following (emphases added):

- **Viewpoint Diversity in Admissions and Hiring.** … [T]he University shall commission an external party … to *audit the student body, faculty, staff, and leadership for viewpoint diversity*, such that *each department, field, or teaching unit must be individually viewpoint diverse*. … Harvard must *abolish all criteria, preferences, and practices, whether mandatory or optional, throughout its admissions and hiring practices*, that function as ideological litmus tests. Every department or field found to lack viewpoint diversity *must be reformed by hiring a critical mass of new faculty* within that department or field who will provide viewpoint diversity; every teaching unit found to lack viewpoint diversity *must be reformed by admitting a critical mass of students* who will provide viewpoint diversity.

- **Governance and leadership reforms.** … Harvard must make meaningful governance reform and restructuring … [including] empowering tenured professors and senior leadership, and, from among the tenured professoriate and senior leadership, exclusively those most devoted to the scholarly mission of the University and committed to the changes indicated in this letter; *reducing the power held by students and untenured faculty*; [and] *reducing the power held by faculty (whether tenured or untenured) and administrators more committed to activism than scholarship*.

- **International Admissions Reform.** … [T]he University must reform its recruitment, screening, and admissions of international students to *prevent admitting students* hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence, including students supportive of terrorism or anti-Semitism. Harvard will immediately report to federal authorities, including [DHS] and [the] State Department, any foreign student, including those on visas and with green cards, who commits a conduct violation. … [T]hese reforms must be durable and demonstrated through *structural and personnel changes*.

- **Student Discipline Reform and Accountability.** … In the future, funding decisions for student groups or clubs *must be made exclusively by a body of University faculty accountable to senior University leadership*. In particular, Harvard must end support and recognition of those student groups or clubs that engaged in anti-Semitic activity since October 7th, 2023, including the Harvard Palestine Solidarity Committee, Harvard Graduates Students 4 Palestine, Law Students 4 Palestine, Students for Justice in Palestine, and the National Lawyers Guild, and discipline and render ineligible the officers and active members of those student organizations.

- **Transparency and Monitoring.** … The University shall … , [n]o later than June 30, 2025, and every quarter thereafter … at least until the end of 2028, … submit to the federal government a report—certified for accuracy—that documents its progress on the implementation of the reforms detailed in this letter …. [and] must also, to the satisfaction of the federal government, disclose the source and purpose of all foreign funds; cooperate

with the federal government in a forensic audit of foreign funding sources and uses, including how that money was used by Harvard, its agents, and … third parties acting on Harvard's campus.

*Id.* at 1-5.

117.    The Demand Letter reiterated the government's expectation of "immediate cooperation in implementing these critical reforms." *Id.* at 5. It cited no authority for that demand or any other.

118.    On April 14, 2025, Harvard declined to accept the government's demands. President Garber, in a letter to the Harvard Community, wrote: "Although some of the demands outlined by the government are aimed at combating antisemitism, the majority represent direct governmental regulation of the 'intellectual conditions' at Harvard."[15] President Garber added that "[n]o government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue." *Id.* at 2.

119.    In a separate April 14, 2025 letter to the government, attorneys for Harvard stated that "[n]either Harvard nor any other private university can allow itself to be taken over by the federal government."[16]

120.    The government's response was swift and punishing. The same day, the Federal Task Force responded by "announcing a freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University" (the "Freeze Order").[17] The Freeze Order cited

---

[15] Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ., Office of the President (Apr. 14, 2025) (the "Garber Letter") (attached as **Exhibit 10**).

[16] Letter from William A. Burck & Robert K. Hur, Counsel for Harvard Univ., to Josh Gruenbaum, U.S. Gen. Servs. Admin., Sean R. Keveney, U.S. Dep't of Health & Hum. Servs., and Thomas E. Wheeler, U.S. Dep't of Educ., at 2 (Apr. 14, 2025) (attached as **Exhibit 11**).

[17] Press Release, U.S. Dep't of Educ., *Joint Task Force to Combat Anti-Semitism Statement*

"[t]he harassment of Jewish students" and "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." *Id.*

121. The government immediately began implementing the Freeze Order. Within hours of the Freeze Order, Harvard began receiving stop work orders.

122. The next morning, on April 15, 2025, President Trump published the following post on his social media website, Truth Social:[18]



Donald J. Trump ✓
@realDonaldTrump

Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting "Sickness?" Remember, Tax Exempt Status is totally contingent on acting in the PUBLIC INTEREST!

**7.98k** ReTruths  **34.3k** Likes                    Apr 15, 2025, 10:09 AM

---

*Regarding Harvard University* (Apr. 14, 2025) (the "Freeze Order") (attached as **Exhibit 12**).

[18] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 15, 2025, 10:09 AM) (attached as **Exhibit 13**); *see also* Tyler Pager et al., *Trump Threatens Harvard's Tax Status, Escalating Billion-Dollar Pressure Campaign*, N.Y. Times (Apr. 15, 2025) (attached as **Exhibit 14**).

123.    The following day—April 16, 2025—President Trump again targeted Harvard in a Truth Social post:[19]



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> Everyone knows that Harvard has "lost its way." They hired, from New York (Bill D) and Chicago (Lori L), at ridiculously high salaries/fees, two of the WORST and MOST INCOMPETENT mayors in the history of our Country, to "teach" municipal management and government. These two Radical Left fools left behind two cities that will take years to recover from their incompetence and evil. Harvard has been hiring almost all woke, Radical Left, idiots and "birdbrains" who are only capable of teaching FAILURE to students and so-called "future leaders." Look just to the recent past at their plagiarizing President, who so greatly embarrassed Harvard before the United States States Congress. When it got so bad that they just couldn't take it anymore, they moved this grossly inept woman into another position, teaching, rather than firing her ON THE SPOT. Since then much else has been found out about her, but she remains in place. Many others, like these Leftist dopes, are teaching at Harvard, and because of that, Harvard can no longer be considered even a decent place of learning, and should not be considered on any list of the World's Great Universities or Colleges. Harvard is a JOKE, teaches Hate and Stupidity, and should no longer receive Federal Funds. Thank you for your attention to this matter!
>
> **9.91k** ReTruths  **41.7k** Likes                              Apr 16, 2025, 7:05 AM

### D.    The April 16, 2025 Records Request

124.    Within hours of the President's April 16 Truth Social post, Secretary Noem sent HIO a letter entitled "Student and Exchange Visitor Program Records Request."[20] The Records Request demanded voluminous documents, including those not contemplated by any of the applicable statutes or regulations, and threatened to withdraw Harvard's certification in the event of noncompliance:

a.    The Records Request began by stating that Harvard's foreign student program "is a privilege[,] … not a guarantee" and that "[t]he United States Government understands that Harvard University relies heavily on foreign student funding from over 10,000

---

[19] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 16, 2025, 7:05 AM) (attached as **Exhibit 15**).

[20] Letter from Kristi Noem, U.S. Dep't of Homeland Sec., to Maureen Martin, Harvard Univ., *Student and Exchange Visitor Program Records Request* (Apr. 16, 2025) (the "Records Request") (attached as **Exhibit 16**).

foreign students to build and maintain their substantial endowment." *Id.* at 1. The Request offered

no basis for this claim, though its reference to "foreign student funding," *id.*, echoes language in

the April 11 Demand Letter seeking to require Harvard to permit the government to inspect all

"foreign funding sources and uses," Ex. 9 at 5.

       b.    The Records Request continued: "At the same time, your institution has

created a hostile learning environment for Jewish students due to Harvard's failure to condemn

antisemitism." Ex. 16 at 1. Quoting Executive Order 14188, the letter stated that it is "the policy

of the United States to combat anti-Semitism vigorously, using all available and appropriate legal

tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic

harassment and violence." *Id.* Again, the Request offered no basis for the claim that Harvard

"created a hostile learning environment for Jewish students," *id.*, which paralleled claims made in

the government's March 31, April 3, and April 11 communications to Harvard. *See* Ex. 7 at 1

(asserting that Harvard has neglected its "dut[y] to curb or combat anti-Semitic harassment"); Ex. 8

at 1 (asserting that Harvard operates "biased programs that fuel antisemitism"); Ex. 9 at 3

(asserting that some Harvard programs have "[e]gregious [r]ecords of [a]ntisemitism").

       c.    The Records Request then shifted gears, stating that the SEVP "regularly

monitors SEVP-approved schools to determine their compliance with governing regulations," and

the "accuracy of information in" SEVIS. *Id.* It went on: "Your continued SEVP certification is

contingent upon meeting the requirements of the U.S. Department of Homeland Security (DHS),

set out in *Title 8 Code of Federal Regulations (8 CFR)*." Ex. 16 at 1.

       d.    Pointing to one of the provisions contained in the referenced regulations,

the Records Request then stated that "SEVP may request information regarding nonimmigrant

students from certified schools under *8 CFR § 214.3(g)(1)*." *Id.* Invoking the government's

authority under that provision, the Records Request stated that Harvard's PDSO "must submit the following information to our office on or before April 30, 2025," *id.* at 1-2:

1. Provide relevant information regarding each student visa holder's known illegal activity, and whether the activity occurred on campus.

2. Provide relevant information regarding each student visa holder's known dangerous or violent activity, and whether the activity occurred on campus.

3. Provide relevant information regarding each student visa holder's known threats to other students or university personnel, and whether the activity occurred on campus.

4. Provide relevant information regarding each student visa holder's known deprivation of rights of other classmates or university personnel, and whether the activity occurred on campus.

5. Provide relevant information on whether any student visa holders have left Harvard University due to dangerous or violent activity or deprivation of rights, and whether the activity occurred on campus.

6. Provide relevant information on whether any student visa holders have had disciplinary actions taken as a result of making threats to other students or populations or participating in protests, which impacted their nonimmigrant student status.

7. Provide relevant information regarding each student visa holder's obstruction of the school's learning environment.

8. Provide relevant information regarding each student visa holder's maintenance of at least the minimum required coursework to maintain nonimmigrant student status.

125.    Despite the letter's invocation of Section 214.3(g)(1), much of the information listed above is not information that HIO is required to maintain or report to DHS under that provision.

126.    The Records Request did not define any terms in these requests—such as "known," "illegal," "dangerous or violent," "deprivation of rights," "threats," or "obstruction of the school's learning environment"—and did not specify a time period for which the specified information was

requested. Yet it threatened serious consequences for noncompliance, for both the PDSO who would be responsible for submitting the responsive documents and Harvard itself:

  e. As to the PDSO, attached to the Records Request was an "Evidence Attestation Statement" to be completed and signed by the PDSO and submitted in connection with the production of documents. This Attestation asked the PDSO to personally attest to her understanding that "willful misstatements may constitute perjury (18 USC § 1621)"; that "providing materially false, fictitious, or fraudulent information may subject me to criminal prosecution under 18 USC § 1001"; and that "[o]ther possible criminal and civil violations may also be applicable[.]" Ex. 16 at 3; *see also id.* at 2 (also invoking 8 U.S.C. § 1001 and "[o]ther possible criminal and civil violations").

  f. The Evidence Attestation Statement also asked the PDSO to attest to her understanding that "SEVP may review my institution's certification at any time and may request documentation to establish my institution's eligibility for certification as well as review evidence and records for compliance with the regulations." *Id.* at 3.

  g. Finally, the Records Request warned Harvard that "[f]ailure to comply with this Records Request will be treated as a voluntary withdrawal, per *8 CFR § 214.3(h)(3)(vii)*." *Id.* at 2. It concluded: "Therefore, in the event the school fails to respond to this request [by April 30, 2025], SEVP will automatically withdraw the school's certification. The withdrawal will not be subject to appeal." *Id.*

  127. Shortly after DHS sent HIO the Records Request, it publicized the Request—as well as DHS's cancellation of "two DHS grants totaling over $2.7 million to Harvard"—in a press release (the "Press Release").[21] The Press Release referred to the Records Request as a "scathing

---

[21] Press Release, U.S. Dep't of Homeland Sec., *Secretary Noem Terminates $2.7 Million in DHS*

letter demanding detailed records on Harvard's foreign student visa holders' illegal and violent acts." *Id.* The Press Release asserted that Harvard has "ben[t] the knee to antisemitism," adopted a "radical ideology," and allowed "anti-American, pro-Hamas ideology [to] poison[] its campus and classrooms," such that "Harvard's position as a top institution of higher learning is a distant memory." *Id.* It concluded by stating that "if Harvard cannot verify it is in full compliance with its reporting requirements, the university will lose the privilege of enrolling foreign students." *Id.*

128.    Over the last twelve years, HIO has received only a handful of requests for information about its F-1 visa students. These requests have generally sought straightforward information plainly contemplated by the applicable regulations, such as the student's email, physical addresses, and phone number, about a single student at a time. No prior request has asked for information as broad or open-ended—or covering as many students—as the Records Request. No prior request, moreover, has ever come directly from the Secretary of Homeland Security. Nor has any prior request ever been accompanied by a Press Release calling the request "scathing" or citing Harvard's so-called "radical ideology"; included an "Evidence Attestation Statement" suggesting that any misstatement may subject Harvard's PDSO or anyone else to criminal liability; or threatened Harvard with "voluntary withdrawal" for less-than-perfect compliance.

E.    **Subsequent Developments Prior to April 30**

129.    In the run-up to the April 30 deadline for Harvard's response to the Records Request, the Administration continued its public attack on Harvard.

130.    On April 17, 2025, Secretary of Education Linda McMahon sent Harvard a letter accusing the University of "incomplete and inaccurate disclosures" of foreign gifts and contracts

---

*Grants; Orders Harvard to Prove Compliance with Foreign Student Requirements* (Apr. 16, 2025) (the "Press Release") (attached as **Exhibit 17**).

pursuant to Section 117 of the Higher Education Act of 1965. Secretary McMahon demanded that Harvard release a list of gifts, grants, and contracts from foreign sources, communications between Harvard and foreign governments, and internal correspondence about expelled foreign students and faculty affiliated with foreign countries.

131.    On April 20, 2025, the Administration threatened to pull an additional $1 billion in Harvard's federal funding that had been allocated for health research.

132.    On April 24, 2025, President Trump posted the following message on Truth Social:[22]



Donald J. Trump ✓
@realDonaldTrump

Harvard is an Anti-Semitic, Far Left Institution, as are numerous others, with students being accepted from all over the World that want to rip our Country apart. The place is a Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE. It is truly horrific! Now, since our filings began, they act like they are all "American Apple Pie." Harvard is a threat to Democracy, with a lawyer, who represents me, who should therefore be forced to resign, immediately, or be fired. He's not that good, anyway, and I hope that my very big and beautiful company, now run by my sons, gets rid of him ASAP!

4.74k ReTruths  22k Likes                                    Apr 24, 2025, 9:33 AM

133.    On April 25, 2025, the Acting Chair of the Equal Employment Opportunity Commission, Andrea Lucas, filed a charge that launched an investigation in Harvard's employment practices.[23]

134.    On April 30, 2025, President Trump, Secretary Noem, and Secretary McMahon discussed Harvard at a public Cabinet meeting.[24] At the conclusion of Secretary McMahon's

---

[22] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 24, 2025, 9:33 AM) (attached as **Exhibit 18**).

[23] In addition, on May 13, 2025, the Department of Justice issued a civil investigative demand to the University, purporting to investigate False Claims Act violations related to Harvard's compliance with the U.S. Supreme Court's 2023 decision in *Students for Fair Admissions v. President and Fellows of Harvard College.*

[24] The White House, *President Trump Participates in a Cabinet Meeting, Apr. 30, 2025*, YouTube

remarks, President Trump offered his view that Harvard was "scamming the public and hiring people like [former New York City Mayor Bill] DeBlasio and [former Chicago Mayor] Lori Lightfoot who are certainly two of the worst mayors in the history of our country, paying them a fortune on salary, and having them teach our children how to manage cities and how to manage government." *Id.* at 1:21:50-1:22:20. President Trump then asked Secretary McMahon for an update on Harvard specifically, which led to the following colloquy:

> **Secretary McMahon:** We're negotiating with them. When we went back to them to say we'd welcome them back to the negotiating table, their response was a lawsuit. So [Attorney General] Pam [Bondi] and her team are helping work with that. … We're staying tough with them. The other thing we're looking at also are the [Section] 117[25] violations of these big universities, like Harvard and others, who are not reporting, as they're required to do by law, foreign money that comes in and how much that is and where it comes from.
>
> **President Trump:** And students, where are these people coming from?
>
> **Secretary Noem:** So, we've pulled back their grants because Harvard isn't responding to us [about] criminal activity by their students. And until they give us that list they're not getting any more grants from Homeland Security.
>
> **President Trump:** Good, I think we should pull it back. *The students they have, the professors they have, the attitude they have, is not American* and I think you should—a grant is a grant, we don't have to give grants.
>
> **Secretary Noem:** Exactly right.
>
> **President Trump:** So we'll pull back the grant.

*Id.* at 1:22:21-1:23:33 (emphasis added).

---

(Apr. 30, 2025), available at https://www.youtube.com/watch?v=wn2XtufOAHc.

[25] Secretary McMahon's reference was likely to Section 117 of the Higher Education Act of 1965, 20 U.S.C. § 1011f.

**F.      Harvard's Compliance With the Records Request**

135.    Despite the scope and context of the Records Request, HIO worked diligently to comply and produce responsive information that it maintains under the governing statute and regulations.

136.    To that end, within the 10 working days DHS allotted for compliance, HIO collected and produced thousands of pages of records responsive to the Records Request maintained by or accessible to HIO as required by 8 C.F.R. § 214.3(g)(1).

137.    The production was accompanied by a cover letter (the "First Production Letter") explaining the scope of Harvard's responsive production and responding to the allegations in the Demand Letter.[26]

138.    The First Production Letter noted that "portions of the [Records Request] seek categories of information using terms not defined in the regulation." First Production Letter at 1. But it explained that, because "Harvard is committed to good faith compliance," it was "producing responsive materials that [it] believe[s] are reasonably required by 8 C.F.R. § 214.3(g)(1)." *Id.*

139.    Accordingly, the First Production Letter explained that Harvard had produced the following categories of "information relevant to F-1 status" in response to the Records Request: (1) "[r]ecords that reflect student enrollment information, by SEVIS ID Number, for each F-1 visa holder enrolled at Harvard throughout the duration of the program in which that student is presently enrolled"; and (2) "SEVIS termination and cancellation data that include SEVIS ID Number, SEVIS Status, Education Level, Major/Academic Program, Date of Termination or Cancellation, Termination or Cancellation Reason, and Program Start and End Date." *Id.* at 2. This latter

---

[26] Letter from Steve Bunnell, Counsel for Harvard Univ., to SEVP, *Re: Harvard University – BOS214F00162000* (April 30, 2025) (the "First Production Letter") (attached as **Exhibit 19**).

category of data, the First Production Letter explained, "reflect[s] changes to nonimmigrant status for a range of reasons, including but not limited to disciplinary action," though "[t]he basis for any such disciplinary action is not covered by 8 C.F.R. § 214.3(g)(1)." *Id.*

140.    Since the Records Request did not specify a time period, Harvard produced this information for "academic year 2023-2024 and academic year 2024-2025 (through and including April 30, 2025)," though the student enrollment records produced as to some students cover shorter or longer periods, depending on the duration of the student's academic program. *Id.* at 1.

141.    The First Production Letter noted that "Harvard's production reflects its best effort to meet [the Records Request's April 30] deadline notwithstanding the scope of the requests in the [Records Request], which cover more than 5,200 students." *Id.* And it explained that "[i]f Harvard discovers additional information falling into the categories listed above, it will promptly produce that information as a supplement." *Id.*

142.    The First Production Letter emphasized, in bold and underlined font, that "**Harvard is complying with the [Records Request's] lawful requests in lieu of voluntary withdrawal from SEVP certification. Harvard does not seek to withdraw from SEVP. Any withdrawal of Harvard's certification would be involuntary and would cause immediate harm and disruption to Harvard, its mission, and its thousands of international students who hail from over 140 countries and enrich the University community immeasurably with their presence and contributions.**" *Id.*

143.    The First Production Letter went on to state, also in bold and underlined font, that "**[i]f any aspect of this production raises questions or is deemed incomplete or insufficient in any respect, and *before* DHS takes any steps adverse to Harvard due to any perceived**

**deficiency in Harvard's response, Harvard respectfully requests that DHS notify Harvard's**
**counsel in writing and provide an opportunity to discuss, to be heard, and to cure.**" *Id.* at 2-3.

144.    Finally, the First Production Letter addressed the Records Request's allegations
"that Harvard has 'created a hostile learning environment for Jewish students' due to a purported
'failure to condemn antisemitism,' and that Harvard 'relies heavily on foreign student funding …
to build and maintain [its] substantial endowment.'" *Id.* at 3. The Production Letter explained that
"[t]hese assertions have no basis in fact, and [the Records Request] suggests none." *Id.* And it
affirmed that, "[t]o the contrary, Harvard has strongly and repeatedly condemned antisemitism and
has undertaken substantial efforts to ensure that its campus is safe, fair, and welcoming to Jewish
and Israeli students—including those who attend Harvard on F-1 visas." *Id.*

145.    The First Production Letter concluded: "In short, Harvard denies the [Records
Request's] assertions and any suggestion that they justify actions by DHS in contravention of the
statutes and regulations governing SEVP." *Id.*

## G.    Developments from April 30 to May 7

146.    In the days after Harvard responded to the Records Request, Harvard received no
outreach from DHS. But the Administration continued to target Harvard in other ways.

147.    On May 2, 2025, the President posted the following on Truth Social:[27]



Donald J. Trump
@realDonaldTrump

We are going to be taking away Harvard's Tax Exempt Status. It's what they
deserve!

**9.53k** ReTruths  **47.7k** Likes                    May 02, 2025, 7:25 AM

---

[27] President Donald J. Trump (@realDonaldTrump), Truth Social (May 2, 2025, 7:25 AM)
(attached as **Exhibit 20**).

148.    Then, on May 5, 2025, Secretary of Education Linda McMahon sent Harvard a letter (the "McMahon Letter") informing the University that "Harvard should no longer seek GRANTS from the federal government, since none will be provided."[28] The McMahon Letter stated that Harvard has "invited foreign students" who "show contempt for the United States of America[] to its campus." *Id.* at 1. And it asked: "Where do many of these 'students' come from, who are they, how do they get into Harvard, or even into our country—and why is there so much HATE?" *Id.* at 1. The McMahon Letter also criticized Harvard's hiring decisions and its "management" and asserted that Harvard "teach[es] [its] students to despise" the "free-market system." *Id.* at 1-2.

149.    In a May 7, 2025 television interview, Secretary McMahon reiterated these statements, stating about Harvard: "[A]re they vetting students who are coming in from outside of the country to make sure they're not activists? Are they vetting professors that they're hiring to make sure that they're not teaching ideologies, but that they're teaching subject matter? …. They've taken a very hard line, so we took a hard line back."[29]

## H.    DHS's Second Information Request and Harvard's Second Document Production

150.    On May 7, 2025, Acting General Counsel of the Department of Homeland Security, Joseph Mazzara, sent an email to Harvard's counsel (the "Mazzara Email") indicating that DHS had reviewed Harvard's initial document production and "concluded that it does not completely address the Secretary's request."[30]

---

[28] Letter from Linda E. McMahon, Sec. of Educ., to Dr. Alan Garber, Harvard Univ., at 2 (May 5, 2025) (the "McMahon Letter") (attached as **Exhibit 21**).

[29] CNBC Television, *Education Secretary Linda McMahon to Harvard: Obey the law and you can be eligible for funding*, YouTube, at 1:04-31 (May 7, 2025), available at https://www.youtube.com/watch?v=bb6YJUHMqc4.

[30] Email from Joseph Mazzara, DHS, to Steve Bunnell, Counsel for Harvard Univ. (May 7, 2025)

151.    The Mazzara Email reiterated DHS's request for four of the eight categories of information referenced in the Records Request—those relating to student visa holders' "known illegal activity," "known dangerous or violent activity," "known threats to other students or university personnel," and "known deprivation of rights of other classmates or university personnel"—and indicated that Harvard's response should "likely include the disciplinary records for student visa holders." *Id.*

152.    The Mazzara Email gave Harvard until the close of business on May 14, 2025, to respond.

153.    On May 12, 2025, Harvard's counsel sent Acting General Counsel Mazzara an email observing that the Mazzara Email, like the Records Request before it, "ask[ed] for information outside of 8 C.F.R. § 214.3(g)(1), which was cited in the [Records Request]."[31] The email asked if Harvard should construe the Mazzara Email "as requesting information under 8 C.F.R. § 214.3(g)(2)." *Id.* On May 13, 2025, Harvard had not yet heard back from Mr. Mazzara, so its counsel sent Mr. Mazzara a follow-up email again asking whether Harvard should construe the request as one under § 214.3(g)(2). *See id.*

154.    On the morning of May 14, 2025, Mr. Mazzara wrote back, stating: "While many of the records we are seeking and have received may be required to be kept by Harvard pursuant to 8 C.F.R. § 214.3(g)(1), our authority to request information is broader. We are requesting records pursuant to all our authorities contained in 8 C.F.R.§ 214 (many of which are also refenced [sic] in the letter)." *Id.*

---

(the "Mazzara Email") (attached as **Exhibit 22**).

[31] Email Exchange between Joseph Mazzara, DHS, and Steve Bunnell, Counsel for Harvard Univ., at 1 (May 7 to May 14, 2025) (attached as **Exhibit 23**).

155.    On May 14, 2025, Harvard sent DHS a letter (the "Second Production Letter") responding to the additional requests made in the Mazzara Email.[32] As the Second Production Letter explained, Harvard identified three F-1 visa students who were subject to discipline that resulted in a change of academic status as defined in 8 C.F.R. § 214.3(g)(1)(vi) where the discipline was based on one of the four categories of conduct identified in the Mazzara Email. *Id.* at 1. For each of these three students, Harvard provided information about the conduct that led to discipline. *Id.* The Second Production Letter explained that, as to the request for conduct that involved "known deprivation of rights," Harvard interpreted the phrase in line with federal statutes that "use[d] similar formulations [to] refer to rights secured by the Constitution or statute" and found no students who received discipline on the basis of having "deprived a classmate or university personnel of such rights." *Id.* at 2. But the Second Production Letter stated that, if DHS meant "something else" by this phrase, DHS should "let [Harvard] know, and, upon receipt of clarification, [Harvard] will promptly reply in accordance with applicable law." *Id.*

156.    The Second Production Letter reiterated that Harvard did not wish to voluntarily withdraw its SEVP certification, and asked for notice and an opportunity to be heard before DHS took any adverse action stemming from perceived noncompliance. *Id.*

## I.    DHS's Revocation of Harvard's Certification

157.    After submitting the Second Production Letter, Harvard did not hear from DHS for more than a week.

158.    Then, on May 22, 2025, Secretary Noem sent Harvard a letter entitled "Harvard's Student and Exchange Visitor Program Decertification" (the "Revocation Notice") stating that,

---

[32] Letter from Steve Bunnell, Counsel for Harvard Univ., to SEVP, *Re: Harvard University – BOS214F00162000* (April 30, 2025) (the "Second Production Letter") (attached as **Exhibit 24**).

"effective immediately, Harvard University's Student and Exchange Visitor Program certification **is revoked**."[33]

159.    The Revocation Notice, like the Records Request before it, stated that "it is a privilege to enroll foreign students." The Notice added that "it is also a privilege to employ aliens on campus." *Id.* at 1. It asserted that, as a result of Harvard's "refusal to comply with multiple requests to provide [DHS] pertinent information while perpetuating an unsafe campus environment that is hostile to Jewish students, promotes pro-Hamas sympathies, and employs racist 'diversity, equity, and inclusion' policies, [Harvard] ha[s] lost this privilege." *Id.*

160.    The Revocation Notice acknowledged the profound consequences of decertification. It stated that, effective immediately, "Harvard is prohibited from having any aliens on F- or J- nonimmigrant status for the 2025-2026 academic school year." *Id.* It also stated that "[t]his decertification also means that existing aliens on F- or J- nonimmigrant status must transfer to another university in order to maintain their nonimmigrant status." *Id.*

161.    The Revocation Notice stated that this action was "the unfortunate result of Harvard's failure to comply with simple reporting requirements." *Id.* But the Revocation Notice did not identify any specific "reporting requirements" with which Harvard had failed to comply, and did not cite any of the regulatory provisions governing an SEVP-certified school's reporting requirements. *Id.* Instead, the Revocation Notice stated that Harvard had failed to comply with the demands in the Records Request and the Mazzara Email for "information regarding misconduct and other offenses that would render foreign students inadmissible or removable." *Id.* But, as

---

[33] Letter from Kristi Noem, U.S. Dep't of Homeland Sec., to Maureen Martin, Harvard Univ., *Harvard's Student and Exchange Visitor Program Decertification* (May 22, 2025) (the "Revocation Notice") (attached as **Exhibit 25**).

explained above, the regulations governing schools' eligibility for SEVP certification do not require Harvard to maintain records on such information or report it to DHS.

162.    The Revocation Notice stated that DHS had revoked Harvard's certification "to send a clear signal to Harvard and all universities that want to enjoy the privilege of enrolling foreign students, that the Trump Administration will enforce the law and root out the evils of anti-Americanism and antisemitism in society and campuses." *Id.*

163.    The Revocation Notice offered Harvard no opportunity to defend itself against the withdrawal of its certification, including to present evidence or be heard on its argument that it has complied with the law. *See* 8 C.F.R. § 214.4(b)-(f). Nor did the Revocation Notice offer Harvard any opportunity to cure the supposed noncompliance prior to revocation of its certification. *See* 5 U.S.C. § 558(c).

164.    The Revocation Notice also provided Harvard no avenue for seeking administrative review of the withdrawal of its certification. *See* 8 C.F.R. § 214.4(h).

165.    Having summarily revoked Harvard's SEVP certification, the Revocation Notice went on to state that "[i]f Harvard would like the opportunity of regaining [SEVP] certification before the upcoming academic school year, [it] must provide all of the information requested below **within 72 hours**":

> 1.    Any and all records, whether official or informal, in the possession of Harvard University, including electronic records and audio or video footage, regarding illegal activity whether on or off campus, by a nonimmigrant student enrolled in Harvard University in the last five years.
>
> 2.    Any and all records, whether official or informal, in the possession of Harvard University, including electronic records and audio or video footage, regarding dangerous or violent activity whether on or off campus, by a nonimmigrant student enrolled in Harvard University in the last five years.
>
> 3.    Any and all records, whether official or informal, in the possession of Harvard University, including electronic records and audio or video footage, regarding

threats to other students or university personnel whether on or off campus, by a nonimmigrant student enrolled in Harvard University in the last five years.

4. Any and all records, whether official or informal, in the possession of Harvard University, including electronic records and audio or video footage, regarding deprivation of rights of other classmates or university personnel whether on or off campus, by a nonimmigrant student enrolled in Harvard University in the last five years.

5. Any and all disciplinary records of all nonimmigrant students enrolled in Harvard University in the last five years.

6. Any and all audio or video footage, in the possession of Harvard University, of any protest activity involving a nonimmigrant student on a Harvard University campus in the last five years.

166. These demands seek different—and a broader set of—information than what the Records Request sought. And the Revocation Notice cited no statutory or regulatory authority for these additional demands.

167. Shortly after she sent Harvard the Revocation Notice, Secretary Noem posted an image of the Revocation Notice on X (the "Noem Post"), along with a message stating that "[t]his Administration is holding Harvard accountable for fostering violence, antisemitism, and coordinating with the Chinese Communist Party on its campus."[34]

168. DHS also issued a press release (the "Revocation Press Release") proclaiming: "Harvard University Loses Student and Exchange Visitor Program Certification for Pro-Terrorist Conduct."[35] The Revocation Press Release began by asserting: "Harvard's leadership has created an unsafe campus environment by permitting anti-American, pro-terrorist agitators to harass and physically assault individuals, including many Jewish students, and otherwise obstruct its once-

---

[34] Secretary Krist Noem (@Sec_Noem), X (May 22, 2025, 2:01 PM ET) (the "Noem Post") (attached as **Exhibit 26**).

[35] Press Release, U.S. Dep't of Homeland Sec., *Harvard University Loses Student and Exchange Visitor Program Certification for Pro-Terrorist Conduct* (May 22, 2025) (the "Revocation Press Release") (attached as **Exhibit 27**).

venerable learning environment. Many of these agitators are foreign students. Harvard's leadership further facilitated, and engaged in coordinated activity with the CCP, including hosting and training members of a CCP paramilitary group complicit in the Uyghur genocide." *Id.* at 1. The Revocation Press Release then quoted the Noem Post in its entirety, adding boldfaced emphasis to the Noem Post's reference to "the **Chinese Communist Party**." *Id.*

169.    The Revocation Press Release stated that "[o]n April 16, 2025, Secretary Noem demanded Harvard provide information about the criminality and misconduct of foreign students on its campus." *Id.* And it asserted that "Harvard University brazenly refused to provide the required information requested and ignored a follow up request from the Department's Office of General Council. [sic] Secretary Noem is following through on her promise to protect students and prohibit terrorist sympathizers from receiving benefits from the U.S. government." *Id.* The Revocation Press Release also did not identify any specific reporting requirements with which Harvard allegedly failed to comply.

170.    The Revocation Press Release stated that "[t]his action comes after DHS terminated $2.7 million in DHS grants for Harvard last month." *Id.*

171.    The Revocation Press Release then went on to list a number of purported "[f]acts about Harvard's toxic campus climate," including allegations of "pervasive race discrimination and anti-Semitic harassment plaguing [Harvard's] campus." *Id.* The Revocation Press Release also stated that "[i]nstead of protecting its students, Harvard has let crime rates skyrocket, enacted racist DEI practices, and accepted boatloads of cash from foreign governments and donors." *Id.* at 2.

172.    Harvard has had no opportunity to rebut the factual allegations levied against it in the Revocation Notice, Noem Post, and Revocation Press Release, as  required under DHS's process for withdrawal of SEVP certification.

173.    Notably, the State Department seemed unaware that Secretary Noem was taking action to dismantle a program over which she lacks legal authority—*i.e.*, the Exchange Visitor Program for J visas. When asked after the Revocation Notice and Revocation Press Release about those actions, State Department spokesperson Tammy Bruce stated: "I can't speak to Secretary Noem's plans and strategy and her decision to implement this."[36]

**J.    Harvard's Lawsuit and This Court's Temporary Restraining Order**

174.    On May 23, 2025, less than 24 hours after the Revocation Notice issued, Harvard filed a Complaint and Motion for a Temporary Restraining Order seeking to immediately enjoin the Revocation Notice. *See* ECF Nos. 1, 4. The Complaint alleged multiple violations of the U.S. Constitution, the APA, and the statutes and regulations governing the visa programs at issue.

175.    The Court granted Harvard's Motion and entered a Temporary Restraining Order on May 23, 2025. *See* ECF No. 11. The Order enjoined "Defendants, their agents, and anyone acting in concert or participation with" them from either (a) "[i]mplementing, instituting, maintaining, or giving effect to the revocation of Plaintiff's SEVP certification"; or (b) "[g]iving any force or effect to the Department of Homeland Security's May 22, 2025 Revocation Notice." *Id*.

176.    The Court also scheduled a status conference for May 27, 2025, and a preliminary injunction hearing for May 29, 2025. *See* ECF Nos. 12, 13.

177.    At the status conference on May 27, 2025, counsel for the government did not indicate whether or when the government might file a brief opposing Harvard's requested relief in this litigation and instead averted to "other possible avenues the government might take."

---

[36] New York Post, *State Department Defends the Cancellation of Harvard's Student and Exchange Visitor Program*, YouTube (May 22, 2025), https://www.youtube.com/watch?v=isRL-wnUREY.

**K.    The Administration's Continued Targeting of Harvard**

178.    Despite the entry of this Court's Order on May 23, 2025, the Administration's targeting of Harvard continued unabated.

179.    On May 25, 2025, President Trump addressed "the problem with Harvard" when speaking to the press.[37] He asserted that "there are about 31 percent, almost 31 percent, of foreigners coming to Harvard," an apparent reference to the percentage of international students in Harvard's student body. *Id*. That figure is incorrect.

180.    The President went on to state that "they refuse to tell us who the people are," an apparent allegation that Harvard does not identify its international students to the government. *Id*. He continued: "we want a list of those foreign students." *Id*. Those statements reflect a fundamental misunderstanding of the visa programs at issue and the regulations that govern them. International students at Harvard who hold F and J visas are present in the United States only because *the government* has vetted them and approved their visas, and it has detailed information about those students available at the click of a button in SEVIS.

181.    The President also acknowledged in these remarks that "a lot of the foreign students we wouldn't have a problem with" and that "many will be okay, I assume." *Id*. Yet he offered the assumption—without any support—that "with Harvard, many will be bad." *Id*.

182.    President Trump's comments targeting Harvard continued the next day. On May 26, 2025, President Trump published the following post on Truth Social:[38]

---

[37] KSDK News, *Trump: Harvard has too many foreigners, we want to know who they are*, YouTube (May 25, 2025), https://www.youtube.com/watch?v=VOhyUbBGgQ0.

[38] President Donald J. Trump (@realDonaldTrump), Truth Social (May 26, 2025, 8:27 AM) (attached as **Exhibit 29**).



183.    Minutes later, he made a second post about Harvard on the same site:[39]



184.    On May 28, 2025, according to public reporting, the White House convened top

government officials from nearly a dozen agencies to discuss additional punitive measures to

target Harvard.[40] The reporting cited senior Administration officials who said that they would

continue to target Harvard, and it quoted a White House spokesperson who said: "The latest

moves against Harvard are truly just scratching the surface." *Id*. at 3. The same spokesperson also

stated that Harvard would suffer a "self-inflicted demise" because it "decided to litigate." *Id.*

---

[39] President Donald J. Trump (@realDonaldTrump), Truth Social (May 26, 2025, 8:42 AM) (attached as **Exhibit 30**).

[40] Sophia Cai & Megan Messerly, *White House convenes meeting to brainstorm new Harvard measures*, Politico (May 30, 2025) (attached as **Exhibit 31**).

185.    During a press conference in the Oval Office that day, President Trump again targeted Harvard.[41] Echoing prior remarks, he insinuated that the government has no information regarding the identity of Harvard's international students and "where … these people come from." *Id*. Again, this is untrue. The government has information about, among other things, the identity of every Harvard student on a nonimmigrant visa and where they are from—which the government can access through its own database with a keystroke.

186.    The President also made clear that his Administration was retaliating against Harvard for its exercise of its legal rights. He stated: "Every time they fight, they lose another $250 million. Yesterday we found another $100 million." *Id*. He continued that Harvard was "hurting" itself by "fighting" the Administration, commenting: "They want to show how smart they are, and they're getting their ass kicked." *Id*.

187.    Terrell put it even more plainly. Speaking of Harvard during a Fox News appearance days later, he warned: "We are going to go after them where it hurts them financially, and there's numerous ways—I hope you can read between the lines—there's numerous ways to hurt them financially."[42]

## L.    DHS's Issuance of a NOIW

188.    Hours after the President's remarks on May 28, 2025, and on the eve of this Court's preliminary injunction hearing, DHS issued a NOIW to Harvard by sending an email to HIO personnel at 11:48 PM. *See* ECF No. 49.

---

[41] Bloomberg Podcasts, *Trump Says Harvard Must Show List of Foreign Students (Full Q&A)*, YouTube (May 28, 2025), https://www.youtube.com/watch?v=L6yjpvZTbjA.

[42] Betsy Klein, *Universities quietly negotiating with White House aide to try to avoid Harvard's fate, source says*, CNN (May 31, 2025) (attached as **Exhibit 32**).

189.    The NOIW is directed to Harvard's PDSO and signed by Defendant Lyons. It announces the government's intent to withdraw Harvard's SEVP certification for allegedly "failing to comply with the federal regulations detailed below."

190.    The NOIW identifies three purported "compliance issues." The first is that Harvard allegedly failed to comply with reporting requirements under 8 C.F.R. § 214.3(g) in its responses to the Records Request and Mazzara Email. The NOIW declares that "Harvard University has not sufficiently addressed the requested information," without identifying why the responses were insufficient or what information Harvard was required by regulation, but allegedly failed, to provide.

191.    The second "compliance issue" is described as DHS's "serious concerns that Harvard has failed to maintain a campus environment free from violence and antisemitism." The NOIW presents various allegations, without any supporting material, and then proclaims that "failure to protect Jewish students is a valid and substantive reason for withdrawing Harvard University's SEVP certification to enroll foreign students."

192.    Third on the NOIW's list of "compliance issues" is a claim that Harvard's "practices with foreign entities raise national security concerns." These practices and concerns were not cited in the Records Request or Mazzara Email, nor in the Revocation Notice. These alleged practices range from Harvard's receipt of funding from foreign governments to Harvard's alleged ties to China.

193.    The government's counsel filed a notice regarding the NOIW the following morning, hours before the preliminary injunction hearing. *See* ECF No. 49. The notice provided no further explanation of why the NOIW was issued or how it interacted with the earlier Revocation Notice.

194.    On May 29, 2025, the Court held a preliminary injunction hearing. At that hearing, the government's counsel denied that issuance of the NOIW was "an admission that anything was done wrong" yet argued the case was moot and resisted entry of a preliminary injunction. ECF No. 52. The government's counsel also argued that any "injunction should be narrowed to sort of the decertification through this process and just enjoining that and no other sort of legal bases that might be used for other means." *Id*. He did not specify the "other means" that the government intended to pursue, but they soon became apparent.

## M.    The State Department "Pilot Program"

195.    Later that day, the State Department issued a cable from Secretary Rubio to all diplomatic and consular posts, titled: "ACTION REQUEST – Enhanced vetting for All Nonimmigrant Visa Applicants Traveling to Harvard University."[43]

196.    The cable directed recipients "to immediately begin additional vetting of any nonimmigrant visa applicant seeking to travel to Harvard University for any purpose," including any "prospective students, students, faculty, employees, contractors, guest speakersk [sic], and tourists." It described the initiative as a "pilot for expanded screening and vetting of visa applicants" to "be expanded over time," yet the sole institution targeted by the "pilot" is Harvard.

197.    It continued: "Effectively immediately, consular sections must conduct a complete screening of the online presence of any nonimmigrant visa applicant seeking to travel to Harvard University for any purpose," detailing how consular sections can identify such a connection to Harvard. When applicants are linked to Harvard, "[s]uch applicants, if otherwise eligible, should be refused under INA 221(g) pending review of their online presence."

---

[43] Department of State, *ACTION REQUEST – Enhanced vetting for All Nonimmigrant Visa Applicants Traveling to Harvard University* (May 30, 2025) (attached as **Exhibit 33**); *see* Nahal Toosi & Eric Bazail-Eimil, *State begins rolling out expanded student visa vetting – starting with Harvard*, Politico (May 30, 2025) (attached as **Exhibit 34**).

198.    The cable further stated that applicants' lack of online presence by applicants or their setting of social media accounts to private "may be reflective of evasiveness and call into question the applicant's credibility" and warrant refusal "under INA 214(b)."

199.    The cable also directed that even if an applicant "is otherwise eligible for the requested nonimmigrant status, the consular officer must refuse the case under INA 221(g), inform the applicant that his case is subject to review of his online presence, request that the applicant set all of his social media accounts to 'public,' and remind him that limited access to or visibility of social media activity could be construed as an effort to evade or hide certain activity."

200.    According to the cable, all applicants "must" be referred to the Fraud Prevention Unit using a designated category for social media review—after which that unit "must not limit their review of these cases to the applicant's social media activity alone" but rather "should conduct a comprehensive and thorough vetting of each such applicant."

201.    To justify this new program targeting Harvard-bound visa applicants, Secretary Rubio points to "information identified by the Department of Homeland Security" about an alleged failure by Harvard "to maintain a campus environment free from violence and anti-Semitism"— the precise language of the NOIW.

## N.    The President's Proclamation Against Harvard

202.    That was not the end of the government's pursuit of "other means" to accomplish its desired and unlawful result. On June 4, 2025, President Trump issued a Proclamation entitled "Enhancing National Security by Addressing Risks at Harvard University" (the "Proclamation"), which prohibits foreign nationals from entering the United States to study or research at Harvard— and only Harvard.[44]

---

[44] President Donald J. Trump, Executive Order, *Enhancing National Security by Addressing Risks at Harvard University* (June 4, 2025) (the "Proclamation") (attached as **Exhibit 35**).

203.    The Proclamation makes a series of unsubstantiated claims about Harvard, ranging from assertions that crime rates at the University have risen, to allegations that Harvard failed to comply with the Records Request to contentions about Harvard's "extensive entanglements with foreign countries," to criticisms of Harvard's past and present admissions practices and "excessive foreign student enrollment."

204.    It continues: "Considering these facts, I have determined that it is necessary to restrict the entry of foreign nationals who seek to enter the United States solely or principally to participate in a course of study at Harvard University or in an exchange visitor program hosted by Harvard University."

205.    The Proclamation primarily relies on Section 212(f) of the INA, 8 U.S.C. § 1182(f), which authorizes the President to "suspend the entry" of "all aliens or any class of aliens" when their entry "would be detrimental to the interests of the United States." It also cites Section 215(a) of the INA, *id.* § 1185(a), which provides that "[u]nless otherwise ordered by the President, it shall be unlawful … for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." *Id.* § 1185(a)(1).

206.    In issuing the Proclamation, the President did not find that a class of person's entry into the United States "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Quite the contrary, the Proclamation merely bars F-1 students from entering the United States "to pursue a course of study *at Harvard*," and bars J-1 students and researchers from entering "to participate in an exchange visitor program *hosted by Harvard*." Ex. 35, § 1 (emphases added).

207.    In other words, the Proclamation does not deem the entry of an alien or class of aliens to be "detrimental to the interests of the United States," 8 U.S.C. § 1182(f), because noncitizens who are impacted by the Proclamation *can* enter the United States—just so long as they go somewhere other than Harvard. The Proclamation says so explicitly: "The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to any alien who enters the United States to attend other universities through the SEVP." Ex. 35, § 2(c).

208.    The Proclamation goes far beyond suspending and limiting entry "to aliens who enter or attempt to enter the United States to begin attending Harvard University through the SEVP after the date of this proclamation." It also directs the Secretary of State to "consider, in the Secretary's discretion, whether foreign nationals who currently attend Harvard University and are in the United States pursuant to F or J visas and who otherwise meet the criteria described in section 1 of this proclamation should have their visas revoked."

209.    In other words, the Proclamation aims to accomplish precisely what the Secretary attempted through the unlawful and enjoined Revocation Notice: to prevent Harvard from enrolling new visa holders, and to prevent the visa holders already studying, researching, and teaching at Harvard from continuing to do so.

210.    The suspension effectuated by the Proclamation lasts for six months, and it provides that within 90 days, "the Attorney General and the Secretary of Homeland Security shall jointly submit to the President, through the Assistant to the President for National Security Affairs, a recommendation on whether an extension or renewal of the suspension and limitation on entry in section 1 of this proclamation is in the interests of the United States."

211.    The Proclamation was accompanied by a "Fact Sheet" that aptly summarizes the Proclamation's key provisions as follows:

- "The Proclamation suspends the entry into the United States of any new Harvard student as a nonimmigrant under F, M, or J visas.

- It directs the Secretary of State to consider revoking existing F, M, or J visas for current Harvard students who meet the Proclamation's criteria.

- The Proclamation does not apply to aliens attending other U.S. universities through the Student Exchange Visa Program (SEVP) and exempts aliens whose entry is deemed in the national interest."[45]

## O.    The Immediate and Irreparable Harm to Harvard

212.    The government's unlawful revocation of Harvard's longstanding SEVP status, the President's Proclamation, and the overall campaign by this Administration targeting Harvard and its international students are causing the University immediate and irreparable harm and will lead to a cascade of additional negative consequences affecting Harvard and its community.

213.    First, the government's actions seriously and immediately disrupt the University's ongoing, day-to-day operations. International students play vital roles on campus, including as instructors, academic and residential advisors, lab managers, and medical providers. Eliminating the population of F-1 students and J-1 students and scholars fulfilling these functions will halt important research, hamper the educational experience for students left without teachers or advisors, and deprive the community of medical care. This is particularly true in the STEM fields, where international students contribute significantly to Harvard's critical research enterprise. The sudden inability to maintain these students' enrollment jeopardizes ongoing research projects, damages Harvard's reputation as a world-class research institution, and deprives our nation of the benefits of these vital research projects.

---

[45] The White House, *Fact Sheet: President Donald J. Trump Restricts Foreign Student Visas at Harvard University* (June 4, 2025) (attached as **Exhibit 36**).

214.    Second, the loss of certification irreparably harms Harvard's ability to compete with other institutions for the most qualified applicants at home and abroad. In our interconnected global economy, a university that cannot welcome students from all corners of the world is at a competitive disadvantage. Harvard's F-1 and J-1 visa programs are therefore a key factor in maintaining its standing in academia. If the government's actions are permitted to stand, Harvard will not be able to offer admission to *any* new visa holder students for *at least* the next two class years, *see* 8 C.F.R. § 214.4(*i*)(1)-(2), and perhaps longer, since once DHS takes the drastic action of withdrawing certification, it forever retains discretion whether to allow Harvard *ever* to petition for renewed certification, *id.* § 214.4(a)(2). Even if Harvard were ever to regain certification or the President were to rescind the Proclamation, future applicants may shy away from applying out of fear of further reprisals from the government.

215.    Third, the abrupt revocation of certification and the unprecedented Proclamation targeting Harvard impair the educational experience of *all* Harvard students by diminishing the global character and overall strength of the institution. This is particularly true for specific programs that offer richer experiences when they feature dialogue between students from different backgrounds. For instance, the Harvard Kennedy School curriculum focuses on global politics, international systems of governance, and similar topics on which F-1 and J-1 visa holders can provide unique and direct commentary. Similarly, Harvard Law School's LL.M. program is enhanced by the participation of F-1 and J-1 visa holders, who help deepen the community's understanding of comparative law and foreign legal systems. The loss of these international students materially diminishes the breadth of discussion and debate across the entire Harvard community and further irreparably damages Harvard and its reputation.

216.    Fourth, the government's actions irreparably damage HIO as an institution. Given the importance of the F-1 and J-1 visa programs to Harvard's educational mission, Harvard has invested substantial resources in HIO programs and personnel to attract and enroll top-tier international students, integrate them into the broader Harvard community, and comply with SEVP and EVP requirements. HIO employs 25 professionals with specific expertise in supporting these processes, and many are likely to go elsewhere if DHS's actions are sustained. That office has an annual budget of $3.44 million, a substantial portion of which is devoted to facilitating the admission of international students and success of Harvard's visa programs. The revocation of SEVP certification renders much of Harvard's investment in that office and the visa programs effectively worthless, undermining years of careful institutional planning and resource allocation.

217.    These immediate and irreparable harms are not hypothetical. Harvard and its visa holders began facing immediate repercussions following the Revocation Notice on May 22, 2025.

218.    As a result of the Revocation Notice, students and faculty alike have expressed profound fear, concern, and confusion. Faculty members and administrators have been inundated with questions from current international students and scholars about their status and options.

219.    Many international students and scholars are reporting significant emotional distress that is affecting their mental health and making it difficult to focus on their studies. Some were afraid to attend their own graduation ceremonies out of fear that some immigration-related action would be taken against them. Some have cancelled upcoming international travel plans to conduct academic research or see their families in light of the risk that they might not be admitted back into the United States. Some are concerned that losing their visas could mean being forced to separate from partners who live in Cambridge. Some fear being compelled to return abruptly to

home countries where they might not be safe due to ongoing conflicts or where they could face persecution based on their identity or background.

220.   At least half a dozen foreign consulates in the United States have reached out to Harvard seeking information about how the Revocation Notice affects the welfare of students and scholars from their countries who are enrolled at Harvard.

221.   Because of the Revocation Notice, currently enrolled international students are reconsidering their futures at Harvard. Too many international students to count have inquired about the possibility of transferring to another institution. At least three currently enrolled *domestic* students have expressed serious interest in transferring rather than attend an educational institution without international students.

222.   Even for students who wish to transfer, however, that option may not be available to them or may harm their academic career. At the undergraduate level, for example, many transfer deadlines have already passed for the upcoming fall term. At the graduate and PhD level, transfer options can be limited given the small sizes of programs and the specialized fields that many students at Harvard pursue. Moreover, these students may lose competitively awarded research grants and other funding sources if they transfer. Transfer is particularly challenging for PhD students who have completed their requirements other than finishing their dissertations, and these students may be required to backtrack or start again even if they can secure a transfer.

223.   The Revocation Notice is also hurting Harvard's ability to attract and enroll international students and scholars going forward, particularly in STEM fields. As one example, an incoming international student about to begin a graduate program in physics at Harvard has decided to transfer to another U.S. institution given the uncertainty surrounding Harvard's ability to welcome international students.

224.    Dozens of incoming international students have asked about deferring their admission or obtaining Harvard's assistance in enrolling elsewhere. At least one international student has officially deferred admission to a PhD program at Harvard Medical School for visa-related reasons, and another incoming student to Harvard Law School has withdrawn for visa-related reasons.

225.    The Revocation Notice is also hurting Harvard's ability to enroll *domestic* students. For example, an incoming domestic student at Harvard Business School requested a deferral following the Revocation Notice, stating that the educational experience would be different without any international students.

226.    In addition, administrators are already receiving emails from prospective international applicants who are worried about whether they will be able to apply to Harvard for the 2026-27 academic year.

227.    At the same time, news coverage and public statements indicate that universities in Europe and Asia are already taking the Revocation Notice as an opportunity to recruit talented U.S. and international students who would otherwise pursue their studies at Harvard. This is especially true for international students who have already been accepted into STEM programs at Harvard.

228.    As one example, on May 23, the Hong Kong University of Science and Technology (HKUST) issued a press release announcing "**unconditional offers, streamlined admission procedures, and academic support**" (bold in original) for current and incoming international students at Harvard.[46] The press release promoted HKUST as a leader in data science and artificial

---

[46] Press Release, The Hong Kong University of Science and Technology, *HKUST Opens Doors to Harvard Students Amid Global Academic Shifts* (May 23, 2025), (attached as **Exhibit 37**).

intelligence and said: "A dedicated team has been established to assist students with admissions, credit transfers, housing, and visa logistics. Interested individuals are encouraged to contact hkust-Harvard@ust.hk for personalized guidance."

229.    Furthermore, even during the few hours when the Revocation Notice was in effect last week, Harvard visa holders, visa applicants, and their dependents experienced significant consequences during interactions with the U.S. government.

230.    Within hours of the Revocation Notice issuing, HIO began to receive reports that DHS's Customs and Border Protection at Boston Logan International Airport was requiring Harvard visa holders and their dependents to undergo secondary processing, a more detailed inspection to verify admissibility. Individuals subject to secondary processing during this timeframe included a visa holder's wife and one-year-old child, as well as a former head of state who is a current fellow at the Harvard Kennedy School.

231.    The Revocation Notice has also affected admitted international students who have not yet matriculated and visiting scholars who have not yet started their research.

232.    On the morning of May 23, HIO began to receive reports of incoming international students and scholars who are scheduled to travel to the United States to begin studies at Harvard in the fall but were told by U.S. embassy officials that their visa applications had been denied. At least ten international students or scholars who applied for visas were refused for "administrative processing" immediately following the Revocation Notice.

233.    For example, an incoming student scheduled to start a PhD program in Government in the fall reported that on May 23, a consular officer at the U.S. embassy in São Paulo told him that his visa application was "refused" for "administrative processing." The consular officer explained that she was awaiting further instructions from the Department of State and could not

answer the student's follow-up questions about whether it would be possible to obtain visa approval if the Revocation Notice were enjoined or withdrawn. After this incident, the incoming student cancelled his travel plans so that he could stay in São Paulo and address the situation regarding his visa.

234.    Likewise, an incoming visiting research scholar at the Harvard School of Dental Medicine visited the U.S. embassy in Prague on May 23 to obtain a J-1 visa to travel to the United States. A consular officer at the embassy informed this scholar that her visa was refused due to the Revocation Notice. According to the consular officer, because of the Revocation Notice issued on May 22, the embassy was required to revoke visa applications for Harvard University starting the morning of May 23. The officer gave the scholar a slip that stated she had "been found ineligible for a nonimmigrant visa based on section 221(g) of the U.S. Immigration and Nationality Act (INA)." The slip said, "In your case the following is required," and the consular officer checked the box marked "Other" and handwrote, "SEVP Revocation / Harvard."

235.    On the same day, another incoming student in the LL.M. program at Harvard Law School visited the U.S. embassy in Bern to obtain his F-1 visa, as needed to travel to the United States for fall semester. He plans to leave his current job to start his studies in the United States. The consular officer informed the student that the officer could not issue visas for Harvard students at this time and gave the student a slip indicating that the student's application "has been refused under § 221(g)."

236.    Likewise, an incoming student to a PhD program at Harvard Medical School reported that he attended his visa interview on May 23 at the U.S. embassy in Milan and was given a section 221(g) slip that said his visa application was "refused" for "administrative processing."

The consular officer explained that administrative processing was required given "the current situation."

237.    Other incoming international students whose visa applications had *already* been approved received notices that their visas had been revoked.

238.    For example, an incoming Harvard College student who had just been approved at the U.S. embassy in Madrid on May 22 received a notice on May 23 that her visa application had been refused under section 221(g) because Harvard's SEVP certification had been revoked before the visa could be printed. The notice said the student had a year to adjust her application by providing documentation from a different institution.

239.    Another incoming student from the United Kingdom is scheduled to start in the Graduate School of Arts and Sciences in September. He reported that at his visa appointment on May 16, a consular officer took his passport and told him that his visa application was successful. But on May 23, his passport was returned with a section 221(g) slip stating that his "case is refused based DHS terminating Harvard's SEVP certification [sic]."

240.    Although HIO has heard from some of these visa applicants that they were contacted by U.S. officials following entry of the Court's Temporary Restraining Order and invited to submit additional documentation, the harms to Harvard-affiliated visa applicants have continued notwithstanding the Court's Order—including due to the "pilot program" subjecting visa applicants affiliated with Harvard to additional scrutiny, including their social media accounts.

241.    As a result of the "pilot program," incoming students have reported being told by government officials that they will be subject to delayed administrative processing of their visa applications and additional vetting of their social media accounts simply because they are admitted Harvard students.

242.    For example, one applicant for a J visa was required to share his social media account information and attend four different interviews at the São Paulo consulate before ultimately receiving his visa.

243.    Another incoming Harvard student reported that two other visa applicants slated to attend other universities were approved at their visa interviews at the U.S. Embassy in Vienna, whereas the Harvard student was required to undergo additional review and corresponding delay.

244.    Consular officers are asking both Harvard-affiliated visa applicants and their spouses to change all social media account settings from private to public to allow embassy staff to conduct a review of their social media.

245.    The President's Proclamation—which seems to effectuate the action this Court has already enjoined—intensifies all of this harm to Harvard and its students.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### CONTRARY TO CONSTITUTIONAL RIGHT
### FIRST AMENDMENT RETALIATION
### (AS TO SEVP REVOCATION)

246.    Harvard incorporates by reference the allegations of the preceding paragraphs.

247.    Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

248.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(B).

249.    The First Amendment provides that the federal government "shall make no law … abridging the freedom of speech." U.S. Const. amend. I. The First Amendment also "prohibits government officials from relying on the threat of invoking legal sanctions and other means of

coercion … to achieve the suppression of disfavored speech." *Vullo*, 602 U.S. at 175 (ellipses in original) (internal quotation marks and citation omitted).

250.    Academic freedom is "a special concern of the First Amendment." *Keyishian*, 385 U.S. at 603. Colleges and universities have a constitutionally protected right to manage an academic community and evaluate teaching and scholarship free from governmental interference. This right protects "not only students and teachers, but their host institutions as well." *Asociación de Educación Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007) (citation omitted).

251.    Harvard has long exercised its academic freedom by "determin[ing] for itself on academic grounds who may teach" and what they teach. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 47 (2d Cir. 2000) (citation omitted).

252.    "As a general matter the First Amendment prohibits government officials from subjecting an [entity] to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (internal quotation marks and citation omitted). To succeed on a First Amendment retaliation claim, a plaintiff must prove that: (1) it "engaged in constitutionally protected conduct"; (2) it "was subjected to an adverse action by the defendant"; and (3) "the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012); *see also Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

253.    Each of these elements is satisfied here.

254.    The demands in the April 11 Demand Letter go to the core of Harvard's constitutionally protected academic freedom by seeking to assert governmental control over Harvard's teaching, community, and governance. Accepting these demands would restrict

Harvard's academic "programs," Ex. 9 at 3, thereby constraining the content Harvard's faculty may teach students. The demands also require that Harvard modify its hiring and admissions practices to achieve the government's preferred balance of viewpoints in every "department," "field," and "teaching unit." *Id.* And they seek to restrict Harvard's ability to manage its own internal "governance" and "leadership," requiring Harvard to engage in a "governance reform and restructuring" that "exclusively" "empower[s]" those faculty members who are "most … committed to the changes" outlined in the Demand Letter and "reduc[es] the power held by faculty … and administrators" who are "committed to activism." *Id.* at 1.

255.    Adhering to the demands would amount to relinquishing control over Harvard's core academic functions, thereby ceding Harvard's constitutionally protected academic freedom. Harvard's refusal to do so, as stated by President Garber in his April 14 Letter to the Harvard Community, is protected by the First Amendment. *See* Ex. 10.

256.    Defendants then subjected Harvard to a series of adverse actions. Defendants issued the Revocation Notice and revoked Harvard's SEVP certification. That action was adverse: it sought to deprive Harvard of its constitutionally protected property interest in continued certification; prevent Harvard from continuing its robust F-1 and J-1 visa programs, which have long inured to the benefit of the broader Harvard community; damage Harvard's reputation as a global research institution by preventing the university from attracting top students and faculty from around the world; render meaningless years of careful institutional planning and resource allocation with respect to its F-1 and J-1 programs; and cause immediate chaos by potentially rendering over a quarter of Harvard's student body unlawfully present in the United States just days before the end of the spring term and then the start of the summer term, without regard to the vital contributions these students make on campus.

257.    Harvard has established the requisite causal link between its protected conduct—the exercise of its academic prerogatives and the refusal to relinquish that freedom—and the adverse actions. The causal link is clear from the broader context in which the decertification occurred: a series of unprecedented adverse actions, each in contravention of governing statutes and regulations, that began mere hours after Harvard announced it would not comply with the demands.

258.    The link between Harvard's protected conduct and the government's adverse actions is also clear from the government's own statements. In the April 16 Press Release, DHS explained that it had issued a "scathing letter"—the Records Request—to Harvard demanding "detailed records on Harvard's foreign student visa holders' illegal and violent activities," because of what the government views as Harvard's tolerance for "anti-American, pro-Hamas ideology poisoning its campus and classrooms." The May 22 Revocation Notice makes similar statements, albeit with shifting rationales, accusing Harvard of "perpetuating an unsafe campus environment that is hostile to Jewish students, promotes pro-Hamas sympathies, and employs racist 'diversity, equity, and inclusion' policies" and stating that the Administration will "root out the evils of anti-Americanism and antisemitism in society and campuses." In the May 22 Revocation Press Release, DHS stated that Harvard had lost its SEVP certification "for Pro-Terrorist Conduct" and its "toxic campus climate," not for any identified regulatory violations, and further stated that the revocation of Harvard's certification "comes after DHS terminated $2.7 million in DHS grants for Harvard last month." Ex. 27, at 1.

259.    The surrounding circumstances—including the White House meeting and the State Department's Harvard-only pilot program—make plain that Defendants have withdrawn Harvard's SEVP certification, suspended the entry of Harvard students, and directed the potential

revocation of current Harvard students' F and J visas not for any valid reason, but because they seek to punish the University for its courage in refusing to surrender its independence or relinquish its constitutional rights under the First Amendment.

260.    Further evidence of Defendants' retaliation is the President's June 4, 2025 Proclamation, which "restrict[s] the entry of foreign nationals who seek to enter the United States solely or principally to participate in a course of study at Harvard University or in an exchange visitor program hosted by Harvard University" and "den[ies] foreign nationals access to Harvard under the auspices of educational exchange." Ex. 35. The Proclamation brands Harvard as "an unsuitable destination for foreign students and researchers" and asserts that Harvard has "failed to discipline at least some categories of conduct violations on campus." *Id*. And the Fact Sheet accompanying the Proclamation claims that Harvard "has a demonstrated history of ... radicalism" and "has persisted in prioritizing diversity, equity, and inclusion." *Id*. These statements all demonstrate that the revocation of Harvard's certification and the Proclamation's suspension of entry are simply part of the government's larger scheme of retaliation against Harvard.

261.    This constitutional violation causes immediate, ongoing, and irreparable harm to Harvard.

### COUNT II
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### CONTRARY TO CONSTITUTIONAL RIGHT
### FIRST AMENDMENT VIEWPOINT DISCRIMINATION
### (AS TO SEVP REVOCATION)

262.    Harvard incorporates by reference the allegations of the preceding paragraphs.

263.    Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

264.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." *Id*. § 706(2)(B).

265.     The First Amendment prohibits the regulation or censure of speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed*, 576 U.S. at 168-69 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Such government action is a "'blatant' and 'egregious form of content discrimination'" and is subject to strict scrutiny. *Id.* at 168, 171 (citation omitted). A finding that the government has discriminated based on viewpoint is "all but dispositive" in a First Amendment challenge. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

266.     The series of retaliatory actions against Harvard impermissibly seeks to employ viewpoint-based distinctions as a means of correcting the University's perceived "ideological capture," Ex. 9 at 1, and "history of ... radicalism," Ex. 36, at 2. The Demand Letter expressly classifies Harvard's community members on the basis of their actual or perceived viewpoints, requiring differential treatment along ideological lines. Defendants' actions designed to coerce Harvard's compliance with these demands, including the summary decertification and Proclamation, similarly aim to bring Harvard's expressive activity (and the expression of Harvard's community members) more closely in line with the government's preferred viewpoints. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976), *superseded by statute as stated in McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003).

267.     Defendants' campaign of retribution against Harvard is expressly viewpoint-based, both in its motivation and its demanded effects. The Demand Letter itself makes plain that its demands are premised on the Administration's perception of Harvard as an institution in the grips of "ideological capture," whose leadership, faculty, and students lack sufficient "viewpoint

74

diversity." Ex. 9 at 1-2. And the Press Release, which links those demands to what it touts as a "scathing letter" threatening Harvard's SEVP certification, doubles down—citing Harvard's "anti-American … ideology," its research that supposedly "brand[s] conservatives as far-right dissidents," and its "public health propaganda." Ex. 17. The Revocation Notice and the Revocation Press Release make many of the same points, while not identifying any failure on Harvard's part to comply with the regulations governing SEVP certification. In other words, Defendants expressly attribute perceived viewpoints to Harvard and have targeted the University (including its SEVP certification) on that basis.

268.    Viewpoint discrimination that is retaliatory cannot be justified by any government interest.

269.    In any event, even supposing the revocation of Harvard's certification served some compelling governmental interest, Defendants cannot reasonably argue that summary withdrawal is the "least restrictive means of achieving" it. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Defendants' own regulations supply, and indeed *require*, a less restrictive means of ensuring compliance by SEVP-certified institutions: namely, by following a detailed set of procedures for resolving alleged noncompliance that present opportunities for the institution to cure prior to withdrawal. Defendants failed to follow those procedures and instead summarily revoked Harvard's certification.

270.    These constitutional violations cause immediate, ongoing, and irreparable harm to Harvard.

### COUNT III
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### CONTRARY TO CONSTITUTIONAL RIGHT
### UNCONSTITUTIONAL CONDITION
### (AS TO SEVP REVOCATION)

271.    Harvard incorporates by reference the allegations of the preceding paragraphs.

272.    Defendants have taken final agency action by issuing the Revocation Notice and summarily revoking Harvard's SEVP certification. *See* 5 U.S.C. § 704.

273.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." *Id*. § 706(2)(B).

274.    Although the government generally may "impose limits on the use of [government] funds to ensure they are used in the manner Congress intends," the government cannot "leverage funding to regulate speech" or other protected conduct "outside the contours of the [government] program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213-15 (2013).

275.    The First Amendment forbids the government from conditioning access to government benefits on the relinquishing of constitutional rights or adherence to the government's viewpoint. That is true even where the speaker "has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (quotation marks omitted).

276.    SEVP certification is a government benefit and thus cannot be conditioned on an institution's relinquishing its academic freedom or adopting the government's preferred viewpoints.

277.    Here, the government made clear that Harvard would face significant consequences unless it agreed to conform the content of its teaching, the composition of its community, and the structure of its governance to align with the government's agenda—that is, if it conformed its own speech to the government's preferred message. Those conditions are plainly unconstitutional.

278.    Harvard complied with the lawful inquiries in the Records Request and the Mazzara Email by producing requested documents that fell within the scope of the University's recordkeeping obligations as a SEVP-certified institution. Yet DHS summarily deemed these

responses "insufficient," Ex. 25 at 1, without identifying any actual regulatory requirement with which Harvard had failed to comply, and revoked Harvard's certification "effective immediately," *id.*, without providing Harvard an opportunity to cure any purported noncompliance or otherwise following the usual, required procedures.

279.    By threatening to revoke Harvard's SEVP certification in retaliation for constitutionally protected conduct, and then following through on that threat without any legitimate regulatory basis for doing so, Defendants effectively conditioned Harvard's SEVP certification on the University's relinquishing of its constitutional rights. Put otherwise, Harvard's SEVP certification was effectively conditioned not on Harvard's compliance with its obligations as a SEVP-certified institution, but instead on its compliance with the administration's impermissible ideological demands. That condition violates the First Amendment.

280.    This constitutional violation causes immediate, ongoing, and irreparable harm to Harvard.

## COUNT IV
### VIOLATION OF THE FIRST AMENDMENT
### (EQUITABLE CAUSE OF ACTION – *ULTRA VIRES*)
### (AS TO SEVP REVOCATION AND PRESIDENTIAL PROCLAMATION)

281.    Harvard incorporates by reference the allegations of the preceding paragraphs

282.    Federal courts have the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015); *see also R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 42-43 (1st Cir. 2002) (stating that "district court[s]" retain the "nonstatutory" power "to review agency action that is ultra vires" and provide equitable relief unless Congress precludes that review).

283.    As alleged in Counts I, II, and III, Defendants' action to revoke Harvard's SEVP certification constitutes impermissible First Amendment retaliation and viewpoint discrimination

and involved the imposition of unconstitutional conditions. The Constitution forecloses any lawful authority for that actions.

284.    For the same reasons articulated in Counts I, II, and III, Defendants' actions to implement the Proclamation and thereby suspend the entry of any new Harvard student as a nonimmigrant under F or J visas and to direct the potential revocation of existing F or J visas for current Harvard students likewise constitute impermissible retaliation, viewpoint discrimination, and the imposition of an unconstitutional condition, all in violation of the First Amendment.

285.    Even supposing the suspension of entry of Harvard students served some compelling governmental interest, Defendants cannot reasonably argue that the suspension is the "least restrictive means of achieving" it. *Ams. for Prosperity*, 594 U.S. at 607 (citation omitted). Suspending the entry into the United States of any new Harvard student as a nonimmigrant under F or J visas and directing the Secretary of State to consider revoking existing such visas for current Harvard students are plainly not narrowly tailored to whatever interest—including any purported national security interest—the government might invoke.

286.    Because Defendants' actions are unconstitutional and *ultra vires*, this Court should enjoin Defendants in their official capacities from withdrawing Harvard's SEVP certification and implementing the suspension of entry or revocation of Harvard students seeking or holding F or J visas.

287.    If Defendants' actions are not declared unlawful, set aside, and enjoined as unconstitutional and *ultra vires*, Harvard will suffer substantial injury, including irreparable injury.

**COUNT V**
**VIOLATION OF THE FIRST AMENDMENT RIGHT TO**
**PETITION THE GOVERNMENT**
**(EQUITABLE CAUSE OF ACTION – *ULTRA VIRES*)**
**(AS TO SEVP REVOCATION AND PRESIDENTIAL PROCLAMATION)**

288. Harvard incorporates by reference the allegations of the preceding paragraphs.

289. The Proclamation violates Harvard's First Amendment right "to petition the Government for a redress of grievances." U.S. const. amend. I. The Supreme Court has held that the "right to petition extends to all departments of the Government," including "courts." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Accordingly, the Court has treated "a lawsuit" as a kind of "petition" for purposes of the Petition Clause. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 390 (2011); *see id.* at 387 (identifying "precedents confirm[ing] that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes").

290. The Proclamation violates the Petition Clause by punishing Harvard for filing this lawsuit and having filed the Funding Case. The Supreme Court has long adhered to the "proposition that when a person petitions the government for redress," the "First Amendment prohibits any sanction on that action ... so long as the petition was in good faith." *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009). The Proclamation violates the *Noerr-Pennington* doctrine by sanctioning Harvard for bringing a good-faith—and thus far successful—lawsuit challenging the revocation of its SEVP certification, as well as for bringing a good-faith lawsuit challenging the government's actions to freeze federal funds to Harvard. Defendants plainly seek to punish Harvard for these protected petitioning activities by means of a proclamation that achieves essentially the same result as the revocation that Harvard initially challenged.

291.    This constitutional violation causes immediate, ongoing, and irreparable harm to Harvard.

### COUNT VI
### ACTION UNAUTHORIZED BY STATUTE, 8 U.S.C. §§ 1182(f) and 1185(a)
### (EQUITABLE CAUSE OF ACTION – *ULTRA VIRES*)
### (AS TO PRESIDENTIAL PROCLAMATION)

292.    Harvard incorporates by reference the allegations of the preceding paragraphs.

293.    The Proclamation principally invokes Section 212(f) of the Immigration and Nationality Act ("INA"), which provides that when the President "finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants." 8 U.S.C. § 1182(f).

294.    Section 212(f), however, does not authorize the Proclamation's measures against Harvard. The Proclamation does not bar the entry of any noncitizen or find that any noncitizens entry would be detrimental to the interests of the United States. It simply picks out a disfavored domestic institution, Harvard, and punishes it by forbidding international students from coming to study there. Broad though Section 212(f) may be in its "sphere," *Hawaii*, 585 U.S. at 695, that sphere does not encompass excluding noncitizens from particular U.S. institutions that the President disfavors.

295.    First, the Proclamation does not "suspend … entry." 8 U.S.C. § 1182(f). This authority empowers the President to render noncitizens inadmissible to the United States. *Hawaii*, 585 U.S. at 695 n.4 ("The concepts of entry and admission—but not issuance of a visa—are used interchangeably in the INA. See § 1101(a)(13)(A) (defining 'admission' as the 'lawful entry of the alien into the United States')."). But any noncitizen potentially subject to the Proclamation can continue to enter the United States and can do so under the same immigrant or nonimmigrant

admission programs. The Proclamation merely prevents that noncitizen from studying at Harvard. *See* Proc. § 1 (purporting to limit entry of noncitizens "to pursue a course of study at Harvard University" or "to participate in an exchange visitor program hosted by Harvard University"); *id.* § 2(c) ("The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to any alien who enters the United States to attend other universities through the SEVP."). Section 212(f) authorizes the President to suspend entry and admission into the United States, not entry into Harvard Yard.

296.    Second, the Proclamation does not suspend the entry of any "class of aliens as immigrants or nonimmigrants." 8 U.S.C. § 1182(f). As just explained, any noncitizen potentially subject to the Proclamation can continue to enter the United States and can do so under the same immigrant or nonimmigrant admission programs. The Proclamation merely prevents that noncitizen from studying at Harvard. Section 212(f) allows the President to restrict the entry of particular classes of noncitizens and to limit particular types of admissions, not to target particular classes of U.S. institutions receiving noncitizens—in this case, a class of one. *Cf. Hawaii*, 585 U.S. at 688 ("the word 'class' comfortably encompasses a group of people linked by nationality").

297.    Third, the Proclamation does not set forth the predicate the statute requires—a finding that the "entry of any aliens or any class of aliens into the United States would be detrimental to the interests of the United States." As just explained, noncitizens covered by the Proclamation can still enter the United States and can still do so via the very same SEVP programs to study at other Universities. The Proclamation merely purports to find that it would be detrimental to the United States for noncitizens "to participate in a course of study at Harvard University or in an exchange visitor program hosted by Harvard University." Section 212(f) requires that the President find that particular *noncitizens*' entry would be detrimental to the

interests of the United States and does not permit the President to enforce his view that it would be detrimental to the interests of the United States for noncitizens to attend particular *U.S. institutions*.

298.    Moreover, the Proclamation makes plain that the "interests of the United States" that it pursues reflect animus toward Harvard, not any national interest related to the "entry of any aliens or of any class of aliens." The Proclamation is clear that the supposed "interests of the United States" concern Harvard's admissions practices, Harvard's supposed suitability as a "destination for foreign students and researchers," and Harvard's provision of data concerning its international students to DHS. However broad may be the scope of Section 212(f)'s authority to suspend the entry of noncitizens whose admission would be detrimental to interest of the United States, it does not empower the President to punish disfavored domestic institutions by barring noncitizens from those institutions. Nor do the "interests of the United States" that the President may advance via Section 212(f) encompass evading the limitations of the SEVP regulations on what information may be required from U.S. institutions.

299.    Fifth, the Proclamation violates 8 U.S.C. § 1372(c), which confirms that the Proclamation exceeds the authority that Section 212(f) confers. In 8 U.S.C. § 1372(c)(1), Congress identified the "information for collection" under the SEVP program, and in 8 U.S.C. § 1372(c)(5), Congress specified that the "Attorney General shall prescribe by regulation reporting requirements." The President may not, under the guise of Section 212(f), create his own reporting requirements or circumvent the procedural and substantive limits on the authority that Congress set forth in 8 U.S.C. § 1372(c), including that "the Attorney General" must act "by regulation" to establish reporting requirements. That would allow the President to entirely displace Congress's reticulated scheme by banning international students from attending institutions that do not comply

with the new scheme that the President has devised apart from Congress. *See O.A. v. Trump*, 404

F. Supp. 3d 109, 151 (D.D.C. 2019) (holding that "a presidential proclamation" under Section

212(f) could not be used to "sidestep [a] statutory restriction on" agency authorities); *cf. United*

*States v. Fausto*, 484 U.S. 439, 455 (1988) (explaining that where Congress "establishe[s] a

comprehensive scheme," omissions from that scheme should be given force).

**COUNT VII**
**VIOLATION OF THE FIFTH AMENDMENT – EQUAL PROTECTION**
**(EQUITABLE CAUSE OF ACTION – *ULTRA VIRES*)**
**(AS TO PRESIDENTIAL PROCLAMATION)**

300.    Harvard incorporates by reference the allegations of the preceding paragraphs.

301.    The Equal Protection Clause of the Fourteenth Amendment, as incorporated against

the federal government through the Fifth Amendment, protects all individuals and entities from

unjust discrimination by the federal government. Though the Fifth Amendment "does not contain

an equal protection clause," discrimination by the federal government that would run afoul of the

Equal Protection Clause if undertaken by a State is "violative of due process." *Bolling v. Sharpe*,

347 U.S. 497, 499 (1954).

302.    The government violates equal protection when, as here, it singles out similarly

situated entities for adverse treatment without a constitutionally legitimate justification. *Vill. of*

*Willowbrook v. Olech*, 528 U.S. 562, 563-64 (2000) (*per curiam*).

303.    In cases where the government treats similarly situated individuals or entities

differently, the government must articulate a legitimate interest for doing so. Such justification

cannot be arbitrary, irrational, or pretextual, which is to say that it cannot serve only to mask the

government's true, illegitimate motive for singling out the entity. A desire to single out that group

will not suffice.

304.    The Revocation Notice and the Proclamation plainly violate these equal-protection principles. The evident purpose of both the Revocation Notice and the Proclamation is to discriminate against Harvard and Harvard alone by imposing on Harvard extraordinary and punitive measures that apply to no other school in the country. On information and belief, scores of other universities receive foreign funding (including from China) admit large numbers of international students, and maintain and report information to DHS only as required by applicable regulations. Yet none of these other similarly situated schools have been subject to a similar Proclamation. This singling out of Harvard demonstrates that the Proclamation was motivated by a bare intent to punish Harvard, as just the latest aspect of the Administration's months' long campaign of retaliation.

305.    Defendants' discriminatory intent is reinforced by the numerous public statements made by President Trump and various other members of his Administration that reflect the President's deep-seated animus toward Harvard and his desire to seek retribution against it at all costs for the way it exercises its First Amendment right to academic freedom and its refusal to capitulate to the Administration's demands.

306.    No credible or rational justification exists for singling out Harvard in this way. Indeed, the Proclamation is a transparent attempt to circumvent the temporary restraining order this Court already entered against the summary revocation of Harvard's SEVP certification.

**COUNT VIII**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)**
**CONTRARY TO LAW**
**VIOLATION OF 8 C.F.R. § 214.4(b)-(h)**
**(AS TO SEVP REVOCATION)**

307.    Harvard incorporates by reference the allegations of the preceding paragraphs.

308.    Defendants have taken final agency action by issuing the Revocation Notice, summarily revoking Harvard's SEVP certification, and refusing to withdraw the Revocation Notice. *See* 5 U.S.C. § 704.

309.    The APA directs courts to hold unlawful and set aside agency action that is not in accordance with law, *id*. § 706(2)(A), or that fails to observe "procedure required by law," *id.* § 706(2)(D).

310.    Under applicable regulations, if DHS wishes to withdraw a school's certification out-of-cycle, it must provide the school with a NOIW stating "[t]he grounds for withdrawing SEVP certification." 8 C.F.R. § 214.4(b)(1). After receiving a NOIW, the school has 30 days to submit an answer either admitting or denying the allegations in the NOIW and supporting its position with "sworn statements, and documentary or other evidence, to rebut the grounds for withdrawal of certification." *Id.* § 214.4(b)(2); *see id* § 214.4(d)-(e). The school must be given the opportunity to request "a telephonic interview in support of its response to the NOIW," *id.* § 214.4(b)(3), and it must be permitted to be "represented by counsel of its choice" during these proceedings, *id.* § 214.4(c).

311.    If DHS intends to proceed with withdrawing a school's certification, it must consider the school's evidentiary submissions and issue a decision "explain[ing] in writing the specific reasons for" withdrawing the certification. *Id.* § 103.3(a)(1)(i); *see id.* § 214.4(g). It must also provide the school with the opportunity to take an administrative appeal of the decertification decision. *See id.* § 214.4(h).

312.    In addition, under 22 C.F.R. § 62.50(d)(1), only the Department of State can revoke a school's designation to sponsor J-1 students and only then with 30 days' notice. That notice must "specify the grounds for the proposed sanction and its effective date, advise the sponsor of its right

to oppose the proposed sanction, and identify the procedures for submitting a statement of opposition thereto." *Id.*

313.    The government did not provide Harvard with any of these procedural protections prior to summarily revoking Harvard's certification to host F-1 students and designation to sponsor J-1 students. That is unlawful: "An agency may not … simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

314.    Because Defendants failed to withdraw Harvard's certification "in accordance with" 8 C.F.R. § 214.4(b), *id.*, the revocation of Harvard's certification must be set aside.

315.    The summary revocation of Harvard's SEVP certification, without the benefit of codified procedural protections, causes immediate, ongoing, and irreparable harm to Harvard.

**COUNT IX**
**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)**
**CONTRARY TO LAW**
**VIOLATION OF 5 U.S.C. § 558**
**(AS TO SEVP REVOCATION)**

316.    Harvard incorporates by reference the allegations of the preceding paragraphs.

317.    Defendants have taken final agency action by issuing the Revocation Notice, summarily revoking Harvard's SEVP certification, and refusing to withdraw the Revocation Notice. *See* 5 U.S.C. § 704.

318.    The APA directs courts to hold unlawful and set aside agency action that is not in accordance with law, *id.* § 706(2)(A), or which fails to observe "procedure required by law," *id.* § 706(2)(D).

319.    The APA defines "licenses" to include "the whole or part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id.* § 551(8).

320.    SEVP certification is a "license" within the meaning of the APA. *See Blackwell Coll. of Bus. v. Att'y Gen.*, 454 F.2d 928, 933-35 (D.C. Cir. 1971). Thus, in order to revoke that license, the government was required to comply with the strictures of Section 558(c)(1)-(2).

321.    Section 558 provides that "[e]xcept in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefore, the licensee has been given" both (1) "notice by the agency in writing of the facts or conduct which may warrant the action" and (2) "opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c)(1)-(2).

322.    DHS violated Section 558(c) because it failed to "institut[e] … agency proceedings" for the revocation of Harvard's SEVP certification, *id.* § 558(c), instead purporting to summarily revoke Harvard's certification by issuing the Revocation Notice.

323.    DHS also violated Section 558(c)(1) because the Revocation Notice failed to provide the required "notice … in writing of the facts or conduct which may warrant the action." *Id.* § 558(c)(1). The Revocation Notice does not identify any regulatory provision with which Harvard failed to comply, instead purporting to revoke Harvard's certification based on its failure to comply with demands that exceeded the scope of its reporting requirements. Failure to comply with such demands is not conduct that "may warrant" revocation of Harvard's certification.

324.    Relatedly, DHS also violated Section 558(c)(2). That provision requires DHS, "*before* the institution of [revocation] proceedings," to give schools an "opportunity to demonstrate or achieve compliance with all *lawful* requirements" of licensure. *Id.* § 558(c)(2) (emphases added). The "lawful requirements" of continued SEVP certification, *id.*, are those specified by the regulations. DHS has not identified any such lawful requirements with which Harvard has failed

to comply. Nor has it given Harvard the required chance to "demonstrate or achieve compliance with" any such requirements. *Id.* § 558(c)(2).

325.    These violations of Section 558 cause immediate, ongoing, and irreparable harm to Harvard by depriving the University of its property interest without required procedure.

### COUNT X
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### CONTRARY TO CONSTITUTIONAL RIGHT
### PROCEDURAL DUE PROCESS
### (AS TO SEVP REVOCATION)

326.    Harvard incorporates by reference the allegations of the preceding paragraphs.

327.    Defendants have taken final agency action by issuing the Revocation Notice, summarily revoking Harvard's SEVP certification, and refusing to withdraw the Revocation Notice. *See* 5 U.S.C. § 704.

328.    Under the APA, a court shall "hold unlawful and set aside agency action … found to be … contrary to constitutional right, power, privilege, or immunity." *Id*. § 706(2)(B).

329.    As a license, SEVP certification is a protected property interest subject to the procedural due process requirements of the Fifth Amendment to the U.S. Constitution. *See Blackwell Coll. of Bus.*, 454 F.2d at 933 ((holding that "withdrawal of [certification]" is permitted "only in accordance with procedural due process").

330.    Due process requires the government to provide "fair notice of conduct that is forbidden or required" before depriving private parties of their property. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment," and "[i]t requires the invalidation of laws [and regulations] that are impermissibly vague." *Fox Television Stations*, 567 U.S. at 253.

331.    Due process also requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner" before the government may deprive a person of a protected interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation marks omitted).

332.    Defendants violated Harvard's right to procedural due process by (a) failing to provide adequate notice of the grounds for withdrawal of Harvard's SEVP certification and opportunity to avoid those grounds; (b) failing to disclose the evidence upon which SEVP relied in making its decision; and (c) denying Harvard a meaningful opportunity to respond to the allegations and evidence before the adverse action was taken, including but not limited to a pre-deprivation hearing.

333.    The revocation also violated due process because the Records Request and the Mazzara Email both "fail[ed] to provide a person of ordinary intelligence fair notice of what [was required]" and was "so standardless that it authorize[d] or encourage[d] seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). DHS demanded information that HIO is not required to maintain under the applicable regulations, did not specify the time period for which it sought information, and employed hopelessly vague descriptions of the information sought. DHS did not define what it considers to be "dangerous" conduct, or "obstruction of the school's learning environment," within the meaning of the Records Request, and those terms are not defined in the regulations. DHS then summarily stated that Harvard's responses were "insufficient." Ex. 25 at 1.

334.    Subjecting Harvard to deprivation of its protected property based on failure to comply with this "impermissibly vague" request, *Fox Television Stations*, 567 U.S. at 253, plainly designed to authorize "seriously discriminatory enforcement," *Williams*, 553 U.S. at 304, violated Harvard's rights under the Due Process Clause.

335.    Defendants' actions deprive Harvard of its constitutionally protected property interest in continued certification; prevent Harvard from continuing its robust F-1 visa program, which has long inured to the benefit of the broader Harvard community; damage Harvard's reputation as a global research institution; and disrupt years of careful institutional planning and resource allocation with respect to its F-1 program.

336.    The harm caused by the improper revocation of Harvard's SEVP certification is immediate and severe, while the additional burden on the government of providing constitutionally adequate procedures would be minimal.

### COUNT XI
### PROCEDURAL DUE PROCESS
### (EQUITABLE CAUSE OF ACTION – *ULTRA VIRES*)
### (AS TO SEVP REVOCATION)

337.    Harvard incorporates by reference the allegations of the preceding paragraphs.

338.    As alleged in Count VII, Defendants' revocation of Harvard's SEVP certification and refusal to withdraw the revocation deprived Harvard of protected property interests without due process.

339.    The Constitution forecloses any lawful authority for Defendants' actions, and this Court should declare them unconstitutional and *ultra vires*.

### COUNT XII
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### CONTRARY TO LAW
### 8 C.F.R. §§ 214.3(e)(4)(ii) & 214.4(a)(2)
### (AS TO SEVP REVOCATION)

340.    Harvard incorporates by reference the allegations of the preceding paragraphs.

341.    Defendants have taken final agency action by issuing the Revocation Notice, summarily revoking Harvard's SEVP certification, and refusing to withdraw the Revocation Notice. *See* 5 U.S.C. § 704.

342.    The APA directs courts to hold unlawful and set aside agency action that is arbitrary and capricious and not in accordance with law. *Id*. § 706(2)(A).

343.    8 C.F.R. § 214.4(a)(2) permits DHS to withdraw certification but only for a "valid and substantive reason." A "valid and substantive reason" must be understood in context to mean a violation of the regulations governing SEVP-certified institutions, for two reasons.

344.    First, to withdraw a school's certification out of cycle, the government must issue a NOIW. But it can only issue a NOIW under the narrow circumstances specified in Section 214.3(e)(4)(ii) of the regulation: if the university "has failed to sustain eligibility" under Section 214.3(a)(3)(i) (which requires that the school is "bona fide," an "established institution of learning or other recognized place of study," possesses "the necessary facilities, personnel, and finances to conduct instruction in recognized courses," and "engage[s] in instruction in those courses"), or if it "has failed to comply with the recordkeeping, retention, reporting and other requirements of paragraphs (f), (g), (j), (k), and (l)." 8 C.F.R. § 214.3(a)(3)(i), (e)(4)(ii). If the alleged violation is something other than ineligibility or the specified regulatory requirements, the government cannot issue a NOIW, and therefore cannot withdraw a school's certification.

345.    Second, and confirming the point, all examples of "valid and substantive reason[s]" for withdrawing a certification enumerated in 8 C.F.R. § 214.4(a)(2) are regulatory violations. Under those examples, decertification must be tied either to failure to maintain eligibility or failure to comply with regulations governing the program.

346.    Indeed, the Evidence Attestation Statement attached to the Records Request confirmed this understanding of the permissible reasons for decertification. That document stated that "SEVP may review [a school's] certification at any time and may request documentation to

establish [the school's] *eligibility for certification* as well as *review evidence and records for compliance with the regulation*." Ex. 16 at 3 (emphasis added).

347.    Here, DHS's revocation of Harvard's certification was not based on a determination that Harvard was no longer eligible for certification, and it was not based on a determination that Harvard had failed to comply with the regulations. While the Revocation Notice asserts that Harvard's responses to the Records Request and the Mazzara Email were "insufficient," Ex. 25 at 1, DHS has not identified any actual regulatory requirement with which Harvard has failed to comply.

348.    The Records Request exceeded the scope of 8 C.F.R. § 214.3(g)(1). That provision specifies nine categories of information that a school "must keep on each [F-1] student" and "furnish … to DHS representatives upon request." 8 C.F.R. § 214.3(g)(1). Not among the listed categories of information: conduct of F-1 students that constitutes "illegal," "dangerous," or "violent" conduct; "deprivation of rights"; "threats"; or "obstruction of the school's learning environment," Ex. 16 at 1-2, particularly where such conduct did not result in disciplinary action that altered the student's academic status.

349.    To the extent Defendants have revoked Harvard's SEVP certification for failure to comply with a request made pursuant to Sections 214.3(g)(1) and 214.3(g)(2) for information not required to be maintained or produced to DHS under those provisions, Defendants have failed to base the revocation of Harvard's certification on a "valid and substantive reason," 8 C.F.R. § 214.4(a)(2), and the revocation must be set aside.

350.    The improper revocation of Harvard's certification causes immediate, ongoing, and irreparable harm to Harvard.

## COUNT XIII
## VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
## ARBITRARY AND CAPRICIOUS
## (AS TO SEVP REVOCATION)

351.    Harvard incorporates by reference the allegations of the preceding paragraphs.

352.    Defendants have taken final agency action by issuing the Revocation Notice, summarily revoking Harvard's SEVP certification, and refusing to withdraw the Revocation Notice. *See* 5 U.S.C. § 704.

353.    The APA directs courts to hold unlawful and set aside final agency actions that are arbitrary and capricious or an abuse of discretion. *Id*. § 706(2)(A).

354.    Under the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quotation marks omitted), consider all "important aspect[s] of the problem" when setting forth that explanation, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *State Farm*, 463 U.S. at 43), and, if the agency's action represents a change in positions, "be cognizant that longstanding policies may have engendered serious reliance interests" and ensures that those reliance interests are "taken into account." *Id.* (quotation marks omitted).

355.    Defendants' decision to revoke Harvard's SEVP certification failed each of these requirements. That action was therefore arbitrary and capricious and an abuse of discretion.

356.    The Revocation Notice asserts that DHS is revoking Harvard's certification because of "Harvard's failure to comply with simple reporting requirements." Ex. 25 at 1. But Defendants have not identified any actual "reporting requirements" with which Harvard has failed to comply.

357.    Defendants' decision to revoke Harvard's SEVP certification on those grounds was arbitrary and capricious because it reflects an unacknowledged and unexplained change in the agency's policy. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (stating that agencies must both "acknowledge" and "offer a reasoned explanation for" deviations from past agency practice). Upon information and belief, prior to the decertification decision in this case, no school had ever had its SEVP certification revoked for any reason other than failure to meet the eligibility criteria for certification or failure to comply with the recordkeeping, retention, reporting, and other requirements set out in the federal regulations governing certification. In revoking Harvard's certification, Defendants did not acknowledge, much less provide a reasoned explanation for, that change in policy.

358.    Defendants also have not articulated any rational explanation for revoking Harvard's certification. Harvard complied with the lawful requests within the Records Request and the Mazzara Email. In response, Defendants summarily deemed Harvard's document production noncompliant without providing a cogent reason for that determination, and without explaining why the noncompliance—if any—warranted revocation of Harvard's certification. Indeed, the revocation letter was wholly irrational. It states that Harvard failed to comply with reporting requirements, without explaining what those reporting requirements were and why Harvard did not comply with them. It states that Harvard failed to provide a sufficient response to DHS's records request, without articulating why the response was insufficient, why DHS's records request complied with DHS's regulations, or why Harvard's purportedly insufficient response was a basis to revoke Harvard's statements. And it makes generalized statements about campus environment and "anti-Americanism," again without articulating any rational link between those statements and the decision to retaliate against international students. Accordingly, Defendants

failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

359.    The decertification decision was arbitrary and capricious because it was not supported by any evidence. The revocation letter stated that Harvard violated "reporting requirements" and that its response to DHS's record requests were "insufficient." It failed to substantiate these statements.

360.    The decertification decision was also arbitrary and capricious because it fails to explain why wholesale decertification—rather than some lesser "remedial action" to cure any noncompliance, 8 C.F.R. § 214.3(h)(3)(iii)—was the appropriate remedy here.

361.    The decertification decision was also arbitrary and capricious because the penalty imposed—wholesale decertification of a program that has been continuously certified for over 70 years—was entirely disproportionate to the alleged noncompliance identified: failure to supply information that the regulations do not require Harvard to maintain or report as a condition of its continued SEVP certification.

362.    The decertification decision was also arbitrary and capricious because it ignores Harvard's and its students' reliance interests and does not provide an explanation that accounts for those reliance interests. Decertification directly impacts both Harvard and its many international students. The decision thus lacks a rational connection between the facts found and the choice made.

    a.    Harvard invests in recruitment, housing, support services, and specialized programs designed specifically for its international student populations. The Harvard International Office, with its 25 full-time staff members and annual budget of $3.44 million, is the hub of this

investment. It represents decades of accumulated expertise and systems for recruiting and enrolling students through the F-1 visa program.

b.    Harvard relies on its ability to enroll international students to enrich its student population and to attract other students and faculty. Harvard's dual mission of teaching and research relies on its global character and its ability to attract students wishing to participate in an intellectual community populated by the brightest minds it can recruit to Massachusetts.

c.    Harvard relies on its SEVP certification in admitting its incoming summer students and its incoming fall class. Reconfiguring these admitted classes in both the undergraduate and graduate schools is not practically possible given that the admissions cycle is nearly concluded.

d.    Students, likewise, rely on Harvard's SEVP certification to legally enter and remain in the United States. Students make significant financial and time commitments based on a school's certification. Students build academic and career plans around specific programs at certified institutions. Interruptions in academic plans can derail degree completion. Students make major life and professional decisions based on their educational plans, including to pursue a program on the understanding that they will be able to access pre- and post-graduate pathways to employment like the Optional Practical Training and Curricular Practical Training Visas. They transplant themselves, and often their families, too, to come to Cambridge and Boston to study.

e.    Students also make practical decisions in reliance on Harvard's SEVP certification. Students do not prepare for the costly travel and moving arrangements needed to return home abruptly upon revocation of an F-1 visa, nor do they prepare for facing return to a home country where they may face violent or dangerous circumstances.

363.    Defendants' arbitrary decertification decision causes immediate, ongoing, and irreparable harm to Harvard.

**COUNT XIV**
**SEPARATION OF POWERS**
**(EQUITABLE CAUSE OF ACTION –** *ULTRA VIRES***)**
**(AS TO SEVP REVOCATION AND PRESIDENTIAL PROCLAMATION)**

364.    Harvard incorporates by reference the allegations of the preceding paragraphs.

365.    As alleged, the Revocation Notice and the Proclamation bypass any judicial process to single out Havard for punishment. In so doing, they violate fundamental separation-of-powers principles.

366.    The Revocation Notice and the Proclamation effectively function as a "prepared and proclaimed governmental blacklist[]"—they "possess almost every quality of [an unlawful] bill[] of attainder." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring); *see* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder ... shall be passed"). They punish Harvard—and only Harvard—without process or cause. From the very beginning of our Republic, such measures have been "forbidden to both national and state governments." *McGrath*, 341 U.S. at 144 (Black, J., concurring). It cannot be "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Id.*

367.    This *ultra vires* action causes immediate, ongoing, and irreparable harm to Harvard.

**REQUEST FOR RELIEF**

WHEREFORE, Harvard respectfully requests the following relief:

A.    Declare that Defendants' actions to revoke Harvard's SEVP certification and/or EVP designation through the Revocation Notice are unconstitutional and/or

unlawful;

B.    Declare that the June 4, 2025, Presidential Proclamation entitled, "Enhancing National Security by Addressing Risks at Harvard University," is unconstitutional and unlawful;

C.    Preliminarily and permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, or giving effect to the unlawful revocation of Harvard's SEVP certification or EVP designation;

D.    Preliminarily and permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from giving any force or effect to the Department of Homeland Security's May 22, 2025 Revocation Notice;

E.    Preliminarily and permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from giving effect to any suspension, withdrawal, revocation, termination, or other alteration of Plaintiff's SEVP certification or EVP designation or any other categorical restriction of Plaintiff's authority to sponsor non-immigrant F visas or J visas, other than through the procedures laid out in 8 C.F.R. §§ 214.3 and 214.4 or in 22 C.F.R. § 62;

F.    Preliminarily and permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from implementing, enforcing, or giving effect to the June 4, 2025, Presidential Proclamation entitled, "Enhancing National Security by Addressing Risks at Harvard University";

G.    Preliminarily and permanently enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from relying on or giving force or effect

to any suspension or limitation on entry for Harvard students, or removal orders

issued to Harvard students, pursuant to the Proclamation;

H.    Award Harvard its reasonable fees, costs, and expenses, including attorneys' fees,

pursuant to 28 U.S.C. § 2412; and

I.    Grant other such relief as this Court may deem equitable, just, and proper.

Dated: June 5, 2025                                    Respectfully submitted,

JENNER & BLOCK LLP                          LEHOTSKY KELLER COHN LLP

Ishan Bhabha*                                      By: */s/ Steven P. Lehotsky*
Ian Heath Gershengorn*
Lauren J. Hartz*                                   Steven P. Lehotsky (BBO # 655908)
1099 New York Avenue, NW                           Scott A. Keller*
Suite 900                                          Serena M. Orloff*
Washington, DC 20001                               Shannon G. Denmark*
Tel: (202) 639-6000                                Jacob B. Richards (BBO # 712103)
IBhabha@jenner.com                                 200 Massachusetts Ave. NW, Suite 700
IGershengorn@jenner.com                            Washington, DC 20001
LHartz@jenner.com                                  T: (512) 693-8350
                                                   F: (512) 727-4755
Andrianna Kastanek*                                steve@lkcfirm.com
353 N Clark Street                                 scott@lkcfirm.com
Chicago, IL 60654                                  serena@lkcfirm.com
Tel: (312) 222-9350                                shannon@lkcfirm.com
AKastanek@jenner.com                               jacob@lkcfirm.com

William A. Burck*                                  Katherine C. Yarger*
QUINN EMANUEL URQUHART &                            700 Colorado Blvd., #407
SULLIVAN, LLP                                       Denver, CO 80206
1300 I Street NW, Suite 900                         katie@lkcfirm.com
Washington, DC 20005
williamburck@quinnemanuel.com                      Joshua P. Morrow*
                                                   408 W. 11th Street, 5th Floor
                                                   Austin, TX 78701
Robert K. Hur*                                     josh@lkcfirm.com
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900               Danielle K. Goldstein*
Washington, DC 20006                               3280 Peachtree Road NE
rhur@kslaw.com                                     Atlanta, GA 30305
                                                   danielle@lkcfirm.com

*Admitted Pro Hac Vice