## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY;

KRISTI NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT;

TODD LYONS, in his official capacity as Acting Director of
United States Immigration and Customs Enforcement;

STUDENT AND EXCHANGE VISITOR PROGRAM;

JOHN DOE, in their official capacity as Director of the
Student and Exchange Visitor Program;

JAMES HICKS, in his official capacity as Deputy Assistant
Director of the Student and Exchange Visitor Program;

UNITED STATES DEPARTMENT OF JUSTICE;

PAMELA BONDI, in her official capacity as Attorney
General of the United States;

UNITED STATES DEPARTMENT OF STATE;

MARCO RUBIO, in his official capacity as Secretary of the
United States Department of State,

        Defendants.

Case No. 1:25-cv-11472-ADB

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION
<u>FOR A TEMPORARY RESTRAINING ORDER</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

      A.    The Detailed Statutory and Regulatory Framework for SEVP
           Certification and Withdrawal.............................................................. 3

      B.    The Government's Assault on Academic Freedom at Harvard ...................... 4

      C.    DHS's Revocation of Harvard's Certification and Harvard's
           Lawsuit................................................................................................ 7

      D.    Defendants' Attempts to Subvert the Court's TRO........................................ 8

      E.    The Immediate and Irreparable Harm Inflicted by This Lawless
           Action................................................................................................ 10

LEGAL STANDARD ................................................................................................... 11

ARGUMENT ................................................................................................................ 11

I.      Harvard Has a Strong Likelihood of Success on the Merits................................ 11

      A.    The Proclamation Violates the First Amendment.......................................... 12

           1.    Defendants Unlawfully Retaliated Against Harvard for Its
                 Refusal to Cede Control Over Its Academic
                 Decisionmaking. ................................................................. 13

           2.    Defendants Engaged in Impermissible Viewpoint
                 Discrimination. ................................................................... 17

           3.    Defendants Violated the Petition Clause. ......................... 19

      B.    The Proclamation Is Unauthorized By the Statutory Authorities It
           Invokes................................................................................................ 21

      C.    The Proclamation Violates the Equal Protection Clause. .............................. 25

      D.    The Proclamation Is an End Run Around this Court's TRO. ....................... 27

II.     The Proclamation Inflicts Irreparable Harm. ................................................. 29

III.    The Balance of the Equities and Public Interest Overwhelmingly
      Favor Relief. .................................................................................................. 32

**CONCLUSION** ............................................................................................................... **33**

# TABLE OF AUTHORITIES

CASES

*178 Lowell Street Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47 (D. Mass. 2016) ................................................................................................................11

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016).................................................................15

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)..............................13

*Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1 (1st Cir. 2007)..............................................................................................................13, 14

*Blasdel v. Northwestern University*, 687 F.3d 813 (7th Cir. 2012) ...................13, 14, 27

*Bolling v. Sharpe*, 347 U.S. 497 (1954)..........................................................................25

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011)..................................................19

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020).......................................................33

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ..............19

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ...............................................................11

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26 (1st Cir. 2012) ................................14

*Goldstein v. Batista Contracting LLC*, 671 F. Supp. 3d 68 (D. Mass. 2023) ...............11

*Hartman v. Moore*, 547 U.S. 250 (2006)........................................................................14

*Hodgens v. General Dynamics Corp.*, 144 F.3d 151 (1st Cir. 1998)..............................16

*Iancu v. Brunetti*, 588 U.S. 388 (2019)...................................................................17, 19

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951)......................19

*Keyishian v. Board of Regents of University of New York*, 385 U.S. 589 (1967)..........2, 12, 13, 14

*Massachusetts v. National Institutes of Health*, No. 25-CV-10338, --- F. Supp. 3d ----, 2025 WL 702163 (D. Mass. Mar. 5, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025)....................................................................................................32

*Matal v. Tam*, 582 U.S. 218 (2017) .........................................................................18, 19

*Nader v. Democratic National Committee*, 567 F.3d 692 (D.C. Cir. 2009)..................21

*National Rifle Ass'n of America v. Vullo*, 602 U.S. 175 (2024) ................................2, 12

*News America Publishing, Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988)........................................25

*Nken v. Holder*, 556 U.S. 418 (2009) ...............................................................................32

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ..........................................................24

*Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) .............................33

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ..........................................................17, 18

*Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985)..............................13, 14, 26

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)...........................................29

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8 (1st Cir. 2000) .........................30, 31

*Shelton v. Tucker*, 364 U.S. 479 (1960)...............................................................................14

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ...............................................................17

*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013)...........................................25, 26

*Trump v. Hawaii*, 585 U.S. 667 (2018)...............................................................21, 22, 24, 25

*United States v. New York Telephone Co.*, 434 U.S. 159 (1977)................................................28

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) .....................................................25

*Weinstock v. Columbia University*, 224 F.3d 33 (2d Cir. 2000)..................................................14

*West Virginia v. EPA*, 597 U.S. 697 (2022)..........................................................................24

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. I ...............................................................................................19

5 U.S.C. § 558(c) ......................................................................................................8

5 U.S.C. § 706(2)(A)...................................................................................................8

8 U.S.C. § 1182(f)......................................................................2, 9, 10, 21, 22, 29

8 U.S.C. § 1185(a)(1)...........................................................................................9, 24

8 U.S.C. § 1372(c)...............................................................................................23, 25

20 U.S.C. § 1232(g) ..................................................................................................7

26 U.S.C. § 7217......................................................................................................16

OTHER AUTHORITIES

8 C.F.R. § 214.3(g) ........................................................................................7, 23

8 C.F.R. § 214.3(g)(1) ....................................................................................7, 26

8 C.F.R. § 214.3(g)(2) ........................................................................................26

8 C.F.R. § 214.4(a)(2) ....................................................................................8, 26

8 C.F.R. § 214.4(b)-(h) ........................................................................................8

34 C.F.R. § 99, et seq. ........................................................................................7

Bloomberg Podcasts, *Trump Says Harvard Must Show List of Foreign Students
    (Full Q&A)*, YouTube (May 28, 2025), https://www.youtube.com/
    watch?v=L6yjpvZTbjA ..............................................................................20, 26

CNBC Television, *Education Secretary Linda McMahon to Harvard: Obey the
    law and you can be eligible for funding*, YouTube (May 7, 2025),
    https://www.youtube.com/watch?v=bb6YJUHMqc4 ............................................20

*Education Secretary Linda McMahon to Harvard: Obey the law and you can be
    eligible for funding*, YouTube (May 7, 2025), https://www.youtube.
    com/watch?v=bb6YJUHMqc4. ..........................................................................20

Nahal Toosi and Eric Bazail-Emil, *State begins rolling out expanded student visa
    vetting – starting with Harvard*, Politico (May 30, 2025),
    https://www.politico.com/news/2025/05/30/state-implements-reviews-of-
    harvard-visa-applicants-social-media-accounts-00375921 ....................................2

Sophia Cai and Megan Messerly, *White House convenes meeting to brainstorm
    new Harvard measures*, Politico (May 30, 2025),
    https://www.politico.com/news/2025/05/30/white-house-convenes-meeting-
    to-brainstorm-new-harvard-measures-00376782 ..................................................2

The White House, *President Trump Participates in a Cabinet Meeting, Apr. 30,
    2025*, YouTube (Apr. 30, 2025), https://www.youtube.com/watch?
    v=wn2XtufOAHc.................................................................................................19

## INTRODUCTION

Less than two weeks ago, this Court enjoined the Administration's weaponization of the immigration system as part of an unprecedented, government-wide campaign to punish and retaliate against Harvard for its exercise of its First Amendment rights, which has made thousands of Harvard students pawns in the Administration's campaign. At the time, we told this Court that the unconstitutional campaign was likely not finished. Unfortunately, that was correct.

Last night, the President issued a Proclamation that purports to immediately suspend entry of all aliens who "enter or attempt to enter the United States to begin attending Harvard University" and directs the Secretary of State to consider whether to revoke the F, M, and J visas of current Harvard students. *See* President of the United States, *Proclamation: Enhancing National Security by Addressing Risks at Harvard University* ("Proclamation") (Am. Compl. Ex. 35). Once again, the Administration has sought to sever Harvard from its international students, with the inevitable and intended effect of wreaking havoc on the Harvard community, throwing into disarray every aspect of campus life. The government has done so not because of any concerns about the risks posed by those students—who (as the Proclamation says expressly) could be admitted to the United States if they sought to attend *any other school* in the country—but instead solely to punish Harvard and force it to yield to the Administration's unlawful demands.

The First Amendment violations are undeniable. When Harvard stood before this Court on May 29, 2025, it detailed the campaign of retaliation that followed Harvard's refusal to comply with the Administration's demands that Harvard submit to government oversight of the faculty it hires, the students it admits, and the courses it teaches. The Administration froze billions in federal grants, proposed to eliminate Harvard's tax-exempt status, disqualified Harvard from future federal grants, opened multiple federal investigations, and then terminated Harvard's participation in the F-1 and J-1 visa program. In the wake of Harvard's lawsuit and this Court's temporary

restraining order ("TRO"), the campaign has further intensified. Less than a week after the entry of this Court's order, the Secretary of State implemented a "pilot" program of "enhanced vetting" of foreign students and chose Harvard alone, out of all the schools in the Country, as the subject of that program.[1] As if that were not enough, the White House also recently convened senior Administration officials to "brainstorm additional punitive measures" for Harvard.[2] But the government simply cannot "invok[e] legal sanctions and other means of coercion" to police private speech, especially when the government's treatment is animated by viewpoint discrimination, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)), and especially when "academic freedom" is at stake. *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967).

The First Amendment violations do not stand alone. The President has acted here without legal authority. Although the President has invoked 8 U.S.C. § 1182(f), that statute cannot justify his action. The statute gives the President authority to protect the nation from a class of aliens whose entry would be "detrimental to the interests of the United States." 8 U.S.C. § 1182(f). But the President is not suspending entry for any class of aliens. To the contrary, all of those aliens may enter the Country unabated, just as long as they go to any school but Harvard. The President's actions thus are not to protect the "interests of the United States," but instead to provide another means for the Administration to retaliate against Harvard for the exercise of its constitutional rights.

---

[1] *See, e.g.*, Nahal Toosi and Eric Bazail-Emil, *State begins rolling out expanded student visa vetting – starting with Harvard*, Politico (May 30, 2025), https://www.politico.com/news/2025/05/30/state-implements-reviews-of-harvard-visa-applicants-social-media-accounts-00375921 (Am. Compl., Ex. 34).

[2] *See, e.g.*, Sophia Cai and Megan Messerly, *White House convenes meeting to brainstorm new Harvard measures*, Politico (May 30, 2025), https://www.politico.com/news/2025/05/30/white-house-convenes-meeting-to-brainstorm-new-harvard-measures-00376782 (Am. Compl., Ex. 31).

The Proclamation, moreover, is an end-run around this Court's grant of injunctive relief. Purporting to punish Harvard for failing to provide data in response to the subset of the DHS's information requests that have no basis in law, DHS withdrew Harvard's authority to host international students. When this Court enjoined that action, the Administration used other means, with no greater basis in law, to respond to Harvard's purported "refusal" to comply with the "recent requests of the DHS for information" by depriving Harvard of its ability to host international students. Same purported wrong; same unlawful sanction—notwithstanding this Court's injunction.

As before, emergency relief is essential. Effective immediately, once again Harvard may no longer sponsor or host F-1 or J-1 visa holders. The thousands of international students who were scheduled to arrive on campus for the upcoming summer and fall terms will no longer be able to enter the country. Countless academic programs, laboratories, clinics, and courses that these students support will be thrown into disarray. Classmates, teammates, and roommates will be separated. Pioneering research, groundbreaking technologies, and new businesses will be irretrievably lost. In the fewer than 24 hours during which the original revocation was in effect prior to this Court's entry of a TRO, the harms were profound. They will be all the more so now.

This Court should immediately grant the motion for a TRO and enjoin the Defendants from giving effect to the President's June 4 Proclamation.

## BACKGROUND

### A.    The Detailed Statutory and Regulatory Framework for SEVP Certification and Withdrawal

The SEVP is a federal program—administered by U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS")—that allows international students to study at American colleges and universities on nonimmigrant F-1 visas.

As described in Harvard's May 23, 2025, memorandum in support of a TRO, Dkt. 9 at 4-8,[3] a detailed set of DHS regulations govern eligibility to participate in the F-1 visa program, define the limited set of conditions under which DHS can revoke that certification once granted, and set out the process for doing so. The regulations governing the J-1 Exchange Visitor Program ("EVP"), administered by the Department of State, are similarly detailed, and as provided in the Administrative Procedure Act ("APA"), require the agency to provide notice and process before a school's sponsorship designation can be revoked. *See id.* at 8-10. In short, DHS and the State Department can only revoke a school's authority to host F and J students under certain limited conditions and after notice and process.

**B.    The Government's Assault on Academic Freedom at Harvard**

As also described in Harvard's last request for a TRO, the last several months have seen an unparalleled attack, led by the President, singularly and unrelentingly seeking to punish Harvard for its exercise of its First Amendment rights.

Harvard will not reproduce here the entire history of the campaign against it, but a few critical facts bear repeating. Defendants' campaign against Harvard began with the Administration's formation of a multi-agency Task Force to Combat Antisemitism ("Federal Task Force")[4] and issuance of a March 2025 letter to Harvard about an investigation into "anti-Semitic harassment" on campus,[5] but by April 2025 those efforts had morphed into an unprecedented

---

[3] This Court's docket in this case is cited as "Dkt." followed by document and page numbers. The original complaint, Dkt. 1, is cited as "Compl." and exhibits to that complaint are cited as "Compl., Ex." The amended complaint, Dkt. 54, is cited as "Am. Compl." Exhibits to the amended complaint are cited as "Am. Compl." followed by "Ex." and the exhibit number. The citations to the declarations of Maureen Martin and Mark Elliott are those submitted with Harvard's first motion for a temporary restraining order, Dkt. 9-3, 9-4.

[4] Compl., Ex. 4.

[5] Compl., Ex. 7.

intrusion into academic freedom. Most notably, on April 3 and April 11, 2025, the government sent Harvard long lists of demands to which it was required to agree to retain $8.7 billion in federal research grants, awarded to Harvard researchers through a rigorous and competitive process, including that Harvard would need to make "each department, field, or teaching unit ... individually viewpoint diverse"; "hir[e] a critical mass of new faculty" to do so; and "admit[] a critical mass of students who will provide viewpoint diversity" in departments and teaching units found to lack viewpoint diversity.[6] In other words, to retain federal funds awarded on merit, Harvard would be required to give up its academic freedom to government oversight, with no basis in law and in violation of the First Amendment.

Harvard rejected these demands in an April 14, 2025, letter,[7] triggering the government's swift—and now unending—retaliation. Immediately, the government froze "$2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University," citing "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges."[8] It initiated investigations of Harvard, including into its DEI and employment practices. It threatened Harvard's "Tax Exempt Status," with President Trump making clear that such action would be purely retaliatory: Harvard, he stated in a Truth Social post, should "be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness[].'"[9] Less than

---

[6] Compl., Ex. 9.

[7] Compl., Ex. 11.

[8] Compl., Ex. 12. Likewise, on May 5, 2025, Secretary McMahon sent a letter to Harvard stating that the government would no longer award Harvard any federal grants, despite Harvard's decades-long status as among the largest recipients of federal research grants awarded pursuant to a competitive process based on merit. Compl., Ex. 21. This letter once again took aim at Harvard's hiring decisions, its classroom management, and its alleged "mismanagement" by those whom the Government views as political opponents. *Id.* at 1-2.

[9] Compl., Ex. 13.

24 hours later, on April 16, 2025, the President again took aim at Harvard in a Truth Social post, criticizing the University for its hiring decisions, asserting that Harvard has "hir[ed] almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE," and claiming that, as a result, "Harvard can no longer be considered even a decent place of learning."[10]

Against this backdrop, on April 16, 2025, DHS sent Harvard a letter (the "Records Request") seeking a broad array of documents from Harvard about its international students, falling into eight categories.[11] In an accompanying press release (the "Press Release"), DHS made clear that the Records Request (which the Press Release celebrated as "scathing") had been sent because of the government's belief that Harvard had allowed "anti-American, pro-Hamas ideology" to "poison[] its campus and classrooms."[12] The Press Release expressly linked the Records Request to the government's string of actions targeting Harvard, stating that the Records Request "follows President Donald J. Trump's decision to freeze $2.2 billion in federal funding to Harvard, proposing the revocation of its tax-exempt status over its radical ideology." *Id.*

The onslaught continued. On April 17, 2025, the Department of Education sent a records request for information regarding Harvard's foreign funding. On April 20, 2025, the Administration threatened to pull an additional $1 billion in federal funding. On April 25, 2025, the Chair of the EEOC filed a charge triggering an investigation into Harvard's employment practices. On May 2, 2025, the President again threatened to revoke Harvard's Section 501(c)(3) status. On May 5, 2025, the Secretary of Education announced that the federal government would no longer provide Harvard with federal grants. And on May 13, 2025, Harvard received a Civil Investigative Demand regarding admissions at Harvard College.

---

[10] Compl., Ex. 15.
[11] Compl., Ex. 16.
[12] Compl., Ex. 17.

Meanwhile, Harvard responded on April 30, 2025, by producing materials encompassed by DHS's requests that the University was required to maintain and report pursuant to 8 C.F.R. § 214.3(g)(1), the sole authority invoked in the Records Request. *Id.* Similarly, when Joseph Mazzara, DHS's Acting General Counsel, sent Harvard's counsel an email (the "Mazzara Email") reiterating four of the eight document requests[13]—then clarifying in response to Harvard's question that he was requesting records pursuant to "all our authorities contained in 8 C.F.R. § 214," not only § 214(g)(1)[14]—Harvard in good faith followed the law, specifically the requirements of DHS's own regulations, which entitle the government to certain limited information about Harvard's international students. Indeed, the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232(g), and its implementing regulations, 34 C.F.R. § 99, *et seq.*, specifically prohibit Harvard from producing educational records to the government unless they fall into the categories delineated in § 214(g).

### C.    DHS's Revocation of Harvard's Certification and Harvard's Lawsuit

On May 22, 2025, and without further engaging with Harvard about its original and supplemental responses, DHS revoked Harvard's SEVP certification, which DHS claimed meant that Harvard could no longer host F or J visa students.[15] The Revocation Notice stated that DHS had revoked Harvard's certification "to send a clear signal to Harvard and all universities that want to enjoy the privilege of enrolling foreign students, that the Trump Administration will enforce the law and root out the evils of anti-Americanism and antisemitism in society and campuses." *Id.*

Harvard filed suit on May 23, 2025, and sought a TRO, precluding Defendants from giving force or effect to the May 22 Revocation Notice. Dkt. 9. Harvard argued that the Revocation Notice

---

[13] Compl., Ex. 22.
[14] Compl., Ex. 23.
[15] Compl., Ex. 25.

was the product of the government's campaign of retaliation and retribution that followed Harvard's refusal to comply with the Administration's demands that Harvard submit to government oversight of the faculty it hires, the students it admits, and the courses it teaches. Harvard also argued that the Revocation Notice was unlawful because it was not done in accordance with the procedures set out in the governing DHS regulations, *see* 8 C.F.R. § 214.4(b)-(h); failed to provide Harvard with the notice and opportunity to cure any supposed noncompliance required by 5 U.S.C. § 558(c); deprived Harvard of due process of law under the Fifth Amendment; revoked Harvard's SEVP certification for an impermissible reason, *see* 8 C.F.R. § 214.4(a)(2); and constituted arbitrary and capricious agency action, *see* 5 U.S.C. § 706(2)(A).

On the same day, this Court granted Harvard's motion for a TRO. Dkt. 11. On May 29, 2025, the Court held a hearing on Harvard's motion for a preliminary injunction and ruled orally that it would grant that motion—over the government's objection and notwithstanding the government's overnight issuance of a Notice of Intent to Withdraw ("NOIW"), a belated nod towards the process it was required to follow in the first instance. Dkt. 50.

### D.    Defendants' Attempts to Subvert the Court's TRO

Defendants have once already tried to extinguish the F and J programs at Harvard by executive fiat. That first attempt is now temporarily restrained by this Court. But since the parties left the courthouse steps a mere week ago, Defendants have worked continuously to find new ways to circumvent the Court's ruling and the procedural protections guaranteed by DHS's own regulations. The Secretary of State announced on May 30, 2025, a "pilot" program of "enhanced vetting" of foreign students and selected Harvard as the sole subject of that program. And all the while Administration officials continued to "brainstorm additional punitive measures." *See supra* n.2.

All of that culminated in the Presidential Proclamation at issue here. On June 4, 2025, President Trump issued a Proclamation entitled "Enhancing National Security by Addressing Risks at Harvard University" (the "Proclamation"), which prohibits foreign nationals from entering the United States to study or research at Harvard—and only Harvard. The Proclamation primarily relies on Section 212(f) of the INA, 8 U.S.C. § 1182(f), which authorizes the President to "suspend the entry" of "all aliens or any class of aliens" when their entry "would be detrimental to the interests of the United States." It also cites Section 215(a) of the INA, 8 U.S.C. § 1185(a), which provides that "[u]nless otherwise ordered by the President, it shall be unlawful … for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).

The Proclamation is an end-run around the existing TRO, and it is intended to interfere with this Court's ruling in Harvard's pre-existing suit. The Proclamation is entirely Harvard-focused. The class itself is defined—for the first time in the history of the statute—by its members' association with a disfavored speaker, which, here, is Harvard. Moreover, in issuing the Proclamation, the President did not find that the entry of a class of aliens "would be detrimental to the interests of the United States." *Id.* § 1182(f). Quite the contrary, the Proclamation merely bars F-1 students from entering the United States "to pursue a course of study *at Harvard*," and bars J-1 students and scholars from entering "to participate in an exchange visitor program *hosted by Harvard*." Am. Compl. Ex. 35, § 1 (emphases added).[16]

In other words, the Proclamation does not deem the entry of an alien or class of aliens to

---

[16] The Proclamation also directs the Secretary of State to consider whether foreign nationals currently at Harvard on F, M, or J visas "should have their visas revoked," Am. Compl. Ex. 35, § 2(b), and to further consider limiting Harvard's participation in SEVP and SEVIS, *see id.* § 3.

be "detrimental to the interests of the United States," 8 U.S.C. § 1182(f), because noncitizens who are impacted by the Proclamation *can* enter the United States—just so long as they go somewhere other than Harvard. The Proclamation says so explicitly: "The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to any alien who enters the United States to attend other universities through the SEVP." Am. Compl. Ex. 35, § 2(c).

### E.    The Immediate and Irreparable Harm Inflicted by This Lawless Action

The Proclamation, if not enjoined, will lead to a cascade of irreparable harms. It precludes any new student, including those scheduled to travel to Harvard for the summer and fall semesters, from entering the country. Without the ability to host new students who have accepted offers to enroll and are planning their lives accordingly, Harvard will be forced to dramatically shrink or reconfigure its carefully crafted incoming classes in a matter of weeks. Decl. of Maureen Martin, Dkt. 4-4 ("Martin Decl.") ¶¶ 39, 44-46.

The Proclamation also directs the Secretary of State to consider whether to revoke the visa of any international student currently studying at Harvard on a F, M, or J visa—a population of more than 5,000 students.[17]

The immediate consequences are severe. An institution is made up of its members, and the selection of those members is an important component of academic freedom. International students enrich Harvard's learning environment and campus life, including by enriching the academic experiences of their American classmates. Decl. of Mark Elliott, Dkt. 4-5 ("Elliott Decl.") ¶ 17. They serve as teaching fellows for undergraduate students, and their loss will harm students and the institution alike. *Id.* ¶ 14. As research assistants and clinical trainees, they contribute to

---

[17]  Harvard does not host students on M visas, which are available for students studying at vocational or technical schools.

important ongoing scientific and medical research and innovation, some of which will grind to a standstill in their absence. *Id.* ¶ 15. In the fewer than 24 hours during which the first attempt at revocation was in effect prior to this Court's issuance of a TRO, Harvard already began to experience some of these harms. *See* Supplemental Decl. of Maureen Martin, Dkt. 46 ("Martin Supp. Decl.") ¶¶ 7-29. The Proclamation will set them back into motion.

## LEGAL STANDARD

The burden of proof for a TRO is the same as that for a preliminary injunction under Federal Rule of Civil Procedure 65. *178 Lowell St. Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47, 53 (D. Mass. 2016). The movant must establish the following requirements: "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Goldstein v. Batista Contracting LLC*, 671 F. Supp. 3d 68, 72 (D. Mass. 2023) (*quoting NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020)). When defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

## ARGUMENT

## I.    HARVARD HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

The Proclamation seeks to upend the status quo in response to the Court's TRO. Faced with an injunction of the May 22 Revocation Notice, the government has found new ways to attempt to force Harvard to capitulate to government demands and retaliate for its decision to maintain private control of its curriculum, hiring, admissions, and governance. The latest punitive step, the President's invocation of Sections 212(f) and 215(a) of the INA, is yet another tool used by the government in its campaign of retaliation, and it violates blackletter First Amendment law.

Even putting aside its unconstitutionality, the Proclamation is unlawful, including because

it does not suspend entry of a class of aliens. The same students who will be affected by the Proclamation can still enter the United States—just not while studying at Harvard. Not only does this undermine any national security claim related to the entry of these individuals, it lays bare the Proclamation's true purpose: to punish Harvard as a disfavored institution.

## A.    The Proclamation Violates the First Amendment.

The record is clear that the Proclamation has nothing to do with any legitimate exercise of executive authority and everything to do with a desire to retaliate against Harvard for its perceived viewpoint, its insistence on maintaining its commitment to academic freedom, and its legal challenges to the government's unlawful actions.

"[T]he First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion … to achieve the suppression of disfavored speech," especially when the government targets a perceived viewpoint. *Vullo*, 602 U.S. at 189 (ellipsis in original) (internal quotation marks omitted). That is all the more true where "academic freedom"—"a special concern of the First Amendment," *Keyishian*, 385 U.S. at 603—is at stake. As part of a campaign of escalating sanctions against Harvard for exercising its right to academic freedom,[18] the President has directed suspension and limitations on entry of Harvard students and commanded the Secretary of State to consider revoking the visas of existing Harvard students. That action violates the First Amendment several times over, and this Court has "equitable power[]" to enjoin it. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015).

---

[18] In addition to the funding freeze being challenged in the Funding Case, the government's campaign of escalating sanctions has included numerous federal investigations launched in the immediate aftermath of April 14. *See* Am. Compl. ¶ 133.

1.      **Defendants Unlawfully Retaliated Against Harvard for Its Refusal to Cede Control Over Its Academic Decisionmaking.**

The Proclamation unlawfully retaliates against Harvard for its refusal to allow the federal government to control its academic decisionmaking.

"Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also … on autonomous decisionmaking by the academy itself." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (citations omitted). Universities have a right to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (quotation marks omitted). This right to "academic freedom," *Keyishian*, 385 U.S. at 603, protects "not only students and teachers, but their host institutions as well," *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007) (quotation marks omitted).

Here, the Proclamation is the culmination of a series of retaliatory actions the government undertook after Harvard refused to accept the government's April 11 Demand Letter. That letter sought to impose the government's preferences over how Harvard operates, the viewpoints of those it admits and hires, and what it teaches. The government's message was simple and unmistakable: Harvard must speak as the government wishes it to or suffer the consequences. On April 14, Harvard made clear through the Garber Letter that it would not accede to government control of its teaching, community, or governance. *See* Compl., Ex. 10. Immediately, and in retaliation for Harvard's refusal to accede to the government's demand to control its "autonomous decisionmaking," *Ewing*, 474 U.S. at 226 n.12, the government responded, revoking billions of dollars in funding, threatening to revoke Harvard's 501(c)(3) status, initiating the process that resulted in the Revocation Notice, convening a meeting at the White House to identify additional ways to punish Harvard, issuing an NOIW, introducing a State Department "pilot program" that

13

imposes additional social-media vetting requirements only on those individuals seeking to travel to Harvard, and issuing the Proclamation after this Court granted a temporary restraining order against the SEVP revocation.

Each of the elements for a First Amendment retaliation claim is satisfied here: (1) Harvard engaged in constitutionally protected conduct; (2) it was immediately subjected to a series of adverse actions by the government, including the Proclamation at issue here; and (3) its protected conduct was a substantial or motivating factor in that adverse action. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012); *see Hartman v. Moore*, 547 U.S. 250, 260-61 (2006).

*First*, Harvard's "constitutionally protected conduct" includes its right to engage in "autonomous decisionmaking," *Ewing*, 474 U.S. at 226 n.12, with respect to the "manage[ment]" of its "academic community," *Blasdel*, 687 F.3d at 816 (quotation marks omitted). Harvard enjoys the "constitutional right to determine for [itself], as [an] educational institution[], what to teach and how to teach it." *Garcia-Padilla*, 490 F.3d at 8. The First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom," *Keyishian*, 385 U.S. at 603, and "nowhere" are these First Amendment freedoms "more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). The Demand Letter sought to interfere with these freedoms—to oversee faculty hiring (who may teach); mandate the government's preferred balance of "viewpoint diversity" in each "department, field, or teaching unit" (what is taught and how); and require admission of a "critical mass of students who will provide viewpoint diversity" (who is admitted). Compl., Ex. 9, at 2-3. It is Harvard's prerogative, not the government's, "to determine for itself on academic grounds" each of these quintessential university functions. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 47 (2d Cir. 2000) (quotation marks omitted).

*Second*, the Proclamation is adverse action. It precludes Harvard from welcoming new

international students—despite being SEVP certified—by barring entry of those students into the United States. It also subjects existing international students at Harvard to potential visa revocation, in the discretion of the Secretary of State. These actions damage Harvard's ability to maintain its status and reputation as a leading global research institution and frustrate years of careful planning and resource allocation with respect to its F-1 and J-1 programs. Such action is certainly "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citations omitted).

*Third*, Harvard's assertion of academic freedom was a "substantial or motivating factor" in the revocation. Both the Proclamation and the accompanying Fact Sheet confirm the Administration's retaliatory motive. The very first sentence of the Proclamation makes clear the government's desire to influence who may "attend, conduct research, or teach" at Harvard. Am. Compl. Ex. 35. And elsewhere the Proclamation states its objection to Harvard admitting an "excessive" number of foreign students rather than "American[s]." For its part, the Fact Sheet suggests that Harvard has a "history of ... radicalism" and has admitted "radicalized lunatics." Am. Compl. Ex. 36.

Other recent statements further demonstrate the government's express retaliatory purpose. For example, in the Press Release accompanying the Records Request, DHS explained that Secretary Noem had "wr[itten] a scathing letter" to Harvard "demanding detailed records on Harvard's foreign student visa holders' illegal and violent activities," because of Harvard's purported tolerance for "anti-American, pro-Hamas ideology poisoning its campus and classrooms." Compl., Ex. 17. Those statements were the rationale for the government's initial revocation of Harvard's SEVP certification, and the government is now trying to circumvent the Court's injunction by invoking the President's authority under Sections 212(f) and 215(a).

The surrounding circumstances confirm that Defendants have targeted Harvard to retaliate against the University for refusing to surrender its independence. Hours after Harvard publicly refused to comply with the Demand Letter, the Federal Task Force froze more than two billion dollars in federal research funds—previously awarded via neutral and rigorous processes—and the President called for Harvard to lose its tax-exempt status, citing Harvard's alleged "political" and "ideological" positions (despite a criminal statute, 26 U.S.C. § 7217, expressly barring the President from asking the IRS to audit or investigate particular taxpayers). The Records Request followed just behind, with the accompanying Press Release that expressly described the request as "scathing" and linked the issuance of the DHS Records Request to those two earlier actions. *See* Compl., Ex. 17 (stating that the Records Request "follows" the freezing of Harvard's grants and the threatened revocation of its tax-exempt status). As noted, a slew of investigations, records request, and funding cut-offs followed. Then came the Revocation Notice, which again invoked the "evils of anti-Americanism" on Harvard's campus.

Thereafter, on the eve of the preliminary injunction hearing in this matter, the government issued its NOIW. Dkt. 49 at 4. And promptly after this Court extended the TRO following that hearing, the government convened a meeting to "brainstorm" further punitive actions to take against Harvard. Then this Proclamation issued, effectively seeking to achieve the same result that the Revocation Notice would have achieved. Given this steady drumbeat of adverse actions and their close temporal proximity to Harvard's protected activity, Harvard has established the required retaliatory intent. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).

These statements and context also make apparent that the Proclamation's vague references to other rationales are pretextual. For example, the assertion that crime rates at Harvard have "drastically risen in recent years" bears no relation to the categorical suspension of entry that the

Proclamation imposes. Am. Compl. Ex. 35. More broadly, the notion that national security is motivating the Proclamation is incorrect on its face given that the Proclamation expressly says that the same students may still enter the United States as long as they choose to enroll anywhere other than Harvard. *Id*. § 2(c). This unprecedented and irregular Proclamation—particularly viewed in light of the context of the equally unprecedented and irregular NOIW, Revocation Notice, and Records Request before it—is part of the Administration's pressure campaign to force Harvard to capitulate to the Administration's unconstitutional demands.

**2.    Defendants Engaged in Impermissible Viewpoint Discrimination.**

The Proclamation is also the product of unlawful viewpoint discrimination. The First Amendment prohibits the regulation or censure of speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (quotation marks omitted); *see Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys."). Government action that draws "distinctions … based on the message a speaker conveys" is unlawful unless it "survive[s] strict scrutiny," meaning that it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 163-64, 171 (quotation marks omitted). Strict scrutiny in the First Amendment context is so difficult for the government to satisfy that it is "all but dispositive." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

The government's actions constitute viewpoint discrimination twice over.

*First*, the government's actions involve viewpoint discrimination in a literal sense. The Demand Letter purports to require Harvard to submit to a "department-by-department" viewpoint "audit," asserting that "[e]very department … found to lack viewpoint diversity must be reformed by hiring a critical mass of new faculty … who will provide viewpoint diversity." Compl., Ex. 9,

at 2-3. To perform that inquiry, the government must necessarily examine the viewpoint of each Harvard professor, student, and employee to determine whether the overall mix of "viewpoints" meets with the government's approval. The inevitable effect of the government's "audit" is that Harvard would be penalized *unless* a sufficient number of professors flipped their viewpoints to those the government supported. That is quintessential viewpoint discrimination. Harvard cannot constitutionally be punished for declining to subject itself to such a regime—yet the Proclamation does precisely that.

*Second*, and relatedly, the obvious reality is that the government has "singled out" Harvard "for disfavor based on the views expressed" by the University—like those in the April 14 Garber Letter—and for its perceived viewpoints more generally. *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part and concurring in the judgment). The Demand Letter makes plain the government's position that Harvard's "student body, faculty, staff, and leadership" currently lack the requisite "viewpoint diversity." Compl., Ex. 9, at 2. When DHS revoked Harvard's certification, the letter similarly assailed Harvard for "anti-Americanism"—an open declaration that the Administration is punishing Harvard because it perceives that members of Harvard's community have the wrong ideas. Likewise, in the Press Release, Secretary Noem expressly explained her actions as targeting Harvard's "anti-American" "ideology" and "propaganda," and expressly linked the DHS actions to the President's own repeated attacks on what he perceives to be Harvard's viewpoints—the same claims repeated in DHS's May 22, 2025 Press Release issued immediately after the SEVP revocation. Compl., Exs. 17, 27.

Given these "'blatant' and 'egregious'" examples of viewpoint discrimination, *Reed*, 576 U.S. at 168 (citation omitted), it is impossible to understand the newest adverse action, the Proclamation, as anything other than "discriminat[ion] against [Harvard's] speech based on the

ideas or opinions it conveys." *Iancu*, 588 U.S. at 393.

Indeed, the government's actions to "single[] out" Harvard, *Matal*, 582 U.S. at 248 (Kennedy, J., concurring in part and concurring in the judgment), are so extreme that they "possess almost every quality of [a] bill[] of attainder, the use of which [has been] from the beginning forbidden to both national and state governments." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring). For more than two months now, the government has waged an all-out, multi-front attack on Harvard for reasons that are plain: the President believes Harvard's "students," "professors," and "attitude … [are] not American."[19] These actions are nothing more than an "officially prepared and proclaimed governmental blacklist[]" with a single member—Harvard. *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 143-44 (Black., J., concurring).

### 3.    Defendants Violated the Petition Clause.

The Proclamation also violates Harvard's First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I. The Supreme Court has held that the "right to petition extends to all departments of the Government," including "courts." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Accordingly, the Supreme Court has treated "a lawsuit" as a kind of "petition" for purposes of the Petition Clause. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 390 (2011); *see id.* at 387 (identifying "precedents confirm[ing] that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for the resolution of legal disputes").

---

[19] The White House, *President Trump Participates in a Cabinet Meeting, Apr. 30, 2025*, YouTube, at 1:21:50-1:23:33 (Apr. 30, 2025), https://www.youtube.com/watch?v=wn2XtufOAHc.

The Proclamation violates the Petition Clause by punishing Harvard for filing this lawsuit and having filed the Funding Case. The evidence in support of that conclusion is overwhelming: On May 25, 2025, two days after the entry of this Court's Order, the President addressed "the problem with Harvard" when speaking to the press, asserting (incorrectly) the percentage of international students in Harvard's student body. The following day, on May 26, 2026, the President published two posts on Truth Social, stating that he was "considering taking Three Billion Dollars of Grant Money away from a very antisemitic Harvard," Ex. 29, at 1, and expressly referring to this Court and the ongoing litigation, Ex. 30, at 1. Two days later, on May 28, 2025, the White House convened top government officials from nearly a dozen agencies to discuss additional punitive measures to target Harvard. Ex. 31, at 2. And at a press conference later that same day, the President again made clear that his Administration was retaliating against Harvard for its exercise of its legal rights, stating that "[e]very time they fight, they lose another $250 million," and that Harvard was "hurting" itself by "fighting." Bloomberg Podcasts, *Trump Says Harvard Must Show List of Foreign Students (Full Q&A)*, YouTube (May 28, 2025, at 20:50), https://www.youtube.com/watch?v=L6yjpvZTbjA; *see also* CNBC Television, *Education Secretary Linda McMahon to Harvard: Obey the law and you can be eligible for funding*, YouTube, at 1:04-31 (May 7, 2025) (the "McMahon Interview"), https://www.youtube.com/watch?v=bb6YJUHMqc4 (Secretary McMahon stating that Harvard has "taken a very hard line, so we took a hard line back").

By sanctioning Harvard for bringing good-faith—and thus far successful—lawsuits challenging the revocation of its SEVP certification and termination of its funding, Defendants have violated the long-standing "proposition that when a person petitions the government for redress," the "First Amendment prohibits any sanction on that action ... so long as the petition was

in good faith." *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009) (discussing the *Noerr-Pennington* doctrine). Precisely because Harvard has sought redress against that unlawful certification, the government has concocted a new mechanism to achieve effectively the same sanction that this Court has temporarily enjoined. In so doing, the government violated the Petition Clause.

### B.  The Proclamation Is Unauthorized By the Statutory Authorities It Invokes.

The Proclamation is also unlawful under the very statutory authorities on which it purports to rely.

The Proclamation principally invokes Section 212(f) of the INA, which provides that when the President "finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States," the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants." 8 U.S.C. § 1182(f). Section 212(f), however, does not authorize the Proclamation's measures against Harvard. The Proclamation does not bar the entry of any noncitizen or find that any noncitizen's entry would be detrimental to the interests of the United States. It simply picks out a disfavored domestic institution, Harvard, and forbids international students from coming to study there. Broad though Section 212(f) may be in its "sphere[]," *Trump v. Hawaii*, 585 U.S. 667, 695 (2018), that sphere does not encompass excluding noncitizens from particular U.S. institutions that the President disfavors.

*First*, the Proclamation does not "suspend … entry." 8 U.S.C. § 1182(f). This authority empowers the President to render noncitizens inadmissible to the United States. *Hawaii*, 585 U.S. at 695 n.4 ("The concepts of entry and admission—but not issuance of a visa—are used interchangeably in the INA. *See* § 1101(a)(13)(A) (defining 'admission' as the 'lawful entry of the alien into the United States')."). But any noncitizen potentially subject to the Proclamation can

continue to enter the United States, including on an F-1 or J-1 visa. The Proclamation merely prevents that noncitizen from studying at Harvard. *See* Am. Compl., Ex. 35 § 1 (purporting to limit entry of noncitizens "to pursue a course of study at Harvard University" or "to participate in an exchange visitor program hosted by Harvard University"); *id.* § 2(c) ("The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to any alien who enters the United States to attend other universities through the SEVP."). Section 212(f) authorizes the President to suspend entry and admission into the United States, not entry into Harvard Yard.

*Second*, the Proclamation does not suspend the entry of any "class of aliens as immigrants or nonimmigrants." 8 U.S.C. § 1182(f). As explained, any noncitizen potentially subject to the Proclamation can continue to enter the United States and can do so under the same immigrant or nonimmigrant admission programs. The Proclamation merely prevents that noncitizen from studying at Harvard. Section 212(f) allows the President to restrict the entry of particular classes of noncitizens and to limit particular types of admissions, not to target particular classes of U.S. institutions receiving noncitizens—in this case, a class of one. *Cf. Hawaii*, 585 U.S. at 688 ("the word 'class' comfortably encompasses a group of people linked by nationality").

*Third*, the Proclamation does not set forth the predicate the statute requires—a finding that the "entry of any aliens or any class of aliens into the United States would be detrimental to the interests of the United States." As just explained, noncitizens covered by the Proclamation can still enter the United States and can still do so via the very same SEVP programs to study at other universities. The Proclamation merely purports to find that it would be detrimental to the United States for noncitizens "to participate in a course of study at Harvard University or in an exchange visitor program hosted by Harvard University." Section 212(f) requires that the President find that particular *noncitizens*' entry would be "detrimental to the interests of the United States" and does

not permit the President to enforce his view that it would be detrimental to the interests of the United States for noncitizens to attend particular *U.S. institutions.*

Moreover, the Proclamation makes plain that the "interests of the United States" it pursues arise entirely from animus toward Harvard, not any national interest related to the "entry of any aliens or of any class of aliens." The Proclamation is clear that the supposed "interests of the United States" concern Harvard's admissions practices, Harvard's supposed suitability as a "destination for foreign students and researchers," and Harvard's provision of data concerning its international students to DHS. However broad may be the scope of the President's Section 212(f) authority to suspend the entry of noncitizens whose admission would be detrimental to the interests of the United States, it does not empower him to punish disfavored domestic institutions by barring noncitizens from those institutions.

*Fifth*, the Proclamation violates 8 U.S.C. § 1372(c), which specifies that the "Attorney General shall prescribe by regulation reporting requirements" in furtherance of the SEVP program. DHS has done that. As specified in 8 C.F.R. § 214.3(g), the school is required to maintain and report the delineated information, such as academic enrollment and disciplinary action if the student has been convicted of a crime. DHS has identified no deficiency in Harvard's reporting under these provisions. And the President may not leverage Section 212(f) to create his own reporting requirements or circumvent the procedural and substantive limits on the authority that Congress set forth in 8 U.S.C. § 1372(c), including that "the Attorney General" must act "*by regulation*" to establish reporting requirements. That would allow the President to entirely displace Congress's reticulated scheme by banning international students from attending institutions that do not comply with the new scheme the President has devised apart from congressional action. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 151 (D.D.C. 2019) (holding that "a presidential proclamation"

under Section 212(f) could not be used to "sidestep [a] statutory restriction on" agency authorities).

The Proclamation's novelty underscores its illegality. As the Supreme Court explained in *Hawaii*, Section 212(f) has been invoked to address noncitizens who posed harm to the United States and as a diplomatic tool to induce cooperation from foreign countries. 585 U.S. at 679-80, 692-93. Never has Section 212(f) been used to target domestic entities disfavored by the presidential Administration of the day. And if Section 212(f) were to become such a tool, it would be perilous indeed given the breadth of authority otherwise afforded by the statute. *Id.* at 684. A President, for example, could effectively ban a disfavored corporation from employing foreign workers or could bar the future entry into the United States of noncitizens who had previously associated with domestic institutions he disfavors. No President has ever before asserted that Section 212(f) confers such powers, and such an assertion presents exactly the type of major question that demands a clear congressional statement before it can be answered in the President's favor. *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." (quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941))).

Section 215(a) of the INA, which the Proclamation also cites, does not provide authority that Section 212(f) does not. That provision makes it unlawful "for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1). As the Supreme Court and the government have recognized, this provision has typically been invoked in conjunction with Section 212(f) and "'substantially

24

overlap[s]' with [Section 212](f)." *Hawaii*, 585 U.S. at 683 n.1 (quoting Brief for Petitioners 32-33). This provision—which focuses on orderly border process—likewise does not authorize the President to bar noncitizens from particular U.S. institutions that he disfavors, or to override the more specific requirements of 8 U.S.C. § 1372(c) or other provisions of the INA.

### C. The Proclamation Violates the Equal Protection Clause.

The Proclamation also violates the Fifth Amendment's equal protection clause. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). A disfavored individual may bring an equal protection claim if (1) he has "been intentionally treated differently from others similarly situated," and (2) "there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*). "The classic class-of-one claim is illustrated when a public official, 'with no conceivable basis for his action other than spite or some other improper motive … comes down hard'" on a citizen. *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (alteration in original) (citation omitted). And where the differential treatment burdens First Amendment activity, the test is "appreciably more stringent than 'minimum rationality.'" *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988).

The Proclamation is the latest salvo in the government's continually escalating campaign of retaliation against Harvard. The absence of any real justification for the Proclamation makes this clear. The Proclamation's purported justification is Harvard's failure to "share[] the information that the Federal Government requires to safeguard national security and the American public"—a reference to DHS's Records Request, which is discussed at length elsewhere in the Proclamation. Am. Compl. Ex. 35.[20] But as Harvard argued in its initial motion for a TRO, Dkt. 9

---

[20] The Proclamation also takes issue with Harvard's receipt of foreign funds. *See* Am. Compl. Ex. 35. But scores of other schools do the same, and the Proclamation does not apply to any of them.

at 18, 37-38, the Records Request far exceeded the permissible scope of Section 214.3(g)(1)-(2), the only provisions that authorize DHS to require schools to maintain and report student information. Failure to comply with valid requests under Section 214.3(g)(1) is a permissible basis for revoking a school's SEVP certification. *See* 8 C.F.R. § 214.4(a)(2)(i)-(ii). Failure to comply with a request that is *not* covered by those provisions is *not* a permissible basis for revocation.

Only Harvard has had its certification revoked—directly at first, through the Revocation Notice, and now (since the Revocation Notice has been enjoined) indirectly through the Proclamation—for failure to comply with vague requests for information completely untethered to the applicable regulations. There is no plausible justification for that action beyond the government's "improper motive" to "come[] down hard" on Harvard. *Swanson*, 719 F.3d at 784; *see, e.g.*, Bloomberg Podcasts, *Trump Says Harvard Must Show List of Foreign Students (Full Q&A)*, YouTube (May 28, 2025, at 20:50), https://www.youtube.com/watch?v=L6yjpvZTbjA (President Trump stating that Harvard is "hurting themselves" by "fighting" the government); Am. Compl., Ex. 31, at 3 (White House Spokesperson stating that Harvard would suffer a "self-inflicted demise" because it "decided to litigate" against the government); McMahon Interview (Secretary McMahon stating "[t]hey've taken a very hard line, so we took a hard line back").

The Proclamation claims to rely on Harvard's admission of what the government believes to be an "excessive" number of foreign students "[i]nstead of … Americans," and a number of other shifting rationales. Am. Compl. Ex. 35. But a core component of a university's academic freedom is its right to "autonomous decisionmaking," *Ewing*, 474 U.S. at 226 n.12, as to the "manage[ment]" of its "academic community," *Blasdel*, 687 F.3d at 816—including the choice of who it admits to teach. The Proclamation intentionally singles out Harvard for disfavored treatment relative to similarly situated schools—colleges and universities that enroll even greater

percentages of international students, that likewise receive funding from foreign sources and collaborate with counterparts around the world, that value inclusion, and that have allegedly failed to stem the tide of antisemitism—because of its First Amendment activities. The Proclamation therefore violates the equal-protection principles embedded in the Fifth Amendment.

### D.  The Proclamation Is an End Run Around This Court's TRO.

Finally, the Proclamation is an obvious effort to interfere with this Court's jurisdiction over Harvard's pre-existing suit, and should be rejected for that reason, too.

The Court's TRO—which remains in force—bars "Defendants, their agents, and anyone acting in concert or participation with Defendants" from "[i]mplementing, instituting, maintaining, or giving effect to the revocation of Plaintiff's SEVP certification" and "[g]iving any force or effect to the Department of Homeland Security's May 22, 2025 Revocation Notice." Dkt. 11. As the Court subsequently made clear at the May 29, 2025 hearing, the Court intended to preserve the status quo and ensure that Harvard could continue to enroll international students while the Court evaluated the legality of the government's conduct.

Yet the Proclamation does in substance exactly what this Court enjoined—it revokes Harvard's ability to enroll international students. According to Section 1 of the Proclamation, entry is suspended for *all* Harvard international students "who enter or attempt to enter the United States to begin attending Harvard University through the SEVP after the date of this proclamation." That provision bans international students from entering the United States to enroll at Harvard, which is precisely the type of categorical ban that the Court sought to restrain when it entered its TRO.

What is more, the *reasons* for the government's actions match the reasons given for the now-enjoined revocation. The now-enjoined Revocation Notice claimed that the revocation was "the unfortunate result of Harvard's failure to comply with simple reporting requirements." Harvard's complaint explained that the government could not lawfully ban Harvard from enrolling

international students on this ground, both because the revocation notice failed to identify any reporting requirements that Harvard had violated and because DHS's procedures did not permit DHS to unilaterally revoke SEVP certification on this ground. Yet the Proclamation again repeats the same substantively and procedurally inadequate rationale to ban Harvard from enrolling new international students: "Harvard's actions show that it either is not fully reporting its disciplinary records for foreign students or is not seriously policing its foreign students … . When a university refuses to uphold its legal obligations, including its recordkeeping and reporting obligations, the consequences ripple far beyond the campus." The Proclamation simply reflects the Administration's effort to accomplish the very result that the Court sought to prevent.

The Court should not stand for that, and it should issue a fresh TRO to prevent the government from making an end-run around the prior TRO. *See United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977) (emphasizing that the Supreme Court has "repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained"). Here, the original TRO was intended to preserve the status quo and ensure that this Court could resolve the suit in an orderly fashion before Harvard experienced even more irreparable harm. The government has now sought to upend the status quo in response to the Court's TRO. An additional TRO is again needed to ensure the orderly exercise of the Court's jurisdiction.

It is no answer for the government to contend that it is now and for the first time relying on Section 1182(f), which it did not previously invoke. To begin, as explained above, Section 1182(f) does not confer the government with statutory authority to ban aliens from attending one particular university that the President views as an ideological opponent. And as it does not confer

that expansive authority, it surely does not confer the authority the President claims here: authority to deploy Section 1182(f) as a means of undermining a court order and effecting the backdoor revocation of Plaintiff's SEVP certification. Crucially, the Proclamation's timing makes clear that it is a direct response to this Court's order. The "class of aliens," 8 U.S.C. § 1182(f), targeted by the Proclamation are aliens who are able to enroll at Harvard pursuant to an injunction issued by this Court. Permitting the government to use Section 1182(f) as a means of overcoming court orders—by defining the "class of aliens" as "aliens that are the beneficiaries of a specific court order with which the President disagrees"—would profoundly undermine the separation of powers.

For all these reasons, the implementation and enforcement of the Proclamation must be enjoined.

## II.    THE PROCLAMATION INFLICTS IRREPARABLE HARM.

Harvard will suffer irreparable harm from the Proclamation if its enforcement is not enjoined. First, to the extent that the Court finds that Harvard is likely to prevail on the merits of its First Amendment claims, then a finding of irreparable harm follows automatically. It is hornbook law that a loss of First Amendment freedoms—and the chilling effect of retaliatory government action—is a quintessential irreparable injury. *See, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citation omitted)).

Although that First Amendment irreparable harm is sufficient, it is just the tip of the iceberg. Effective immediately, according to the Proclamation, incoming international students and scholars are barred from entering the United States "to pursue a course of study at Harvard University" or "to participate in an exchange visitor program hosted by Harvard University," and the Secretary of State is directed to "consider" whether visa holders "who currently attend Harvard

University … should have their visas revoked." Am. Compl. Ex. 35 §§ 1, 2(b).

The human costs of the Proclamation cannot be overstated. Harvard has admitted thousands of international students who are scheduled to come to campus for the upcoming summer and fall terms. Effective yesterday, these students are no longer able to enter the country, including for summer classes about to commence. Absent preliminary relief, Harvard will thus be forced to dramatically shrink or reconfigure its carefully crafted incoming classes in a matter of weeks. Martin Decl. ¶¶ 39, 44, 46.

The harms do not stop there. Absent preliminary relief, approximately a quarter of Harvard's current student body is at imminent risk of having its visas revoked and becoming subject to deportation. *See* Martin Decl. ¶ 5. These students—many of them teaching fellows, research assistants, and clinical trainees; all of them classmates, teammates, roommates, and friends—enrich Harvard's learning environment and campus life in countless ways. *See* Elliot Decl. ¶¶ 14-17, 23. The same is true of the approximately 2,000 international F-1 graduates currently working in jobs across the country through the Optional Practice Training (OPT) and STEM OPT programs. *See* Martin Decl. ¶ 2.

The loss of Harvard's international students and scholars, present and future, and their trust and faith in Harvard's ability to host visa holders, will have an irreversible impact on the University's status and reputation as a preeminent institution of learning. *See, e.g.*, *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (explaining that one recognized type of irreparable injury is the "incalculable loss of reputation and prestige" (citation omitted)). This irreparable harm to Harvard's reputation is already evident: Dozens of incoming international students, and at least one incoming *domestic* student, have asked about deferring their admission or obtaining Harvard's assistance in enrolling elsewhere. Martin Supp. Decl. ¶¶ 13, 14. Students

matriculate at Harvard *because* they want to learn from—and with—the top students Harvard can recruit from around the world. *See* Elliott Decl. ¶¶ 5, 7, 8, 10. By forbidding Harvard from enrolling foreign students and arbitrarily terminating the ability of existing students to complete coursework and degrees, the government does long-lasting harm to Harvard's "goodwill and reputation." *Ross-Simons*, 217 F.3d at 13.

Consider STEM fields. University-wide, 45% of all STEM graduate students are international. Elliott Decl. ¶ 11. In the School of Engineering and Applied Sciences, that figure is 48%. *Id*. These programs rely on the presence and contributions of international students. Nor is STEM an outlier. More than 1,000 undergraduate students are international students, and international students comprise more than half of the Kennedy School's student body, nearly one third of the Business School's, and more than 90% of the Law School's LLM program. In addition, if preliminary relief is not granted, the brightest minds in the United States will enroll in other schools' programs that "do not labor under the same handicap" being imposed on Harvard. *Ross-Simons*, 217 F.3d at 13 (citation omitted).

More broadly, the loss of international students is likely to cause a harmful feedback loop affecting students and professors alike. Because many of the most talented American students will not want to attend a Harvard that is isolated from the world, the most accomplished professors will choose to teach at other schools where those students—international or American—can and will choose to attend. *See* Elliott Decl. ¶ 10. In turn, talented American students will be still less interested in attending a Harvard that loses its most distinguished professors, and the remaining professors will be less interested in staying to teach the remaining students.

Moreover, the government's action will immediately cripple Harvard's day-to-day functioning and ability to both advance academic inquiry and provide an excellent education. *See*

Martin Decl. ¶¶ 45, 55. Without preliminary relief, graduate student instructors will be unable to enter or return to the country to teach undergraduates in the fall. *See* Elliott Decl. ¶¶ 13-14. Important scientific research—which continues through the summer—will be interrupted or halted. *See, e.g.*, *id*. ¶ 15. Teaching hospitals will become understaffed and unable to care for patients. Each of these consequences of decertification—all of which "unquestionably make it more difficult for [Harvard] to accomplish its primary mission"—constitute irreparable harm. *Massachusetts v. Nat'l Insts. of Health*, No. 25-CV-10338, --- F. Supp. 3d ----, 2025 WL 702163, at *30 (D. Mass. Mar. 5, 2025), *appeal docketed*, No. 25-1344 (1st Cir. Apr. 9, 2025) (citation omitted).

## III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST OVERWHELMINGLY FAVOR RELIEF.

The balance of the equities and public interest—two factors that "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009)—favor granting Harvard its requested relief. The Proclamation substantially burdens the University and grossly impairs the public interest.

As discussed, international students are an integral part of Harvard's community and mission—and its ability to execute on that mission redounds to the public benefit. Losing a substantial portion of incoming classes, including those who will serve as teaching fellows and research assistants and otherwise enrich the campus and its classrooms, *see* Elliott Decl. ¶¶ 13-14, will impair the ability of Harvard's remaining students to master their coursework, hampering their intellectual growth to the detriment of the businesses, hospitals, governments and other organizations they work for now or in the future.

The government, by contrast, will not suffer any harm if the enforcement and implementation of the Proclamation is enjoined. "It is well established that the Government cannot

suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citation omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations … that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). And even aside from the Proclamation's patent illegality, the government incurs no cognizable harm from the continuation of Harvard's visa programs that have endured for over half a century.

## CONCLUSION

Harvard respectfully urges this Court to immediately enter, pursuant to Federal Rule of Civil Procedure 65(b)(1), a TRO against the above-named Defendants enjoining them, their agents, and anyone acting in concert or participation with Defendants from implementing, instituting, maintaining, enforcing, or giving force or effect to the June 4, 2025, Presidential Proclamation entitled, "Enhancing National Security by Addressing Risks at Harvard University."

Harvard also moves pursuant to Rule 65(b)(2) of the Federal Rules of Civil Procedure to extend the Court's May 23, 2025, TRO until June 20, 2025, or such earlier time as a preliminary injunction order can be issued. Good cause exists for such extension in light of the disruption the Proclamation has caused to the parties' efforts to convert that temporary restraining order to a preliminary injunction, because the many constitutional infirmities with respect to the Revocation Notice remain the same and because Harvard will suffer irreparable harm absent preservation of the status quo ante.

Dated: June 5, 2025

JENNER & BLOCK LLP

Ishan Bhabha*
Ian Heath Gershengorn*
Lauren J. Hartz*
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
IGershengorn@jenner.com
LHartz@jenner.com

Andrianna Kastanek*
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
AKastanek@jenner.com

William A. Burck*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com

Respectfully submitted,

LEHOTSKY KELLER COHN LLP

By: */s/ Steven P. Lehotsky*
Steven P. Lehotsky (BBO # 655908)
Scott A. Keller*
Serena M. Orloff*
Shannon G. Denmark*
Jacob B. Richards (BBO # 712103)
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com
scott@lkcfirm.com
serena@lkcfirm.com
shannon@lkcfirm.com
jacob@lkcfirm.com

Katherine C. Yarger*
700 Colorado Blvd., #407
Denver, CO 80206
katie@lkcfirm.com

Joshua P. Morrow*
408 W. 11th Street, 5th Floor
Austin, TX 78701
josh@lkcfirm.com

Danielle K. Goldstein*
3280 Peachtree Road NE
Atlanta, GA 30305
danielle@lkcfirm.com

*Admitted Pro Hac Vice

34

## CERTIFICATE OF SERVICE

Counsel for Plaintiff certify that they have submitted the foregoing document with the Clerk of Court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

By: */s/ Steven P. Lehotsky*

Dated: June 5, 2025