# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff*,

v.

Case No. 1:25-cv-11472-ADB

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants*.

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................................i

INTRODUCTION ........................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ....................................................2

LEGAL STANDARD ..................................................................................................7

ARGUMENT ...............................................................................................................8

   I.   The Proclamation was lawfully issued under the President's expansive powers under
      8 U.S.C. § 1182(f). ............................................................................................8

     A.  The President enjoys broad constitutional and statutory authority to exclude individual
        aliens or classes of aliens..............................................................................8

     B.  Harvard's statutory challenge to the Proclamation is not justiciable. ...............9

     C.  The Proclamation is a facially valid exercise of presidential authority under § 1182(f)..10

   II.  Harvard is not likely to succeed on its claim that the Proclamation violates the First
      Amendment..........................................................................................................16

     A.  The Proclamation is facially legitimate and thus constitutional........................16

     B.  The Proclamation easily passes rational basis review. .....................................19

     C.  The Proclamation does not retaliate against Harvard for exercising its First Amendment
        rights.............................................................................................................21

  III. Harvard is not likely to succeed on its equal protection claim. ............................30

  IV. The Proclamation is not an "end run" of the TRO................................................33

   V.  The remaining preliminary injunction factors weigh against Harvard. ................34

     A.  Harvard has not established that irreparable harm is likely................................34

     B.  The balance of equities and public interest weigh against Harvard. ..................35

CONCLUSION............................................................................................................37

# TABLE OF AUTHORITIES

**Cases**

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) ............................................................ 10, 11

*Adams v. Vance*, 570 F.2d 950 (D.C. Cir. 1978) ........................................................................... 36

*Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219 (D. Mass.) ............................................ 34

*Baptiste v. Kennedy*, 490 F. Supp. 3d 353 (D. Mass. 2020) .......................................................... 29

*Clubside, Inc. v. Valentin*, 468 F.3d 144 (2d Cir. 2006) ............................................................... 31

*Cordi-Allen v. Conlon*, 494 F.3d 245 (1st Cir. 2007) ............................................................. 31, 32

*Demore v. Kim*, 538 U.S. 510 (2003) ............................................................................................. 17

*Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016) ........................ 23

*Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008) ................................... 31, 32

*Fiallo v. Bell*, 430 U.S. 787 (1977) ......................................................................................... passim

*Fiba Leasing Co. v. Airdyne Indus., Inc.*, 826 F. Supp. 38 (D. Mass. 1993) ................................ 37

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .................................................................................... 29

*Gattineri v. Town of Lynnfield, Massachusetts*, 58 F.4th 512 (1st Cir. 2023) ........................ 21, 22

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) ....................................................................... 8, 9

*Hartman v. Moore*, 547 U.S. 250 (2006) ...................................................................................... 29

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ..................................................... 17, 29

*Kerry v. Din*, 576 U.S. 86  (2015) ................................................................................................. 17

*Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297 (D. Mass. 2024) ..... 22

*Kidwell v. Eisenhauer*, 679 F.3d 957 (7th Cir. 2012) ................................................................... 23

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ........................................................... 16, 17, 18, 19

*Lowe v. SEC*, 472 U.S. 181 (1985) ................................................................................................ 22

*Massachusetts v. Nat'l Insts. of Health*, 2025 WL 702163 (D. Mass. Mar. 5, 2025) ............ 8, 35

*Mathews v. Diaz*, 426 U.S. 67 (1976) ........................................................................................... 17

*Nat. Res. Def. Council, Inc. v. Dep't of State*, 658 F. Supp. 2d 105 (D.D.C. 2009) ..................... 23

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ........................................................... 21

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................. 36

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ................................................ 15

*Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747 (1st Cir. 1996) ............................... 31

*Romer v. Evans*, 517 U.S. 620 (1996) ............................................................ 26

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ................ 35

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993) .......................... 13, 14, 36

*Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) ............................... 9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)
.................................................................................................. 25

*Suero v. Fed. Home Loan Mortg. Corp.*, 2013 WL 6709001 (D. Mass. Dec. 17, 2013) ........ 34, 35

*Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) .................................. 33

*Toledo v. Sanchez*, 454 F.3d 24 (1st Cir. 2006) ............................................... 30

*Trump v. Hawaii*, 585 U.S. 667 (2018) .................................................... *passim*

*U.S. ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ................................................................ 8, 9, 10, 30

*United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926) ................................ 23

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) ............................... 9

*Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000) .......................................... 31

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26 (1st Cir. 2011) ..... 7, 33

*Wash. Tr. Advisors, Inc. v. Arnold*, 646 F. Supp. 3d 210 (D. Mass. 2022) ...................... 7

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ......................................... 35

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................... 9

*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ....................................................... 17

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015) ............................... 9

**Statutes**

8 U.S.C. § 1101 ................................................................................................ 2, 6

8 U.S.C. § 1181 ................................................................................................... 2

8 U.S.C. § 1182 ............................................................................................ passim

8 U.S.C. § 1185 ................................................................................................ 2, 8

8 U.S.C. § 1201 ............................................................................................ 2, 6, 7

8 U.S.C. § 1203 ................................................................................................... 2

8 U.S.C. § 1225 ................................................................................................... 2

8 U.S.C. § 1372 .............................................................................................. 14, 25

**Rules and Regulations**

8 C.F.R. § 214.2(f)(8) .................................................................................... 12, 13

8 C.F.R. § 214.3(g) ....................................................................................... passim

Fed. R. Civ. P. 65 ................................................................................................ 7

Plaintiff (Harvard) seeks to enjoin a statutorily authorized action of the President of the United States—an action grounded in express congressional delegation under 8 U.S.C. §§ 1182(f) and 1185(a)(1). The Proclamation at issue suspends the entry of aliens seeking to study at Harvard, based on concrete and articulated concerns about national security, springing from institutional noncompliance and entanglements with foreign adversaries. It is facially legitimate and bona fide, in addition to being well within the President's constitutional and statutory authority to govern the immigration system and foreign affairs of the nation. That should be the end of this case.

Harvard's invocation of the First Amendment cannot override these foundational principles. Contrary to its contention, this Proclamation is not the latest chapter in a supposed campaign of retaliation. It is a distinct and independently justified act issued nearly two months after the events on which Harvard relies, by a different decisionmaker acting under a different statutory framework and motivated by different concerns. The Supreme Court in *Trump v. Hawaii* expressly foreclosed the approach Harvard advocates—an approach that would invite intrusive judicial scrutiny of presidential national security decisions, simply based on assertions of subjective motive. 585 U.S. 667, 684 (2018). Indeed, this Proclamation is even stronger than the one upheld in *Hawaii*.

Nor can Harvard prevail by portraying itself as a uniquely aggrieved institution. While it is unquestionably prominent, Harvard is not unique. Other institutions—public and private alike— have faced scrutiny for similar failures to contain violence, address discriminatory conduct, and comply with lawful federal requests. That Harvard has now become the subject of an immigration-related enforcement action is neither discriminatory nor retaliatory. It reflects considered enforcement discretion directed to address well-founded national-security concerns, which courts cannot question. Since Harvard cannot justify its sweeping relief and intrusion into core executive functions, the temporary restraining order should be vacated and any preliminary injunction denied.

1

## BACKGROUND AND PROCEDURAL HISTORY

### 1.  The Executive's Broad Authority

The Constitution and the Immigration and Nationality Act both confer on the President broad authority to suspend or restrict the entry of aliens outside the United States when he deems it in the Nation's interest. *See* 8 U.S.C. §§ 1182(f), 1185(a)(1). Presidents have routinely invoked that authority to restrict entry of aliens from abroad to advance national-security and foreign-policy objectives.

Under the Immigration and Nationality Act (INA), ch. 477, 66 Stat. 163 (8 U.S.C. § 1101 et seq.), admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. Though a visa is normally necessary for admission, it does not guarantee admission; the alien still must be found admissible upon inspection at a port of entry. 8 U.S.C. §§ 1201(h), 1185(d), 1225(a); *see* 8 U.S.C. § 1101(a)(4) (application for visa is distinct from application for admission).

The INA establishes numerous grounds on which an alien abroad may be inadmissible to the United States and ineligible for a visa. *See, e.g.*, 8 U.S.C. §§ 1182(a), 1201(g). Congress also has accorded the President broad authority to suspend or restrict the entry of aliens. Section 1182(f) of Title 8 provides in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

"By its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. The Supreme Court has "observed that § 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* Section

1185(a)(1) of Title 8 further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe."

### 2. The Situation at Harvard

Following the brutal terrorist attack on Israel in October 2023, pro-Palestine activists "disrupt[ed] classes in Harvard Yard . . . defac[ed] [] hostage posters around campus with antisemitic slogans . . . and . . . post[ed] a classic antisemitic cartoon on social media . . . [that was] reshar[ed] [] by Harvard Faculty and Staff for Justice in Palestine - ke[eping] many Jewish students on edge." Ex. A at 25.[1] In the spring semester, they set up an "encampment" purported to show solidarity with Palestine and led chants calling for violence against Jews. *Id.* at 114–15. Protestors followed and verbally harassed some Jewish students, vandalized Harvard's campus, and posted swastika stickers near Harvard Hillel's Rosovsky Hall. *Id.* at 26.

But activist students cannot shoulder the entire blame. "[B]etween October 7 and the April 24 formation of the encampment, Harvard failed to impose *any* formal discipline on any students." Ex. B.[2] Harvard's own report on antisemitism revealed that, in addition to certain students, "segments of Harvard's faculty [and] staff," even "some Harvard curricula and study abroad programs," espoused "a stereotyped notion: that Israel is not a state, but rather a 'settler colony' of white Europeans who have no real connection with the land they had stolen, that epitomized

---

[1] Final Report Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, Harvard University, Apr. 29, 2025 at 25 (hereinafter Harvard Report). FINAL REPORT Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, April 29, 2025, https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf.

[2] House Committee on Education and the Workforce, Harvard University Failed to Discipline Antisemitic Conduct Violations, Sept. 26, 2024, https://edworkforce.house.gov/uploadedfiles/9.23.2024_harvard_disciplinary_final.pdf.

aggression, and was bereft of virtues." Ex. A at 8. Students perceived that "anti-Israeli and anti-Jewish expression are tolerated in a way that hostile rhetoric towards other groups would not be; that some of Harvard's offices for Equity, Diversity, Inclusion, and Belonging have not taken antisemitism seriously; and that discipline against students who engaged in bullying, harassment, and intimidation has been lax." *Id.* at 27. But when one student "expressed frustration with the administrative response" and "brought this to administrators' attention eight times, 'their response was that slogans and chants can mean different things to different people.'" *Id.* at 127.

Instead of disciplining its students, "in July, administrative boards at the College and various Schools eliminated or reduced penalties that they had imposed on undergraduate and graduate students in connection with various protests and related events of the previous year, and in the same month the Harvard Corporation conferred degrees on 11 of the 13 seniors whose degrees had been withheld." *Id.* at 25. "Harvard's response to the spring encampment protests fueled perceptions of inconsistency and a lack of transparency in its disciplinary processes, with some Schools declining to impose sanctions while others faced internal disagreements and reversals." *Id.* at 117. The House Committee on Education and the Workforce found that Harvard violated Title VI obligation to protect its Jewish students "[b]y failing to hold students responsible for clear violations of university policy, including repeat offenders." *See supra* n.2. And that its failure to do so "invited further ones." *Id.*

In addition, "[c]rime rates" generally "at Harvard University—including violent crime rates—have drastically risen in recent years." Proclamation No. 10948, 90 Fed. Reg. 24493 (June 4, 2025). And given Harvard's documented failure to discipline student misconduct, the Department of Homeland Security became concerned that "foreign adversaries and competitors" may "take advantage of" Harvard's lax environment and "among other things, steal technical information and

products, exploit expensive research and development to advance their own ambitions, and spread false information for political or other reasons." *Id.* To investigate its concerns, the Department of Homeland Security wrote to Harvard on April 16, 2025, requesting student visa holders' disciplinary records and supporting evidence of misconduct.[3] National security concerns require careful tracking of individuals present in the United States in nonimmigrant student status and the schools authorized to enroll them.

Federal regulations set out the recordkeeping and reporting requirements for the certification and recertification of schools for enrollment of F and M nonimmigrants. 8 C.F.R. § 214.3(g). Subsection (g)(1) details the types of student records an SEVP-certified school must keep and how long it must keep them. It broadly requires that "[s]chools . . . maintain and be able to provide an academic transcript *or other routinely maintained student records that reflect the total, unabridged academic history of the student* at the institution." *Id.* § 214.3(g)(1). It notes that "[a] DHS officer may request any or all of the data in paragraphs (g)(1)(i) through (x) of this section on any individual student or class of students upon notice." *Id.* § 214.3, "Note to paragraph (g)(1)." Subsection (g)(2) covers reporting requirements regarding changes in student and school information. Among other things, it requires schools "to report within 21 days any change of the information contained in paragraph (g)(1) or the occurrence of the following events" which include: "(D) Any disciplinary action taken by the school against the student as a result of the student being convicted of a crime; and (E) Any other notification request not covered by paragraph (g)(1) of this section made by DHS with respect to the current status of the student." 8

---

[3] The U.S. Immigration and Customs Enforcement (ICE), a part of the Department of Homeland Security (DHS), administers the Student and Exchange Visitor Program (SEVP). *Background: SEVP and SEVIS*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/sevis.

*Id.* §§ 214.3(g)(2)(ii)(D), (E). Harvard, however, failed to comply with the Department's records request, vaguely identifying only three instances of student misconduct. *See* 90 Fed. Reg. at 24493. Harvard failed to provide Defendants with documentation to ensure that foreign nationals admitted on student or exchange visitor visas remained in compliance with federal law.

### 3. *The Proclamation*

On June 4, 2025, the President issued a Proclamation entitled "Enhancing National Security by Addressing Risks at Harvard University" (Proclamation). 90 Fed. Reg. 24493. It suspends: "[t]he entry of any alien into the United States as a nonimmigrant to pursue a course of study at Harvard University under . . . 8 U.S.C. 1101(a)(15)(F) or 1101(a)(15)(M), or to participate in an exchange visitor program hosted by Harvard University under . . . 8 U.S.C. 1101(a)(15)(J).'" 90 Fed. Reg. at 24495. "That suspension . . . expire[s], absent extension, 6 months after the date of th[e] proclamation." *Id*.

The Proclamation applies to aliens who enter or attempt to enter to begin attending Harvard as F or M nonimmigrants or participate in an exchange visitor program hosted by Harvard as J nonimmigrants after the Proclamation's date. *Id*. at 24495.[4] It commands the Secretary of State to consider, in his discretion, whether foreign nationals who currently attend Harvard and are in the U.S. per F, M, or J visas and otherwise meet the specified criteria should have their visas revoked under 8 U.S.C. § 1201(i). *Id*. It clarifies that the suspension and limitations articulated in Section 1 do not apply to any alien who enters the U.S. to attend other universities through the SEVP or whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their designees. *Id*. Further, it requires, no later than 90 days after the

---

[4] Harvard is not currently certified to enroll M visa students.

Proclamation, the Attorney General and Secretary of Homeland Security, must jointly submit to the President a recommendation on whether an extension or renewal of the suspension and limitation on entry in Section 1 is in the national interest. *Id*.

### 4. *This Lawsuit*

On May 23, 2025, Harvard filed a complaint challenging DHS's May 22, 2025 revocation of Harvard's SEVP certification and Exchange Visitor Program designation (ECF No. 1), along with a motion seeking a temporary restraining order (TRO) of the revocation (ECF Nos. 4, 9). The Court granted the TRO the very same day. ECF No. 11.

On May 28, 2025, DHS sent a Notice of Intent to Withdraw (NOIW) to Harvard identifying compliance issues and giving Harvard 30 days to respond. ECF 49. On June 4, 2025, the President issued the Proclamation. 90 Fed. Reg. 24493. The following day, Harvard filed an Amended Complaint, adding challenges to the Proclamation (ECF No. 54) along with a motion for a TRO (ECF Nos. 56, 57). The Court granted the motion the same day. ECF No. 59. The Court set a preliminary injunction hearing for June 16. ECF No. 60.

## LEGAL STANDARD

The same standard for assessing motions for a temporary restraining order—as Plaintiff originally requested—applies to requests for a preliminary injunction. *See* Fed. R. Civ. P. 65; *Wash. Tr. Advisors, Inc. v. Arnold*, 646 F. Supp. 3d 210, 217 (D. Mass. 2022). The "extraordinary and drastic" remedy of a preliminary injunction is "never awarded as of right" and requires the moving party to show four elements: (1) substantial likelihood of success on the merits, (2) a high likelihood of irreparable harm in the absence of injunctive relief, (3) that the balance of equities tips in the party's favor, and (4) that the injunctive relief is in the public interest. *See Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). While all the

factors must generally be weighed, the "most important of the four elements is the likelihood of success on the merits." *Massachusetts v. Nat'l Instits. of Health*, 2025 WL 702163, at *1 (D. Mass. Mar. 5, 2025).

## ARGUMENT

I.    **The Proclamation was lawfully issued under the President's expansive powers under 8 U.S.C. § 1182(f).**

A. **The President enjoys broad constitutional and statutory authority to exclude individual aliens or classes of aliens.**

The exclusion of aliens is a fundamental act of sovereignty," and "[t]he right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)). Consistent with that principle, Congress has accorded the President broad authority to suspend or restrict the entry of aliens. Section 1182(f) of Title 8 provides in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions." *Hawaii*, 585 U.S. at 684. Section 1185(a)(1) of Title 8 further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing the entry of aliens, and the President may make entry "subject to such limitations and exceptions as [he] may prescribe." 8 U.S.C. § 1185(a)(1).

As the Supreme Court has repeatedly held, Article II confers upon the President expansive authority over foreign affairs, national security, and immigration. *See Harisiades v. Shaughnessy,*

342 U.S. 580, 588 (1952); *Knauff*, 338 U.S. at 542; *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Thus, where "the President acts pursuant to an express or implied authorization of Congress"—*e.g.*, 8 U.S.C. §§ 1182(f) and 1185(a)(1)—the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015) (similar).

Here, the President expressly invoked his unquestioned discretion under those constitutional and statutory authorities to suspend the entry of a particular class of aliens—citing explicit national security concerns that compelled the conclusion that Harvard "is no longer a trustworthy steward of international student and exchange visitor programs." 90 Fed. Reg. at 24494. Plaintiffs might disagree, but that has no bearing on the analysis under § 1182(f). All that is required under the "comprehensive delegation" of authority from Congress to the President is a finding *by* the President that entry of the designated aliens or class of aliens "would be detrimental to the interests of the United States." *Hawaii*, 585 U.S. at 685; 8 U.S.C. § 1182(f). The President more than met that "sole prerequisite" here, and there are no other limitations on his exercise of his vast powers to suspend entry and preserve and protect the nation's borders. *Id*.

**B. Harvard's statutory challenge to the Proclamation is not justiciable.**

As just discussed, the Supreme Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210 (1953)); *see Harisiades*, 342 U.S. at 588–89 ("Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). In particular, the Supreme Court has

held that "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo*, 430 U.S. at 796 (citation omitted).

Because the authority to regulate the entry of aliens is "inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). That is what Congress did in enacting 8 U.S.C. §§ 1182(f) and 1185(a)—conferring a "sweeping proclamation power" to suspend entry of aliens and impose restrictions wholly in the President's discretion. *See Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.). Because the President has issued the Proclamation pursuant to that expansive inherent authority, Plaintiff's claims against the entry suspension are not justiciable. *See Knauff*, 338 U.S. at 542.

### C. The Proclamation is a facially valid exercise of presidential authority under § 1182(f).

**1.** Unable to dispute the President's broad authority to "suspend the entry of all aliens or any class of aliens," 8 U.S.C. § 1182(f), Harvard instead contends that the Proclamation does not actually "suspend entry" of a "class of aliens" because it singles out Harvard. ECF No. 57 (Mot.) at 11–12. But that is incorrect.

Section 1 of the Proclamation is titled "Suspension of Entry," and indeed that section explicitly states that "[t]he entry of any alien into the United States as a nonimmigrant to pursue a course of study at Harvard University," "or to participate in an exchange visitor program hosted by Harvard University," "*is suspended* and limited, subject to section 2." 90 Fed Reg. at 24495 (emphasis added). Section 2, in turn, is a provision governing the scope and implementation of the

"*suspension* and limitation on entry." *Id.* (emphasis added). By its very text, then, the Proclamation does suspend entry—falling squarely within the purview of § 1182(f) and its recognition of the President's "sweeping proclamation power" to control and restrict the entry of any and all aliens. *See Abourezk*, 785 F.2d at 1049 n.2; 8 U.S.C. § 1182(f).

Regarding the "class of aliens," the statute provides no definition. 8 U.S.C. § 1182(f). Classes are inherently abstract concepts that are subject to nearly infinite permutations. Indeed, Harvard's equal protection claim relies on either a very narrow class or a "class of one." *See infra* Argument III. There is no basis to limit the President's broad discretion to determine the relevant class of aliens under the statute. The Supreme Court rejected a similar argument that a class "must refer to a well-defined group of individuals who share a common 'characteristic' apart from nationality" as atextual. *Hawaii*, 585 U.S. at 688. The Proclamation here properly defines a "class of aliens" based on the *purpose* of their entry. 90 Fed Reg. at 24495 ("to pursue a course of study at Harvard University"). That is a proper class. Indeed, the presidential proclamation in *Hawaii* was also based on the purpose of entry, as the same immigrant barred for business or tourism could enter as a permanent resident or asylee. 585 U.S. at 680. Most visas are inherently based on the purpose of entry. The Proclamation reasonably determines that the Government does not trust Harvard to properly vet, host, monitor, and if necessary discipline foreign students due to the ongoing unlawful conduct on the campus and Harvard's unwillingness to address it. 90 Fed Reg. at 24493–94. At bottom, a group looking to enter for a specific reason—in this case, to attend Harvard on visas that could be issued only for that express purpose—is a class of aliens, and Plaintiff's suggestion that there may be no such class here simply does not stand up to scrutiny.

Harvard's confusion on both straightforward textual provisions appears to stem from its belief that "any noncitizen potentially subject to the Proclamation can continue to enter the United

States, including on an F-1 or J-1 visa." Mot. at 21–22. But that mistakes the point. Even if a foreign student barred entry to attend Harvard could be admitted to the United States on some other legal basis (such as another nonimmigrant visa) or even secure transfer to another school within the country, for purposes of the F, M, or J visa that would have allowed them to study at Harvard, their entry into the country is in fact suspended. And coming on another visa or with a different purpose would place them in a different "class of aliens," as *Hawaii* makes clear. *See* 585 U.S. at 680. Again, the Government has reason to believe Harvard is particularly derelict at monitoring and disciplining foreign students. *See infra* Argument II. So the same students attending another school with better oversight is certainly in the national interest.

Indeed, for the student to be initially admitted to the United States, the regulations require that he "intend[] to attend the school *specified* in the student's visa." 8 C.F.R. § 214.2(f)(1)(i)(C) (emphasis added); *see* 8 C.F.R. § 214.2(f)(1)(i)(A) (providing that a nonimmigrant student may be admitted if he "presents a SEVIS Form I-20 issued in his [] own name *by a school approved by the Service* for attendance by F-1 foreign students" (emphasis added)); *Id.* § 214.2(j)(1)(i) (requiring an exchange visitor to present a SEVIS Form DS-2019 issued "by a program approved by the Department of State for participation by J-1 exchange visitors"). Thus, suspension of entry by an alien on a student visa is suspension of entry, plain and simple. Because acceptance to a school or program is a prerequisite for the visa, it defies logic—and the plain operation of the regulations—to suggest that entry would still be permitted absent the ability to study at the designated institution. The institution is part of the visa and purpose of entry. So entering for one institution versus another does make a difference for class purposes.[5]

---

[5] The regulations explicitly state that "an F-1 student is not permitted to remain in the United States when transferring between schools or programs" except under certain limited circumstances.

**2.** Plaintiff also argues that the Proclamation lacks the required statutory predicate because the President did not find that the entry of "particular" aliens—i.e., the aliens subject to the Proclamation—would be "detrimental to the interests of the United States," as § 1182(f) requires. Mot. at 22–23. That misconstrues both the Proclamation and the statute. The Proclamation expressly finds that the entry of certain foreign nationals to study at Harvard presents specific harms, including security risks related to data deficiencies, a breakdown in institutional oversight of visa holders, and increased threats of campus violence. *See* 90 Fed. Reg. at 24493–94. These are specific, concrete reasons that satisfy the deferential standard set forth in *Hawaii* for a proclamation issued under § 1182(f). *See Hawaii*, 585 U.S. at 686 (holding that "whether the President's chosen method of addressing perceived risks is justified from a policy perspective is irrelevant to the scope of his § 1182(f) authority" (cleaned up)).

Indeed, as the Supreme Court acknowledged, previous proclamations have provided as little as a sentence to justify suspension. *Id.* For decades Presidents have imposed restrictions pursuant to §§ 1182(f) and 1185(a)—which does not require any predicate findings at all—without detailed public justifications or findings. *See, e.g.*, Proclamation 8,015, 71 Fed. Reg. 28541 (May 12, 2006) (barring entry of members of the Belarussian government based on the importance of "fostering democratic institutions in Belarus"); Exec. Order No. 12172, § 1-101 (Nov. 26, 1979) (President Carter invoking § 1185(a)(1) to restrict Iranian nationals, unaccompanied by any findings, and delegating authority to prescribe restrictions to lower Executive Branch officials). In fact, Executive Order No. 12,807—the presidential action at issue in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993)—contained only a single sentence justifying its measures. Exec.

---

8 C.F.R. § 214.2(f)(8) (requiring departure "unless the student will begin classes at the transfer school or program within 5 months of transferring out of the current school or within 5 months of the program completion date on his or her current Form I-20, whichever is earlier").

Order No. 12,807, pmbl. pt. 4 (1992) ("There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally."). Yet the Supreme Court expressed no concerns about the sufficiency of that finding, and instead remarked on the "ample power" given to the President, declaring that "[w]hether the President's chosen method" made sense from a policy perspective was "irrelevant to the scope of his authority" under the statute. *Sale*, 509 U.S. at 187–88. The Proclamation here provides more than enough.

Plaintiff tendentiously recasts the President's justifications in terms of "retaliation" to claim that they could not properly serve as the basis for an invocation of § 1182(f). Mot. at 23. As explained below, there are significant non-retaliatory reasons for the Proclamation to focus on entry to Harvard. *See infra* Argument II. Regardless, Harvard's plea for "a searching inquiry into the persuasiveness of the President's justifications is inconsistent with the broad statutory text and the deference traditionally accorded the President" in the spheres of immigration, foreign affairs, and national security. *See Hawaii*, 585 U.S. at 686. The Proclamation articulates legitimate, neutral reasons for imposing entry suspensions on the designated class of aliens—under *Hawaii*, that is the end of the judicial inquiry.

**3.** Plaintiff's attempt to limit the President's power based on 8 U.S.C. § 1372(c) and related SEVP regulations is equally unavailing. Section 1182(f) is an independent grant of authority that allows the President to restrict entry irrespective of agency-level reporting frameworks. *See Hawaii*, 585 U.S. at 691 ("[N]o Congress that wanted to confer on the President only a residual authority to address emergency situations would ever use language of the sort in § 1182(f)."). Congress's grant of SEVP oversight responsibilities to DHS does not strip the President of his inherent authority to act more broadly when institutional noncooperation undermines the goals of

14

the INA—especially since the Proclamation is both broader and narrower that the SEVP issue. It includes far broader justifications for suspension. 90 Fed Reg. at 24493–94. But unlike total revocation, which would end all J visas, the Proclamation does not apply to existing students, allows for exceptions, and is time-limited. 90 Fed Reg. at 24495. So both authorities can co-exist.

As for Plaintiff's reliance on *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), that case involved an alleged attempt to override specific asylum eligibility statutes through a proclamation. Here, no such statutory conflict exists. Section 1182(f) has long been interpreted to authorize even sweeping entry restrictions where the President makes the required detriment finding—which he did here. *See Hawaii*, 585 U.S. at 687–88 (citing other broadly justified § 1182(f) proclamations). In any case, the court in *O.A.* gave short shrift to the Supreme Court's reasoning in *Hawaii*, and this Court should not accord it any persuasive authority.

Nor is this a "major question" requiring a clear statement from Congress. *See* Mot. at 24. The Supreme Court has already held that § 1182(f) grants far-reaching authority to the President to suspend entry based on a broad conception of national interests. *Hawaii*, 585 U.S. at 684–85. The fact that the Proclamation addresses a unique situation—a highly prominent institution with a documented failure to report misconduct by its foreign students and "extensive entanglements with foreign countries, including our adversaries," 90 Fed. Reg. at 24494—does not transform this into a regulatory overhaul. Rather, it is a focused response to a concrete and credible problem.

\*\*\*

Against this background, there is no basis to conclude § 1182(f) should be read so narrowly as to prevent the President from meaningfully exercising his power over the entry of aliens in this instance. Harvard may wish that *Hawaii* was not the law, but it is and this Court cannot rule

otherwise. The President's vast authority under § 1182(f) leaves no doubt as to the Proclamation's validity.

## II.    Harvard is not likely to succeed on its claims that the Proclamation violates the First Amendment.

As explained, the President's Proclamation is "facially legitimate." *Hawaii*, 585 U.S. at 703. That is the end of Harvard's constitutional claim. Far from being "undeniable" (Mot. at 1), Harvard's First Amendment claims are untenable. Harvard asserts the Proclamation is merely "a desire to retaliate against Harvard for its perceived viewpoint," its commitment to academic freedom, and its legal challenges against the government. Mot. at 12. But Harvard overlooks the deferential framework Supreme Court precedent holds applies to such claims. *See Kleindienst v. Mandel*, 408 U.S. 753, 760 (1972); *Hawaii*, 585 U.S. at 702. Because the President's national-security and foreign-relations determinations provide "a facially legitimate and bona fide reason" for the Proclamation's restrictions, *Mandel*, 408 U.S. at 770, Harvard's contentions are meritless. Even taken on its own terms, Harvard's claims fail. The Proclamation was not issued to retaliate against protected speech or this lawsuit. Rather, it was issued to address serious ongoing issues regarding how Harvard handles illegal and harmful conduct on its campus. Harvard fails to show otherwise.

### A.  The Proclamation is facially legitimate and thus constitutional.

Under the proper standard of review, the Proclamation is clearly constitutional. The Supreme Court has made clear that *Mandel*'s deferential standard of review governs where "plaintiffs seek to invalidate a national security directive regulating the entry of aliens abroad." *Hawaii*, 585 U.S. at 702. All that is needed in that instance is "a facially legitimate and bona fide reason"—which "courts will neither look behind . . . , nor test [] by balancing [the] justification against the" asserted constitutional rights of even U.S. citizens. *Mandel*, 408 U.S. at 770. Indeed,

the Supreme Court applied this deferential standard and rejected a First Amendment challenge to a travel ban under § 1182(f). *Hawaii*, 585 U.S. at 710. Harvard's claims are much weaker than the ones rejected there.

That deferential standard reflects the Constitution's "exclusive[]" allocation of power over the admission of aliens to the "political branches." *Mandel*, 408 U.S. at 765 (citation omitted); *see Fiallo*, 430 U.S. at 792–96; *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). It also reflects that aliens outside the United States seeking a visa or initial admission have no constitutional rights at all regarding entry into the country. *Hawaii*, 585 U.S. at 703. In this context, *Mandel*'s limited requirement of "a facially legitimate and bona fide reason" for exclusion, 408 U.S. at 770, accords the necessary respect for the Nation's sovereign authority to protect its borders. *See Demore v. Kim*, 538 U.S. 510, 521 (2003). Indeed, "*Mandel*'s narrow standard of review 'has particular force' in admission and immigration cases that overlap with "the area of national security.'" *Hawaii*, 585 U.S. at 704 (quoting *Kerry v. Din*, 576 U.S. 86, 104 (2015) (Kennedy, J., concurring)). That is because such judicial inquiry intrudes on the President's constitutional responsibilities in the area of foreign affairs, *Hawaii*, 585 U.S. at 704 (citing *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017)), and courts have a "marked" lack of competence "when it comes to collecting evidence and drawing inferences" on questions of national security." *Hawaii*, 585 U.S. at 704 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)).

Indeed, in *Mandel* the Supreme Court rejected a First Amendment challenge brought by students who wished to hear from a foreign journalist that was denied entry because he "advocates the economic, governmental, and international doctrines of world communism." 408 U.S. at 756, 769. The Supreme Court held that the Government offered a "facially legitimate and bona fide reason" that he had abused the visa process, so "the courts will neither look behind the exercise of

that discretion, nor test it by balancing its justification against the First Amendment interests." *Id.* at 770. The President's Proclamation is even stronger here. The Proclamation, which offers a national security-based rationale and accompanying factual support, easily withstands *Mandel*'s narrow standard of review.

The Proclamation sets forth a facially legitimate and bona fide factual basis for that justification. It describes the risks posed to national security when institutions who host foreign students and exchange visitors do not fully adhere to the relevant regulatory framework, as well as the FBI's long-standing warnings about foreign adversaries using access to American higher education to steal information, exploit research, and spread false information. 90 Fed. Reg. at 24493. It also details how Harvard "refused the recent requests of the DHS for information about foreign students' 'known illegal activity,' 'known dangerous and violent activity,' 'known threats to other students or university personnel,' 'known deprivation of rights of other classmates or university personnel,' and whether those activities 'occurred on campus,' and other related data." *Id.* Accordingly, the President states: "In my judgment, these actions and failures directly undermine the Federal Government's ability to ensure that foreign nationals admitted on student or exchange visitor visas remain in compliance with Federal law." *Id.* at 24493–94.

The Proclamation goes even further. It also raises other national-security and foreign-relations concerns, including Harvard's extensive acceptance of foreign money; that it "repeatedly hosted and trained members of a Chinese Communist Party paramilitary organization"; and that Harvard researchers have partnered with China-based individuals on research that could advance China's military modernization. *Id.* at 24494. Those are unquestionably facially legitimate and bona fide reasons for the entry restrictions. *Mandel*, 408 U.S. at 770; *see also Fiallo,* 430 U.S. at 795 (categorical entry based on sex is not for judiciary to question). In fact, these rationales are

much stronger than those offered in *Mandel* where the Government did not even rely on the letter

saying Mandel had abused the visa process. *Mandel*, 408 U.S. at 769. And unlike *Mandel*, the legal

basis for the Proclamation here is premised on "national interests" under § 1182(f) rather than a

facially viewpoint-based bar on the advocacy of communism. *Id.* If the Supreme Court was

unwilling to balance First Amendment rights there, surely courts should refrain from doing so here.

### B.  The Proclamation easily passes rational basis review.

To the extent courts can ever look behind the facial validity of the Proclamation, they must

apply "rational basis review," asking only whether "the entry policy is plausibly related to the

Government's stated objective to protect the country and improve vetting processes." *Hawaii*, 585

U.S. at 704–05 (only "assuming" if courts can review, it would be rational basis). The Proclamation

easily passes. It is grounded in national-security concerns stemming from Harvard's failure to

comply with federal law. 90 Fed. Reg. 24493–95. Harvard has serious issues with unrest, crimes,

foreign influence, and unlawful discrimination. *Id.* Yet Harvard has been unwilling to adequately

address these issues or respond to lawful inquires by federal agencies. *Id.* The Government does

not trust Harvard to responsibly admit and monitor additional foreign students at this time. *Id.* Still,

the President balanced that interest against those of existing students and the desire for individual

exceptions. *Id.* This well-considered policy judgment is clearly related to the national interest.

Indeed, the Proclamation is on even stronger grounds than the one reviewed in *Hawaii*.

The Proclamation shares certain salient features with Proclamation No. 9645 (at issue in *Hawaii*),

which the Court found supported the "claim of a legitimate national security interest." *Id.* at 708.

First, the Proclamation explains that the suspension is temporary (six months with the possibility

of extension), and requires near-term (within 90 days) reassessment of whether the suspension

continues to be in the interest of the United States. 90 Fed. Reg. at 24495, Sec. 2(e). It also notes

that the suspension is only in the national interest "[u]ntil such time as the university shares the information that the Federal Government requires to safeguard national security and the American public[.]" 90 Fed. Reg. at 24494. In other words, it describes how Harvard can end the suspension—by sharing the information federal law requires it share upon request. *See Hawaii*, 585 U.S. at 708 (noting that the provision stating that its "conditional restrictions" will remain in force only so long as necessary to "address" the identified "inadequacies and risks," supported the claim of a legitimate national security interest).

Second, the Proclamation "includes significant exceptions for various categories of foreign nationals." *Id.* at 709. It only prohibits entry of an alien "as a nonimmigrant to pursue a course of study at Harvard" or participate in an exchange visitor program at Harvard under certain INA provisions. 90 Fed. Reg. at 24495, Sec. 1. It does not prohibit the entry of those aliens for other purposes. Nor does it exclude existing students. *Id.* Sec. 2. In *Hawaii*, the Proclamation prohibited entrance for the purpose of business or tourism but allowed the same aliens to enter for other purposes such as permanent residency or asylum. *See* 585 U.S. at 680.

Third, the Proclamation contains provisions similar to the waiver program contained in Proclamation No. 9645. *Id.* at 709. Specifically, the Proclamation here notes that the suspension "shall not apply to any alien whose entry would be in the national interest" (Proclamation, 90 Fed. Reg. at 24495, Sec. 2(d)) and leaves to the Secretary of State's discretion whether to revoke visas of foreign nationals who currently attend Harvard (*id.* at Sec. 2(b)). Accordingly, like Proclamation No. 9645, "the Government has set forth a sufficient national security justification to survive rational basis review . . . [and] plaintiffs have not demonstrated a likelihood of success on the merits of their constitutional claim." *Hawaii*, 585 U.S. at 710.

### C. The Proclamation does not retaliate against Harvard for exercising its First Amendment rights.

Regardless of the standard of review, the Proclamation would survive. This is because there is no basis to conclude that the Proclamation was issued in retaliation for Harvard exercising its First Amendment rights. Harvard cannot and does not prove otherwise. Instead, it latches onto months old letters sent by non-defendants regarding different issues and resulting in different legal actions. Harvard cannot use that event as a get out of jail free card to immunize itself from all actions indefinitely into the future. Nor can Harvard establish that the Proclamation is retaliation for this very suit; that claim is based on pure speculation, in the teeth of the presumption of regularity.

To succeed on a First Amendment retaliation claim, a plaintiff must show: (1) the plaintiff engaged in constitutionally protected conduct; (2) the plaintiff was subjected to an adverse action by the defendant; and (3) the protected conduct was a substantial or motivating factor in the adverse action. *Gattineri v. Town of Lynnfield, Massachusetts*, 58 F.4th 512, 514–15 (1st Cir. 2023); *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019). Harvard cannot sustain its burden.

#### 1. The Proclamation is disconnected from any possible retaliation.

Harvard's retaliation argument is that a negotiation letter sent on April 11, 2025 targeted its First Amendment rights and any adverse consequence since it rejected that offer has been retaliatory. Mot. at 13–18. Harvard cannot use a negotiation letter sent two months ago by non-defendants to tar any future adverse government action.

**a.** At the outset, Harvard ignores that the April 11, 2025 letter stemmed from antisemitic conduct on Harvard's campuses and its repeated failures to address the issue, not Harvard's speech. The initial letters were issued based on the generally applicable Executive Order, "*Additional Measures to Combat Anti-Semitism*," which was focused on addressing "unlawful anti-Semitic

harassment and violence." 90 Fed. Reg. 8847. The first letter on March 31 made clear the agencies were investigating many "institutions of higher education . . . for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment." Compl., Ex. 7, March 31 Letter; *see also* Ex. 8, April 3 Letter. Antisemitic conduct and inaction by Harvard are not protected speech. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court consequently is dubious that Harvard can hide behind the First Amendment" to cover for its "indecisive, vacillating, and at times internally contradictory [response to antisemitism]."). The April 11 Letter was also concerned with conduct that "discriminated against Jewish or Israeli students or incited students to violate Harvard's rules following October 7" and asked Harvard to assist in discipline "within the bounds of academic freedom and the First Amendment." Compl., Ex. 9, at 4. And the Letter was clearly an offer for an opening negotiation: "If acceptable to Harvard, this document will constitute an agreement in principle, which the parties will work in good faith to translate into a more thorough, binding settlement agreement." Compl., Ex. 9, at 1.

Harvard argues it was retaliated against for its rejection of that offer. Mot. at 13–18. But a rejection of an offer is not protected speech. *See Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring in the result) ("[O]ffer and acceptance are communications incidental to the regulable transaction called a contract . . . .").

**b.** Even so, the Proclamation has no connection to the April 11 letter, and Harvard cannot show otherwise. To establish retaliation, a plaintiff must prove a causal link between the plaintiff's constitutionally protected conduct and the defendant's retaliatory action. *Gattineri*, 58 F.4th at 514–15. Harvard is incapable of connecting any retaliatory motive to the Proclamation.

The April 11 letter and Harvard's rejection have no relation to the Proclamation, which was issued pursuant to the President's sole discretionary authority under the Constitution and § 1182(f).[6] First, the gap in time undermines any link. More than seven weeks elapsed between the rejection letter on April 14 and the Proclamation, issued on June 4, 2025. So Harvard is incorrect that "close temporal proximity" proves retaliatory intent here, *see* Mot. at 16, as courts "typically allow no more than a few days to elapse between the protected activity and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). And that is in the context of private disputes—not government action, where the presumption of regularity kicks in. *See United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926).

Second, the relevant parties are different. The April letters were sent by the General Services Administration, Department of Health and Human Services, and the Department of Education. Compl., Ex. 7–9. The President was not on those letters, so they cannot be imputed on him reflexively.[7]

---

[6] Harvard names a slew of federal agencies and heads of Departments as defendants, but that obscures the fact that when an agency acts "solely on behalf of the President" and exercises "purely presidential prerogatives," such direction constitutes an "unreviewable presidential action because it involved an exercise of discretionary authority committed to the President by law (*i.e.*, Article II of the Constitution . . . )." *Nat. Res. Def. Council, Inc. v. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009). Indeed, "[w]hen the President retains *final* authority pursuant to the Constitution or a valid statute, . . . presidential acquiescence constitutes an exercise of discretion that gives effect to the delegee's actions." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 102 (D.D.C. 2016) (emphasis added).

[7] Other evidence Harvard relies on similarly involves other actors with different purposes and legal justifications. The Federal Task Force that froze Harvard's grants consists of representatives from the Departments of Justice, Education, Health and Human Services, and the General Services Administration, and the Department of Education released the Press Release announcing the freeze (Compl., Ex. 7, 12). The Department of Education informed Harvard that the federal government will no longer provide it grants (Compl., Ex. 21). Although Harvard cites no specifics, presumably the "slew of investigations" it refers to are those filed by the Equal Employment Opportunity Commission on April 25, 2025, and the Department of Justice on May 13, 2025. Mot. at 6. Harvard

Third, the April letters were focused on grants. *Id.* And the April 11 letter offered a wide variety of possible solutions that Harvard rejected. *Id.* Here, even the April SEVP student records demand and revocation letters from DHS made precise requests for information under 8 C.F.R. § 214.3(g). Compl., Ex. 16, 22–23. Revocation of Harvard's certification was then premised on the failure to comply. Compl., Ex. 25. The Proclamation then raised even broader concerns with national security, foreign influence, unrest, unlawful discrimination, and Harvard's unwillingness to address these concerns or respond to lawful inquiries. Fed. Reg. at 24493. There is no mention of a demand letter, rejection, grant terminations, ideology, or anything of the sort. *Id.* And the Proclamation was issued under the broad authority granted by § 1182(f) to deny entry, not grants.

**c.** Realizing the gulf between the April letters and the current matter, Harvard pivots to relying on selective quotations in an attempt to show that the Proclamation itself evinces a retaliatory motive. Mot. at 15. But as mentioned, on its face the Proclamation is concerned with national security, conduct, and Harvard's inadequate responses. Fed. Reg. at 24493. Again, speech is not mentioned. Harvard claims that the "very first sentence of the Proclamation makes clear the government's desire to influence who may 'attend, conduct research, or teach' at Harvard" (Mot. at 15). A closer reading exposes the willfully obtuse nature of Harvard's reading. The first sentence states: "Admission into the United States to attend, conduct research, or teach at our Nation's institutions of higher education is a privilege granted by our Government, not a guarantee." Proclamation, 90 Fed. Reg. at 24493. Harvard ignores the first five words, as it must, because the government's political departments—not Harvard—control the admission and exclusion of foreign

---

also cites a government "brainstorming meeting" based on an unconfirmed media account from two anonymous sources. Mot. at 16; Amend. Compl., Ex. 31. It alleges no actions resulting from the alleged meeting.

nationals. *Hawaii*, 585 U.S. at 702 (citing *Fiallo*, 430 U.S. at 792). Harvard otherwise misses the fact that the sentence applies to every higher-education institution in the country, and does not even name Harvard. 90 Fed. Reg. at 24493. Harvard's complaint about the fact sheet suffers from the same malady: reading the complete sentence Harvard selectively quotes shows this statement presents national-security concerns—that Harvard is not properly monitoring its foreign students and that it is not complying with federal law by providing requested information to DHS. Fact Sheet at 2–3. Finally, the Proclamation's critique of the "excessive" foreign student enrollment was made in the context of Harvard's discriminatory admissions practices, which have been so egregious that the Supreme Court intervened. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (holding Harvard's admissions programs "cannot be reconciled with the guarantees of the Equal Protection Clause").

The same is true of the SEVP certification and Exchange Visitor Program revocation letters. The first student records request issued by DHS was based on the Antisemitism Executive Order due to concerns of "anti-Semitic harassment and violence" on campus, not speech. Compl., Ex. 16. It just asked for information on such conduct, such as "known illegal activity," "known dangerous or violent activity," "known threats to other students or university personnel," "known deprivation of rights of other classmates or university personnel," and "whether th[ose] activit[ies] occurred on campus," which Harvard must maintain and produce under 8 U.S.C. § 1372 and 8 C.F.R. § 214.3(g). *Id.* at 1–3. The follow up emails were the same. Compl., Ex. 22-23. The revocation letter was based on these requests and was likewise focused on the fact that Harvard is "perpetuating an unsafe campus environment that is hostile to Jewish students, promotes pro-Hamas sympathies, and employs racist" policies. Compl., Ex. 25. Antisemitic conduct and racist policies are "anti-American[]," that is not the same as protected speech. *Id.* And the legal basis for

the letter was Harvard's failure to provide basic information on the conduct of its foreign students, Harvard's handling of that, and the results, nothing related to speech. *Id.* So there was no mention of speech, the April letters from other agencies, Harvard's rejection, grant terminations, or any protected conduct.

In short, Harvard wants to the Court to take the massive and impermissible inference that all of these disparate actions are connected and designed to single out Harvard for its speech. But Harvard lacks evidence for that sweeping claim. Indeed, this case is even stronger than *Hawaii*. There, the Supreme Court upheld Proclamation No. 9645 despite the plaintiffs' contention that religious animus motivated it. 585 U.S. at 699–701, 710. The plaintiffs relied on "a series of statements by the President and his advisers casting doubt on the official objective of the Proclamation." *Id.* at 699–701. They also cited various statements by the President's advisors supposedly showing religious animus. *Id.* at 700–01. Nevertheless, the Court upheld Proclamation No. 9645 because it was not "impossible to 'discern a relationship to legitimate state interests' or that the policy [was] 'inexplicable by anything but animus.'" *Id.* at 706 (quoting *Romer v. Evans*, 517 U.S. 620, 632, 635 (1996)). Instead, "because there [was] persuasive evidence that the entry suspension has a legitimate grounding in national security concerns, quite apart from any religious hostility," the Court "accept[ed] that independent justification." *Hawaii*, 585 U.S. at 706.

Harvard's evidence is even less persuasive. In *Hawaii*, the President *himself* (or his direct advisors) made the cited statements, whereas, here, other government agencies took the various actions Harvard complains of (*see supra* n.7). *Hawaii*, 585 U.S. at 699–700. In contrast, most of the independent actions Harvard relies on to show animus address funding (through multi-year federal grants and federal-government contracts (Compl., Ex. 7, 8, 12, 21)) and discrimination (in its hiring practices and admissions practices (*see* Mot. at 6)). These topics are disconnected from

the Proclamation, which addresses visas and is grounded in national-security concerns. The sole conduct attributable to the President is a social media post "call[ing] for Harvard to lose its tax-exempt status." Mot. at 16. But Harvard does not allege that it actually lost its tax-exempt status—indeed, it contends that the President cannot ask the IRS to audit or investigate particular taxpayers. *Id.* Thus Harvard cannot connect any of this evidence to the Proclamation.

**d.** The Proclamation is not part of an ongoing campaign to single out Harvard for speech or out of retaliatory animus. Again, the original (and unrelated) grant letters were based on a general Executive Order on antisemitism and the March 31, 2025 Letter made clear other universities were being investigated. 90 Fed. Reg. 8847; Compl., Ex. 7. On February 28, 2025, the Federal Task Force to Combat Anti-Semitism announced visits to ten university campuses that experienced antisemitic incidents since October 2023. Ex. C, Press Release, Dep't of Justice, Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced; Ex. D, Press Release, Dep't of Justice, Justice Department Announces Formation of Task Force to Combat Anti-Semitism (Feb. 3, 2025), https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism. As a result of similar concerns, dozens of universities have faced investigations and even grant freezes.[8]

---

[8] *See, e.g.*, Ex. E, Press Release, Dep't of Justice, DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million (Mar. 7, 2025), https://www.justice.gov/opa/pr/doj-hhs-ed-and-gsa-announce-initial-cancelation-grants-and-contracts-columbia-university; Ex. F, Press Release, Dep't of Educ., U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment (Mar. 10, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-sends-letters-60-universities-under-investigation-antisemitic-discrimination-and-harassment.

Nor is Harvard unique as to restrictions on the entry of foreign nationals who seek to enter the United States to solely or principally participate in a course of study there. On the same day, the President announced the full suspension of entry of nationals of twelve countries. 90 Fed. Reg. 24,497. These restrictions on entry are based on similar public policy grounds as this Proclamation: to address highly deficient information-sharing and identity-management practices that compromise national security, protect the United States from aliens who might support threats to the nation or espouse hostile positions or ideologies toward the American people, or otherwise exploit the immigration laws for malevolent purposes. *See generally* 90 Fed. Reg. 24,493; 90 Fed. Reg. 24,497.

Harvard claims that the Proclamation's thoroughly articulated national-security rationale is merely "pretextual." Mot. at 16–17. This assertion is groundless. Harvard itself has admitted to serious instances of antisemitic conduct.[9] Harvard has also seen a significant increase in hate crimes.[10] And Harvard has received millions from China, "repeatedly hosted and trained members of a Chinese Communist Party paramilitary organization," and partnered with Chinese researchers working on Chinese military projects. 90 Fed. Reg. at 24494 (internal quotation marks omitted). Yet Harvard has repeatedly failed to adequately address these concerns. *See* Ex. B. Indeed, when

---

[9] *See generally* Ex. A; *see also* Ex. G, Max J. Krupnick, *Harvard Settles Antisemitism Lawsuits,* HARVARD MAG., Jan. 22, 2025, https://www.harvardmagazine.com/2025/01/harvard-settles-antisemitism-lawsuits (noting that Harvard announced that it had settled two lawsuits about failure to address antisemitism on campus).

[10] *See* Ex. H, Sally E. Edwards and Asher J. Montgomery, *Hate Crimes Reported to Harvard Police Doubled From 2022 to 2023*, THE HARVARD CRIMSON, Oct. 3, 2024, https://www.thecrimson.com/article/2024/10/3/hupd-reports-hate-crimes-2024/#:~:text=In%20the%20report%2C%20HUPD%20detailed%2010%20hate%20crimes,campus%20following%20Hamas%E2%80%99%20Oct.%207%20attack%20on%20Israel (stating that Harvard faced increased crime rates—especially hate crimes—raising concerns around its October 8th conduct).

28

agencies sought records on student discipline (which Harvard is required to maintain and produce), Harvard played hard ball and produced only three vague instances of discipline against foreign students. Compl., Ex. 16, 19, 22-25. Given the amount of unrest over the last three years and Harvard's significant foreign student population, this response was implausible and inadequate. Simply put, the Government does not trust Harvard to vet and monitor incoming foreign students the way other universities might. The Proclamation relies on this. 90 Fed. Reg. at 24493–94.

As the Supreme Court has recognized, "the Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'" *Hawaii*, 585 U.S. at 708 (quoting *Humanitarian Law Project*, 561 U.S. at 33–34). That is the end of the matter. *Id.*

### 2. Harvard's Petition Clause argument is equally misplaced.

Harvard suggests that because it engaged in protected activity—namely, pursuing litigation against the Government—it is entitled to special solicitude or heightened scrutiny of any later federal action affecting it. *See* Mot. at 19–21. That is incorrect. The Petition Clause does not grant blanket protection from adverse governmental actions that are otherwise lawful. *See Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006) (observing that a petition "can express views that contravene governmental policies or impair the proper performance of governmental functions"); *Baptiste v. Kennedy*, 490 F. Supp. 3d 353, 395 (D. Mass. 2020) (holding that, "even if the right to access to the courts is deemed to be a fundamental right," a governmental action should "be found constitutional if there was a rational basis for it when enacted"). In *Hartman v. Moore*, the Supreme Court held that a plaintiff must plead and prove not only retaliatory motive but also the absence of independent lawful reasons for the official action. 547 U.S. 250, 260–61 (2006). As explained, the Proclamation is supported by ample non-retaliatory justifications. *Supra* Argument II.C.1.

Harvard instead refers to a smattering of remarks by the President that it believes constitute decisive evidence of an intent to "punish[] Harvard." Mot. at 20. But *Hawaii* once again proves helpful in resolving this question: "[T]he issue [at hand] is not whether to denounce the [President's] statements. It is instead the significance of those statements in reviewing a Presidential directive, *neutral on its face*, addressing a matter within the core of executive responsibility." *Hawaii*, 585 U.S. at 701–02 (emphasis added). Under that analysis, the focus is on the President's authority. *Id.* at 702. Here, that authority is the President's vast powers under § 1182(f), as well as his inherent constitutional authority over foreign affairs and national security. *See Knauff*, 338 U.S. at 542.

Harvard cannot point to a single statement in the Proclamation that would remotely suggest it was inspired by retaliatory animus toward Harvard. The Proclamation says nothing about the lawsuit. 90 Fed. Reg. at 24493–94. It is pure speculation by Harvard that there is any connection.

### 3. The Viewpoint Discrimination claim fails for the same reasons

Harvard's viewpoint discrimination claim fails for the same reasons as its retaliation claims: the Proclamation has nothing to do with its speech. Again, Harvard focuses on the April grant letters. Mot. at 17–18. But, as shown, those are irrelevant. *Supra* Argument II.C.1. Harvard also says it is being "singled out." Mot. at 18. Once more, that is not the case. *Supra* Argument II.C.1. Harvard has engaged in unique conduct that has resulted in specific responses. Nothing more, nothing less. That is not viewpoint discrimination.

## III.    Harvard is not likely to succeed on its equal protection claim.

Harvard's meek Equal Protection claim must fail. Even in the realm of education, "non-suspect classes" received only "rational basis review." *Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir.

2006). The Proclamation easily passes, as explained. *See supra* Argument I.C. Harvard's actual claim is weaker yet.

Harvard styles its contention as a "class of one" claim—it does not assert membership in a class or group, but asserts Defendants impermissibly singled it out for unfavorable treatment. Mot. at 25. A "class of one" claim "is cognizable when—and only when—a 'plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Cordi-Allen v. Conlon*, 494 F.3d 245, 250 (1st Cir. 2007) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). "To carry the burden of proving substantial similarity, 'plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Id.* at 251 (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). Thus, the plaintiff "must show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." *Id.* at 251 (citing *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996)).

First, Harvard is not a class of one in the sense that other universities have been investigated for similar conduct and faced repercussions. *Supra* Argument II.C.1. And it is not an Equal Protection violation to enforce the law against one entity but not others with similar violations; the Government does not and cannot pursue every issue. *See Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 604 (2008) ("allowing an equal protection claim on the ground that a [speeding] ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action"). This is

doubly true where the Executive have inherent discretion, such as matters of immigration and foreign affairs. *Id.*

Second, even if the class of one is narrowly defined as to this Proclamation, the precise response to Harvard is because of its otherwise unique circumstances and responses to the issues the Government has raised. *Id.* Harvard cannot show "substantial similarity" to another institution in this regard. While Harvard may share some general similarities with other institutions, the Proclamation cited specific instances of *Harvard's* behavior that jeopardized national security and spurred the President to act. *See* Argument I.C. For example, Harvard has "repeatedly hosted and trained members of a Chinese Communist Party paramilitary organization" and "partnered with China-based individuals on research that could advance China's military modernization." 90 Fed. Reg. at 24494. Likewise, the Proclamation notes the rise in violent crime rates at Harvard, *see* Ex. A; Ex. H, which it contrasts with Harvard only reporting data on misconduct by *three* foreign student visa holders, demonstrating "that it either is not fully reporting its disciplinary records for foreign students or is not seriously policing its foreign students." 90 Fed. Reg. at 24494. Harvard cites no other institution with such reporting and monitoring deficiencies. Thus, Harvard cannot show that other institutions "with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." *Cordi-Allen*, 494 F.3d at 251.

Third, Harvard argues that that the Proclamation lacks "any real justification," Mot. at 25. But as thoroughly explained, *supra* Argument I.C, the Proclamation contains specific and thorough rationale for its suspension and limitation of foreign students coming to Harvard. 90 Fed. Reg. at 24493–94. The rationale includes how Harvard persistently "refused the recent requests of the DHS for information about foreign students' 'known illegal activity,' 'known dangerous and

violent activity,'" which directly undermines the Federal Government's ability to ensure that foreign nationals admitted on student or exchange visitor visas remain in compliance with Federal law." 90 Fed. Reg. at 24493–94. Again, that is different from other schools. *Supra* Argument II.C.1. Put simply, Harvard cannot show the President had "no conceivable basis for his action other than spite or some other improper motive." *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013).

## IV.    The Proclamation is not an "end run" of the TRO.

The Proclamation also has nothing to do with this Court's initial Temporary Restraining Order. ECF No. 11. That TRO narrowly restricted "the revocation of Plaintiff's SEVP certification" and "[g]iving any force or effect to the Department of Homeland Security's May 22, 2025 Revocation Notice." *Id.* That is all the initial complaint was about. ECF No. 1 at Counts I-X. So that is all it could and did enjoin.

Harvard argues that the Proclamation constitutes an end run around the Court's TRO. Mot. at 27. But the Proclamation falls under a different authority that was not at issue. 8 U.S.C. §§ 1182(f) and 1185(a)(1). It is also more targeted: revocation of SEVP certification and Exchange Visitor Program designation terminates Harvard's ability to host F and J visa holders, but the Proclamation only bars entry for new students, allows for exceptions, and is time limited. 90 Fed. Reg. at 24494-95. The reasoning is also much broader than the basis for terminating Harvard's SEVP certification, including foreign influence. *Id.* at 24492–93. Ultimately, it is not even effectively the same as the revocation at issue in the TRO.

Even if the Proclamation does undermine the effect of a TRO, that is not a basis to enter a new injunction against a different action. The Government is free to explore other legal avenues to accomplish its legitimate goals. To enjoin that, Harvard still has to satisfy the preliminary injunction factors. *Voice of the Arab World, Inc.*, Inc., 645 F.3d at 32. The only question here is

33

whether the Proclamation is lawful on its own terms. As explained above, it is—and Harvard is therefore not entitled to an injunction.

## V.    The remaining preliminary injunction factors weigh against Harvard.

### A.  Harvard has not established that irreparable harm is likely.

In addition to showing a likelihood of success on the merits, "plaintiffs seeking injunctive relief must make a 'clear showing' that substantial and immediate irreparable harm is 'likely' in the absence of an injunction." *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 230 (D. Mass.) (Burroughs, J.) (cleaned up). "[E]conomic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction." *Id*. (quoting *Suero v. Fed. Home Loan Mortg. Corp.*, 2013 WL 6709001, at *7 (D. Mass. Dec. 17, 2013) (citation omitted).

Harvard's first claim of irreparable harm rests on the shaky assumption that it is likely to prevail on its First Amendment claims. *See* Mot. at 29. The national security and public safety concerns that undergird the Harvard-specific suspension and restriction on entry are legitimate government interests that outweigh Harvard's claimed interest in an unmoored "right to manage an academic community and evaluate teaching and scholarship free from [governmental] interference." *See* Mot. at 13 (citation omitted).

Harvard cites the "human costs" of the travel restrictions on international students who expected to come to campus this summer and fall. Mot. at 30. That is an injury to the students, not Harvard. In any event, the suspension and limitation have a termination point. 90 Fed. Reg. at 24495 (providing that they expire, absent extension, 6 months after the date of the Proclamation, which is December 4, 2025). Harvard has not explained why the harm arising out of the absence of international students for one summer and one fall semester reasonably could be described as

"irreparable." More fundamentally, Harvard fails to acknowledge that it could end the suspension and limitation by simply providing the data DHS has requested. 90 Fed. Reg. at 24494.

Harvard also argues that it would suffer "incalculable loss of reputation and prestige," as dozens of incoming international students and one domestic student have asked about deferring their admission to Harvard or applying elsewhere. Mot. at 30. Again, Harvard asserts "long-lasting harm," *id.*, but does not consider the limited duration of the suspension and restriction. While "several courts have recognized that the loss of a prestigious brand or product line may create a threat of irreparable injury if it is likely that customers (or prospective customers) will turn to competitors who do not labor under the same handicap," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (citation omitted), Harvard has options. These options include enrolling more U.S. citizens, including more of the brightest minds who are already in the United States.

Finally, Harvard argues that decertification "unquestionably make[s] it more difficult to accomplish its primary mission." *Id.* (citing *Massachusetts v. Nat'l Institutes of Health*, 2025 WL 702163, at *30 (D. Mass. Mar. 5, 2025)). But the Proclamation only prevents new students from entry, it does not decertify Harvard completely, or take away its program designation. And again, unlike the rate-change notice in *Nat'l Institute of Health*, the suspension and restriction that the President announced are of a finite duration, making it unlikely that any resulting harm would be irreparable.

### B.  The balance of equities and public interest weigh against Harvard.

Nor has Harvard shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 32 (2008).

Where the government is the defendant, these factors simply "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Fundamentally, Harvard seeks to overturn the Proclamation—an exercise of the President's broad discretion under § 1182(f) to suspend the entry of aliens whose entry he has found to be detrimental to the nation's interests. The Supreme Court has accepted even a single sentence explaining the President's rationale. *Sale*, 509 U.S. at 164 n.13. Here, the President has cited the strong public interest in ensuring that foreign nationals admitted on student or exchange visitor visas—along with the institutions that enable them to enter the country in the first place—do not "compromise national security" and "jeopardize the integrity of the entire United States student and exchange visitor visa system." 90 Fed. Reg. at 24494. Those critical national interests are at stake in this litigation, and granting sweeping injunctive relief against the Government would not only excuse Harvard's refusal to respond to repeated official requests for information about foreign students' known illegal activity and other basic information, but also impinge on the Executive's ability to govern sensitive areas of immigration and foreign policy. Such an injunction "deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978).

Nor should this Court overlook the precedential impact of granting the overbroad relief Harvard seeks. Doing so would effectively invite institutions to flout the Government's efforts to uphold the law, including "the civil rights of [their own] students and faculty," under the assurance that any enforcement action could be deflected or delayed through litigation. 90. Fed. Reg. at 24494. That outcome would have a cascading effect, further weakening the Government's ability

to implement duly enacted laws and policies, while also "embolden[ing] other institutions to similarly disregard the rule of law." *Id.*

In addition, when balancing the equities, a movant's "alleged harm" receives little to no weight when that harm "is self-inflicted." *Fiba Leasing Co. v. Airdyne Indus., Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993). Harvard argues that not having international students will impair the ability of the remaining students to grow intellectually. Mot. at 31. But Harvard conveniently ignore the pivotal role Harvard itself has played in bringing about those adverse effects, by repeatedly "refus[ing] the recent requests of the DHS for information about foreign students'" known illegal, dangerous, or violent activity. 90 Fed. Reg. at 24493. And in any case, Harvard easily could admit more U.S.-based students to fill the seats of the international students.[11] Again, it is simply not credible that Harvard, the nation's oldest and most elite university, would suffer irreparable harm on account of having to enroll fewer international students (but more domestic students) during the time it takes the university to address its deficient data and reporting practices and come into compliance with all applicable laws. The Government, on the other hand, would be irreparably harmed by an injunction stopping the President from furthering key national interests in foreign affairs and immigration.

**CONCLUSION**

For the foregoing reasons, the Court should deny Harvard's motion.

---

[11] Ex. I, Harvard University, U.S. NEWS, https://www.usnews.com/best-colleges/harvard-university-2155#:~:text=Harvard%20University%20is%20a%20private,is%20National%20Universities%2C%20%233 (last visited June 13, 2025) (showing a three percent acceptance rate for the most recent year).

Dated: June 14, 2025                    Respectfully submitted,

                                        BRETT SHUMATE
                                        Assistant Attorney General
                                        Civil Division

                                        DREW ENSIGN
                                        Deputy Assistant Attorney General
                                        Office of Immigration Litigation
                                        Civil Division

                                        BRIDGET K. O'HICKEY
                                        Counsel to the Assistant Attorney General
                                        Civil Division

                                        DAVID KIM
                                        CATHERINE M. RENO
                                        CHRISTINA PARASCANDOLA
                                        Senior Litigation Counsel
                                        Office of Immigration Litigation
                                        General Litigation and Appeals Section

                                        _s/ Tiberius T. Davis_
                                        TIBERIUS DAVIS
                                        Counsel to the Assistant Attorney General
                                        Civil Division
                                        U.S. Department of Justice
                                        P.O. Box 878, Ben Franklin Station
                                        Washington, DC 20044-0878
                                        (202) 514-2000
                                        tiberius.davis@usdoj.gov


                                        *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I, Tiberius Davis, hereby certify that I served a true copy of the above document upon all counsel of record via this court's electronic filing system and upon any non-registered participants via first class mail.


Dated: June 14, 2025                    /s/ *Tiberius Davis*
                                        TIBERIUS DAVIS
                                        Counsel to the Assistant Attorney General