☰     **HARVARD** MAGAZINE     Donate

ADVERTISEMENT

**UNIVERSITY NEWS | 1.22.2025**

Updated 2.13.2025

# Harvard Settles Antisemitism Lawsuits

Adopts IHRA definition, bolsters antisemitism education

by **Max J. Krupnick**



▶ Harvard will introduce new processes "building on measures it has implemented over the past year," the SAA settlement says. | PHOTOGRAPH BY NIKO YAITANES/*HARVARD MAGAZINE*

**T**his story has been updated below with details of Harvard's rollout of its new antisemitism definition.

AT A December 5, 2023 hearing of the House Committee on Education and the Workforce, Rep. Elise Stefanik '06 (R-NY) asked Harvard President Claudine Gay whether "calling for the genocide of Jews" violates "Harvard's rules of bullying and harassment." Gay responded, "It can be, depending on the context." That vague, legalistic response sparked furious criticism and eventually contributed to her January 2024 resignation.

A little over a year after that exchange, Harvard is starting to publicly clarify what it considers to be antisemitism and how it will respond. Tuesday morning, the University announced that it settled a pair of lawsuits about antisemitism on campus. As a result, Harvard will adopt a definition of antisemitism that includes certain types of anti-Israel rhetoric, convene an annual academic symposium on antisemitism (with a focus on campus hatred), provide training about antisemitism, and, for five years, publish annual reports on its responses to campus discrimination and harassment.

**Subscribe to our Friday email:**
*This Week*

Join thousands of *Harvard Magazine* readers getting the top Harvard stories in their inbox every Friday.

Email                                                                              Subscribe

## Two Lawsuits

THE FIRST SUIT was filed in January 2024 by Shabbos Kestenbaum, M.T.S. '24, and five other Jewish students. The students were represented by Students Against Antisemitism (SAA), a group that also sued New York University, Columbia University, and the University of Pennsylvania later that year. Their complaint alleged that Harvard "has become a bastion of rampant anti-Jewish hatred and harassment." Kestenbaum did not join Tuesday's settlement and is continuing his litigation against the University. (He spoke at the Republican National Convention last July, and has attracted criticism from some students for his combativeness and aggressive rhetoric.)

The second suit was filed in May 2024 by the Louis D. Brandeis Center for Human Rights Under Law, a nonprofit that "engages in research and legal advocacy to combat the resurgence of anti-Semitism on college and university campuses, in the workplace, and

elsewhere." The group's founder and chairman, Kenneth Marcus, served in the Bush and Trump administrations. In 2004, during the Bush administration, he helped expand Title VI of the Civil Rights Act of 1964 protections to include ethnicity and religion. And in 2019, he successfully lobbied the Trump administration to judge campus antisemitism cases using the International Holocaust Remembrance Alliance (IHRA) definition of antisemitism, which includes certain types of anti-Israel rhetoric (see further discussion below). The Brandeis Center represented five other Jewish and Israeli students, including an Israeli Harvard Business School student involved in a confrontation at an October 2023 pro-Palestine rally.

Each suit outlined incidents on campus deemed to be antisemitic. The Brandeis Center suit discussed a spring 2023 seminar at the Harvard Kennedy School (HKS). The complaint alleged that Hauser senior lecturer in leadership, organizing, and civil society Marshall Ganz "pressured" three Israeli students to "abandon" a project about Israeli Jewish democracy. The filing outlines the social and academic consequences the students (who were part of the suit) faced for continuing their project. In June 2023, an independent investigator hired by HKS agreed there was "sufficient evidence" that Ganz discriminated against these three students based on their ethnic identities.

The SAA case described a pro-Palestine protest entering a Harvard Law School (HLS) building. "Fearing a violent attack," some Jewish students attending a discussion session removed "indicia of their Jewishness, such as kippot" and hid under desks. SAA also submitted the Harvard Jewish Alumni Alliance's (HJAA) May 2024 report, "The Soil Beneath the Encampments: How Israel and Jews Became the Focus of Hate at Harvard," as evidence of antisemitic patterns on Harvard's campus.

The two lawsuits claimed that Harvard violated Title VI of the Civil Rights Act of 1964 by not sufficiently protecting its Jewish and Israeli students. The U. S. Department of Education has investigated, and reached settlements with, several other universities found to have violated Title VI in their handling of protests in the wake of the October 2023 Hamas attack on Israel and ensuring Middle East war. Given the private lawsuits against Harvard, the department deferred acting separately. Felix Frankfurter professor of law Noah Feldman tells *Harvard Magazine* that "Title VI guarantees that any institution that receives federal funding will not tolerate or engage in discrimination against students or faculty or staff that would impinge upon their capacity to have an equal right to participate in the life of the university or the institution."

In August and November, a federal judge declined Harvard's request to dismiss the two lawsuits. Now, the parties are settling. Harvard issued separate press releases for each settlement, but they are similar. The University did not admit wrongdoing or liability but did include monetary terms (not further detailed or disclosed, but possibly covering the litigants' legal expenses or other matters).

## Settlement Terms

HARVARD WILL introduce new processes "building on measures it has implemented over the past year," the SAA settlement says.

*Annual reporting.* For the next five years, the director of Harvard's Office for Community Conduct (OCC) will publish an annual report "that covers Harvard's response to discrimination or harassment based on Title VI-protected traits." (OCC will hire a staff member to oversee all complaints of antisemitism and supervise the annual report).

*Academic symposium and Israel partnership.* The University will provide additional resources to the study of antisemitism, including a yearly academic symposium on the topic (an unusual intellectual commitment, not specifically tied to any particular department or academic program, at least as explained so far). At least once a year, the University will "reaffirm…that antisemitism (and all forms of hate) will not be tolerated at Harvard." The Brandeis Center settlement further announces that Harvard "will establish an official partnership with a university in Israel," "provide an opportunity for the Brandeis Center to host a variety of events on campus," and invite three HKS alumni "to organize and host an on-campus event…on the substantive issues of Israeli Jewish democracy." (Neither Harvard nor the Brandeis Center would formally confirm that the three HKS alumni were the three plaintiffs from Marshall Ganz's class.)

*Definition of antisemitism.* Notably, Harvard will adopt the IHRA definition of antisemitism. It reads as follows:

> Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities.

The IHRA definition contains 11 examples that are now part of Harvard's own definition of antisemitism. Some of these explain that certain criticisms of Israel can be antisemitic. Such situations include:

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.
- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.
- Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation.
- Drawing comparisons of contemporary Israeli policy to that of the Nazis.
- Holding Jews collectively responsible for actions of the state of Israel.

A frequently asked questions (FAQ) document will be published by the University to provide further details about what types of anti-Israel and anti-Zionist rhetoric would violate existing non-discrimination and anti-bullying policies. According to the SAA settlement, the FAQ will include the following statement:

> For many Jewish people, Zionism is a part of their Jewish identity. Conduct that would violate the Non-Discrimination Policy if targeting Jewish or Israeli people can also violate the policy if directed toward Zionists. Examples of such conduct include excluding Zionists from an open event, calling for the death of Zionists, applying a 'no Zionist' litmus test for participation in any Harvard activity, using or disseminating tropes, stereotypes, and conspiracies about Zionists (e.g., 'Zionists control the media'), or demanding a person who is or is perceived to be Jewish or Israeli to state a position on Israel or Zionism to harass or discriminate.

The IHRA definition has gained adherents worldwide since its 2005 inception. The U.S. State Department adopted it in 2010; 30 additional nations did in 2016; and 35 states have legally enshrined it since 2019. But the definition has detractors. Frost professor of Jewish history Derek Penslar, who cochairs Harvard's antisemitism task force, has written that IHRA's suggested use as institutional policy is "bizarre," since it was "developed for the purpose of data collection, not policy making." In that 2021 essay, he also expresses concern about how the definition treats critiques of Israel, writing that it "assumes guilt rather than innocence" and implies that "highly critical but factually accurate statements about Israel are antisemitic."

But HLS's Feldman explains that Harvard's adoption of the IHRA definition will not change anything institutionally. "The Department of Education's Office of Civil Rights (OCR) under the Trump administration had already announced that it would be looking into the IHRA definition as it reviewed the actions of universities to ascertain whether they were in violation of Title VI," he says. "In layman's terms, that means that OCR had effectively already demanded that universities use the IHRA definition. So, I think the University, by agreeing to be guided by that definition itself, is acting fully in accordance with what was de facto required by the Department of Education already."

## Early Reactions

UNIVERSITY STAKEHOLDERS reacted in a variety of ways to Tuesday's settlements. Former president Lawrence S. Bacow tells *Harvard Magazine*, "The agreement should stimulate more teaching, scholarship, and public awareness of the roots and consequences of antisemitism. It should also provide more transparency in what Harvard is actively doing to combat this ancient form of hatred and bigotry." He adds that the settlements are "not likely to quell the controversy on campus over the war in Gaza but it takes important and needed steps to prevent legitimate debate from spilling over into bullying and discrimination."

Rabbi Jason B. Rubenstein '04, executive director of Harvard Hillel, wrote an email to Harvard's Jewish community saying that the settlement "does not represent everything that can, should, or must be done." Harvard Hillel, he says, is hiring a senior staff member to monitor, advance, and sustain the implementation of these settlements and recommendations.

A coalition of pro-Palestine student organizations, including the Harvard Undergraduate Palestine Solidarity Committee and Harvard Out of Occupied Palestine, which organized the spring 2024 encampment, criticized the settlement on Instagram—specifically the adoption of the IHRA definition and the new partnership with an Israeli university. Professor of government Ryan Enos told *The Boston Globe* that the settlement "is a clear response to political pressure and it's accurate to call this anticipatory obedience in the sense they are afraid of the coming illiberal pressure from the Trump administration." He added, "Harvard should be embarrassed."

•••••••

HARVARD WILL HAVE more opportunities to clarify its institutional response to antisemitism. The final report of the task force on combating antisemitism is expected to be published in the coming weeks (along with the report of the parallel task force on combating bias against Muslims, Arabs, and Palestinians). The interim recommendations, released in June, acknowledged that "the situation of Israeli students at Harvard has been dire." The final report is expected to contain further anecdotes about antisemitism on campus alongside robust recommendations on how to improve the campus climate.

**UPDATE: January 29, 12:00 P.M.:**

ON FRIDAY, JANUARY 24, Harvard's Office for Community Conduct (OCC) posted a Frequently Asked Questions (FAQ) webpage for the University's Non-Discrimination and Anti-Bullying (NDAB) policies, as required by the pair of settlements. The initial NDAB policy went into effect in September 2023.

•*Anti-Palestinian discrimination and harassment settlement*. The new FAQs are also shaped by Harvard's January 17 settlement with the U. S. Department of Education's Office of Civil Rights (OCR), sparked by a January 2024 complaint of anti-Palestinian, anti-Muslim, and anti-Arab harassment. Unlike the two antisemitism cases, which were litigated between private individuals or organizations and Harvard, the OCR investigation was between Harvard and the federal government. (The OCR settlement arrived somewhat under the radar: unlike the two antisemitism lawsuits, the resolution of the federal investigation did not mandate Harvard jointly release a news announcement.) A University spokesperson provided the following statement on the OCR settlement:

> Harvard is pleased to have reached a voluntary resolution with the Office for Civil Rights and reaffirms its dedication to ensuring that all members of the Harvard community can access educational programs free from harassment or discrimination. With the conclusion of OCR's investigation, Harvard has not admitted to any wrongdoing or liability and has agreed to take specific actions enhancing University policies and procedures to ensure that it continues to comply with Title VI of the Civil Rights Act. Harvard remains dedicated to providing a safe and welcoming environment for learning and discourse and equitable treatment for all members of its community.

•*Antisemitism and Islamophobia definitions and procedures.* The new NDAB FAQs provide more details about what constitutes campus antisemitism and Islamophobia. Harvard now uses the International Holocaust Remembrance Alliance (IHRA) working definition of antisemitism and part of the United Nations working definition of Islamophobia. The FAQs note that although Harvard's antisemitism definition contains more detail than its Islamophobia definition, "NDAB Policies protect Muslims, Jews, and other protected groups equally." The document further specifies that anti-Arab, anti-Palestinian, and anti-Israeli discrimination are all prohibited by the NDAB policies.

The FAQs outline the process for evaluating claims of harassment. A "factfinder" will examine "all the relevant circumstances" of the incident, including duration, target, setting, and threat of violence. Any member of the Harvard community can file a "report" (a concern of alleged discrimination) or a "formal complaint" (a testimony of alleged discrimination or bullying that identifies the parties involved, witnesses, and evidence). It provides eight concrete examples of behaviors that are considered harassment. These include, but are not limited to:

- Abuse based on a protected category (age, race, color, national origin, sex, genetic information, ancestry, religion, caste, creed, veteran status, disability, military service, sexual orientation, and political beliefs)
- Denying someone access to a University program or benefit (such as events or letters of recommendation) due to looks, stereotypical features, religious dress, or language
- Hateful graffiti (swastikas and nooses, denying the Holocaust, invoking Holocaust imagery to harass, or advocating genocide)
- Forcibly removing someone's religious or ethnic jewelry or clothing
- Accusing individuals of supporting genocide based solely on their protected characteristic
- Accusing individuals of being terrorists or terrorist sympathizers, or urging them to self-harm based solely on their protected characteristic

The NDAB FAQs emphasize that the policy is "consistent with the University's protections for free speech and academic freedom." The policy does not protect community members from "exposure to all uncomfortable or challenging conversations," explicitly stating that challenging conversations "are a normal part of University life."

Actions that would violate the NDAB if targeted at Jewish or Israeli individuals, the FAQs say, would also violate the policy if targeted at Zionists. Similarly, actions that would violate the NDAB if targeted at Muslim, Arab, Palestinian individuals also violate the policy if targeted at individuals who support Palestinian rights.

•*A "Hostile Campus."* Harvard's settlements and revamped guidance have led to some dissatisfaction. On Tuesday, the Council on American-Islamic Relations (CAIR), a Muslim civil rights and advocacy group, announced that it would declare Harvard a "hostile campus." The initial press release said the designation comes "after the administration adopted new, anti-speech, anti-Palestinian policies that threaten to expand the persistent abuse of anti-genocide, anti-apartheid voices."

Read more articles by Max J. Krupnick ➔