```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


PRESIDENT AND FELLOWS OF          )
HARVARD COLLEGE,                  )
                                  )        Civil Action
              Plaintiff,          )        No. 25-11472-ADB
                                  )
v.                                )
                                  )
DEPARTMENT OF HOMELAND SECURITY,  )
et al.,                           )
                                  )
              Defendants.         )



             BEFORE THE HONORABLE ALLISON D. BURROUGHS
                  UNITED STATES DISTRICT JUDGE


                            HEARING


                        June 16, 2025
                          10:32 a.m.



            John J. Moakley United States Courthouse
                      Courtroom No. 17
                      One Courthouse Way
                Boston, Massachusetts  02210




                        Kelly Mortellite, RPR, RMR, CRR
                        Official Court Reporter
                        One Courthouse Way, Room 3200
                        Boston, Massachusetts  02210
                        mortellite@gmail.com
```

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiff:

 3    Ian Heath Gershengorn
      Ishan Bhabha
 4    Lauren J. Hartz
      Jenner & Block LLP
 5    1099 New York Ave., NW
      Suite 900
 6    Washington, DC 20001
      202-639-6869
 7    igershengorn@jenner.com

 8    Steven Paul Lehotsky
      Serena M. Orloff
 9    Lehotsky Keller Cohn LLP
      200 Massachusetts Avenue NW
10    Washington, DC 20001
      202-365-2509
11    steve@lkcfirm.com

12    Jennifer O'Connor
      Harvard University
13

14    Counsel on behalf of Defendants:

15    Tiberius T. Davis
      Department of Justice
16    Civil Division
      950 Pennsylvania Avenue
17    Washington, DC 20530-0001
      202-326-7924
18    tiberius.davis@usdoj.gov

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S
 2            (The following proceedings were held in open court
 3    before the Honorable Allison D. Burroughs, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 17, Boston, Massachusetts, on
 7    Monday, June 16, 2025.)
 8    (Case called to order.)
 9            COURTROOM CLERK:  Will counsel identify themselves for
10:33 10    the record.
11            MR. GERSHENGORN:  Good morning, Your Honor.  Ian
12    Gershengorn from Jenner & Block on behalf of Harvard
13    University.  With me is Jennifer O'Connor, the vice president
14    and general counsel of Harvard.  And I'll let the other counsel
15    introduce themselves.
16            MS. HARTZ:  Good morning, Your Honor.  Lauren Hartz
17    from Jenner & Block for plaintiff Harvard.
18            MR. BHABHA:  Good morning, Your Honor.  Ishan Bhabha
19    also for Harvard University.
10:34 20            MR. LEHOTSKY:  Good morning, Your Honor.  Steven
21    Lehotsky, Lehotsky, Keller, Cohn, for Harvard University.
22            MR. ORLOFF:  Good morning, Your Honor.  Serena Orloff,
23    Lehotsky, Keller, Cohn, for Harvard.
24            MR. DAVIS:  Good morning, Your Honor.  Tiberius Davis
25    on behalf of the government.
```

     1              THE COURT:  You're all alone over there still, Mr.
     2    Davis.
     3              MR. DAVIS:  Yes.  Ray is a little bit busy today.
     4              THE COURT:  I think I'll see him this afternoon.
     5              All right.  I know I saw some of you outside, and I
     6    have had a fun-filled morning at the periodontist, so you all
     7    are looking pretty good today.
     8              So we can get started.  I've read all the papers that
     9    have been filed.  I got Mr. Davis's over the weekend.  Thank
10:34 10    you for that.  So it's your motion.  Do you want to start?
    11              Can I ask you a question before you start?  The
    12    proclamation was issued by President Trump.
    13              MR. GERSHENGORN:  Correct.
    14              THE COURT:  And he is not named as a party to the
    15    litigation in your amended complaint.
    16              MR. GERSHENGORN:  That's right, Your Honor.
    17              THE COURT:  Does he need to be here to litigate a
    18    proclamation that he issued?
    19              MR. GERSHENGORN:  He does not, Your Honor.  In fact,
10:35 20    had we done that, we'd have a whole series of side motions
    21    about our ability to sue the government.  We've sued the people
    22    who implemented the proclamation, and what we'd be seeking is
    23    an injunction against implementation of the proclamation.
    24    That's the standard practice for proclamations, executive
    25    orders and things like that, that the injunction would run

         1    against the secretaries and the agencies that would implement

         2    the proclamation, and that's what we'd be seeking here.

         3          THE COURT:  Do you agree with that, Mr. Davis?

         4          MR. DAVIS:  I think that's generally right, Your

         5    Honor.  There are some DDC cases that say when the power is the

         6    President himself and he's just delegating it, that is the

         7    President.  Rather there are other statutes that give the power

         8    directly to the departments rather than the President, but that

         9    generally is the practice.  And if he did sue the President, we

10:35   10    would obviously say you can't enjoin the President.

        11          THE COURT:  Okay.  So you believe we're proceeding in

        12    a procedurally correct posture?

        13          MR. DAVIS:  I think this is probably the most correct

        14    posture we could be proceeding in, correct.

        15          THE COURT:  Okay.  I'm not sure what that means, but

        16    okay.

        17          MR. GERSHENGORN:  I'm not sure what that means either,

        18    Your Honor, and if we need to amend the complaint, we'd be

        19    happy to do so.  As I say, I think that would be quite unusual

10:36   20    for the Justice Department to be suggesting we actually should

        21    be suing the President, but we'd be happy to do so.

        22          THE COURT:  I think he's saying that at least for the

        23    time being he's content going forward.

        24          MR. GERSHENGORN:  Thank you, Your Honor.  And may it

        25    please the court.  We are back before the court because, once

again, without process or cause, the government has targeted

Harvard by seeking to prevent international students and

scholars from arriving on the Harvard campus and from joining

the Harvard community.

Last time, the Secretary just sent a letter

unilaterally withdrawing Harvard's certification to host

international students.  Rather than responding to our TRO, the

government effectively conceded procedural error at least, and

it initiated a sham proceeding to provide some veneer of

process before it reached the same preordained result.

Then, after a publicly reported brainstorming session

at the White House to find more ways to punish Harvard, the

Administration decided it could not wait even for its own sham

proceeding to finish.  The President issued the proclamation

here suspending entry for Harvard students, thus accomplishing

roughly the same result by different means.

The proclamation is unlawful for three independent

reasons, which I want to mention briefly at the start and then

discuss in more detail.

First, the proclamation is a plain violation of the

First Amendment.  It's part of an escalating campaign of

retribution and retaliation to punish Harvard because of its

perceived viewpoints and because of its refusal to submit to a

series of government-imposed conditions designed to control the

viewpoint of its faculty and students and the content of the

1    courses that are taught.

2        Now, sometimes First Amendment animus is hard to

3    detect, but not here.  The Administration has been explicit

4    about its viewpoint-based demands and about the consequences of

5    rejecting those demands.  At every conceivable juncture the

6    Administration at the highest levels have condemned Harvard for

7    its perceived viewpoints, and there's no doubt that the

8    proclamation is part of that effort using Harvard's

9    international students as pawns to retaliate against Harvard.

10:38 10        The government's principal contention is that *Mandel*

11    and *Trump v. Hawaii* rendered this court powerless to address

12    those constitutional violations, but that is wrong.  Both cases

13    involved restrictions aimed at aliens that were alleged to have

14    indirect effects on the rights of American citizens.  Neither

15    case has relevance to the allegations of direct targeting of

16    U.S. citizens for protected speech on U.S. soil, and neither

17    insulates the government for its efforts to weaponize the

18    immigration laws to retaliate for U.S. citizens' fully

19    protected speech.

10:38 20        Second, even leaving the First Amendment aside, the

21    proclamation is outside the authority that 1182(f), which I'll

22    sometimes call section 212(f), conveys.  The proclamation seeks

23    to regulate not foreign students but rather Harvard itself.

24    Indeed the proclamation states expressly that its purpose is to

25    compel Harvard to fix perceived deficiencies in its data

collection and reporting, and it cites Harvard's perceived

failures in admissions.  But that conduct is regulated by other

domestic statutes.  In deploying section 212(f) in that way,

the executive branch has purported to find in an immigration

statute a vast new authority to regulate the domestic --

THE COURT:  Slow down, slow down.

MR. GERSHENGORN:  I'm sorry -- to regulate the

domestic conduct of domestic institutions that are perceived to

violate domestic statutes.

Section 212(f) has been around for more than 70 years,

and not once, never in the course of nearly 100 proclamations

has it been used in that manner.  And nothing in the text of

1182(f) or its use since enactment gives the President the

authority to use that -- to use entry as a tool not to protect

the borders but instead as an all-purpose hammer to compel

domestic institutions like Harvard to comply with the

Administration's demands or the Administration's view about

what domestic statutes require of U.S. citizens.

Third, the proclamation makes no finding as section

212(f) requires that the entry of students into the United

States would be, quote, detrimental to the interests of the

United States.  Indeed the proclamation itself refutes that

proposition as it states expressly that students can enter as

long as they attend literally any other school in the country,

except Harvard.

1           More to the point, the proclamation finds not that

2     entry is detrimental but instead that Harvard's purported

3     refusal to turn over certain records is detrimental, and it

4     finds, what it actually finds is that limiting Harvard's

5     international students from coming to campus will pressure

6     Harvard to respond.  That is not the finding the statute

7     requires.

8           THE COURT:  Hold on.  You can correct me, but I'm not

9     sure that's what they're actually saying.  Do you want to --

10:41 10   what I think -- I mean, he does say that if Harvard

11    capitulates, this goes away; he does say that.  But I think

12    that what he's arguing is that these people are a potential

13    danger because they don't have the documentation to evaluate

14    whether they're a danger or not, and they can come to a

15    different university because the Administration will be better

16    able to assess their risk when they have the documentation.

17          Do I have that right, Mr. Davis?

18          MR. DAVIS:  That is correct, Your Honor.

19          MR. GERSHENGORN:  So, Your Honor, I don't actually

10:41 20   think that's correct in terms of what the statute says.  And I

21    think that you know that because it says, "I've determined that

22    the class of entry of nationals described above is detrimental

23    because in my judgment Harvard has rendered it an unsuitable

24    destination, until such time as the university shares the

25    information" -- excuse me -- "until such time as the university

1  shares the information that the federal government requires to

2  safeguard national security and the American public."

3      So the detrimental thing I think is actually that

4  Harvard isn't turning over its information and that the

5  students therefore are a way to get at Harvard to do that.

6      THE COURT:  I think what they're saying is that it's

7  not safe to have those students there unless they have access

8  to more information.

9      MR. GERSHENGORN:  So, Your Honor, I guess I don't read

10:42 10  it that way.  And I think, you know, there is no finding, I

11  don't think that Harvard itself is sort of dangerous.  But I

12  don't want to fight Your Honor too much on this because I

13  think, as I say, there are three independent reasons.

14      And I just want to sort of step back before addressing

15  the sort of First Amendment and statutory ones on their face,

16  like, the consequence of the government's argument here really

17  is extraordinary, right?  Under their theory of the

18  Constitution and the statute, the President could deny entry to

19  relatives of critics of the President; he could forbid entry

10:42 20  for workers at companies that support political candidates

21  other than the President; he could restrict entry for those who

22  want to meet with journalists or media he dislikes, I could go

23  on and on and on, but that is not the law.

24      Before turning to the First Amendment arguments, I

25  can't leave from the intro without emphasizing that the impact

1    of the proclamation is devastating for Harvard and its

2    students.  It separates roommates, teammates and classmates.

3    It threatens labs, pioneering research, engineering

4    innovations.  It deprives students of graduate mentors and

5    teachers.  It deprives the university of a breadth of

6    experience and approaches that fundamentally alters what it

7    means to learn at Harvard, and it does so in a way intended to

8    have devastating consequences for Harvard and its students for

9    years to come.

10:43 10        THE COURT:  Mr. Davis is going to have an uphill

11    battle with me on the irreparable harm.  I think that the

12    battleground here is the likelihood of success on the merits.

13        MR. GERSHENGORN:  Let me turn to that, Your Honor.

14    Let me start, if I could, with the First Amendment.  The

15    Supreme Court affirmed just last term in *Vullo* that the

16    government cannot threaten or impose legal sanctions or other

17    means of coercion to achieve suppression of disfavored speech

18    or to compel speech.  That is exactly what has happened here.

19    The government has violated the First Amendment in three

10:44 20    distinct ways:  retaliation, viewpoint discrimination, and

21    unconstitutional conditions.

22        I take the government to make two principal arguments.

23    One, that the proclamation has no connection to the April 11

24    letter and has no relation to that, and therefore there is no

25    way to infer a First Amendment violation; and, second, that in

1   any event, *Mandel* and especially *Trump v. Hawaii* forbid this

2   court from doing anything about it.

3          And let me take each of those in turn if I can.  It's

4   sort of amazing to me that the government's position could be,

5   like, there was a demand letter, a rejection of that letter,

6   then seven weeks went by where nothing happened, and then

7   mysteriously and out of the blue this proclamation came.  I

8   think what the record shows is something quite different, and

9   if I could take a few moments to go through that, it's in the

10:44 10   briefs, but I think it's important, and I want to make three

11   distinct points while doing that.

12          First, that the sheer number and timing of the actions

13   leaves no doubt about what's going on here; that the First

14   Amendment protected activity was the substantial and motivating

15   factor for the proclamation, which is the agreed-upon test,

16   substantial and motivating factor.

17          Second, there was repeated invocations of protected

18   First Amendment activity to justify those actions.  And third,

19   there is no doubt that the Secretary's actions -- that the

10:45 20   President's actions here are part and parcel of the scheme.

21          So let me just sort of go back to April 14, which is,

22   April 11 the government sends a letter, sets out a number of

23   conditions, including a viewpoint audit of faculty and

24   students, a demand that any viewpoint discrepancies be

25   corrected and a demand that international students whose views

 1    are hostile to the Constitution and the Declaration of

 2    Independence be excluded.

 3         The university rejects that letter on the 14th, and

 4    then the following happens:  that afternoon $2.2 billion in

 5    federal funds are frozen.  The very next day, the President

 6    threatens to pull Harvard's 501(c)(3) status.  The very next

 7    day there is a press release from the Secretary of DHS and

 8    issues the data request, the record request that's at issue

 9    here where she expressly links the three events I've just

10:46 10    described.

11         The next day, the Education Department files a record

12    request about foreign funding.  Three days later, the

13    Administration threatens another billion dollars.  We then file

14    our funding suit, another First Amendment protected activity.

15    Four days later, the EEOC chair initiates an investigation into

16    Harvard's hiring.

17         Fifth, the Secretary of Education says no more grants.

18    On the 13th, they issue a CID about college admissions.  Then

19    on the 22nd, as this court is well aware, the Secretary revokes

10:46 20    Harvard's ability to host international students.

21         We then file suit and get a TRO, yet another protected

22    First Amendment activity.  Then on the 27th, there's a

23    100-million-dollar cancelling of government contracts.  On the

24    28th, a brainstorming session at the White House to find more

25    ways to punish Harvard.  That's what's publicly reported.  On

1    the 30th, there's a pilot program, and the university chosen

2    for the pilot vetting program by the State Department is

3    Harvard.   Then on the 4th is the proclamation.

4         So there's no doubt from the scope and timing exactly

5    what happened.   In terms of, like, First Amendment activity,

6    I'm not going to go through it all because I'm assuming the

7    government actually doesn't need me to do that.   But to start,

8    the April 11 letter finds that the admission of international

9    -- that Harvard is admitting international students, quote,

10:47 10   "hostile to American values and institutions inscribed in the

11   U.S. Constitution and Declaration of Independence."

12        On the day the President threatened the 501(c)(3)

13   status, he said he was quote -- that Harvard was, quote,

14   "pushing political idealogical and terrorist

15   inspired/supporting sickness."   When the Secretary announced

16   her press release, she said that Harvard had radical and

17   anti-American ideology.   The same day, the President posted

18   that Harvard hires all woke, radical left idiots.   On the 24th,

19   he said Harvard is a far left institution and a liberal mess.

10:48 20   I could go on and on.   The idea that there's no sort of First

21   Amendment activity seems to me just preposterous.

22        Finally, there's no doubt that the immigration

23   consequences are linked to one another.   As I said, in the

24   April 11 letter, the government referred expressly to the

25   admission of international students.   When Secretary Noem

1    issued the data request that is sort of the fundamental -- the

2    sort of core point that the government keeps raising as to why

3    Harvard is somehow unfit to host international students, she

4    linked it to the other actions.  She said, "This action follows

5    President Trump's decision to freeze 2.2 billion in federal

6    funding for Harvard University and proposing the revocation of

7    its tax exempt status over its radical ideology."  So again,

8    tying all of these things together is not we're doing.  It's

9    something the Secretary of DHS did herself.

10:49 10          Then, you know, again, I could go on and on, like, the

11    timing of Your Honor's -- the revocation on the 22nd, Your

12    Honor's TRO, the brainstorming session at the White House to

13    punish Harvard, the Secretary of State's enhanced vetted --

14    advanced vetting pilot program that targeted just Harvard, and

15    then ultimately the President's proclamation here.

16          THE COURT:  Hold on.  Let me stop you for one more

17    second.  What's the relationship between the INA and the First

18    Amendment?  If what the proclamation does is permissible under

19    the INA, what happens to the First Amendment argument?  Is it

10:49 20    irrelevant?

21          MR. GERSHENGORN:  Nothing, Your Honor.  That is our

22    point.  If I could just tie off the First Amendment, and then

23    I'll get right to Your Honor's question.

24          THE COURT:  Okay.

25          MR. GERSHENGORN:  Because I think what the government

1    would say is because under *Trump v. Hawaii* and *Mandel* the

2    proclamation is effectively either immune from judicial review

3    or subject to a lesser standard of First Amendment review, and

4    we think that's just wrong.

5         THE COURT:  I want to let you get to it, but just to

6    clarify the question, I think what they're saying is the

7    proclamation is lawful under the terms of the INA.  So if the

8    proclamation is lawful under the terms of the INA, I'm not sure

9    what happens to the First Amendment argument.

10:50 10         MR. GERSHENGORN:  So I think it's exactly -- I don't

11    think it changes, Your Honor.  Because our point is that they

12    issued the proclamation in order to deter and in retaliation

13    for protected speech.  Whether it also is unlawful under the

14    statute is a different and separate question.  So even apart

15    from our First Amendment argument, we would have an argument --

16    we do have an argument that it violates the statute.

17         But even if Your Honor thought that in isolation that

18    it would be lawful, you cannot take even a lawful action in

19    retaliation for and to compel protected speech.  That's exactly

10:51 20    -- there are things that the government can do, for example, a

21    prosecution is perfectly lawful, but not if you do it in

22    response to and to deter protected speech.  That would be true

23    for a funding cancellation.

24         And the question in each case in the First Amendment

25    is, is the First Amendment protected activity a, quote,

1    "substantial and motivating factor" for the otherwise lawful

2    activity.  And so the question is not just is it lawful or not,

3    right?  Again, independently we think it's unlawful.  But even

4    if Your Honor thought it was totally lawful, if the First

5    Amendment protected activity was a substantial and motivating

6    factor, then that is unlawful activity.

7        And I don't take the government to dispute that as a

8    general matter, that that's the First Amendment test, that even

9    lawful activity, if it is done -- if the First Amendment

10:52 10    protected activity is a substantial and motivating factor.

11    Indeed Your Honor, *Vullo* illustrates that, right?  *Vullo* was a

12    situation -- *Vullo* is the Supreme Court case from last term.

13    The investigations, the insurance investigations were totally

14    lawful, but the court said they cannot be taken in order to

15    punish the NRA's First Amendment rights.  So if they're taken

16    for a protected purpose, then that violates the First

17    Amendment.

18        So I think it's super important, Your Honor, those are

19    distinct and independent arguments we have.  One, it violates

10:52 20    the First Amendment; two, it's unlawful under the statute, and

21    those really are two different mechanisms, and we think we

22    prevail on both of those.

23        THE COURT:  Okay.

24        MR. GERSHENGORN:  Let me just tie off the First

25    Amendment and turn to the standard of review on the First

1    Amendment, which I really think is central.  The government --

2    just two -- three more points on the First Amendment.

3            First, we're in the context of academic freedom where

4    the Supreme Court and the First Circuit has always recognized

5    and continually recognized that there are special First

6    Amendment heightened protections.

7            Second, like, the unprecedented nature of the assault

8    that we've been seeing over the last two months is yet another

9    strong piece of evidence of First Amendment animus.  You're

10:53 10  talking about billion-dollar funding freezes that have never

11   happened before, threats on tax exempt status, which has never

12   happened before, pulling of entire -- a legitimate university's

13   ability to host international students has never happened

14   before.

15           These are the kinds of -- the government says our

16   argument flies in the teeth of the presumption of regularity.

17   What we have suffered over the last two months is like the most

18   irregular and improper treatment that a university has probably

19   ever suffered at the hands of the government, and so to invoke

10:54 20  the presumption of regularity takes some courage.

21           The last point I'll make, Your Honor, is that although

22   we're focusing through the First Amendment argument, we've also

23   raised equal protection and bill of attainder.  All I want to

24   say there is they're getting at the same thing, and it's not

25   coincidence that the bill of attainder case is *McGrath*, which

1    comes from the McCarthy era, sort of attacking individuals and

2    institutions for their viewpoints.  They're all getting at the

3    same thing, which is you cannot target a single individual

4    because you don't like what they say or because they have not

5    acceded to your demands.

6         So let me turn then to the *Mandel* Harvard question,

7    because I think candidly, like, the First Amendment violation

8    standing alone outside the immigration context is overwhelming.

9    The court has said over and over the judiciary does not have to

10:54 10   blind itself to what every citizen can see.  You can see what

11   has happened, to read that record and find that the First

12   Amendment activity was not a substantial and motivating factor

13   here would really be I think unthinkable.

14        So what the government says is that *Mandel* and *Hawaii*

15   alter the proper standard of review.  Neither *Mandel* nor Trump

16   provides the relevant constitutional standard.  Both cases

17   involve restrictions on aliens that were alleged to have

18   indirect effects on the rights of American citizens.  Neither

19   case has relevance to the allegations of direct targeting of

10:55 20   U.S. citizens by weaponizing immigration laws to retaliate for

21   fully protected speech.

22        So let's start with *Mandel*.  That was a situation in

23   which plaintiffs asserted that the barring of a foreign

24   citizen, Ernest Mandel, an avowed communist, interfered with

25   their First Amendment right to receive information and ideas.

1    So the person excluded was Professor Mandel, right?  That is
2    not a case that says if the President -- it would be lawful if
3    the President had said, Well, Berkeley has too many liberal
4    professors, we've told them to hire more conservative
5    professors.  Until they do so, they cannot listen to Professor
6    Mandel.  The Supreme Court did not address that kind of case.
7    And that is our case, right?  That was a case --

8           THE COURT:  Hold on.  I'm just looking at the realtime
9    here.  You've got to slow down.

10:56 10          MR. GERSHENGORN:  I'm sorry.

11          THE COURT:  You need to slow down.

12          MR. GERSHENGORN:  Sorry, Your Honor.

13          So I think *Mandel*, which also by the way was an
14    individual visa case, just isn't the right standard.  *Trump v.*
15    *Hawaii* is exactly the same.  Again, the asserted injury was
16    entirely derivative.  Here is what the Supreme Court said.  So
17    the proclamation was aimed not at U.S. citizens and the harm
18    alleged was, quote, "the real world effect that the
19    proclamation has had in keeping plaintiffs separated from
10:56 20    certain relatives who seek to enter the country."  Again, a
21    derivative injury from something targeted at the aliens abroad.
22    Your Honor surely remembers and has read *Trump v. Hawaii*.  It
23    was targeted at citizens of countries abroad.

24          Here, the proclamation directly targets a U.S.
25    citizen, Harvard.  The proclamation imposes not an indirect

1    burden but a direct one, and it is directed not at aliens

2    abroad but at a U.S. citizen, and the purpose of the action is

3    to punish and retaliate for the U.S. citizens' First Amendment

4    rights.

5         Now, I also want to talk more broadly, since the

6    government puts a lot of weight on *Trump v. Hawaii*, as to why

7    that is just not the relevant test.  The Supreme Court

8    identified four aspects of the case that it thought mandated

9    kind of a lesser standard.

10:57 10   The first was that it was kind of an unconventional

11   constitutional claim.  It was an effort to apply the test for

12   religious displays for menorahs and creches to a presidential

13   proclamation.

14        Second, the proclamation itself was neutral toward

15   religion.

16        Third, it was unusual evidence, the court said, right?

17   It said that the plaintiffs were relying on campaign statements

18   from candidate Trump to come -- to try to figure out the intent

19   of President Trump.

10:58 20   And fourth, there was a worldwide review that looked

21   at national security.

22        Our case is totally different on every metric.  First,

23   there is nothing unconventional about our claim.  Indeed last

24   term the Supreme Court heard two cases that did the exact same

25   thing.  The question is can the government weaponize the levers

1    of the federal government to punish for speech or to compel

2    speech.  And the answer the court said in *Vullo* and then the

3    three justices who reached the question in *Murphy* was that you

4    cannot do that under the First Amendment.

5          Second, the *Trump v. Hawaii* was neutral toward

6    religion.  On its face, this proclamation is not neutral toward

7    Harvard.  It singles out Harvard.  We are not challenging

8    something that says no foreign students can come into the

9    country and we would say, oh, that's just an effort to target

10:58 10   Harvard.  That's a neutral restriction, not a Harvard-based

11   one.  So again, totally different from *Trump v. Hawaii*.

12          Third, *Trump v. Hawaii* was the unusual evidence from

13   the campaign trail.  We are relying on official statements by

14   the President, official statements by the members of his

15   cabinet and most important by a series of official actions,

16   funding freezes, withdrawals of certification, investigations,

17   terminations, that are official government actions.  We are a

18   million miles from *Trump v. Hawaii*.

19          And finally, *Trump v. Hawaii* had a worldwide review to

10:59 20   check out national security.  We had a meeting at the White

21   House to find more ways to punish Harvard University.  So,

22   like, on every metric, *Trump v. Hawaii* has nothing to do with

23   this, and that is no surprise.

24          As I've said before, their application here would

25   create a gaping hole in the First Amendment.  The President

could target politicians he didn't like, journalists he didn't

like, individuals he didn't like, cities he didn't like,

businesses he didn't like.  The First Amendment just doesn't

allow that.

And in fact, when you look at the case law involving

any assertion of national security as applied to U.S. citizens

in the United States, a case like *Holder v. Humanitarian Law

Project,* the court has always, always applied strict scrutiny.

So I just think that the reduced standard that's at issue in

*Trump v. Hawaii* and in *Mandel* has zero application here.

Now, that said, just to tie it off, we don't think

this is a facially legitimate and bona fide reason, and so we

think even if the *Mandel* standard applied, we would still

prevail.  We do not think -- and I'm going to get to this more

when we get to the statute, but we do not think it is a proper

use of the entry power to use it to enforce a domestic

statutory obligation against a domestic institution on domestic

soil.  So on its face, the effort to enforce and compel

compliance with data laws is not itself a, quote, "facially

legitimate reason."  That is a reason that is beyond the

statute.

And finally, just the last point on this set of

issues, *Trump v. Hawaii* also says under rational basis that a

statute must fall or the proclamation must fall if it doesn't

pursue a legitimate aim and it has, quote -- lacks, quote, "any

1    purpose other than to harm a politically unpopular entity."

2    And we think that would apply here.

3          The aim is to retaliate against Harvard for the

4    exercise of its First Amendment rights, force government's

5    overseeing changes in pursuit of viewpoint, and to condition

6    rights, like entry on students, on compliance with

7    unconstitutional speech-related conditions.

8          Your Honor, that's what we think on the Constitution.

9    And if Your Honor has no questions, I'll turn to the statute.

11:01 10    Maybe I'll pause for half a second.

11          THE COURT:  You can go to the statute.

12          MR. GERSHENGORN:  Okay.  Let me go to the statute.

13    You know, it is our position that the proclamation is not a

14    proper restriction on entry into the United States under

15    212(f).  The proclamation seeks not to regulate the entry of

16    students but rather to regulate Harvard itself.  On its face

17    and on its own terms, it's an effort to compel Harvard to turn

18    over data and records that the federal government wants and to

19    alter its admission practices.

11:02 20          I guess I'd like to make five points on the statutory

21    construction and why we think -- why we're right here.

22          First, the statute seeks -- I'm sorry.  The

23    proclamation seeks to regulate Harvard and forced it to comply

24    with federal law.  It's not trying to address risk posed by

25    foreign nationals.  The first paragraph says, "Admission into

 1   the United States is a privilege," quote, "necessarily tied to

 2   the host institution's compliance and commitment to following

 3   federal law," i.e., Harvard is not in the government's view

 4   complying with federal law.

 5         And the proclamation's restriction on foreign

 6   nationals seeking entrance to Harvard will remain in force,

 7   quote, "until such time as the university shares the

 8   information that the federal government requires."  Those are

 9   aimed at Harvard and its data collection.

11:03 10         Second, and I think this is really critical -- and

 11   when we file our reply brief, which I'd like to talk to Your

 12   Honor about the timing, but let's bracket that -- when we file

 13   our reply brief, we'll have the cite to the CRS report.  But

 14   there is a CRS report, Congressional Research Report, that

 15   lists every proclamation since the statute was passed in 1952,

 16   for the last 70 years, nearly 100 proclamations.  Not one, not

 17   a single one seeks to regulate a domestic institution.

 18         Indeed, when Your Honor looks at the list, what you

 19   will see is the proclamation -- all previous proclamations have

11:03 20   been what you would expect.  They keep people out of the

 21   country because, for example, they've engaged in human rights

 22   abuses, they've violated sanction orders, they've impeded

 23   democracy from emerging in various foreign countries, or

 24   they're trying to get foreign countries to do things that the

 25   United States would want.

1          Not a single one mentions a specific domestic

2    institution.  Not a single one has as its trigger that the

3    domestic institution take some action.  Not a single one has as

4    its purpose to compel the domestic institution to comply with

5    domestic law.  Every one bases the entry restriction on the

6    characteristics of the national or the country.  The national

7    has done something bad; the country that the national is coming

8    from has done something that the United States doesn't like.

9    You know, those are the kinds of things that one would expect,

11:04 10   and every proclamation is based on that.

11          Third, the text of the statute we think is sort of not

12   naturally read to be understood so that this proclamation

13   suspends entry into the United States of a class of aliens.

14   And I mean that in three respects.

15          First, that students of course can enter the United

16   States.  They just couldn't go anywhere other than Harvard.

17   Second, this is far afield for reasons I've suggested from the

18   kinds of classes of aliens that Congress would have expected

19   and that every President has understood.  We are not looking at

11:05 20   things the alien has done, places that the alien has traveled

21   to, countries the alien is coming from.  It is instead

22   domestic.

23          And third, it is targeting a domestic institution.

24   And you've heard me use this refrain, and this is -- I think

25   it's just critical, right?  It is targeting a domestic

1    institution for compliance with domestic law.

2         The parade of horribles -- this is the fourth point,

3    Your Honor -- fourth of five, I'm coming to an end -- is pretty

4    dramatic, right?  Under the President's view -- even setting

5    aside the First Amendment, right?  The President could decide

6    that Ford has raised its prices and therefore interfered with

7    application of the steel tariffs and could limit the ability of

8    federal workers to go to Ford.  He could decide that app stores

9    have not put on their app store TikTok and therefore he's going

11:06 10   to limit the ability of relatives of those executives or

11   workers for those companies to come visit those companies.  He

12   could decide that the way certain companies here are handling

13   AI creates certain security requests -- security threats --

14   I'll slow down again -- and then keep relatives of those

15   executives out of the country or workers who are going to visit

16   those places out of the country.  Again, I could go on and on

17   and on.

18         THE COURT:  That is a parade of horribles, I hear you

19   on that, and I understand you to be saying that it's not

11:06 20   typically the way the statute is used.  But go to the statutory

21   language for me.

22         MR. GERSHENGORN:  Yeah.  So I think, Your Honor, that

23   to me, this is not a proper restriction on entry that governs a

24   class of aliens, that it is not a proper -- it's not a

25   restriction on entry because you can enter.  It's a restriction

 1    on what you do after entry.  And in particular, it's a

 2    restriction on who you associate with.

 3            And what the Supreme Court has said over and over is,

 4    you know, even if the statute could be read that way, the way

 5    the statute has consistently been interpreted for 70 years

 6    across every single presidential administration is strong and

 7    powerful evidence of how the statute has to be interpreted.

 8            That brings me to my fifth point, which I think will

 9    go directly to a set of -- a response to Your Honor's question,

11:07 10    which is, there are a set of constitutional concerns that

 11    powerfully counsel against the government's reading here.  And

 12    those are the sort of related doctrines of major questions and

 13    separation of powers and nondelegation.

 14            Under the major questions doctrine, it is of course

 15    correct that the statute is powerful and within the foreign

 16    affairs' authority.  It is a powerful statute, but it is

 17    powerful within its sphere.  What the government is seeking to

 18    do is to take that statute and allow it not to regulate

 19    foreigners coming into our country but instead domestic

11:08 20    institutions and their domestic obligations on domestic soil.

 21    That is a vast expansion.  That is a major question, right?

 22            So as a matter of both sort of constitutional

 23    interpretation, statutory interpretation and constitutional

 24    avoidance, to find what the Supreme Court has said a newly

 25    discovered power in a long-existing statute that has never been

1    used that way before, is something that as a matter both of

2    statutory construction and constitutional avoidance the court

3    should avoid.

4           And, of course, the court has applied that, as Your

5    Honor is well aware, even to emergency invocations of

6    authority, such as the authority President Biden invoked in the

7    student debt case.  It also implicates separation of powers and

8    nondelegation.  It implicates separation of powers because

9    these are issues that Congress has addressed.  Congress could

11:09 10   has set up a data collection scheme; Congress has decided what

11   the penalties are for that; Congress has passed Title VI;

12   Congress has decided what the penalties for admissions

13   processes that you don't like are.

14          What the President is doing here is legislating.  He

15   is deciding what additional obligations can be -- should be

16   undertaken and what the proper penalties are.  That is a

17   separation of powers violation.  And related, it is a

18   nondelegation violation because the President is seeking

19   unreviewable authority to do that to any domestic institution

11:09 20   for any domestic statute.  Perhaps, although I don't even know

21   that this is part of the limit, there's some arguable nexus to

22   national security.  That's not an intelligible principle as

23   applied to domestic institutions on domestic soil.

24          So I think this constellation of constitutional

25   arguments really reinforces the history and reinforces that, to

1     the extent Your Honor has sort of, you know, in equipoise on

2     the text, although we think the text better favors us, there

3     are extremely strong reasons for the court to reject the

4     government's approach here.

5             THE COURT:  I'm just looking at the statute.

6             MR. GERSHENGORN:  Sure.

7             THE COURT:  "Whenever the President finds," we've

8     satisfied that clause, right?  The President has found.

9             MR. GERSHENGORN:  Yeah.  You and I -- can I put a

11:10  10     footnote there, Your Honor?  I don't want to stop you.  A

11     footnote, we don't think he has found what he needs to find,

12     which is that the entry would be detrimental.  I think what he

13     has found is that Harvard's data processes are detrimental, and

14     entry is a great way to pressure Harvard to do something that

15     the Administration wants.

16             THE COURT:  I understand that's the interpretation

17     that you're arguing.

18             MR. GERSHENGORN:  Okay.

19             THE COURT:  Okay.  But they're arguing something

11:10  20     different, and I want to hear your best argument against what

21     they're posing.  I shouldn't say "them."  I should say poor

22     Mr. Davis who is sitting over there by himself.

23             Whenever the President finds, which, okay, he's found

24     something, "that the entry of any aliens or any class of

25     aliens."  Now, they're saying that the class of aliens is

 1  people coming in to go to Harvard, right?  So is there
 2  something in the statute that precludes them from defining a
 3  class of aliens in that way?
 4      MR. GERSHENGORN:  So, Your Honor, so I guess what I
 5  would say is there is a lot in the toolbox of statutory
 6  construction that counsels, that argues against interpreting
 7  the statute in that way.
 8      So what we would say is, and the Supreme Court has
 9  said this, all of the courts textualists have said this, that
11:11 10 statutory construction is played on a field called context, and
11  Justice Barrett emphasized that as recently in the major
12  questions doctrine case.
13      And we would say both that the President is not
14  restricting entry, because entry is admission into the United
15  States.  What he is -- what he is -- what he is limiting is not
16  admission into the United States but what you do and who you
17  associate with after you get to the United States.
18      Second, we would say, we do say that the class of
19  aliens -- that the permissible way to define a class of aliens
11:12 20 is based on the characteristic of the alien and/or the foreign
21  country that the alien is from.  How do we know that?  We think
22  it is a combination of a natural reading of the text but also
23  the 70-year history, also the fact that the statute is grounded
24  in war powers and foreign affairs, not in commerce clause or
25  any of the other domestic spending clause or any of the

1    domestic congressional powers and in the -- and in the powerful

2    statutory construction idea of major questions and in

3    constitutional avoidance.

4        When Your Honor is construing a statute, no one,

5    certainly nobody on the current court looks solely at the text.

6    They look at the text in that context against the historical

7    understanding, the constitutional implications, et cetera.

8        But I just want to be crystal clear.  We don't think

9    this is regulating entry, and we don't think it's a proper

11:13 10    definition of a class.  So I think those -- in terms of the

11    places we're focusing in the text, it's on those two things.

12        THE COURT:  Okay.  Those two things, let me make sure

13    I have this, class and entry?

14        MR. GERSHENGORN:  Correct, Your Honor.

15        THE COURT:  Okay.

16        MR. GERSHENGORN:  And then I guess, you know, I'm not

17    going to address harm, but I do want to make one more point,

18    kind of the statutory point.  You know, there has been sort of

19    a basic understanding, and this goes a little bit to, you know,

11:13 20    the way this case has unfolded.  You know, there's been a basic

21    assertion that somehow we didn't -- we haven't responded to

22    their data requests and we didn't comply lawfully and properly.

23    I just want to make clear, like, we believe and have documented

24    to the government that we responded, and we responded properly.

25        We confirmed that there are no F-1 students with

1   criminal convictions that we're aware of, and we gave the

2   Administration the students for whom there was particular

3   disciplinary actions taken in response to illegal activity, and

4   we flagged for the government what we did and why we did it.

5          You know, the reason we're doing this, Your Honor, I

6   think is important context.  It is not because, like, we're

7   standing on Ps and Qs and saying tell us your authority to ask

8   for more.  It's because Congress has passed a statute called

9   FERPA, which limits our ability to respond to requests that go

11:14 10   outside government authority.  And the government -- the DHS

11   has regulations that limit the exemptions from FERPA to things

12   that are covered by 214(g).

13          So 214(g) is really important.  I just want to sort of

14   flag for the court the kind of sort of gamesmanship that we are

15   experiencing throughout this process that now Your Honor is

16   experiencing.

17          THE COURT:  Hold on.  I'm happy to hear about the

18   gamesmanship, but before you get there --

19          MR. GERSHENGORN:  Yes.

11:15 20          THE COURT:  Are you thinking that I should or it is

21   appropriate for me to have an evidentiary hearing on what and

22   whether Harvard has complied to resolve this issue?

23          MR. GERSHENGORN:  Absolutely not, Your Honor.

24          THE COURT:  I was thinking no.

25          MR. GERSHENGORN:  Absolutely not, no.  I think this is

just context and rhetoric, but absolutely not.  We don't think
there's any need for that.  In fact, we think it's sort of
largely irrelevant.

THE COURT:  Okay.  Because I can't make a finding
based on the Harvard --

MR. GERSHENGORN:  We're not asking you to, Your Honor.
I just want to sort of illustrate for the court.  This will be
quick, then I'll sort of close.

On page 5 of the brief, Your Honor, the government is
trying to show sort of how broad its data requests are -- how
broad its authority to request data is.  And so in the middle
of the page there, on page 5, it says, "214.3(g) broadly
requires that schools maintain and be able to provide an
academic transcript," then it puts in italics "or other
routinely maintained student records that reflect total
unabridged academic history of the student at the institution,"
which sounds quite broad, but only because the government has
omitted the last eight words of that sentence, which say all of
that, but then says "in accordance with paragraph (g)(1)(iv) of
this section."  That is omitted from the government's
quotation.

THE COURT:  Sorry.  Where is their quotation?

MR. GERSHENGORN:  Their quotation is right in the
middle of the page.

THE COURT:  Page 5 did you say?

```
 1            MR. GERSHENGORN:  Right in the middle.

 2            THE COURT:  Page 5, where the number 5 is at the

 3     bottom or page 5 of 44?

 4

 5            MR. GERSHENGORN:  No.  Page 10 of 44.  Page 5 at the

 6     bottom.

 7            THE COURT:  Okay.  Got it.  Go ahead.

 8            MR. GERSHENGORN:  So you see in the italicized part

 9     where, "other routinely maintained records that reflect total

11:17 10   unabridged academic history of the student," they omitted the

11     last eight words, which say, "in accordance with the paragraph

12     of (g)(1)(iv) of this section."  And (g)(1)(iv) requires the

13     record of coursework.  It requires GPA.  It requires periods of

14     enrollment.  It requires curriculum and things like that.

15            So, again, like, the kinds of requests we're getting

16     from the government are broad assertions of authority that

17     simply don't track the statute.  And to us, I think that shows

18     both sort of on the First Amendment side that this is not being

19     done sort of in the usual course with the usual practice; and,

11:18 20   second, that what the President really is trying to do here is

21     use his statutory authority to broaden what Congress said and

22     to leverage the immigration statute and to leverage our

23     students at Harvard and to use that to expand what they're

24     entitled to in data and to punish us for our First Amendment.

25            Your Honor, you've been very patient.  If Your Honor
```

        1    has no more questions, I'll reserve my remaining time for
        2    rebuttal.
        3            THE COURT:  No one's ever told me I've been patient
        4    before.  I like that.
        5            MR. GERSHENGORN:  Thank you.
        6            MR. DAVIS:  I was told I need to speak up.  Apparently
        7    I'm too meek, which is why I have this case.
        8            THE COURT:  Not only do you have it, but you seem to
        9    have it alone.
11:19  10            MR. DAVIS:  It's lonely up here, yes.
       11            Your Honor, if you're ready.
       12            THE COURT:  All set.  Go ahead, Mr. Davis.
       13            MR. DAVIS:  Your Honor, the ability to come to this
       14    country to attend some of the most prestigious universities in
       15    the world is a privilege.  The ability of Harvard to host
       16    people from around the world is also a privilege.
       17            Harvard seems to think that they have a First
       18    Amendment right to bring in anybody across the world that they
       19    choose.  They've said this in their brief.  That is inaccurate.
11:19  20    That is for the political branches of the government to
       21    determine.
       22            THE COURT:  I don't think they're saying they have a
       23    First Amendment right to bring in whoever they want.  I think
       24    what they're saying is their right to bring in anyone that they
       25    want can't be restricted by their speech.

1          MR. DAVIS:  So, Your Honor, I agree that's one of
2    their arguments, but in response to the facial validity of the
3    proclamation, they say that there's two pieces of evidence in
4    the proclamation itself that shows that it's retaliatory.  They
5    point to the first sentence and say, Look, they're trying to
6    control who Harvard admits and who they bring in to work.  That
7    sentence talks about the privilege of all universities to host
8    people internationally, not just Harvard.  And that's true, it
9    is a privilege to bring people in.  That has nothing to do with
11:20 10   the First Amendment.
11          They also point to another part in the proclamation
12   that says that the government is concerned with an excessive
13   amount of foreign students at Harvard.  Again, that has nothing
14   to do with the First Amendment.  That is a national interest
15   that the President could have that they only accept three
16   percent of people, the taxpayers give billions of dollars to
17   Harvard, and the government wants the people of America to be
18   trained at the best universities rather than people from
19   potentially adversarial countries like China.
11:20 20          For example, states do this all the time.  They give
21   taxpayer money to state institutions, and a lot of them have
22   laws that those state institutions have to have a certain
23   percentage of in-state people because they want to keep them
24   there and they want to respect that the taxpayers are giving
25   money to those states.  I think it's the exact same for the

1    universities of this country and the United States on who they

2    let enter.

3         I think the fundamental point, Your Honor, is that

4    this case comes at the intersection of two areas of executive

5    authority.  That's foreign affairs and immigration.  Not only

6    that, Congress has delegated to the President sweeping powers,

7    according to the Supreme Court in *Trump v. Hawaii,* to, in his

8    determination, suspend entry of a class of aliens that he

9    determines is detrimental to the national interests.

11:21 10    And the Supreme Court in *Trump v. Hawaii* said this

11   exudes deference, it's broad, it focused on the word "he" shall

12   find, and "he" makes the determination.  I think that's what's

13   at issue here, is that Congress and *Youngstown* says this is the

14   apex of the President's power when Congress clearly delegated

15   something, and also we're dealing with national affairs and

16   immigration.

17        Congress gave this sweeping authority to the

18   President, and he has lawfully exercised it here.  I think he

19   has lawfully exercised it based on the face and the validity of

11:21 20   the proclamation, which is all that we really look at.  The

21   class of aliens here are the purpose of entry, which is true of

22   basically every visa is the purpose of entry.  Some people can

23   come in for some reasons and not other reasons all the time,

24   and that's completely normal and consistent with the statute.

25   Harvard is attempting to graft on extra textual requirements

 1    that are nowhere there.  And the Supreme Court cautioned

 2    against this.

 3         THE COURT:  How many schools did they ask to provide

 4    this sort of information about their students?

 5         MR. DAVIS:  I don't know that they have yet asked

 6    other schools.  I do know that there is a task force on

 7    antisemitism, which is where some of the April letters he was

 8    talking about started from, and it's looked at about a dozen

 9    schools.  There are about 70 schools I believe that are getting

11:22 10   civil rights investigations for antisemitism.  And a lot of

11    these schools have lost federal funding as a result of the

12    antisemitic conduct in these investigations.  So in that sense

13    I don't think Harvard is targeted at that level.

14         I think more specifically if you're looking at just

15    the proclamation, there are good reasons the President finds

16    for this proclamation to specifically go for Harvard.  And I

17    think the reasons are we don't trust Harvard to vet, host,

18    monitor or discipline the foreign students that it is bringing

19    into this country, where other universities we don't have as

11:23 20   many concerns yet, but that still could change, and there's

21    sort of still ongoing investigations.

22         The reasons for this are manifold.  They have a lot of

23    unrest on campus.  They have serious antisemitic conduct.

24    Their own report has said this.  They didn't adequately

25    discipline students and even started to roll back some

1    discipline for that.  Their own Harvard Crimson newspaper talks

2    about increased crime rates on campus, mostly hate crimes

3    against Jews and assaults against Jews.  We believe they

4    continue to engage in discriminatory admissions in violation of

5    *Students For Fair Admissions*, a case you are familiar with, and

6    they also have entanglements with the Chinese government.  $150

7    million, a lot of research into paramilitary issues --

8           THE COURT:  Nothing you've described -- I can't

9    imagine anything you described only applies to Harvard.

11:23 10          MR. DAVIS:  I think we know that it's worse there, and

11   I think they have looked at other universities, and other

12   universities have had their funding cut for similar problems.

13   In fact, Columbia was facing a loss of accreditation, which is

14   also a pretty extreme measure, and they've been coming to the

15   table trying to find ways to better address this.  For example,

16   they had a lot of protesters that broke into a library and sort

17   of took over, and they arrested a lot of them.  So they're

18   attempting to make moves that Harvard has yet to do.

19          THE COURT:  If the point is antisemitism, how do we

11:24 20   get to keeping out all aliens?  Why aren't we letting in people

21   from Israel or Italy, right?  If the point is antisemitism, it

22   seems we could -- you would be focusing on a narrower group of

23   aliens; whereas if the point is just retaliating against

24   Harvard, you're attacking the whole universe.

25          MR. DAVIS:  Well, I don't think it's just

1    antisemitism.  I think that's the main point, but I think it's

2    also foreign entanglement, and I think it's also a concern that

3    Harvard is not providing adequate information to know that

4    they're monitoring and disciplining.  For example, in response

5    to the letters seeking information on disciplinary records,

6    which we do believe is within the regulations, and we can talk

7    about that --

8         THE COURT:  I'm not going to have an evidentiary

9    hearing on it.  Just so we're all on the same page, they say

11:25 10    they gave you what FERPA allows, which I think they're saying

11    includes the disciplinary records.  You're saying you think

12    they've only given over disciplinary records of three people

13    and that can't possibly be the universe, right?

14         MR. DAVIS:  Well, I think that, and what they gave us

15    weren't the full records.  It was basically vague references to

16    a couple people had substance abuse issues.  We're taking about

17    three disciplinary records over a series of years during

18    increased crime, increased unrest.  And we know, for example,

19    MIT said that they were pulling back on punishing their

11:25 20    international students because of concerns of immigration

21    consequences.  We're worried that Harvard is doing the same,

22    and they've not been forthcoming on this.

23         And given the fact that they say 25 percent of their

24    student body -- and in STEM, some really sensitive areas of

25    practice like STEM, it's about 50 percent, I think 45 to 50

1    percent of their students are international.  So the idea that

2    there's only three disciplines from that long period of time,

3    we don't frankly credit that.  And Harvard has been resistant,

4    as they are now, to turn this over.

5        So, for example, they pointed to (g)(1), but they

6    ignored (g)(2), which their own letters acknowledged.  And that

7    says, "Following any disciplinary action taken by the school

8    against the student as a result of the student being convicted

9    of a crime and any other notification request not covered by

11:26 10  paragraph (g)(1)," so not covered any (g)(1), "of this section

11    made by DHS with respect to the current status of the student

12    has to be produced."

13        So that's quite a bit of a catch-all and clearly

14    encompasses disciplinary records.  And we believe that Harvard

15    has not done that.  And because they haven't done that and

16    because of the other conduct on campus and their

17    inattentiveness to it, we don't trust them to host foreign

18    students, where we think other universities might be better.

19        Again, the government is free to continue to

11:26 20  investigate other schools and make a contrary determination for

21    those schools too, but as the Supreme Court has said, they

22    don't have to pull over everybody who is speeding.  Frankly, we

23    can't do that.  But Harvard is a very prestigious university.

24    Their response to these concerns has been inadequate.  So the

25    Administration has taken actions in an attempt to ensure that

1    the people who are coming to this country are adequately

2    vetted, adequately monitored and adequately disciplined if they

3    violate the law or any other sort of standards of conduct that

4    the university might have.  So I think that's the point of why

5    it's Harvard here.  And again, there are other universities

6    that have faced similar investigations that have had grants cut

7    as well.  I think that goes to why the proclamation is valid.

8         They were saying that -- Harvard was saying that this

9    isn't a class of aliens and it's not about entry because it's

11:27 10   targeting Harvard.  But again, it's because we don't think that

11    Harvard can monitor the aliens that are coming in, not

12    necessarily just Harvard itself.  We're not excluding Harvard.

13    We're excluding aliens.  It's a class of aliens based on the

14    purpose of entry.  That's endemic to all visas.  So, for

15    example, in *Trump v. Hawaii*, that proclamation covered tourism

16    and business visas, but people could come in for other

17    immigration purposes and for asylum.

18         So the purpose of entry always matters.  Somebody can

19    be here on a work visa for a specific company that validates

11:28 20   them, and if that company no longer employs them, they have to

21    get a new visa, they would have to get to a new company.

22    People can come here for student visas.  They can come here for

23    work visas.  They can come here for different types of work

24    visas, like agriculture.  So those visas are built in the

25    purpose of entry.

1          And people can have multiple visas.  I believe there

2     was somebody from Harvard who would have been revoked under the

3     J visa, but he had a different visa, and so he got to stay

4     because that visa was valid for a different purpose.  That's

5     completely normal in immigration.

6          That's especially true of the F visas, which built

7     into it, you have to specify the institution that you're going

8     to.  And if you try to transfer when you're in America, you can

9     lose that visa.  And there are quite a few loopholes you have

11:28 10   to jump through to try to get a transfer visa, or you have to

11    leave and get a new visa.  So the institution and the purpose

12    of entry is built into visas, and that's reflected in the INA,

13    which covers visas.  So this atextual sort of graph they're

14    trying to put on is just not there.

15         In *Trump v. Hawaii*, the court had a very similar

16    argument they dealt with and handled swiftly, which was that

17    the plaintiff said that the characterization of aliens had to

18    be similar and it couldn't be about nationality.  And the court

19    said that's nowhere in the statute.  It just says class of

11:29 20   aliens.  There's a lot of discretion and that's that.  So I

21    think the same thing is true here.

22         On to the First Amendment point, we obviously disagree

23    that *Mandel* and *Trump v. Hawaii* doesn't apply.  We think they

24    are frankly on all fours.  So starting with *Mandel*, in consular

25    non-reviewability cases where we're talking about the entry of

1    an alien, which I believe that is what we're talking about,

2    despite what Harvard says, these are aliens being suspended

3    from entry, not Harvard, that you only look at the facial

4    validity of the proclamation.  Nothing in the proclamation here

5    says anything about speech, anything about these April letters,

6    anything about Harvard, other than the conduct on its campus

7    and its unwillingness to act and the concern that that leaves

8    about them hosting foreign students.  That is facially valid.

9         In *Mandel*, for example, you know, he talked about

11:30 10   *McGrath* being a McCarthy era case.  I'll throw in another one,

11   which is *Mandel.*  In that case, the professors wanted to have

12   over a communist journalist.  The law that forbid that said

13   that there was no entrance for people who advocated communism,

14   which was clear viewpoint discrimination.  American citizens

15   brought a suit saying that violated their rights.  The court

16   acknowledged that they had First Amendment rights that were

17   being burdened and said, But this is about entrance of an

18   alien, and we're not going to look beyond that in balance of

19   the First Amendment.  It's facially valid.  That's the end of

11:30 20   the case.

21        In fact, they cited to a letter from the Attorney

22   General saying that *Mandel* had abused visas, and they were

23   like, that's enough.  Even though the government didn't even

24   rely on it, that's enough.  Here we have pages and pages of a

25   proclamation.

1          And pointing to some of the previous proclamations

2    that my opposing counsel talked about, one of them by Carter,

3    had no explanation, no justification.  One by Clinton only had

4    a single sentence, and the Supreme upheld that in *Sale* as being

5    sufficient.

6          There is more than enough in this proclamation that is

7    facially valid about the national security and national

8    interest concerns that the President has with aliens entering

9    for the purpose of attending Harvard, given how Harvard has

11:31 10   handled those students and the conduct on its campus.

11          And then if we get to *Trump v. Hawaii*, that case used

12    rational basis review, but it said assuming that there could

13    even be review, it would use rational basis review, and it

14    upheld the proclamation there.  And those challenges there were

15    from U.S. citizens saying that they couldn't have people come

16    over, but also there are people in America who have first

17    Amendment rights because they're immigrants or they're living

18    and residing in the United States, they were also directly

19    impacted by that proclamation because if they left the country,

11:32 20   they could not re-enter.  So their rights were also burdened.

21          The Supreme Court still applied rational basis review

22    and said it passed, and it passed for many of the same reasons

23    here.  It was facially valid.  It had a time limit on it.  It

24    had exceptions, as this one has exceptions.  And I think this

25    one is even more narrowly tailored because it doesn't apply to

1    current existing students because that would be more disruptive

2    and it just applies to future students coming in and, again, is

3    time limited and there can be exceptions for individual

4    students.

5            Again, in *Trump v. Hawaii*, the plaintiffs there had

6    evidence of statements from the President and others directly

7    about that policy, about that proclamation that they said

8    proved their case.  There are no direct statements from the

9    President or anything here about this policy.  There are some

11:32 10   about potential tax exemption, which hasn't even happened, and

11   a lot of other sort of noise out there but nothing about this

12   proclamation.  And the Supreme Court has made clear you look at

13   this proclamation, and that's sort of the mode of analysis.

14           Even focusing on the retaliation piece on its own,

15   even assuming, which I don't believe it would, it gets analyzed

16   in a sort of typical way, I don't think Harvard has met its

17   burden to show retaliation.

18           Start with sort of the grant situation.  The reason

19   that that started was the President had an executive order to

11:33 20   combat antisemitism.  That executive order was focused on

21   conduct.  It was focused on all universities.  A task force was

22   then assembled with a number of agencies that looked into

23   several universities, I believe about a dozen, and the first

24   letter I believe March 31 that went to Harvard was from GSA

25   about that issue, and it was general and said it was looking

1    into antisemitic conduct and wanted to know more about the

2    contracts Harvard had with the federal government.

3         The last letter that they complain about on April 11

4    was from Health and Human Services, GSA, and the Department of

5    Education.  It listed a whole lot of negotiations and demands.

6    In parts of it, it said we're doing this consistent with the

7    First Amendment, with academic freedom, this is an opening

8    offer, a negotiation.  So Harvard could return and say, look,

9    we think this pushes too much on things we're concerned about

11:34 10    in the First Amendment, we're not going to do that.

11         Instead, they went on a public campaign against the

12    Administration and rejected that offer.  A rejection of an

13    offer is not protected speech.  Then over the course of weeks,

14    different agencies, individual agencies chose to terminate

15    grants with Harvard because they believed that they were not

16    following the law.

17         And now we get to the SEVP revocations and that whole

18    situation.  Again, the letters were focused on under the

19    regulations that Harvard has to maintain and produce these

11:34 20    records and was asking for records about conduct and Harvard's

21    response to that conduct.  All the requirements were about

22    convictions, disciplinary records, how Harvard handled them.

23    And they went in a back and forth, and what Harvard produced

24    was, in the government's view, insufficient.

25         And then they sued, and we came and we said, okay,

1    we'll go through the procedures.  And now they say, before

2    those procedures have even really gotten that far along, it is

3    a sham without any basis for saying those are going to be a

4    sham, that's going to be a couple months in the future most

5    likely with an independent determination and reasoning.

6         So I think there's a disconnect.  I don't think that

7    the grant terminations and the April letters were retaliatory.

8    There is a disconnect between those and SEVP, which was a

9    different defendant with different legal basis with different

11:35 10   reasoning.  And then you get to the proclamation, which does

11   talk about SEVP, but as Your Honor noted, has a lot of other

12   potential points in there and is again not the defendants from

13   the April letters.  We have DHS.  We have state here.  They

14   were not on the April letters.  They were not involved in

15   those.

16        And the proclamation is based on different reasoning

17   and a different legal basis.  This is 1182(f).  It's very broad

18   power that Congress delegated to the President in an area where

19   he otherwise has, as opposing counsel has acknowledged, very,

11:35 20  very broad powers.

21        So I think there's a lack of evidence of retaliation

22   here.  I think based on the very deferential standards of

23   reviews that the Supreme Court has mandated that this would

24   clearly stand up, and I think that the statute on its face

25   provides for this sort of authority, and the President has more

1    than met that.

2         I think for a lot of the same reasons, as Harvard's

3    counsel pointed out, the viewpoint discrimination and the equal

4    protection sort of fall in the same buckets with the same sort

5    of reasoning in them.

6         Just briefly on the sort of singling Harvard out, I

7    know we talked about this a little bit.  I think the level of

8    generality is are they being investigated for antisemitic

9    conduct, and what are the consequences.  They are not being

11:36 10    singled out.

11         As I noted in their own exhibit, which is Exhibit 32,

12    it's a Politico article, talks about the fact that a ton of

13    universities have been investigated.  A ton of them have gotten

14    these letters.  A lot of them have lost grants.  So in that way

15    they are not being singled out at all.

16         If you take the mode of analysis and try to tailor it

17    and fix it and modify it to be just about the proclamation,

18    just about certain course of action over the last couple of

19    weeks, the reason that Harvard is being singled out and

11:37 20    tailored is because Harvard's specific actions here are ones

21    that the government has found and that the proclamation has

22    laid out that we haven't found with other universities, and as

23    their own Exhibit 32 points out, a lot of these other

24    universities have been more willing to address these concerns.

25         Harvard's own report talks about the fact that it had

1    widespread antisemitism and it was withholding degrees from 13

2    people and chose to then give 11 back.  There were assaults on

3    a Jewish student.  Those people then got to give commencement

4    speeches for the Divinity School and got fellowships.  We don't

5    think based on the evidence that Harvard is following through

6    on its commitments.

7         THE COURT:  When you say "The President finds," the

8    statute says, "When the President finds," and you're saying,

9    "He's found," what's the standard for that?  Can he just say,

11:37 10  "I have found," and that's sufficient, or does there have to be

11    some level of proof?

12         MR. DAVIS:  I mean, I don't think that's reviewable,

13    Your Honor, but if it was, it would probably be something like

14    substantial evidence.  And I think based on things from Harvard

15    itself, based on the increased crime rates, based on their

16    unwillingness to provide certain data, based on the history

17    with their entanglement with China, including the fact that the

18    chair of the chemistry department was sentenced for lying about

19    his ties to China and the research he has done there, I think

11:38 20  the President has more than sufficient evidence to reach this

21    proclamation.  But again, I don't think, given the wide

22    deference in that statute that that's reviewable.

23         So, Your Honor, I just want to briefly talk about the

24    TRO point.  They bring this up also with trying to get their

25    proposed PI entered.  The original case, the original complaint

1    was focused on the SEVP revocation.  It was also focused on the

2    May letter revoking it.  That's what the TRO said.  That's what

3    the PI was about.  They themselves acknowledge that they had to

4    amendment their complaint and move for a TRO because this is a

5    different action with different legal authority.  They have to

6    meet their burdens under the PI, so that doesn't really add

7    anything to the analysis and I think is also why it shouldn't

8    sweep any broader, where it just focused on the proclamation

9    here and that was focused on a different aspect.

11:39 10        I also think -- and this I think is important also for

11   some of the other analyses.  A proclamation is narrower than an

12   SEVP revocation.  It's more nuanced.  It's more thought-through

13   in that sense because the SEVP revocation would take away the J

14   visas for all future and existing students, and there's not

15   really a time limit to that.  So they can just completely deny

16   it, which also, again, proves that Harvard doesn't have a right

17   to host these students, but the SEVP revocation is complete.

18        The proclamation, on the other hand, because it didn't

19   want to disrupt existing students who might be here for three

11:39 20   years and who hopefully we have more ways of monitoring, does

21   not cover existing students.  It covers future students.  And

22   there are exceptions on the front end and the back end if the

23   Secretary of State finds that it's in the national interests to

24   do so.  And it's time limited to I think about 90 days.

25        So this is tailored to the issues at Harvard that the

1    President has found, that is a highly deferential standard of

2    review, and even if it wasn't, we believe that Harvard has not

3    shown enough evidence to connect its allegedly protected

4    conduct to what the United States and the government has done

5    and to show that there is retaliatory motive behind it.

6         I think the two-month gap, for example, between the

7    proclamation and the April letter that they say is the start of

8    this is more proof of that.  I think the difference of the

9    defendants is proof of that.  Again, those letters were HSS,

11:40 10   ED, GSA.  Here we have a state DHS and State Department who are

11   the real actors at interest.

12        There's different reasoning, different legal

13   justifications.  If we're talking about the April letters,

14   those are about grant terminations.  If we're talking about

15   this, this is about visa entry under the SEVP, and now the

16   proclamation, which, again, the proclamation is more than just

17   SEVP, but the proclamation, if we get assurances from Harvard

18   that they're going to provide the requisite information to know

19   that they're monitoring and disciplining the students and that

11:41 20   there will be safety in those students coming to this country

21   and attending Harvard, is willing to go away.  So the power is

22   within Harvard to fix this and to make it go away.

23        There are other issues there that the President is

24   concerned about besides just the antisemitism, besides just the

25   higher crimes.  It's also sort of the entanglement with China

1    and with other foreign adversaries.  Again, I think if they

2    provided all the correct documentation, we would have less of a

3    concern, but those concerns are not completely tied to a

4    enforcement of separate law.

5           So with that, Your Honor, if you have any questions,

6    I'm happy to answer them.  Thank you.

7           MR. GERSHENGORN:  Thank you, Your Honor.  I'll be

8    somewhat brief.  So first, on the First Amendment, a couple of

9    quick points.

11:41 10         First, you did not hear Mr. Davis dispute what I said

11   in response to Your Honor's question that no one disputes that

12   even lawful acts can constitute impermissible acts of

13   retaliation and retribution under the First Amendment.  I think

14   that's quite settled law.

15          Second, I don't think you heard Mr. Davis dispute, and

16   he couldn't because it's in his brief, that the test on the

17   First Amendment is substantial and -- whether the protected

18   activity is substantial and motivating factors.  And so the

19   question before the court is, is Harvard's First Amendment

11:42 20   protected activity, the rejection of the viewpoint-based

21   demands and the perceived wokeness, radical left, et cetera,

22   that consistently invoked by the President himself and by

23   several of the cabinet secretaries, was a substantial and

24   motivating factor.

25          We think that's open and shut.  I think Mr. Davis sort

1    of dismissed that as a lot of noise.  I'm not going to rehearse

2    it, but it basically was a nonstop virtual daily barrage of

3    basically every agency in the federal government that had any

4    dealings with Harvard.

5         With respect to, you know, the timing and some

6    suggestion that this was part of a negotiation, of course

7    Harvard's April 14 letter said we're happy to continue to talk

8    to the government.  It was hours after that arrived that the

9    first barrage hit, the 2.2 billion in funding.  It was the next

11:43 10   day that the tax exempt status was done.  And it was the next

11   day that the records request came.

12        So, like, I think the record on the First Amendment is

13   really overwhelming.  And certainly the question about whether

14   it was a substantial and motivating factor is beyond serious

15   dispute.

16        So then the question comes back down to on the First

17   Amendment of like one way -- one part of it is who is right on

18   what *Mandel* and *Trump v. Hawaii* say.  And I'm quite comfortable

19   relying on what I said earlier, and Your Honor will read the

11:43 20   cases and make the decision.  But neither of those cases

21   involves situations in which -- neither of those involved

22   situations in which the target of the proclamation or the visa

23   denial was the American citizen on U.S. soil.  And certainly

24   neither of them had anything to do with an effort to enforce

25   domestic obligations.

1          Those cases are different and limited in important

2     ways, and it would be a vast expansion under the First

3     Amendment to apply to situations in which restrictions are

4     targeted at aliens and have indirect effect on Americans to say

5     that those allow, in an attack, a concerted retaliatory attack

6     on American citizens, it allows the President to weaponize the

7     immigration laws against that individual.  So, like, Your Honor

8     will read the cases, but I don't think that either *Trump v.*

9     *Hawaii* or *Mandel* have anything to do with this case on the

11:44 10    First Amendment.

11          On the statutory construction, again, I think what was

12    notable was what you didn't hear.  What Mr. Davis said was lots

13    of times the purpose is to sort of protect individuals here,

14    but what he did not say was that there was ever a single

15    example of a situation over nearly 100 proclamations in 70

16    years across every President since 1952 where a proclamation

17    has identified a U.S. citizen, has made conduct by the U.S.

18    citizen the trigger for lifting the sanctions, as this does,

19    and that one of the critical purposes of it was to force

11:45 20    compliance with domestic statutes.

21          Now, Mr. Davis seems to approach this with the idea

22    that it's perfectly permissible for the President to make the

23    kind of judgments where he singles out a particular U.S.

24    citizen or institution and says we are allowed under the

25    statute to deprive you of the right to interact with or host

1   citizens, not only has that ever been done -- never been done

2   before, but the constitutional concerns with that, which again

3   Mr. Davis didn't address, the major questions issues, the

4   separation of powers issues, and candidly the bill of attainder

5   issues from having the President make a judgment like that

6   about domestic citizen compliance on domestic statutes is

7   really extraordinary.

8          And that then brings me to the last sort of -- yeah,

9   that brings me to sort of the last set of issues, which is like

11:46 10  the authority here.  Like, it is clear from the text of the

11  proclamation that the President said if you comply with your

12  federal data obligations, then we will lift these -- we will

13  lift these restrictions.  So, like, on the face, the purpose is

14  compliance with the domestic statute.

15         There's a lot of other stuff that Mr. Davis kind of is

16  throwing at the wall, like you're not doing vetting.  It is not

17  the job of Harvard or Yale or Princeton or University of Miami

18  or University of Texas to do the vetting.  The vetting is done

19  by the State Department in the visa process.  And they have

11:47 20  that information.  So the idea that we're supposed to be

21  vetting foreign students, we admit them, qualified for Harvard

22  that they'll be spectacular scholars and students.  The vetting

23  is done by the State Department, and indeed the State

24  Department is using enhanced vetting in a pilot program against

25  Harvard.  So the idea we're not vetting our students is just,

1    like, not serious, right?

2         The violent crime statistics, this is the federal

3    government, right?  The federal government has access to law

4    enforcement databases.  The violent crime statistics are taken

5    from the Harvard Crimson.  And the idea that there's this

6    rampant sort of violent attacks based on religion, the Crimson

7    article, which is attached to the government's brief, says that

8    hate crimes reported in 2023 involving religion included one

9    case of larceny motivated by religion and one case of simple

11:48 10   assault motivated by religion.  That's the sort of scourge of

11   violence.  Two is too many, to be sure.  But the idea that

12   there's, like, widespread violent crime at Harvard is not --

13   it's just not borne out by the record.

14        So like, you know, I think when you look at what the

15   government is saying, it's like throwing a bunch of things on

16   the wall to see what sticks, and it just is not persuasive.

17        I'll just close with two thoughts, Your Honor.  One,

18   Mr. Davis said, you know, the power to fix this is with

19   Harvard.  And we think that's the problem, not the solution.

11:48 20   In other words, like, the fact that what this is is an effort

21   to collect data that the government doesn't have a right to

22   under the law and that we are statutorily prohibited from

23   giving to them is the problem, not the solution.  The fact that

24   the government is relying on this to, you know, basically

25   enforce domestic obligations is the flaw, not the sort of easy

     1    way out.

     2          And then, you know, I just can't help but, like,

     3    stepping back and closing with sort of a combination of the

     4    First Amendment and the harms here.  You know, Mr. Davis has

     5    sort of tried to pick apart that this one came from Secretary,

     6    this -- this is a unified scheme.  And Your Honor just does not

     7    have to close her eyes to, like, what everybody can see and

     8    what the Administration has made crystal clear from the start,

     9    that it is trying to bring Harvard to heel because Harvard

11:49 10   wouldn't give over the viewpoint control of its faculty and its

    11    students and the students it admits from international places

    12    to the government.

    13          And second, I don't want to lose sight of the harms

    14    here, and Your Honor said you're well aware of them, but I

    15    think it's important to close.  The harms here are not

    16    incidental byproducts of the government's activity.  It is a

    17    concerted effort to leverage the international students, to use

    18    them as pawns and a weaponize the immigration laws to bring

    19    Harvard to heel both in its data obligations and more

11:50 20   importantly and fundamentally in response to its assertion of

    21    academic freedom.  We think that's unconstitutional, and the

    22    court should so hold.  Thank you, Your Honor.

    23          THE COURT:  Mr. Davis, do you want the final word?

    24          MR. DAVIS:  Briefly, Your Honor.  The sort of limits

    25    that Harvard is talking about to *Mandel* and *Hawaii v. Trump* you

will find nowhere in those cases, they are applying to the
admittance of aliens into this country because of both the
statutory and constitutional breadth of the President's power
there.  I do think that some of the examples he gave of
targeting a corporation, I mean, imagine if a company was
bringing in a bunch of people on visas fraudulently or doing so
to traffic them or doing so to have them do illegal jobs or pay
them under minimum wage.  The government does have other tools
to address that, criminal, regulatory law.  Those can take a
lot of time.  I think it's weird to say that in the meantime
the statute just prohibits the President from saying, look,
that is a purpose of entry.  We're going to restrict entry to
that company while it does illegal things.

         And I think if the proclamation says, for example,
Governor Newsom has insulted me, so I'm not allowing anybody to
come into California, yeah, on the face of the proclamation,
that would have a constitutional problem.  We are far from that
situation.  We are in a situation where the President has a lot
of legitimate bases for restricting entrance for the purpose of
attending Harvard because Harvard is not adequately monitoring
and disciplining its foreign students, given the concerns on
campus.

         I just want to point to the crime rates that he
selectively quoted here.  You can see the graph from their own
newspaper says that the total crime rates rose by 55 percent,

1    from 208 incidents to 323.  This is an elite university in a

2    very safe part of the country.  One of the reports said that

3    Jews are the targets of more hate crimes than any other

4    identity, and they talk about at least three instances of

5    assaults and larceny against Jewish populations and that that's

6    the biggest increase, the biggest increase is in hate crimes

7    and the biggest increase against Jews on campus.

8          So that's what the President is concerned with.  He

9    thinks that giving over the data will help and is a way to

11:52 10   ameliorate this so they can go back to negotiating.  Until

11   then, the President does not trust that Harvard can safely

12   monitor these students, and that's the core issue here and one

13   that is well within the discretion of the President and one

14   that cannot be second-guessed.  Just because Harvard would

15   prefer it to be otherwise, would have preferred Congress not to

16   pass this broad law, that does not make this a major questions

17   doctrine issue or a nondelegation issue.

18         The statute says what it says.  There's not any limits

19   to it.  This is well within sort of the control of allowing

11:53 20   people into the country, which the executive has long had wide

21   discretion in.  With that, Your Honor, I have no further

22   comments.

23         THE COURT:  Okay.  We'll take this under advisement.

24   We'll kick out an opinion as quickly as we can.  I have a

25   little bit of time off coming up next week.  I'll try and kick

1    out an opinion before I leave.  I'm just not sure I can.

2         Are there any objections to leaving the TRO in effect

3    until we can get an opinion out?  I assume not from you.

4    Mr. Davis, what's your view?

5         MR. DAVIS:  Again, Your Honor, we think this is a

6    lawful action and should not be enjoined, so we would object to

7    that.

8         THE COURT:  You would object to what?

9         MR. DAVIS:  You extending the TRO beyond the already I

11:53 10   believe 15 days that it would last.

11        THE COURT:  When is the 15th day?

12        MR. DAVIS:  I don't know off the top of my head.

13   Sorry, Your Honor.

14        THE COURT:  Who knows when the -- Mr. Gershengorn?

15        MR. GERSHENGORN:  You're asking about the original

16   TRO, Your Honor, or the second TRO?

17        THE COURT:  The first TRO I have draft orders in front

18   of me.  We'll resolve that.  I'm talking about the second TRO.

19   I can go back and look myself.

11:54 20        MR. DAVIS:  I think you entered it on the 5th.

21        MR. GERSHENGORN:  Two weeks will end this Thursday,

22   Your Honor, I believe the 19th.

23        THE COURT:  Okay.  That's a federal holiday,

24   Juneteenth, right?  So even under Mr. Davis's objection, that

25   gives me until the 20th, right?

1

                    MR. DAVIS:  Sure.  Understood, Your Honor.

1                    THE COURT:  Does it give me until Monday?

2                    MR. DAVIS:  We can do that.

3                    THE COURT:  Okay.

4                    MR. GERSHENGORN:  Your Honor, can I ask one thing on

5       that?  We would like to file a reply brief, if we could, and we

6       would propose, if it works with Your Honor's schedule, like,

7       6:00 on Wednesday to file --

8                    THE COURT:  Well, he's objecting to extending the TRO

11:55 10 beyond what the statute allows.

11                   MR. GERSHENGORN:  Right, which is, we just agreed

12      until Monday.

13                   THE COURT:  He has, I guess, conceded between

14      Juneteenth and the weekend that I can have until Monday.

15                   MR. GERSHENGORN:  We'd like to get a reply in by

16      Wednesday.

17                   THE COURT:  Yes, you can get a reply in, but

18      understand I can't sit on it until Thursday morning, right?

19                   MR. GERSHENGORN:  Yes, we'll get it in as soon as we

11:55 20 can.  No later than Wednesday and sooner if possible.

21                   THE COURT:  We'll read it whenever it comes in.  So

22      think about brevity being the soul of wit, okay?

23                   MR. GERSHENGORN:  Yes, Your Honor.  Thank you.

24                   THE COURT:  I'm not going to have time for a lot of

25      paper.  Anything else?

1

1              MR. GERSHENGORN:  I don't know if you want to put a

2      page limit or trust us to use brevity.  A 20-page limit is

3      fine --

4              THE COURT:  Well, 20 pages would be a lot under these

5      circumstances.  But I understand the arguments.  I've read

6      them.  I'm going to go back to the cases which I have read but

7      not in the last few days.  And so think about pure response to

8      his brief.  I think we've aired a lot of those issues today.

9              MR. GERSHENGORN:  Understood.  Thank you, Your Honor.

11:56 10              THE COURT:  Okay.  I'm going to be able to give more

11      in-depth consideration to fewer pages than I am to many pages,

12      which will get a review, but I only have the time that I have.

13      All right.  Anything else from you, Mr. Gershengorn?

14              MR. GERSHENGORN:  No, Your Honor.

15              THE COURT:  Government?

16              MR. DAVIS:  Nothing further, Your Honor.

17              THE COURT:  All right.  Thanks, everyone.  We're in

18      recess for today.

19                   (Adjourned, 11:56 a.m.)

20

21

22

23

24

25

1

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kelly Mortellite, Registered Professional

4  Reporter, Registered Merit Reporter and Certified Realtime

5  Reporter, in and for the United States District Court for the

6  District of Massachusetts, do hereby certify that the foregoing

7  transcript is a true and correct transcript of the

8  stenographically reported proceedings held in the

9  above-entitled matter to the best of my skill and ability.

10              Dated this 16th day of June, 2025.

11

12          /s/ Kelly Mortellite

13          _____

14          Kelly Mortellite, RPR, RMR, CRR

15          Official Court Reporter

16

17

18

19

20

21

22

23

24

25