**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>    Plaintiff,<br><br>    v.<br><br>DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>    Defendants. | Case No. 1:25-cv-11472-ADB |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR A**
**TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

I.    HARVARD IS LIKELY TO PREVAIL ON ITS FIRST AMENDMENT
      CLAIMS. ........................................................................................................... 1

      A.    The Proclamation Violates Harvard's Rights Under the First
            Amendment.............................................................................................. 1

      B.    The Deferential Standards of Review in *Hawaii* and *Mandel* Do Not
            Govern...................................................................................................... 3

      C.    Even With Deferential Review, Harvard Is Likely to Succeed on Its
            Claims. ..................................................................................................... 5

II.   HARVARD IS LIKELY TO PREVAIL ON ITS STATUTORY
      CHALLENGE...................................................................................................... 7

      A.    Harvard's Statutory Challenge Is Justiciable. ....................................... 8

      B.    Section 1182(f) Does Not Authorize the President to Regulate the
            Domestic Conduct of Domestic Institutions. ......................................... 8

      C.    The Proclamation Impermissibly Overrides Section 1372. ............................. 13

III.  THE REMAINING FACTORS FAVOR HARVARD.................................................. 14

CONCLUSION.................................................................................................................. 14

# TABLE OF AUTHORITIES

CASES

*Biden v. Nebraska*, 600 U.S. 477 (2023) ........................................................................11

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26 (1st Cir. 2012) .................................1

*Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020) ..........................................................11

*Elfbrandt v. Russell*, 384 U.S. 11 (1966) ........................................................................4

*Hartman v. Moore*, 547 U.S. 250 (2006) .........................................................................5

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ...........................................3, 5

*International Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798
   (D.C. Cir. 1985) ...........................................................................................................8

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951)......................2

*Kleindienst v. Mandel*, 408 U.S. 753 (1972).......................................................3, 4, 5, 6, 7

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ........................................8

*National Rifle Ass'n of America v. Vullo*, 602 U.S. 175 (2024) ..................................1, 5

*Perkins Coie LLP v. United States Department of Justice*, No. 25-cv-716, __ F.
   Supp. 3d __, 2025 WL 1276857 (D.D.C. May 2, 2025).............................................2

*Pietersen v. United States Department of State*, No. 24-5092, __ F.4th __, 2025 WL
   1536434 (D.C. Cir. May 30, 2025)..............................................................................8

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)................13

*Ralls Corp. v. Committee on Foreign Investment in United States*, 758 F.3d 296
   (D.C. Cir. 2014) ...........................................................................................................5

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)...............................14

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993)......................................8, 10

*Trump v. Hawaii*, 585 U.S. 667 (2018) ...........................3, 4, 5, 6, 8, 10, 11, 12, 13

*Trump v. United States*, 603 U.S. 593 (2024)...................................................................2

*United States v. Robel*, 389 U.S. 258 (1967) ...............................................................4, 5

*United States v. Yong Jun Li*, 643 F.3d 1183 (9th Cir. 2011)........................................10

*West Virginia v. EPA*, 597 U.S. 697 (2022)........................................................................11

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) .........................................8

STATUTES

8 U.S.C. § 1101(a)(13) (West 1996) (repealed)..............................................................10

8 U.S.C. § 1101(a)(13)........................................................................................................10

8 U.S.C. § 1101(a)(15)........................................................................................................14

8 U.S.C. § 1101(a)(15)(F)(i)...............................................................................................14

8 U.S.C. § 1182(f)...........................................................1, 5, 7, 8, 9, 10, 11, 12, 13, 14

8 U.S.C. § 1185(a)(1)..........................................................................................................10

8 U.S.C. § 1372(c) .............................................................................................................13

8 U.S.C. § 1372(c)(5).........................................................................................................13

20 U.S.C. § 1232g...............................................................................................................7

OTHER AUTHORITIES

8 C.F.R. § 214.2(f)..............................................................................................................14

8 C.F.R.§ 214.3(g) .......................................................................................................12, 13

Bloomberg, *McMahon Says Top Universities Could See Grants Restored* (June 10, 2025), https://www.bloomberg.com/news/videos/2025-06-10/mcmahon-says-top-universities-could-see-grants-restored-video ......................................................3

Proclamation No. 9645, *Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats*, 82 Fed. Reg. 45,161 (Sept. 24, 2017) ............................................6

Proclamation No. 9932, *Suspension of Entry as Immigrants and Nonimmigrants of Senior Officials of the Government of Iran*, 84 Fed. Reg. 51,935 (Sept. 25, 2019) ..............................................................................................................................9

Proclamation No. 10,309, *Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Policies or Actions That Threaten Democracy in Nicaragua*, 86 Fed. Reg. 64,797 (Nov. 16, 2021) .....................................................9

Kelsey Y. Santamaria et al., Cong. Rsch. Serv., LSB10458, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (updated Feb. 21, 2024), https://www.congress.gov/crs_external_products/LSB/PDF/LSB10458/ LSB10458.3.pdf...........................................................................................................8, 10, 11

The White House, *President Trump Participates in a Cabinet Meeting, Apr. 30, 2025*, YouTube (Apr. 30, 2025), https://www.youtube.com/watch?v=wn 2XtufOAHc.................................................................................................................................3

The Executive has issued an unconstitutional and retaliatory proclamation that asserts unprecedented authority to coerce and punish the domestic conduct of a domestic entity, without process or judicial oversight. *See* Am. Compl., Ex. 35 ("Proclamation"). The government claims authority to do so by ignoring retaliatory conduct against Harvard, disregarding the statute's text and history, and positing a limitless conception of Executive power under 8 U.S.C. § 1182(f). The government's arguments do not diminish Harvard's likelihood of success, and the Court should preliminarily enjoin the Proclamation.

## I.    HARVARD IS LIKELY TO PREVAIL ON ITS FIRST AMENDMENT CLAIMS.

The Proclamation violates Harvard's First Amendment rights. *See* Mot. at 12-21. It is but the most recent chapter in a coordinated effort to punish Harvard for its exercise of its First Amendment rights and discriminate against Harvard for its perceived viewpoint. The government's attempt to characterize the Proclamation as independent of this coordinated campaign cannot be taken seriously, nor is the government entitled to any presumption of regularity here. Thus, even regardless of the Proclamation's legality under § 1182(f), it must be enjoined on First Amendment grounds. *See generally Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187-88 (2024) (a lawful exercise of statutory authority is unlawful if done in retaliation for protected speech).

### A.    The Proclamation Violates Harvard's Rights Under the First Amendment.

Harvard has "engaged in constitutionally protected conduct"; it was subjected to a "series of adverse action[s]"; and its protected conduct was a substantial or motivating factor in that adverse action. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012).

The government disputes causation, suggesting an alternate reality in which the only two facts in the record are: (i) Harvard's April 14 rejection of the government's April 11 Demand Letter, and (ii) the President's Proclamation. Not so. The Proclamation is the latest in a series of

openly retaliatory actions spanning more than two months. *See* Mot. at 4-10, 13-17. It began with the Demand Letter, which—far from a "negotiation" (Opp'n 21-22)—told Harvard what it "must" or "shall" do a combined 52 times and commanded "[Harvard's] immediate cooperation" with each condition. Compl., Ex. 9. That Letter targeted Harvard's speech, for example asserting that Harvard has fallen prey to "ideological capture." *Id*. at 1.[1] Along the way, the Administration has made clear that it took the actions it did—including those targeting Harvard's ability to host international students—in retaliation for Harvard's refusal to yield, its perceived viewpoint, and its litigation against the Administration. *See* Mot. at 4-7. And yesterday, the government confirmed that Harvard's purported "public campaign" to assert its academic freedom (further First Amendment activity) was a motivating factor too. June 16, 2025 Hr'g Tr. ("Tr.") at 48:11.

The Administration's punitive intent is underscored by its singling out of Harvard. Many universities have been investigated for similar alleged conduct, but none to the degree that Harvard has; and none has been subjected to a Proclamation targeting it.[2]

The government next says that the Proclamation cannot be retaliatory because it was issued by the President, whereas the Demand Letter "[i]nvolved other [government] actors." Opp'n 23 & n.7. The Constitution "vest[s] the Executive power solely in the President," *Trump v. United States*, 603 U.S. 593, 638 (2024), making him responsible for adverse actions directed at Harvard by those

---

[1] That the Demand Letter was "focused on grants" (Opp'n 24) is irrelevant. The termination of Harvard's grants is *one* weapon in the government's arsenal to achieve the same retaliatory end.

[2] This also demonstrates that the Administration violated the equal-protection principles embedded in the Fifth Amendment, and that the President violated the separation of powers when he sought to unilaterally impose sanctions on Harvard akin to a bill of attainder. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 144 (1951) (Black, J., concurring). The Executive has "target[ed] plaintiff specifically, f[ound] facts and declare[d] plaintiff guilty[,] … and impose[d] multiple forms of punitive adverse actions, without notice or other judicial process protections," all features that are "[i]n many ways … indistinguishable from a bill of attainder." *Perkins Coie, LLP v. U.S. Dep't of Just.*, No. 25-cv-716, __ F. Supp. 3d __, 2025 WL 1276857, at *44 n.36 (D.D.C. May 2, 2025).

in the Executive Branch. Moreover, the Administration's assault on Harvard has been at the President's urging. *See, e.g.*, Compl., Exs. 13, 15, 18, 20.[3] As one example, the President stated at an April cabinet meeting that he believes Harvard's "students," "professors," and "attitude … [are] not American."[4] Secretary of Education Linda McMahon has explained that "[t]he President clearly has a stated goal and gives direction, and we take that direction," and that the federal agencies "have coordinated" their actions.[5] That "coordinated" action included a mid-May 2025 "brainstorm[ing]" session to generate new ideas for targeting Harvard, *see* Am. Compl., Ex. 31, at 1, and has culminated (for now) in the Proclamation.

> **B.** **The Deferential Standards of Review in *Hawaii* and *Mandel* Do Not Govern.**

Faced with overwhelming evidence of retaliation, the government resorts to a plea for deferential review under *Trump v. Hawaii*, 585 U.S. 667 (2018), and *Kleindienst v. Mandel*, 408 U.S. 753 (1972). To start, this argument assumes that the President has validly invoked § 1182(f), which he has not. *See* Part II, *infra.* Regardless, neither *Mandel* nor *Hawaii* applies where the President invokes § 1182(f) not to suspend the entry of a class of aliens in the interest of national security, but to target a U.S. citizen for constitutionally protected speech.[6] In those circumstances, the President must respect due process and survive the heightened scrutiny demanded by the First Amendment. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010) (law restricting

---

[3] The government's assertion that "[t]he sole conduct [relied upon by Harvard] attributable to the President is a [single] social media post 'call[ing] for Harvard to lose its tax-exempt status,'" (Opp'n 27 (quoting Mot. at 16)), ignores the many contrary statements in the record.

[4] The White House, *President Trump Participates in a Cabinet Meeting, Apr. 30, 2025*, YouTube, at 1:21:50-1:23:33 (Apr. 30, 2025), https://www.youtube.com/watch?v=wn2XtufOAHc.

[5] Bloomberg, *McMahon Says Top Universities Could See Grants Restored*, at 9:25-12:10 (June 10, 2025), https://www.bloomberg.com/news/videos/2025-06-10/mcmahon-says-top-universities-could-see-grants-restored-video.

[6] Moreover, neither *Mandel* nor *Hawaii* involved a retaliation claim.

expressive activities of U.S. plaintiff subject to strict scrutiny); *Elfbrandt v. Russell*, 384 U.S. 11, 16-19 (1966) (national security measures directly impacting protected rights of Americans "must be 'narrowly drawn'"). "It would indeed be ironic if, in the name of national defense, we would sanction the subversion of ... those liberties ... which make[] the defense of the Nation worthwhile." *United States v. Robel*, 389 U.S. 258, 264 (1967).

Neither *Hawaii* nor *Mandel* hold otherwise. Both involved restrictions on foreign nationals alleged to have indirect and incidental effects, at most, on the rights of American citizens. *See Hawaii*, 585 U.S. at 698; *Mandel*, 408 U.S. at 762. Take *Mandel*, where a single Belgian professor was denied a visa on grounds that he was an avowed Marxist. *See* 408 U.S. at 756-59. American professors at universities where Mandel was scheduled to speak sued, citing their First Amendment right to "receive information and ideas." *Id.* at 762. *Mandel* thus involved a decision about an alien abroad, with an alleged indirect effect on U.S. citizens, with the key fact being that the government's action was *not* aimed at a U.S. citizen at all. Indeed, the government acknowledges that *Mandel's* deferential review applies only if "plaintiffs seek to invalidate a national security directive regulating the entry of aliens abroad." Opp'n at 16 (quoting *Hawaii*, 585 U.S. at 702).

This case presents markedly different facts. The Proclamation here is *not* directed at the entry of aliens abroad; it is directed at Harvard. As the Proclamation makes clear, "[t]he suspension and limitation on entry ... shall not apply to any alien who enters the United States to attend other universities." Proclamation, § 2(c). Harvard is aware of no case—and the government has cited none—that allows the Executive to use its entry power to insulate from review actions taken against American citizens in retaliation for protected speech. Moreover, *Mandel* "[d]id not dispute" the factual grounds on which his waiver decision was based. 408 U.S. at 756. Harvard disputes all of the cited grounds and has had no opportunity to contest them.

4

*Hawaii* is further afield. The U.S. plaintiffs in *Hawaii* did not allege that the proclamation was aimed at or targeted them; the alleged harm the Supreme Court found sufficient for purposes of Article III was a consequence of the proclamation's entry restriction—the "real-world effect that the Proclamation has had in keeping [plaintiffs] separated from certain relatives who seek to enter the country," 585 U.S. at 698—not, as here, its purpose. And the circumscribed standard of review in *Hawaii* flowed from features of those plaintiffs' constitutional claim absent here:

- The Proclamation in *Hawaii* was neutral on its face as to religion, whereas the Proclamation here facially targets Harvard, a U.S. citizen.

- The claim in *Hawaii* sought to extend the Establishment Clause (which typically concerns religious displays or school prayer) to the unique context of a national security directive. Here, by contrast, Harvard's First Amendment claim rests on the well-settled proposition that even otherwise lawful official acts violate the First Amendment if undertaken in retaliation for protected speech. *See, e.g.*, *Vullo*, 602 U.S. at 187, 192 (government may not "wield [its] power" to "threaten enforcement actions … in order to punish or suppress" First Amendment-protected views); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("official actions" that are otherwise "unexceptionable" offend the Constitution if retaliatory).

- The plaintiffs in *Hawaii* relied on campaign statements, whereas Harvard proffers official statements and actions by the President and members of his Cabinet, made mere weeks and days before the Proclamation.

- The *Hawaii* Court upheld the challenged policy because the proclamation reflected a worldwide review by multiple government officials. Here, the White House convened a Cabinet-level meeting to develop new ways to punish Harvard.

In short, where § 1182(f) is used to retaliate against U.S. citizens, as here, due process and First Amendment protections apply—even when national security is invoked. *See, e.g.*, *Holder*, 561 U.S. at 39; *Robel*, 389 U.S. at 262-64; *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 313, 321 (D.C. Cir. 2014) (applying scrutiny even to "matters intimately related to foreign policy and national security" (citation omitted)).

### C.    Even With Deferential Review, Harvard Is Likely to Succeed on Its Claims.

Even assuming *Hawaii*'s rational basis standard or *Mandel*'s "facially legitimate and bona

fide" standard applies, Harvard is still likely to succeed on the merits.

*Hawaii* **Rational Basis Standard**: A policy fails rational basis if it "lack[s] any purpose other than a 'bare ... desire to harm a politically unpopular [entity]'" or is "so discontinuous with the reasons offered for it" that it seems "inexplicable by anything but animus." *Hawaii*, 585 U.S. at 705-06 (citations omitted). Here, the Proclamation takes aim at Harvard because it refused to capitulate to unlawful government demands, not for any legitimate purpose.[7] The government's animus is underscored by differences between this case and *Hawaii*. In *Hawaii*, the Proclamation excluded aliens from countries with inadequate vetting after providing a period for foreign governments to improve their security practices. Presidential Proclamation No. 9645, 82 Fed. Reg. 45161, Preamble (2017). Here, the Proclamation claims that "adversaries," like China, have "tr[ied] to take advantage of American higher education,"[8] Am. Compl., Ex. 35, Preamble, but does nothing to minimize that risk. The Proclamation instead allows the very same students to attend any other university. Likewise, the Proclamation references crime rates but fails to connect the crime to international student enrollment.

Even taking the Proclamation on its own terms, its aim is illegitimate. The Proclamation unilaterally seeks to regulate not the entry of noncitizens, but the domestic conduct of Harvard. The Proclamation is valid only "[u]ntil such time as the university shares the information that the

---

[7] This Court is not limited to the face of the Proclamation. The government characterizes *Hawaii* as "foreclos[ing]" consideration of evidence outside the four corners of the proclamation at issue (Opp'n 1, 16), but *Hawaii* did no such thing. The *Hawaii* Court left the "precise contours" of the rule for another day, *see* 585 U.S. at 704, and "consider[ed] plaintiffs' extrinsic evidence" in evaluating their First Amendment claim under "rational basis review," *id.* at 704-05. At a minimum, therefore, this Court should apply rational basis review of the kind employed in *Hawaii*—not *Mandel*.

[8] These concerns are pretextual. As the President recently announced, "Chinese students using our colleges and universities … has always been good with me!" President Donald J. Trump (@realDonaldTrump), Truth Social (June 11, 2025, 8:04AM), https://truthsocial.com/@realDonaldTrump/posts/114664632971715644 (Ex. B) (cleaned up).

Federal Government requires to safeguard national security and the American public." Am. Compl., Ex. 35, Preamble. But Harvard *has* responded to the government's requests, to the extent allowed by law. *See* Mot. at 7; 20 U.S.C. § 1232g. In seeking more information than statutorily required and implementing a novel enforcement mechanism, the Proclamation purports to amend the law by fiat, upending Congress' careful balance between national security, the integrity of the SEVP, and the regulatory burden imposed on schools.

*Mandel*'s **Facially Legitimate and Bona Fide Standard**. Even if *Mandel* applied, it is not a "facially legitimate and bona fide" use of § 1182(f) to bar the entry of aliens who seek to affiliate with one school while permitting them to enter so long as they study elsewhere. Nor is it facially legitimate and bona fide to use § 1182(f) to override existing statutory and regulatory processes governing a domestic institution's compliance with domestic laws simply because "[t]hose can take a lot of time." Tr. at 60:9-10. The President may not use § 1182(f) to force compliance with a data collection program that Congress has not itself seen fit to create.

## II.    HARVARD IS LIKELY TO PREVAIL ON ITS STATUTORY CHALLENGE.

The Proclamation is also unlawful under § 1182(f). When Congress authorized the President to suspend or restrict the entry of noncitizens, it did not empower him to summarily compel a domestic institution to produce documentation, alter its admission practices, and engage in other domestic conduct, all in conflict with Congress's own statutory schemes. There is no prior example of the President ever using § 1182(f) in this way, despite nearly 100 proclamations over the statute's 70-year history, and he made no findings that would support its use here. A full list of previous invocations of authority under § 1182(f) makes this clear. *See* Kelsey Y. Santamaria et al., Cong. Rsch. Serv., LSB10458, *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. § 1182(f)* (Feb. 21, 2024), https://www.congress.gov/crs_external_products/LSB/PDF/LSB10458/LSB10458.3.pdf (Ex. A). The government's limitless interpretation of § 1182(f)

to authorize this Proclamation raises serious separation-of-powers, non-delegation, and major-questions concerns by allowing the President to use the entry power to target disfavored domestic institutions and extract massive changes of domestic political and economic significance.

### A.    Harvard's Statutory Challenge Is Justiciable.

As a threshold matter, the government suggests that Harvard's statutory claims are not justiciable because the Executive has "broad constitutional and statutory authority" to exclude noncitizens from the United States. Opp'n 8-10. But as reflected by the Supreme Court reaching the merits in both *Trump v. Hawaii*, 585 U.S. 667, 682-83 (2018), and *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 171 (1993), the "well settled" proposition is that judicial review is available where U.S. citizen plaintiffs "confine their challenge to the lawfulness of the [governing] policy," instead of contesting individual consular determinations, *Pietersen v. U.S. Dep't of State*, No. 24-5092, __ F.4th __, 2025 WL 1536434, at *6 (D.C. Cir. May 30, 2025); *see also Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985). Section 1182(f) may be a broad delegation within its sphere, but it remains the Judiciary's role to ensure the Executive has not exceeded Congress' delegation or the Executive' constitutional authority. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024).

### B.    Section 1182(f) Does Not Authorize the President to Regulate the Domestic Conduct of Domestic Institutions.

The Proclamation's target is Harvard's domestic conduct rather than the suspension or restriction of entry of noncitizens from abroad. As the title of the Proclamation makes clear, the President seeks to "address[] risks at Harvard University," not risks posed by a foreign government

or foreign nationals.[9] Am. Compl., Ex. 35. The conditions imposed by the Proclamation will remain in force only "[u]ntil such time as the university shares the information that the Federal Government requires." Am. Compl., Ex. 35, at Preamble. That is, the government seeks to coerce Harvard to give DHS additional documents (beyond what the law invoked by the DHS allows) by means of a separate, presidential process outside of what Congress contemplated.

It is important to recognize how broad and unprecedented this assertion of executive authority is. The President is claiming unlimited authority to leverage his power over the border as a means of targeting domestic activity that he disfavors. This view of § 1182(f) portends a dangerous expansion of the President's power to control domestic affairs. Under the President's theory, he could cut off a private company's access to foreign employees, business partners, and customers for a purported failure to comply with a domestic regulatory obligation. Or he could manipulate media coverage by banning foreign correspondents of U.S. media organizations from entering the U.S. unless they portray the President favorably. These hypotheticals are no different from what the President is doing to Harvard: leveraging § 1182(f) to coerce Harvard into disclosing information outside of the processes that Congress has set forth.

Section 1182(f)'s text, structure, and history all show that the statute does not stretch that far. By its plain terms, § 1182(f) delegates to the President the authority to "suspend" "the *entry* of any aliens or of any class of aliens *into the United States*" "as immigrants or nonimmigrants" or to impose restrictions "on the *entry* of aliens." 8 U.S.C. § 1182(f) (emphasis added). In other words, § 1182(f) confers on the President authority to close the border to noncitizens, including a

---

[9] *Compare, e.g.*, Proclamation No. 10,309, *Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Policies or Actions That Threaten Democracy in Nicaragua*, 86 Fed. Reg. 64,797 (Nov. 16, 2021); Proclamation No. 9932, *Suspension of Entry as Immigrants and Nonimmigrants of Senior Officials of the Government of Iran*, 84 Fed. Reg. 51,935 (Sept. 25, 2019).

"class of aliens." *Id*. What it does not do is confer authority to control a class of aliens' conduct *after* they enter, or their ultimate destination within the United States.

This limitation is consistent with § 1182(f)'s grounding in foreign affairs and war powers, rather than the Commerce Clause. It is consistent with § 1182(f)'s reference to entry "as immigrants or nonimmigrants," which makes clear that a valid restriction on entry regulates at the border, and a valid suspension regulates immigration status at entry.[10] *Cf.* Opp'n 11. And it is consistent with long-standing practice of defining classes of aliens based on the actions or characteristics of the alien or of their home country.[11] *See* Ex. A (CRS Report); *Hawaii*, 585 U.S. at 675 (upholding "entry restrictions on nationals of countries that do not share adequate information for an informed entry determination"); *Sale*, 509 U.S. at 187 (upholding naval blockade to preclude entry on U.S. soil).

The government here is asking the Court to read "entry" and "class" in an unprecedented way that changes the nature and scope of the authority Congress intended to delegate. Instead of using § 1182(f) to restrict entry at the border, the President purports to use it to restrict entry *within* the United States to a particular destination.[12] Instead of suspending entry of a class of aliens as

---

[10] Statutory context confirms this conclusion. Sections 1182(f) and 1185(a)(1) are substantially coextensive. *See Hawaii*, 585 U.S. at 683 n.1. Section 1185 governs "[t]ravel control of citizens and aliens." 8 U.S.C. § 1185(a)(1). Section 1182(f) should therefore also be read to focus on "travel control"—that is, as a tool to ensure an orderly border process.

[11] This understanding tracks the definition of "entry" that previously appeared in the INA, which defined "entry" as "any coming of an alien into the United States, from any foreign port or place or from an outlying possession, whether voluntarily or otherwise." 8 U.S.C. § 1101(a)(13) (West 1996) (repealed); *see also id.* § 1101(a)(13)(A) (defining "admission" as "lawful entry ... after inspection and authorization by an immigration officer"); *see United States v. Yong Jun Li*, 643 F.3d 1183, 1188 (9th Cir. 2011).

[12] That § 1182(f) is a power pertaining to entry only is reflected in § 1182(f)'s reference to the Attorney General's authority to suspend entry of aliens "transported to the United States" by certain "commercial airline[s]" who do not comply with regulations governing "detection of fraudulent documents."

immigrants or nonimmigrants, the President purports to condition entry on the alien's decision not to attend a particular college once they enter the United States. After the Proclamation, as before, noncitizens are free to enter the United States, as tourists, businesspeople, or asylees, or even as students at a different college, or for any reason whatsoever *other than* to attend Harvard. Indeed, in an apparent effort to put additional pressure on Harvard, the Proclamation openly invites students to enter to attend any other university. *See* Am. Compl., Ex. 35 §§ 1, 2(c).

No President has used § 1182(f) this way before. "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (citation omitted); *see also Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (no authority to cancel student loans where the "Secretary has never previously claimed powers of this magnitude under the [] Act"). Prior proclamations under § 1182(f) restricted entry from certain countries (as in *Hawaii*), of certain foreign government officials, or of individuals subject to sanctions. Prior proclamations also have followed the statutory language and categorically suspended entry of certain individuals *as* immigrants and/or nonimmigrants.[13] No President has ever wielded § 1182(f) as leverage against a domestic organization—an indication the President lacks power to do so.[14]

As to purpose, the Proclamation strays from § 1182(f)'s obvious aim: that of regulating foreign affairs and inducing changes in foreign conduct. The Court recognized the statute's aim in

---

[13] *See* Ex. A.

[14] *Cf. Doe #1 v. Trump*, 957 F.3d 1050, 1067 (9th Cir. 2020) (denying the government's stay request with respect to a proclamation that "deals with a purely domestic economic problem," namely "uncompensated healthcare costs in the United States").

*Hawaii. See, e.g.*, 585 U.S. at 696 (referring to the President's "flexible authority to suspend entry based on foreign policy interests"). And the Court upheld the proclamation in *Hawaii* because it served the "legitimate purpose[]" of "inducing other nations to improve their practices." *Id.* at 706. The Proclamation here does not serve any such interest. There is nothing a foreign government or citizen could do here to signal cooperation or ease the Proclamation's restrictions. Rather, the Proclamation expressly ties its endpoint to Harvard's production of documents to DHS.

Additional textual evidence comes from § 1182(f)'s preamble, which requires the President to find that the "entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States." The statute contemplates that the President will make a finding that the aliens in question crossing the border will cause detriment to the United States. The President did not make that finding here. The Proclamation finds *Harvard* to be "detrimental" to the United States but makes no findings on the entry of its international students.

The government asserts that the President's finding is non-reviewable. But that proposition is gleaned from *Hawaii* in the context of a proclamation targeting noncitizens. It has no application to a proclamation targeting a domestic entity. And if any standard of review is applied to the Proclamation, it cannot survive.[15] Regardless, even if (as the government claims), the finding is unreviewable, the very fact that Congress required the finding to be made is powerful structural evidence that the statute is narrower than the President claims.

Finally, principles of constitutional avoidance dictate rejecting the government's reading

---

[15] The Proclamation is irrational. If the government's concern is Chinese espionage, the documentation Harvard is required to collect and maintain under 8 C.F.R. § 214.3(g)—e.g., enrollment data, academic status, and discipline resulting from a criminal conviction—does little to address that concern (and reinforces that the government, not Harvard, is tasked with addressing such issues). Plus, the President himself has said he has no objection to Chinese students entering. *See* Ex. B. Similarly, if the concern is about crime rates, the government makes no connection between any increase in crime and the activities of international students.

in view of the serious separation-of-powers, non-delegation, and major questions concerns. If the Court were to adopt the government's position, the President's power over entry restrictions would be converted into a weapon to influence domestic policy and interfere with individual liberties within the United States. And, as here, the President could condition the lifting of entry restrictions on the targeted domestic entities' changing course to align with the President's policy preferences.

The government's brief—which supplies no limiting principle—embraces these eventualities. Yet Congress could not possibly have intended these results, and it certainly has not clearly authorized this expansion of presidential authority. At minimum, therefore, constitutional avoidance requires confining § 1182(f) to restrictions that genuinely address "entry" into the United States rather than the conduct of domestic entities.

### C.    The Proclamation Impermissibly Overrides Section 1372.

Not only does the Proclamation improperly assert authority over a domestic organization, but it does so by running roughshod over another provision of the INA. In *Hawaii*, the Court took as given that "§ 1182(f) does not allow the President to expressly override particular provisions of the INA." 585 U.S. at 689; *see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Yet that is what the President is trying to do here. He seeks to enforce Harvard's compliance with purported data collection obligations under 8 U.S.C. § 1372(c). Section 1372 specifies that the "Attorney General shall prescribe *by regulation* reporting requirements" in furtherance of the SEVP program, 8 U.S.C. § 1372(c)(5), which DHS has in fact promulgated, *see, e.g.*, 8 C.F.R. § 214.3(g) (emphasis added). Attempting to control a domestic organization's affairs under § 1182(f) is bad enough; doing so by overriding a statute addressing university recordkeeping is worse.

The same concerns arise for the Proclamation's other pretextual rationales. For example, the Proclamation suggests Harvard's admissions practices are discriminatory. But Congress has

enacted Title VI to address such concerns. The President cannot use his authority over entry restrictions to coerce changes to Harvard's admissions practices outside of Title VI's procedures.[16]

## III.    THE REMAINING FACTORS FAVOR HARVARD.

Harvard will sustain irreparable harm if the Proclamation is not enjoined. Harvard's First Amendment injuries are irreparable. *See, e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). The Proclamation's enforcement would cause massive disruptions to Harvard's mission, programs, reputation, and student body. In dismissing these harms as limited to Harvard's students, the government ignores the record evidence about serious and ongoing harms suffered by the University, reflected in multiple declarations. Nor does the government overcome Harvard's arguments about the equities and the public interest.

## CONCLUSION

The Court should preliminarily enjoin the Proclamation.

Dated: June 17, 2025

LEHOTSKY KELLER COHN LLP

Steven P. Lehotsky (BBO # 655908)
Scott A. Keller*
Serena M. Orloff*
Shannon G. Denmark*
Jacob B. Richards (BBO # 712103)
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com

Respectfully submitted,

JENNER & BLOCK LLP

By: */s/ Ian H. Gershengorn*
Ishan Bhabha*
Ian Heath Gershengorn*
Lauren J. Hartz*
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
IGershengorn@jenner.com

---

[16] Similarly, the Proclamation displaces the statutory scheme governing F, J, or M visas by adding the requirement that no such visa holder may enter if they are attending Harvard—despite Harvard being a school approved by the Attorney General pursuant to the statute and the implementing regulations. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.2(f).

scott@lkcfirm.com
serena@lkcfirm.com
shannon@lkcfirm.com
jacob@lkcfirm.com

Katherine C. Yarger*
700 Colorado Blvd., #407
Denver, CO 80206
katie@lkcfirm.com

Joshua P. Morrow*
408 W. 11th Street, 5th Floor
Austin, TX 78701
josh@lkcfirm.com

Danielle K. Goldstein*
3280 Peachtree Road NE
Atlanta, GA 30305
danielle@lkcfirm.com

LHartz@jenner.com

Andrianna Kastanek*
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
AKastanek@jenner.com

William A. Burck*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com


*Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

Counsel for Plaintiff certify that they have submitted the foregoing document with the Clerk of Court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

By: */s/ Ian H. Gershengorn*

Dated: June 17, 2025