# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE,

*Plaintiff*,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

*Defendants*.

Case No. 1:25-cv-11472-ADB

**Leave to File Excess Pages
Granted on August 4, 2025**

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

## INTRODUCTION

Congress empowered the President with sweeping authority to suspend the entry of a class of aliens under 8 U.S.C. §§ 1182(f) and 1185(a)(1). Exercising that broad power, the President determined that foreign student and exchange visitor visa holders entering the United States to attend Harvard present serious national security and public safety risks. The President reached this conclusion for several reasons: Harvard faced increased crime rates, disciplinary failures, unrest on campus, entanglement with foreign adversaries, and ongoing discrimination in admissions. To ensure that Harvard was a proper steward of its international students and that those students were not contributing to these ongoing problems, the Department of Homeland Security (DHS) requested mandatory information about the disciplinary and criminal records of its foreign students.

Yet Harvard's responses were woefully insufficient. Because Harvard had shown itself to be incapable of properly hosting, monitoring, disciplining, and reporting on its foreign students, the President determined that nonimmigrants entering the country to attend Harvard posed a serious risk to the nation. The President thus issued a Proclamation suspending the entry of such aliens until Harvard provided necessary information. Harvard has not done so. Instead, it brings wide ranging claims against the Proclamation under the immigration statutes, First Amendment, Equal Protection Clause, and Bill of Attainder Clause. All fail.

First, Harvard lacks a cause of action to challenge the statutory requirements for the Proclamation. Second, the Proclamation clearly suspends entry for a class of aliens based on the purpose of entry and thus satisfies 8 U.S.C. §§ 1182(f) and 1185(a)(1). Third, judicial review of the Proclamation is highly circumscribed even when constitutional claims are raised; as long as the Proclamation offers a facially legitimate reason, it must be upheld. Harvard's claims ignore this well-established standard. Because the President articulated legitimate rationales for the

Proclamation, it withstands all constitutional challenges. Fourth, at most, the Proclamation can be reviewed under rational basis review, which it also easily passes. Fifth, on the merits, Harvard fails to plausibly allege that the Proclamation was caused by retaliatory motivations, either for its speech, lawsuit, or viewpoint. Sixth, the equal protection claim fails because, once again, the Proclamation satisfies rational basis review and Plaintiffs have not plausibly alleged otherwise. Seventh, a Bill of Attainder only applies to legislation, not executive actions. In addition, the May 22, 2025 letter from the Secretary of Homeland Security revoking Harvard's Student and Exchange Visitor Program (SEVP) certification and Exchange Visitor Program designation is moot. So, all of Harvard's claims fail and must be dismissed.

## BACKGROUND AND PROCEDURAL HISTORY

### *1. The Executive's Broad Authority*

Under the Immigration and Nationality Act (INA), ch. 477, 66 Stat. 163 (8 U.S.C. § 1101 et seq.), admission to the United States normally requires a valid visa or other travel document. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203. Though a visa is normally necessary for admission, it does not guarantee admission; the alien still must be found admissible upon inspection at a port of entry. 8 U.S.C. §§ 1201(h), 1185(d), 1225(a); *see* 8 U.S.C. § 1101(a)(4) (application for visa is distinct from application for admission).

The Constitution and Acts of Congress confer broad authority on the President to suspend or restrict the entry of aliens into the United States in the Nation's interest. *See* 8 U.S.C. §§ 1182(f), 1185(a)(1). Section 1182(f) of Title 8 provides in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

2

"By its terms, § 1182(f) exudes deference to the President in every clause." *Trump v. Hawaii*, 585 U.S. 667, 684 (2018). The Supreme Court has "observed that § 1182(f) vests the President with 'ample power' to impose entry restrictions in addition to those elsewhere enumerated in the INA." *Id.* Section 1185(a)(1) of Title 8 further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe." Presidents have routinely invoked that authority to advance national security and foreign policy objectives.

### 2. The Student and Exchange Visitor Program

Foreign individuals may be admitted to the United States in F, M, or J nonimmigrant status to pursue a full-time academic or vocational program. 8 C.F.R. § 214.2(f), (m), (j). Students seeking admission in F or M nonimmigrant status are required to present documentation from "a school certified by the Student and Exchange Visitor Program (SEVP) for attendance," and upon arrival must attend "the school specified in the student's visa." 8 C.F.R. § 214.2(f)(1)(i)(A), (C), (m)(1)(i)(A); *see also* 8 C.F.R. § 214.2(j) (similar requirements for J visas).

Any school that wishes to enroll an F nonimmigrant student must first obtain SEVP certification. *See* 8 U.S.C. § 1372; 8 C.F.R. § 214.3(a)(1), (f)(1) (school required to submit a Form I-17 petition stating the programs for which it seeks SEVP approval). Federal regulations set out the various requirements for obtaining and maintaining SEVP certification, including the types of nonimmigrant student records a school must keep and for how long. 8 C.F.R. § 214.3(g). Subsection (g)(1) of 8 C.F.R. § 214.3 states that the designated school official "must make the information and documents required by this paragraph (g)(1) available, including academic transcripts, and must furnish them to DHS representatives upon request." It further notes that a "DHS officer may request any or all of the data in paragraphs (g)(1)(i) through (x) of this section

on any individual student or class of students upon notice." 8 C.F.R. § 214.3(g)(1). Subsection (g)(2) covers reporting requirements regarding the obligation "to report within 21 days any change of the information contained in paragraph (g)(1) or the occurrence of the following events." Such events include "[a]ny disciplinary action taken by the school against the student as a result of" a criminal conviction and "any other notification request not covered by paragraph (g)(1) of this section made by DHS with respect to the current status of the student." 8 C.F.R. § 214.3(g)(2)(ii)(D), (E).

Consistent with SEVP's national security mission, federal law requires schools to petition SEVP for recertification every two years to demonstrate ongoing eligibility to enroll nonimmigrant students and continued compliance with federal statutes and regulations. *See, e.g.*, 8 U.S.C. § 1762; 8 C.F.R. § 214.3(a)(3), (h)(2). SEVP may also conduct an out-of-cycle review at any time to verify full regulatory compliance. *See, e.g.*, 8 C.F.R. § 214.3(h)(3)(iii).

SEVP continuously monitors certified schools to determine compliance with governing regulations. In accordance with 8 C.F.R. § 214.4(a)(2), SEVP is authorized to deny a petition for recertification or withdraw a certified petition on notice, if the school is determined to no longer be entitled to certification for any valid and substantive reason, including, but not limited to, the reasons enumerated at 8 C.F.R. § 214.4(a)(2)(i)–(xix) (including failure to comply with the reporting requirements at 8 C.F.R. § 214.3(g)(1)–(2) and a school DSO's noncompliance with the regulations).

### 3. The Situation at Harvard

Following the brutal terrorist attack on Israel in October 2023, pro-Palestine activists "disrupted classes in Harvard Yard," "defaced hostage posters around campus with antisemitic slogans," "posted a classic antisemitic cartoon on social media" that was "reshared by Harvard

Faculty and Staff for Justice in Palestine"—"keeping many Jewish students on edge"—verbally harassed some Jewish students, and vandalized Harvard's campus.[1] "[B]etween October 7 and the April 24 formation of the encampment, Harvard failed to impose *any* formal discipline on any students."[2] As Harvard's own Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias found, "Harvard's response to the spring encampment protests fueled perceptions of inconsistency and a lack of transparency in its disciplinary processes, with some Schools declining to impose sanctions while others faced internal disagreements and reversals." Harvard Report at 117.

In addition, "[c]rime rates" generally "at Harvard University—including violent crime rates—have drastically risen in recent years." Proclamation No. 10948, 90 Fed. Reg. 24493 (June 4, 2025) (Proclamation). Given Harvard's documented failure to discipline student misconduct, DHS became concerned that "foreign adversaries and competitors" may "take advantage of" Harvard's lax environment and, "among other things, steal technical information and products, exploit expensive research and development to advance their own ambitions, and spread false information for political or other reasons." *Id.*

On April 16, 2025, to investigate DHS's concerns, Secretary of Homeland Security Noem sent Harvard a letter requesting disciplinary records and supporting evidence of misconduct relating to its nonimmigrant student visa holders. ECF 1-16. The letter highlighted Harvard's "failure to condemn antisemitism" and the resulting "hostile learning environment for Jewish

---

[1] *Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias*, HARV. U. 25 (Apr. 29, 2025) [hereinafter "Harvard Report"], https://www.harvard.edu/wp-content/uploads/2025/04/FINAL-Harvard-ASAIB-Report-4.29.25.pdf (cleaned up).

[2] *Harvard University Failed to Discipline Antisemitic Conduct Violations*, COMM. EDUC & WORKFORCE 4 (Sept. 23, 2024) [hereinafter Committee Report"], https://edworkforce.house.gov/uploadedfiles/9.23.2024_harvard_disciplinary_final.pdf.

students." *Id.* After several letters, Havard identified one F-1 nonimmigrant student as having engaged in conduct, in response to DHS's request.

On May 22, 2025, Secretary Noem sent Harvard a letter revoking Harvard's SEVP certification and Exchange Visitor Program designation, noting Harvard's "refusal to comply with multiple [information] requests," as well as its "perpetuat[ion] [of] an unsafe campus environment that is hostile to Jewish students." ECF 1-25. The letter detailed the information that Harvard was required to provide to regain SEVP certification and Exchange Visitor Program designation— including records regarding illegal activities perpetrated by nonimmigrant student visa holders enrolled at Harvard in the preceding five years. *Id.*

### 4. The Proclamation

On June 4, 2025, the President issued a Proclamation entitled "Enhancing National Security by Addressing Risks at Harvard University." 90 Fed. Reg. 24493. The Proclamation suspends: "[t]he entry of any alien into the United States as a nonimmigrant to pursue a course of study at Harvard University under . . . 8 U.S.C. 1101(a)(15)(F) or 1101(a)(15)(M), or to participate in an exchange visitor program hosted by Harvard University under . . . 8 U.S.C. 1101(a)(15)(J).'" 90 Fed. Reg. at 24495. "That suspension . . . expire[s], absent extension, 6 months after the date of th[e] proclamation." *Id.*

The Proclamation applies to aliens seeking to enter the United States to begin attending Harvard after its effective date. *Id.* at 24495.[3] It commands the Secretary of State to consider, in his discretion, whether foreign nationals who currently attend Harvard, are in the United States pursuant to F, M, or J visas, and otherwise meet the specified criteria should have their visas

---

[3] Harvard is not currently SEVP-certified to enroll M nonimmigrant students for vocational or nonacademic studies.

revoked under 8 U.S.C. § 1201(i). *Id.* It clarifies that the suspension and limitations articulated in Section 1 do not apply to any alien who enters the U.S. to attend other universities through the SEVP or whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their designees. *Id*. Further, it requires, no later than 90 days after the Proclamation, the Attorney General and Secretary of Homeland Security to jointly submit to the President a recommendation on whether an extension or renewal of the suspension and limitation on entry in Section 1 is in the national interest. *Id.*

### 5. This Lawsuit

On May 23, 2025, Harvard filed a complaint challenging DHS's May 22, 2025, revocation of Harvard's SEVP certification and Exchange Visitor Program designation (ECF 1), along with a motion seeking a temporary restraining order (TRO) of the revocation (ECF 4, 9). The Court granted the TRO the very same day. ECF 11.

On May 28, 2025, DHS sent a Notice of Intent to Withdraw (NOIW) to Harvard identifying multiple compliance issues, including Harvard's failure to comply with reporting requirements under 8 C.F.R. § 214.3(g) and failure to maintain a campus environment free from violence and antisemitism—each sufficient to warrant withdrawal of Harvard's SEVP certification. ECF 49. The NOIW gave Harvard 30 days to respond, allowing Harvard an opportunity "to demonstrate compliance with all lawful requirements and overcome alleged deficiencies." *Id.*; *see* 8 C.F.R. § 214.3(e)(4). The NOIW warned that failure to provide a timely response would result in the withdrawal of Harvard's SEVP certification and bar an administrative appeal of that decision, in accordance with 8 C.F.R. § 214.4(d). ECF 49.

On June 4, 2025, the President issued the Proclamation. 90 Fed. Reg. 24493. The following day, Harvard filed an Amended Complaint, adding challenges to the Proclamation (ECF 54) along

with a motion for a TRO (ECF 56, 57). The Court granted the motion the same day and then held

a preliminary injunction hearing on June 16, 2025. ECF 59, 60. On June 20, 2025, the Court issued

an order preliminarily enjoining the Government from implementing DHS's May 22, 2025

revocation letter. ECF 73. It followed that by issuing another preliminary injunction order,

enjoining the Government from implementing the Proclamation on June 23, 2025. ECF 75.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). This standard requires factual allegations that "permit the court to infer more than

the mere possibility of misconduct." *Id.* at 679. If the factual allegations "are too meager, vague,

or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint

is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (citing *Bell Atl. Corp.

v. Twombly*, 550 U.S. 544, 555 (1955)). Along with the requirement to bring plausible claims, the

plaintiff bears the burden of plausibly alleging that a court has jurisdiction. *Lujan v. Defenders of

Wildlife*, 504 U.S. 555, 561 (1992).

## ARGUMENT

**I.    The Proclamation was lawfully issued under the President's expansive powers under 8 U.S.C. § 1182(f).**

### A.  Harvard's statutory challenge to the Proclamation is not justiciable.

The Supreme Court has "long recognized the power to expel or exclude aliens as a

fundamental sovereign attribute exercised by the Government's political departments largely

immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v.

United States ex rel. Mezei,* 345 U.S. 206, 210 (1953)). In particular, the Supreme Court has held

that "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied

entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo*, 430 U.S. at 796 (citation omitted). Thus, Harvard's challenges to the Proclamation cannot be reviewed at all.

This Court distinguished *Fiallo* as being about just congressional policies. But the authority to regulate the entry of aliens is "inherent in the executive department of the sovereign," and "Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see also Trump*, 585 U.S. at 702 (quoting *Fiallo*, 430 U.S. at 792). Such review "is not within the province of any court, unless expressly authorized by Congress." *Trump*, 585 U.S. at 702 (internal quotation omitted). Here, Congress expressly made a policy choice in 8 U.S.C. §§ 1182(f) and 1185(a) by conferring a "sweeping proclamation power" to suspend entry of aliens and impose restrictions wholly in the President's discretion without creating a cause of action for review. *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (Ginsburg, J.). "By its terms, § 1182(f) exudes deference to the President in every clause," and "entrusts to the President the decisions whether and when to suspend entry," "whose entry to suspend," "for how long," "and on what conditions." *Trump*, 585 U.S. at 684. Here, where the President "has act[ed] pursuant to an express or implied authorization of Congress"—e.g., 8 U.S.C. §§ 1182(f) and 1185(a)(1)—the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

In reviewing challenges to restrictions on entry, courts have long recognized that the admission and exclusion of foreign nationals is largely immune from judicial control. *See Dep't of*

*State v. Munoz*, 602 U.S. 899, 907 (2024) (citing 8 U.S.C. § 1252). And even if there were review, only the alien—not third parties—may obtain judicial review. *Id.* Even a spouse may not seek review of her husband's visa denial. *Id*. Surely Harvard has no greater right than a spouse to seek review of its future students being denied entry into the country. Because the President issued the Proclamation pursuant to that expansive inherent authority, Harvard's claims are not justiciable. *See Knauff*, 338 U.S. at 542; *Trump*, 585 U.S. at 682 (declining to resolve this "difficult question").

### B.  Harvard lacks a cause of action.

Harvard faces another barrier: typically, a plaintiff must have a cause of action to sue the Government, but § 1182(f) does not provide one. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Instead, Harvard claims the Proclamation is "ultra vires" under the statute. Count VI. A statutory ultra vires claim, however, "applies only when an agency has taken action entirely in excess of its delegated powers" and "contrary to a *specific prohibition* in a statute." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (internal quotation marks omitted). Section 1182(f) does not specifically prohibit the Proclamation. At most, even a broad view of ultra vires claims requires the statutory violation to be "obviously beyond the terms of the statute" or "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted). As a result, ultra vires claims "rarely succeed." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). The President's action was not "obviously beyond the terms of the statute." *N. Am. Butterfly Ass'n*, 977 F.3d at 1263.

### C.  The Proclamation is a facially valid exercise of presidential authority under § 1182(f).

**1.** Unable to dispute the President's broad authority to "suspend the entry of all aliens or any class of aliens," 8 U.S.C. § 1182(f), Harvard instead contends that the Proclamation does not actually "suspend entry" of a "class of aliens" because it singles out Harvard. That is wrong.

Section 1 of the Proclamation is titled "Suspension of Entry," and indeed that section explicitly states that "[t]he entry of any alien into the United States as a nonimmigrant to pursue a course of study at Harvard University," "or to participate in an exchange visitor program hosted by Harvard University," "*is suspended* and limited, subject to section 2." 90 Fed Reg. at 24495 (emphasis added). Section 2, in turn, is a provision governing the scope and implementation of the "*suspension* and limitation on entry." *Id.* (emphasis added). Harvard itself complains that some foreign student visa holders have already been denied entry. *See* ECF 65. By its very text and effect, then, the Proclamation does suspend entry. *See Abourezk*, 785 F.2d at 1049 n.2; 8 U.S.C. § 1182(f). This Court said that while the Proclamation literally suspended entry, that was neither the intent of the Proclamation nor the purpose of the statute. Neither matters, only the text does. *See Trump*, 585 U.S. at 688, 691 (rejecting reliance on motives and legislative purpose). In any event, visas are often defined by the purpose of entry. And the Proclamation suspends entry on that basis.

Regarding the "class of aliens," the statute provides no definition. 8 U.S.C. § 1182(f). Classes are inherently abstract concepts that are subject to nearly infinite permutations. There is no basis to limit the President's broad discretion to determine the relevant class of aliens under the statute. The Supreme Court rejected a similar argument that a class "must refer to a well-defined group of individuals who share a common 'characteristic' apart from nationality" as atextual. *Trump*, 585 U.S. at 688. The Proclamation here properly defines a "class of aliens" based on the *purpose* of their entry. 90 Fed Reg. at 24495 ("to pursue a course of study at Harvard University" or "to participate in an exchange visitor program hosted by Harvard"). That is a proper class. Indeed, the presidential proclamation in *Trump* was also based on the purpose of entry, as the same immigrant barred for business or tourism could enter as a non-immigrant, a permanent resident, or an asylee. 585 U.S. at 685, 680. Many types of visas are inherently tied to the purpose of entry,

such as to pursue a full-time course of study for F-1 students, to engage in specialized occupations for H-1(b) employees, or to temporarily transfer to another branch of a company as a manager or executive for L-1 employees. *See* 8 U.S.C. § 1101(a)(15)(F), (H), (L). And previous proclamations defined a class of aliens based on affiliation with a group, including political groups. *See* 85 Fed. Reg. 36139 (June 15, 2020) (suspending entry for connection with ICC); 80 Fed. Reg. 819 (Jan. 6, 2015) (suspending entry for position with North Korea Worker's Party); 50 Fed. Reg. 41329 (Oct. 10, 1985) (suspending entry for position with Cuban Communist Party). The Proclamation reasonably determines that Harvard can no longer be trusted to properly host, monitor, and, if necessary, discipline foreign students due to the ongoing unlawful conduct on the campus and Harvard's unwillingness to address it. 90 Fed Reg. at 24493–94. At bottom, a group looking to enter for specific reasons—in this case, to attend Harvard on visas—is a class of aliens.

Harvard's confusion on both straightforward textual provisions appears to stem from its belief that "any noncitizen potentially subject to the Proclamation can continue to enter the United States and can do so under the same immigrant or nonimmigrant admission programs." ECF 54 at 80–81. But that mistakes the point. Even if foreign students or exchange visitors barred entry to attend Harvard could be admitted to the United States on some other legal basis (such as another nonimmigrant visa), or even secure transfer to another school within the country, their entry into the country for the purposes of their F, J, or M visa is in fact suspended. And coming on another visa or with a different purpose would place them in a different "class of aliens." Indeed, the Supreme Court rejected an argument that the Proclamation's national security concerns in *Trump* were irrational because the same people could enter on nonimmigrant visas. 585 U.S. at 685. Harvard's argument is no more persuasive. Again, the Government has reason to believe Harvard is particularly derelict at monitoring and disciplining foreign student and exchange visitor visa

holders. Ultimately, the President determined that concern falls within the scope of the national interest, and it explains the class that he identified in the Proclamation.

Moreover, for an F-1 student to be initially admitted to the United States, the regulations require that he "intend[] to attend the school *specified* in the student's visa." 8 C.F.R. § 214.2(f)(1)(i)(C) (emphasis added); *see* 8 C.F.R. § 214.2(f)(1)(i)(A) (providing that a nonimmigrant student may be admitted if he "presents a Form I-20 or successor form issued in the student's name *by a school certified by the Student and Exchange Visitor Program (SEVP)* for attendance by F-1 foreign students" (emphasis added)); *see also* 8 § 214.2(j)(1)(i) (similar requirement for J-1 exchange visitors). And even if a student wishes to transfer schools, he must follow a complicated process or seek a new visa. 8 C.F.R. § 214.2(f)(8), (m)(11). So those visas permit entry for the purpose of attending the specified school. And suspension of entry for the purpose of attending a specific school is suspension of entry for a class of aliens, plain and simple.

Harvard and this Court posit that the Proclamation is really targeted at a domestic institution, which has never been done before. Again, the Proclamation bans new foreign students; it does not directly regulate Harvard. Even so, it is inaccurate to say the purpose of the statute (and thus its scope) is limited to foreign concerns. The text has no such limit. In fact, the proclamation in *Trump* stemmed from concerns about unvetted migrants raising "national security" and "public-safety threats" *within* the United States. 585 U.S. at 677-80. Those concerns were focused on conduct by the aliens after entrance. Moreover, the fact that this Proclamation is different from previous ones is irrelevant and certainly not a major question. The Supreme Court rejected an identical argument in *Trump*, stating that plaintiffs' "ad hoc . . . account of executive action" could not limit a "statute that grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long." 585 U.S. at 693. While history does not repeat itself,

13

it often rhymes. And all of Harvard's statutory arguments echo those that the Supreme Court has already rejected.

**2.** Harvard also argues that the President "merely purports to find that it would be detrimental to the United States for noncitizens" to enter the country to attend Harvard. ECF 54 ¶ 297. This Court correctly rejected this argument. ECF 75 at 18. The Supreme Court held that "whether the President's chosen method of addressing perceived risks is justified from a policy perspective is irrelevant to the scope of his § 1182(f) authority." *Trump*, 585 U.S. at 686. Previous proclamations provided as little as a sentence to justify suspension. *Id.* The Proclamation here finds that the entry of foreign nationals to attend Harvard presents specific harms, including security risks related to data deficiencies, a breakdown in institutional oversight of visa holders, increased threats of campus violence, civil rights violations, and foreign influence by adversaries. *See* 90 Fed. Reg. at 24493–94. These are specific, concrete reasons that satisfy the deferential standard set forth in *Trump*. 585 U.S. at 686.

Harvard, however, claims that *Trump* is inapplicable because the Proclamation here is focused on what happens at Harvard after entry. *See* ECF 54 ¶ 209. This Court also said that while *Trump* was focused on vetting abroad and the danger in *Trump* was tied to nationality, here it is all about Harvard. ECF 75 at 16-17. But *Trump* does not rest on either fact and neither does the statute. Here, the concern is that the aliens will not be properly monitored, disciplined, or reported on by Harvard—as required to maintain SEVP certification and Exchange Visitor Program designation—compared to other schools. As in *Trump*, the Proclamation here is concerned with national security and public safety after entry. 585 U.S. at 677-80. Nor is the breadth of the class designated by the President relevant to the analysis. Other § 1182(f) proclamations have targeted smaller classes than this one. *See, e.g.*, 62 Fed. Reg. 65987 (Dec. 16, 1997) (suspending entry for high-ranking officials

in Angola's second largest political party); 79 Fed. Reg. 16169 (Mar. 24, 2014) (suspending entry of operators of specific industries in Russia). And in any case, neither the statute nor *Trump* turns on the particular class of aliens at issue. Ultimately, where even this Court acknowledges the entry of such aliens is detrimental to the nation, any parsing of when the detriment occurs and what it arises from is irrelevant.

**3.** Harvard's attempt to limit the President's power based on 8 U.S.C. § 1372(c) and related SEVP regulations is equally unavailing. Section 1182(f) is an independent grant of authority by Congress that allows the President to restrict entry irrespective of agency-level reporting frameworks. *See Trump*, 585 U.S. at 691 ("[N]o Congress that wanted to confer on the President only a residual authority to address emergency situations would ever use language of the sort in § 1182(f)."). As this Court ruled, regulation of the SEVP program cannot override, and is not in conflict with, the President's power to suspend entry. *See* ECF 75 at 20 n.4; *Trump*, 585 U.S. at 695 (rejecting similar argument and noting laws operate in "different spheres").

## II. The Proclamation is facially legitimate and thus constitutional.

Harvard brings a plethora of constitutional claims against the Proclamation. Counts 4, 5, 7. In evaluating any constitutional challenge to a proclamation under § 1182(f), courts must ask "only whether the policy is facially legitimate and bona fide." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 651 (4th Cir. 2020) (quoting *Trump*, 585 U.S. at 704) (making clear *Mandel* always applies). In doing so, "courts will neither look behind" the Executive's justifications, nor test them against the asserted constitutional rights of even U.S. citizens. *Kleindienst v. Mandel*, 408 U.S. 753, 754 (1972). Only if the Proclamation lacks facial validity can a court look at other evidence. *See Int'l Refugee Assistance Project*, 961 F.3d at 651. Even then, courts must apply "rational basis review," asking only whether "the entry policy is plausibly related to the Government's stated

objective to protect the country and improve vetting processes." *Trump*, 585 U.S. at 704–05 (only

"assuming" reviewability to undertake rational basis review). At no point do courts apply regular

constitutional standards when reviewing § 1182(f) proclamations. *See Int'l Refugee Assistance*

*Project*, 961 F.3d at 651. All of Harvard's constitutional claims against the Proclamation fail at the

outset and must be dismissed because the Proclamation is facially valid and easily passes rational

basis review.

**A.  The Proclamation is facially valid.**

Under the proper standard of review, the Proclamation is clearly constitutional. The

Supreme Court has made clear that *Mandel*'s deferential standard of review governs where

"plaintiffs seek to invalidate a national security directive regulating the entry of aliens abroad."

*Trump*, 585 U.S. at 702. All that is needed in that instance is "a facially legitimate and bona fide

reason." *Mandel*, 408 U.S. at 770. "If so, the inquiry is at an end." *Munoz*, 602 U.S. at 908. This

"narrow standard of review 'has particular force' in admission and immigration cases that overlap

with "the area of national security.'" *Trump*, 585 U.S. at 704 (quoting *Din*, 76 U.S., at 104

(Kennedy, J., concurring)). The Proclamation rests on obviously legitimate reasons.

The Proclamation sets forth a facially legitimate and bona fide factual basis for its entry

restrictions. It leads by noting that a foreign student's admission into the United States "is a

privilege . . . tied to the host institution's compliance and commitment to following Federal law."

90 Fed. Reg. at 24493. The institution's compliance with law and regulations governing SEVP

certification and Exchange Visitor Program designation is key. *Id.* SEVP participation "depends

fundamentally on academic institutions' good faith, transparency, and full adherence to the relevant

regulatory frameworks"—all tied to "crucial national-security reasons." *Id.* Central to SEVP's

mission is that sponsoring schools have legal duties that attach to the privilege of hosting foreign

students so that the Government can ensure those students are being properly supervised while in the country. 8 C.F.R. § 214.3(a). SEVP certification requires schools to abide by particular regulations, including recordkeeping and disclosures. *Id.* § 214.3(a), (g), (h), (e). Each foreign student visa seeks entry based on attendance to a particular school that vouches, under oath, for that student. *Id.* § 214.2(f)(1)(i)(A), (m)(1)(i)(A). So it is apparent that national security "is one reason why SEVP regulations require foreign students to obey Federal and State criminal laws and require universities to keep records about foreign students' studies in the United States—including records relating to criminal activity by foreign students and resulting disciplinary proceedings." 90 Fed. Reg. at 24493.

Despite this, Harvard "refused the recent requests of the DHS for information about foreign students' 'known illegal activity,' 'known dangerous and violent activity,' 'known threats to other students or university personnel,' 'known deprivation of rights of other classmates or university personnel,' and whether those activities 'occurred on campus,' and other related data." *Id.* Accordingly, the President found that "these actions and failures directly undermine the Federal Government's ability to ensure that foreign nationals admitted on student or exchange visitor visas remain in compliance with Federal law." *Id.* at 24493–94. The thrust is that SEVP compliance is an important requirement for hosting foreign student visa holders to ensure they are adequately monitored, disciplined, and reported on. Harvard was not complying with its obligations. This raised serious national security and public safety concerns, of which the President's determination is due the utmost deference.

The Proclamation also explains several independent concerns that Harvard's sponsorship of foreign students raises, each of which also highlights the importance of SEVP compliance. This includes Harvard's extensive acceptance of foreign money; that it "repeatedly hosted and trained

members of a Chinese Communist Party paramilitary organization"; and that Harvard researchers have partnered with China-based individuals on research that could advance China's military modernization. *Id.* at 24494. It also includes increased crime rates at a time of heightened unrest and violent conduct on campus. *Id.* Harvard has failed to adequately address these issues or even provide requested information about its foreign student visa holders and their disciplinary records. *Id.* These concerns led the President to conclude that Harvard was not a responsible host of foreign student visa holders and could not be trusted to host monitor, discipline, and report on its foreign student visa holders. *Id.* Those are unquestionably legitimate and bona fide reasons for the entry restrictions. *Mandel*, 408 U.S. at 770; *see also Fiallo,* 430 U.S. at 795 (categorical entry based on sex is not for judiciary to question).

In fact, these rationales are much stronger than those offered in similar cases. In *Mandel*, the Supreme Court rejected a First Amendment challenge brought by professors who wished to hear from a foreign journalist who was denied entry because he "advocate[d] the economic, governmental, and international doctrines of world communism." 408 U.S. at 756, 769. Even though the Supreme Court agreed this burdened the First Amendment rights of American citizens, it held that the Government offered a "facially legitimate and bona fide reason" that he had abused the visa process, such that it would "neither look behind the exercise of that discretion, nor test it by balancing its justification against [] First Amendment interests." *Id.* at 770. The Supreme Court also upheld a travel ban challenged under the First Amendment for allegedly targeting Muslims, noting that if it asked only whether the policy was facially legitimate and bona fide, that "would put an end to [its] review." *Trump*, 585 U.S. at 704. Courts have also applied this review to constitutional challenges that a spouse's visa was denied with merely a statutory citation for its reasoning. *See Munoz*, 602 U.S. at 908; *Colindres v. United States Dep't of State*, 71 F.4th 1018,

18

1024 (D.C. Cir. 2023). If the Supreme Court upheld exclusions based on such minimal reasoning despite burdening the rights of citizens, then clearly the thorough explanation of the Proclamation here must also pass muster.

This Court disagreed, opining that the scope of the Proclamation is so broad that it "quite obviously has no 'legitimate grounding' in its stated concerns" and "is 'inexplicable by anything but animus.'" ECF 75 at 24 (quoting *Trump*, 585 U.S. at 706). But as the Supreme Court said, the only way the Proclamation would fail is "by refusing to apply anything resembling rational basis review," much less facial legitimacy. *Trump*, 585 U.S. at 706. By analyzing the fit between each individual reason and scope of the Proclamation, the Court's analysis reflected intermediate scrutiny more than facial legitimacy or even rational basis. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("narrowly tailored to serve a significant governmental interest"). The Court even probed the Government's evidence that Harvard faced increased crime rates. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 696 (6th Cir. 2016) (en banc) (insufficient evidence to support law under intermediate scrutiny). By contrast, in analyzing the proclamation from *Trump*, the Fourth Circuit did none of this; it simply laid out the reasoning in the Proclamation and concluded it was legitimate. *See Int'l Refugee Assistance Project*, 961 F.3d at 651. This Court noted that in *Trump* the Proclamation made no mention of Muslims, but the Proclamation here also makes no mention of speech.[4] And while the Court analyzed three reasons for the Proclamation, it ignored the overarching justification: Harvard failed to provide the necessary information required under the laws and regulations governing SEVP certification to ensure it is adequately hosting,

---

[4] The Court noted that it was proper to consider a fact sheet as part of the Proclamation. A press release is not part of the four corners of the Proclamation, so that is wrong. In any event, the reference to "radicalism" is a header followed by examples of radical conduct explored in the Proclamation, not speech.

monitoring, disciplining, and reporting on its foreign students. All of the other reasons raise independent concerns, though they also buttress the need for adequate reporting to protect national security and public safety. Those reasons are facially legitimate and that is the end of the inquiry.

**B. The Proclamation easily passes rational basis review.**

To the extent courts can ever look behind the facial validity of the Proclamation, they must apply "rational basis review," asking only whether "the entry policy is plausibly related to the Government's stated objective to protect the country." *Trump*, 585 U.S.at 704-05 (only "assuming" if courts can review, it would be rational basis). A law passes rational basis review "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). "This standard of review is a paradigm of judicial restraint." *Id.* The Proclamation easily passes.

As explained, the President determined that Harvard was not complying with its obligations under the laws and regulations governing SEVP certification to provide fulsome records on the disciplinary and criminal records of its foreign student visa holders, which the Government needs to evaluate each student's fitness to remain in America and Harvard's ability to adequality host, monitor, discipline, record, and disclose information about those students. 90 Fed. Reg. 24493–95. Those requirements are important to protect national security and public safety. *Id.* So allowing aliens to enter the nation to attend a school that is not upholding these basic legal requirements raises serious national security and public safety concerns. *Id.* There are more than enough reasonably conceivable sets of facts to justify the suspension of entry here. Indeed, concerns with rising crime rates, unrest, antisemitic violence, entanglements with China, discrimination, and Harvard's unwillingness to resolve these issues all buttress the conclusion that Harvard is not a proper steward of foreign students and that allowing aliens entry to attend Harvard would be

detrimental to the nation. *Id.* Still, the President balanced that interest against those of existing students and exchange visitors and the desire for individual exceptions. *Id.* This well-considered policy judgment is clearly related to the national interest. Nothing more is required.

Indeed, the Proclamation is on even stronger grounds than the one reviewed in *Trump*, 585 U.S. at 704. First, the Proclamation explains that the suspension is temporary (six months with the possibility of extension) and requires near-term (within 90 days) reassessment of whether the suspension continues to be in the interest of the United States. 90 Fed. Reg. at 24495, Sec. 2(e). It also notes that the suspension is only in the national interest "[u]ntil such time as the university shares the information that the Federal Government requires to safeguard national security and the American public." *Id.* In other words, it describes how Harvard can end the suspension—by sharing the information federal law requires it share upon request. *See Trump*, 585 U.S. at 708 (noting that the provision stating that its "conditional restrictions" would remain in force only so long as necessary to "address" the identified "inadequacies and risks" supported the claim of a legitimate national security interest).

Second, the Proclamation "includes significant exceptions for various categories of foreign nationals." *Id.* at 709. It only prohibits entry of an alien "as a nonimmigrant to pursue a course of study at Harvard" or participate in an exchange visitor program at Harvard under certain INA provisions. 90 Fed. Reg. at 24495, Sec. 1. It does not prohibit the entry of those aliens for other purposes. Nor does it exclude existing students or exchange visitors. *Id.* at Sec. 2. In *Trump*, the proclamation at issue prohibited entrance for the purpose of business or tourism but allowed the same aliens to enter for other purposes such as nonimmigration or asylum. *See* 585 U.S. at 680.

Third, the Proclamation contains provisions similar to the waiver program contained in the proclamation in *Trump*. 585 U.S. at 709. Specifically, the Proclamation here notes that the

suspension "shall not apply to any alien whose entry would be in the national interest," 90 Fed. Reg. at 24495, Sec. 2(d), and leaves to the Secretary of State's discretion whether to revoke visas of foreign nationals who currently attend Harvard, *id.* at Sec. 2(b). Accordingly, as in *Trump*, "the Government has set forth a sufficient national security justification to survive rational basis review," and Harvard has "not demonstrated a likelihood of success on the merits of their constitutional claim." 585 U.S. at 710.

This Court disagreed and noted that three proffered rationales could not justify the Proclamation, including because they were overbroad. ECF 75 at 24–26. Again, the Court's measuring of the exact fitness between each rationale and the policy is more akin to intermediate scrutiny than rational basis. Under rational basis "any reasonably conceivable state of facts" that could justify the policy suffices. *F.C.C.*, 508 U.S. at 313–14. And even under intermediate scrutiny, the policy does not have to be a perfect it; it can be overbroad and also "need not address all aspects of a problem in one fell swoop." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2318 (2025) (quotation omitted).

Yet, here, the Court appeared to look for a perfect match by examining each individual rationale in isolation. First, the Court said the Proclamation does not connect increased crime to international students even though the Government should have superior information. ECF 75 at 24–25. But the fact that Harvard cannot control its crime rates, yet still will not provide adequate disciplinary records, shows it is not equipped to host foreign students, who bring their own additional risks. The Court also questioned why a broader ban was necessary if antisemitism, connections to China, and issues of egalitarianism are at issue. *Id.* at 25–26. Again, the policy does not need to be a perfect match to the problem it addresses. In *Trump*, the Supreme Court rejected similar arguments that insufficient evidence was considered, that the policy was "overbroad" given

22

the concerns, and that it was overinclusive based on its own criteria. 585 U.S. at 707–08. Later, on a full record, the Fourth Circuit rejected those arguments again and made it clear that the "Proclamation must be afforded 'a strong presumption of validity,' and 'those attacking the rationality of the [policy] have the burden to negative every conceivable basis which might support it . . .' [and] it is 'entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated' the decisionmaker." *Int'l Refugee Assistance Project*, 961 F.3d at 651–52 (quoting *F.C.C.*, 508 U.S. at 314–15). The Court's analysis went far beyond this highly deferential standard and Harvard has utterly failed to negate every basis that could support the Proclamation.

Moreover, focusing on these three rationales in isolation ignores the larger justification for the Proclamation: Harvard is not providing required information about its foreign student visa holders, which raises an overarching security concern that those foreign students are entering the United States without adequate monitoring and reporting after they enter. The Court did not address this core reasoning, which all the individual rationales support. Indeed, this is key to the Proclamation, as foreign students will no longer be excluded if Harvard simply provides the necessary information to evaluate them. 90 Fed. Reg. at 24494. That is clearly a rational basis and nothing the Court pointed to undermines that.

## III.    Harvard fails to plausibly allege a First Amendment violation.

Harvard's First Amendment claim does not withstand scrutiny. Harvard asserts that the Proclamation was adopted in retaliation for its protected speech, perceived viewpoint, and assertion of academic independence. ECF 54 at 9. But it identifies no plausible factual allegations supporting the conclusion that the Proclamation was motivated by such retaliatory animus, much less that such animus was the "but-for" cause of the challenged action. *See Nieves v. Bartlett*, 587

23

U.S. 391, 398-99 (2019); *see also Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist.*, 971 F.3d 416, 430 (3d Cir. 2020) (inquiring, in case involving claim of official retaliatory action, whether "the action would have been taken anyway, independently of any retaliatory animus." (quoting *Hartman v. Moore*, 547 U.S. 250, 260-61 (2006)).

To the contrary, the Proclamation sets out national security and compliance-based justifications on its face. *See* 90 Fed. Reg. at 24493-94. It recounts how Harvard repeatedly failed to discipline or monitor foreign students engaged in misconduct, refused to comply with federal requests for records required by regulation, and disregarded growing evidence of violent activities and foreign entanglements on campus. *Id.* None of this has to do with Harvard's speech. In light of the Proclamation's facially valid justifications, there is simply no room to conclude that Harvard's theory of retaliation is plausible. Even if the President had a retaliatory motive, the President had ample reason to issue this proclamation and would have done so anyways. Harvard has not plausibly alleged otherwise.

Harvard cites no statements by the President, his senior immigration advisors, or the State Department indicating a desire to punish Harvard for its speech. And unlike in *Trump*, the statements it does point to are not about *this* Proclamation. 585 U.S. at 700. Instead, the Amended Complaint cherry-picks from unrelated actions taken by other agencies and asks the Court to infer that every government response to Harvard must be part of a unified campaign of retaliation. ECF 54 at 30–34 (citing negotiation letters (ECF 1-7; ECF 1-8; ECF 1-9) issued by the General Services Administration (GSA), the Department of Health and Human Services (HHS), and the Department of Education that would have required Harvard's compliance in areas such as merit-based hiring, student discipline, and whistleblower reporting and protections); *cf. DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020) (finding statements irrelevant because they were

"remote in time and made in unrelated contexts" and thus did "not qualify as 'contemporary statements' probative of the decision at issue"); *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 923 (2025) (refusing to question agency's statements absent a "strong showing of bad faith or improper behavior" (internal quotation marks omitted)). That inference is unwarranted under *Iqbal*, which cautions against crediting "conclusory allegation[s]" and demands plausible factual content linking the defendant to the alleged constitutional violation. 556 U.S. at 678–79, 686.

To establish retaliation, Harvard would have to demonstrate a causal link between the purported retaliatory action and some constitutionally protected conduct. *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514-15 (1st Cir. 2023). Harvard baldly claims that the Proclamation "escalate[d] and intensifie[d] the campaign of retaliation" against it, ECF 54 ¶ 22, ignoring that the Proclamation was issued nearly two months after an April 11, 2025 negotiation letter the Government sent to the university. ECF 1-9; *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). That letter was based on a different Executive Order, "*Additional Measures to Combat Anti-Semitism*," which was not targeted at Harvard but rather issued to address "unlawful anti-Semitic harassment and violence." 90 Fed. Reg. 8847 (Jan. 29, 2025). Several follow-up letters reiterated that this was about "combat[ing] anti-Semitic harassment." ECF 1-7; *see also* ECF 1-8; ECF 1-9. Moreover, the agencies involved in that negotiation—GSA, HHS, and the Department of Education—are not the President or his national security or foreign policy advisors. *See* ECF 1-8; ECF 1-9. And it involved grant terminations, not the entrance, monitoring, and reporting of foreign student and exchange visitor visa holders. *See* ECF 1-7; ECF 1-8; ECF 1-9. The Proclamation makes no reference to the April letter or these issues. The gap in time, subject, legal authority, and parties makes any inference of causation implausible.

While Harvard acknowledges that the April 11 letter "enumerat[ed] detailed conditions for maintaining Harvard's financial relationship with the federal government," it immediately leaps from that to a bare allegation that those conditions sought to "put under direct government control a slate of core university functions, including regulation of the viewpoints of Harvard's students and faculty." ECF 54 ¶ 116. But the letter did nothing of the sort. Instead, it was explicitly premised on the objective of inducing Harvard "to live up to both the intellectual and civil rights conditions that justify federal investment"—stating that "Harvard must abolish all criteria, preferences, and practices . . . that function as ideological *litmus tests*." ECF 1-9 at 2 (emphasis added). In other words, the letter sought to *prevent* the suppression of diverse viewpoints, and it is a gross distortion of the plain text to allege that it somehow purported to impinge on Harvard's academic freedom. The letter also made clear that it was an offer open to negotiation. ECF 1-9 at 1 ("If acceptable to Harvard, this document will constitute an agreement in principle, which the parties will work in good faith to translate into a more thorough, binding settlement agreement."). Rejecting that offer is not speech.

In short, the Proclamation was issued under a distinct statutory authority, based on independent factual predicates, and marked by facially neutral terms—all factors undermining any inference of retaliatory causation. Further, even if Harvard could demonstrate some connection between the April 11 letter and the Proclamation, it is beyond dispute that antisemitic conduct is not protected speech. Harvard cites no authority allowing it to spurn a proposed settlement addressing antisemitism, only to later launch a broad-side attack against the Government based on conjecture about potential hidden motives. *See* ECF 1-9 at 2. Harvard appears to believe that a letter in April can immunize it from Government action. That is an extreme proposition and one this Court should reject.

The claim that the President issued this Proclamation in retaliation for this lawsuit is even less plausible. ECF 54 at 58-60. The Proclamation says nothing about this suit. Most of Harvard's cherry-picked "evidence" at best relates to the April 11 letter regarding grants, not the litigation here relating to the May 22, 2025 revocation of Harvard's SEVP certification and Exchange Visitor Program designation. So any causal connection is even more attenuated. Moreover, such government action must be upheld if there is any rational basis for it, which, as demonstrated, the Proclamation has in spades. *See Baptiste v. Kennedy*, 490 F. Supp. 3d 353, 395 (D. Mass. 2020).

As for Harvard's related claim that it has been targeted for its ideological viewpoint, ECF 54 ¶¶ 266-67, the Proclamation is facially neutral and silent as to speech. It makes no mention of Harvard's views, litigation posture, or public statements. Instead, it references concrete concerns regarding public safety, national security, persistent noncooperation, and failures to comply with binding regulatory reporting obligations. Those are not pretexts for viewpoint discrimination, but legitimate considerations well within the scope of executive authority under § 1182(f). And they reflect core sovereign interests—ensuring the integrity of nonimmigrant visa programs, preserving domestic security, and protecting against foreign exploitation—that the Executive is singularly charged with safeguarding.

In sum, the Amended Complaint offers no facts that could plausibly show that the Proclamation was driven by an intent to interfere with Harvard's protected activity, or that the Proclamation lacked an independent lawful basis. The same is true for the May 22, 2025 DHS revocation letter, as the gap in time, legal authority, defendants, and reasoning is significant. Harvard's theory of a First Amendment violation fails on all fronts.

IV.    **Harvard's Equal Protection claim is equally deficient.**

Harvard's equal protection theory adds nothing. It asserts that the Proclamation discriminates against Harvard as a "class-of-one" without rational basis. But that theory collapses under the same deficiencies described above. To state a class-of-one equal protection claim, Harvard must plausibly allege that it was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

Yet Harvard fails to identify any comparator that is similarly situated in all relevant respects—let alone one that has received more favorable treatment. *See Cordi-Allen v. Conlon*, 494 F.3d 245, 249 (1st Cir. 2007). On the one hand, Harvard has not been singled out. The Executive Order on antisemitism and the March 31, 2025 letter made clear that other universities were being investigated. 90 Fed. Reg. 8847; ECF 1-7; *cf. Coinbase, Inc. v. SEC*, 126 F.4th 175, 202 (3d Cir. 2025) ("agencies have great discretion to treat a problem partially and regulate in a piecemeal fashion" (cleaned up)); *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) ("Agencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop."). The President also issued another Proclamation suspending entry for national security and deficient information-sharing reasons on the same day. 90 Fed. Reg. 24497. And on the other hand, no other institution is alleged to have displayed the same combination of compliance failures, foreign entanglements, student unrest and violence, and refusal to produce mandated student records. Harvard does not even allege otherwise.[5] The executive power includes wide discretion to evaluate

[5] At most, Harvard asserts, upon information and belief, that "scores of other universities receive foreign funding (including from China)[,] admit large numbers of international students, and maintain and report information to DHS only as required by applicable regulations." ECF 54 ¶ 304. But that only bolsters the point that Harvard has not been irrationally singled out for discriminatory

the severity of national security risks and legal violations and to focus on some targets over others. *See Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 604 (2008).

Regardless, the rational basis standard applies. *See Cordi-Allen*, 494 F.3d at 250; *Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir. 2006). And as explained, the Proclamation easily passes. The President's decision is expressly grounded in documented concerns about national security, institutional noncompliance, and unlawful discrimination. *See* 90 Fed. Reg. at 24493-94. Put simply, Harvard cannot show the President had "no conceivable basis for his action other than spite or some other improper motive." *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013).

## V.    Harvard's Bill of Attainder claim lacks any basis in law.

Harvard's final novel claim appears to be that the Proclamation and May 22, 2025 DHS revocation letter constitute bills of attainder. Count XIV, ¶¶ 365-66. It is no wonder that Harvard did not rely on this claim in seeking preliminary relief, given that the "Bill of Attainder" clause is in Article I ("No Bill of Attainder or ex post facto Law shall be passed."). U.S. CONST. art. I, § 9, cl. 3. Bills of attainder have long been understood to be only *legislative* acts, not executive actions. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473 (1977); *Kovac v. Wray*, 2020 WL 6545913, at *3 (N.D. Tex. Nov. 6, 2020) (gathering originalist sources). In fact, every circuit court to address such claims has rejected them out of hand. *See Scheerer v. U.S. Atty. Gen.*, 513 F.3d 1244, 1253 (11th Cir. 2008) (collecting cases); *Glob. Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 755 (7th Cir. 2002); *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966). This Court should do the same.

---

treatment. By Harvard's own admission, those other, unidentified universities are complying with DHS regulations, whereas Harvard is subject to the Proclamation's restrictions precisely because of its failure to demonstrate "good faith, transparency, and full adherence to the relevant regulatory frameworks." 90 Fed. Reg. at 24493 (explaining that admission into the United States by foreign students "is necessarily tied to the host institution's compliance and commitment to following Federal law").

**VI.    The May 22, 2025 DHS revocation letter is moot.**

Harvard also brings 12 claims against the May 22, 2025 DHS letter revoking Harvard's SEVP certification and Exchange Visitor Program designation. Counts 1–5, 8–14.[6] All of those claims are moot. In response to Harvard's procedural concerns, DHS issued the May 28, 2025 NOIW that supersedes the May 22, 2025 letter, making clear that the agency would go through the regulatory procedures to review Harvard's SEVP certification and take appropriate action. ECF 49; *see Fund For Animals, Inc. v. Hogan*, 428 F.3d 1059, 1064 (D.C. Cir. 2005) (going through procedures mooted previous agency letter). Defendants have made clear in argument, and now in a stipulation (ECF 84), that Harvard's SEVP certification and Exchange Visitor Program designation are not revoked, it will not be revoked based on the May 22, 2025 letter, and the regulatory procedures will be followed before any revocation. *See Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 45 (1st Cir. 2024) ("given defendants' withdrawal letter and open-court representations, we think they have made it absolutely clear that they will not repeat the challenged behavior"). It is not clear what more Harvard wants, but it defies reality and is inefficient to allow these claims to continue. They are moot.

## CONCLUSION

The Court should grant Defendants' Motion to Dismiss Harvard's Amended Complaint.

---

[6] Harvard does not challenge the result of SEVP's ongoing regulatory certification withdrawal procedures. Nor could they. There is no final agency action before a decision on certification withdrawal is made. Any claims would be unripe and speculative. Harvard will have to amend its complaint if it plans to challenge any future decision.

Dated: August 8, 2025                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General
                                         Civil Division

                                         DREW ENSIGN
                                         Deputy Assistant Attorney General
                                         Office of Immigration Litigation
                                         Civil Division

                                         */s/ Tiberius T. Davis*
                                         TIBERIUS T. DAVIS
                                         Counsel to the Assistant Attorney General
                                         Civil Division
                                         U.S. Department of Justice
                                         P.O. Box 878, Ben Franklin Station
                                         Washington, DC 20044-0878
                                         (202) 514-2000
                                         tiberius.davis@usdoj.gov

                                         BRIDGET K. O'HICKEY
                                         Counsel to the Assistant Attorney General
                                         Civil Division

                                         DAVID KIM
                                         CATHERINE M. RENO
                                         Senior Litigation Counsel

                                         ANNE R. BURLEY
                                         Trial Attorney
                                         Office of Immigration Litigation
                                         General Litigation and Appeals Section

                                         *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I, Tiberius Davis, hereby certify that I served a true copy of the above document upon all counsel of record via this court's electronic filing system and upon any non-registered participants via first class mail.

Dated: August 8, 2025         /s/ *Tiberius Davis*
                                         TIBERIUS DAVIS
                                         Counsel to the Assistant Attorney General