# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

      Plaintiff,

   v.

DEPARTMENT OF HOMELAND SECURITY, et al.,
      Defendants.

Case No. 1:25-cv-11472-ADB

**Leave to File Excess Pages
Granted on August 12, 2025**

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    The Regulations Governing SEVP Certification And EVP Designation ............... 3

    B.    The Government's Assault On Academic Freedom At Harvard ............................ 5

    C.    The May 22 Revocation Notice And Harvard's Original Complaint ..................... 6

    D.    The June 4 Presidential Proclamation And Harvard's Amended Complaint ......................................................................................................... 8

    E.    This Court's Preliminary Injunction Orders ......................................................... 9

    F.    Subsequent Procedural And Factual Developments ............................................ 10

LEGAL STANDARD .................................................................................................... 11

ARGUMENT ................................................................................................................ 11

I.    The Amended Complaint States Claims Under The First Amendment ............................ 11

    A.    Harvard Has Plausibly Alleged Multiple Violations Of The First Amendment ........................................................................................................ 12

    B.    *Mandel* And *Hawaii* Do Not Apply And Regardless Do Not Require Dismissal ......................................................................................................... 14

II.    The Amended Complaint States An Equal Protection Claim ....................................... 17

III.    The Amended Complaint States A Separation-of-Powers Claim ................................. 18

IV.    The Amended Complaint States A Claim That the Proclamation Violates The INA. ........................................................................................................................ 18

    A.    Harvard's Statutory Claims Are Justiciable ....................................................... 19

    B.    Harvard Has A Cause Of Action To Challenge The Statutory Violation ............. 20

    C.    The Proclamation Violates § 1182(f) ................................................................. 22

V.    Harvard's Challenge To The May 22 Revocation Notice Is Not Moot. ......................... 28

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

**CASES**

*American Forest Resource Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023),
  *cert. denied*, 144 S. Ct. 1110 (2024) ..........................................................................20

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) ............................20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .........................................................................11

*Berge v. School Committee of Gloucester*, 107 F.4th 33 (1st Cir. 2024)......................29

*Burke v. Walsh*, 2024 WL 3548759 (D. Mass. June 5, 2024)........................................30

*Chamber of Commerce of United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ................20, 21

*Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866) ..................................................18

*Department of State v. Munoz*, 602 U.S. 899 (2024)................................................19, 20

*FBI v. Fikre*, 601 U.S. 234 (2024) ......................................................................28, 29, 30

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................27

*Fiallo v. Bell*, 430 U.S. 787 (1977)...............................................................................19

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477
  (2010)...........................................................................................................................13

*Gattineri v. Town of Lynnfield*, 58 F.4th 512 (1st Cir. 2023) ......................................13

*Global Health Council v. Trump*, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ........21

*Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020) .................................................20

*Hartman v. Moore*, 547 U.S. 250 (2006) ......................................................................16

*Houston Community College System v. Wilson*, 595 U.S. 468 (2022) ..........................16

*INS v. Chadha*, 462 U.S. 919 (1983) .............................................................................19

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951)....................18

*Kent v. Dulles*, 357 U.S. 116 (1958) .............................................................................27

*Kleindienst v. Mandel*, 408 U.S. 753 (1972)......................................................10, 16, 17

*Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012) ........28, 29, 30

*League of United Latin American Citizens v. Executive Office of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025) ........................................................................................21

*Manguriu v. Lynch*, 794 F.3d 119 (1st Cir. 2015) ........................................................29

*New York v. National Science Foundation*, No. 25-CV-4452, 2025 WL 2180478 (S.D.N.Y. Aug. 1, 2025) .............................................................................................21

*News American Publishing, Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988) ....................18

*Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) ...........................20, 21

*Pietersen v. United States Department of State*, 138 F.4th 552 (D.C. Cir. 2025) ........20

*President & Fellows of Harvard College v. United States Department of Health & Human Services*, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) ...........................6, 12, 13, 21

*RAICES v. Noem*, No. 25-5243, slip op. (D.C. Cir. Aug. 1, 2025) ..............................23

*RAICES v. Noem*, 2025 WL 1825431 (D.D.C. July 2, 2025), *appeal docketed*, No. 25-5243 (D.C. Cir. July 3, 2025), stay *granted in part on other grounds*, No. 25-5243 (D.C. Cir. Aug. 1, 2025) ........................................................................19, 20

*Rhode Island Department of Environmental Management v. United States*, 304 F.3d 31 (1st Cir. 2002) ...........................................................................................21

*Roane v. Barr*, 980 F.3d 123 (D.C. Cir. 2020) ............................................................11

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993) ........................................19

*SEC v. Tambone*, 597 F.3d 436 (1st Cir. 2010) ........................................................3, 11

*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013) ...........................................18

*Town of Barnstable v. O'Connor*, 786 F.3d 130 (1st Cir. 2015) ..................................28

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) ...............30

*Trump v. Hawaii*, 585 U.S. 667 (2018) .........................9, 10, 15, 16, 19, 23, 25, 26

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) .........................................27

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) .............................20

*United States v Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) ............................15

*United States v. W. T. Grant Co.*, 345 U.S. 629 (1953) ................................................30

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam) ...........................17

*West Virgina v. EPA*, 597 U.S. 697 (2022)................................................................27

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ................................................................27

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) ......................................19

**STATUTES**

8 U.S.C. § 1101(a)(13) (West 1996)................................................................23

8 U.S.C. § 1182(f).............................................................................23, 24, 25, 26

8 U.S.C. § 1185(a)(1).................................................................................9

8 U.S.C. § 1372(a)(1)................................................................................25

8 U.S.C. § 1372(c)...................................................................................25

8 U.S.C. § 1372(c)(5)................................................................................25

**OTHER AUTHORITIES**

8 C.F.R. § 214.1(h) ..................................................................................7

8 C.F.R. § 214.3(g) .................................................................................25

8 C.F.R. § 214.3(g)(1)................................................................................4

8 C.F.R. § 214.3(g)(2)................................................................................4

8 C.F.R. § 214.3(h)(3)................................................................................4

8 C.F.R. § 214.4(a)(2)................................................................................4

8 C.F.R. § 214.4(b)(1)................................................................................4

8 C.F.R. § 214.4(b)(2)................................................................................4

8 C.F.R. § 214.4(c)..................................................................................4

8 C.F.R. § 214.4(d)..................................................................................4

8 C.F.R. § 214.4(e)..................................................................................4

8 C.F.R. § 214.4(f)..................................................................................4

8 C.F.R. § 214.4(g)..................................................................................4

8 C.F.R. § 214.4(h)..................................................................................4

22 C.F.R. § 62.13 ................................................................................................4

22 C.F.R. § 62.60 ................................................................................................4

22 C.F.R. § 62.61 ................................................................................................4

Kristi L. Noem, Opinion, *Harvard flouted the rules. Now, it's getting a hard lesson*, Wash. Post (June 23, 2025), https://www.washingtonpost.com/opinions/ 2025/06/23/kristi-noem-harvard-foreign-students-dhs-restriction/ .........................................11

Press Release, DHS, *DHS Sends Administrative Subpoenas to Harvard University* (July 9, 2025), https://perma.cc/QDW7-3Y9Q..................................................11

Press Statement, Secretary of State, *Investigation of Harvard University Participation in the Exchange Visitor Program* (July 23, 2025), https://perma.cc/QB4Q-S7AN ................................................................11

Proclamation No. 8342, *To Suspend Entry as Immigrants and Nonimmigrants of Foreign Government Officials Responsible for Failing to Combat Trafficking in Persons Billing Code 3195-W9-P4790*, 74 Fed. Reg. 4093 (Jan. 21, 2009) .....................26

Proclamation No. 8693, *Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions*, 76 Fed. Reg. 44751 (July 24, 2011)..................................................26

Proclamation No. 8697, *Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Participate in Serious Human Rights and Humanitarian Law Violations and Other Abuses*, 76 Fed. Reg. 49277 (Aug. 4, 2011) .........................................26

Proclamation No. 9932, *Suspension of Entry as Immigrants and Nonimmigrants of Senior Officials of the Government of Iran*, 84 Fed. Reg. 51935 (Sept. 25, 2019) ................................................................................................26

Proclamation No. 10309, *Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Policies or Actions That Threaten Democracy in Nicaragua*, 86 Fed. Reg. 64797 (Nov. 16, 2021) ..................................................26

Proclamation 10948, *Enhancing National Security by Addressing Risks at Harvard University*, 90 Fed. Reg. 24493 (June 4, 2025) .......................................9, 22, 23, 24

## INTRODUCTION

The Administration has engaged in an unprecedented, government-wide campaign to punish and retaliate against Harvard for its refusal to compromise its academic freedom, which has included using the immigration laws to harm Harvard's vital research programs, educational pursuits, and campus environment. Twice before, this Court preliminarily enjoined the government's actions after finding that they were likely unlawful—first when the Secretary of Homeland Security summarily revoked Harvard's ability to host international students, then again when the President issued a Proclamation seeking to achieve the same result by different means. The government now moves to dismiss, asserting that Harvard has failed to state a claim despite this Court's conclusion that Harvard is likely to prevail on those very claims. And the government asks this Court to dismiss Harvard's challenge to the Secretary's Revocation Notice as moot, even though the Notice has never been rescinded and the government's unilateral stipulation leaves it free to penalize Harvard based on that Notice.

The Court should deny the government's motion. The government contends that Harvard's allegations of First Amendment retaliation are implausible, but they are, in fact, undeniable. The Amended Complaint details the campaign of retaliation that followed Harvard's refusal to comply with the Administration's demands that Harvard submit to government oversight of the faculty it hires, the students it admits, and the courses it teaches. That campaign entailed freezing billions in federal grants, threatening to eliminate Harvard's tax-exempt status, disqualifying Harvard from future federal grants, opening multiple federal investigations, and terminating Harvard's participation in the F and J visa programs. The Administration then convened senior officials to "brainstorm additional punitive measures" for Harvard, and the President issued the Proclamation soon thereafter. All the while, the Administration—including the President and key members of his Cabinet—publicly attacked Harvard both for its supposed "wokeness" and for daring to

challenge the Administration in court. As this Court found, the government's contrary narrative rests on a sanitized view of the record that is "so selective as to be absurd." Dkt. 75 ("Op."), at 32.

The government also argues the Proclamation is effectively immune from constitutional challenge because it imposes entry restrictions on international students. But the Proclamation targets Harvard, not its students, and neither the Supreme Court nor the First Circuit has ever deferred to government actions targeting domestic institutions engaged in constitutionally protected conduct in the United States. Regardless, the government's actions do not survive even the most deferential review. As this Court already concluded, the Proclamation "has no 'legitimate grounding' in its stated concerns, and it is 'inexplicable by anything other than animus.'" Op. 24.

Similarly unavailing are the government's efforts to dispose of Harvard's equal protection and separation-of-powers claims. The Constitution prohibits the government from singling out Harvard for adverse treatment and concentrating the powers of all three branches in the hands of the President alone.

As for Harvard's statutory claims, the government argues that the Proclamation is a facially valid invocation of 8 U.S.C. § 1182(f). But in the statute's 70-year history—spanning over 100 proclamations—no President has ever used § 1182(f) as the President has done here: to target a domestic institution for its domestic conduct. As this Court correctly concluded, the Proclamation is "a perversion of the language and purpose" of § 1182(f) and does not lawfully restrict the "entry" of a "class of aliens." Op. 18-19. If more were needed, the President's asserted authority to use § 1182(f) to target domestic entities or coerce domestic conduct would raise serious constitutional concerns, implicating the nondelegation and major-questions doctrines. In a familiar refrain, the government says its statutory violations, like its constitutional ones, are judicially unreviewable. But Harvard has pleaded valid *ultra vires* claims, and the Supreme Court has twice adjudicated

statutory challenges to proclamations issued pursuant to § 1182(f). This Court should do the same.

Turning to the Revocation Notice, the government has no defense on the merits. Instead, it claims that Harvard's challenge is moot because, on the eve of filing its motion to dismiss, the government unilaterally "stipulated" that it will not again rely on the Notice to revoke Harvard's ability to host international students. Such gamesmanship does not shield the Notice from judicial review. It is the government's burden to establish mootness, and it has not done so. The government *still* has not rescinded the Notice. And the stipulation—which is far less protective than this Court's preliminary injunction—leaves the government free to take adverse action against Harvard based on the Notice and free to resume its challenged conduct without consequence. The government's purported voluntary cessation therefore does not moot Harvard's claims.

## BACKGROUND

The facts alleged in the Amended Complaint are assumed true, with reasonable inferences drawn in Harvard's favor. *See SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010).

For more than 70 years, Harvard has been certified to enroll international students on F-1 visas under the Student and Exchange Visitor Program ("SEVP") administered by the U.S. Department of Homeland Security ("DHS"). Dkt. 54 ("AC"), ¶¶ 11, 50-51, 102. Harvard also has long been authorized to host international exchange students, scholars, and researchers on J-1 visas through the State Department's Exchange Visitor Program ("EVP"). *Id*. ¶ 11. Through these programs, Harvard has hosted tens of thousands of international students and scholars who have enriched the university community, including scholars who have contributed to pioneering research. *Id*. ¶ 12. This case relates to the government's unlawful attack on these programs by abruptly revoking, without process or cause, the certifications that support them. *Id*. ¶¶ 111-211.

### A.    The Regulations Governing SEVP Certification And EVP Designation

Once a school is authorized to host noncitizens through the F and J visa programs—known

as "SEVP certification" and "EVP designation," respectively—the school's obligations for maintaining those authorizations and the circumstances permitting revocation are set out in detailed regulations promulgated pursuant to 8 U.S.C. §§ 1372 and 1762. AC ¶¶ 46-97.

*SEVP certification.* SEVP-certified schools are subject to specified "recordkeeping, retention, reporting and other requirements." 8 C.F.R. § 214.3(h)(3)(iii). Section 214.3(g)(1) lists ten categories of "information and documents that the school must keep on each student," such as biographical information, "[r]ecord of coursework," "[a]cademic status," and application materials. *Id.* § 214.3(g)(1)(i)-(x). Section 214.3(g)(2) requires schools to report changes in the (g)(1) information "or the occurrence of [several enumerated] events." *Id.* § 214.3(g)(2)(i)-(ii).

DHS "may review a school's certification at any time to verify [its] compliance with the recordkeeping, retention, reporting and other requirements" specified by regulation "and may initiate withdrawal proceedings against the school pursuant to 8 CFR 214.4(b) if noncompliance or ineligibility … is identified." *Id.* § 214.3(h)(3)(iii). The regulations do not permit DHS to initiate withdrawal proceedings without finding "noncompliance or ineligibility"—what the regulations elsewhere call a "valid and substantive reason" for withdrawal. *Id.* §§ 214.3(h)(3)(iii), 214.4(a)(2); *see id.* § 214.4(a)(2)(i)-(xix) (listing 19 "valid and substantive reason[s]"). And even when DHS believes it has identified such a reason, the regulations do not permit summary revocations. Rather, they require DHS to issue a Notice of Intent to Withdraw ("NOIW") specifying "[t]he grounds for withdrawing SEVP certification" and to provide the school with a meaningful opportunity to rebut the allegations against it. *Id.* § 214.4(b)(1)-(2); *see id.* § 214.4(c)-(h).

*EVP designation.* Schools designated as EVP sponsors are similarly subject to reporting and recordkeeping requirements, *e.g.*, 22 C.F.R. § 62.13, and may have their designations revoked only in specified circumstances, *see id.* §§ 62.60-62.61. Administration of the EVP program—and

attendant authority to revoke EVP designation—is vested in the State Department alone. AC ¶ 94.

**B.    The Government's Assault On Academic Freedom At Harvard**

The government has engaged in a relentless campaign "to control [Harvard] and squelch diverse viewpoints." Op. 44. On April 11, it sent Harvard a letter (the "Demands Letter") directing it to "hir[e] a critical mass of new faculty," "admit[] a critical mass of students" to achieve a government-approved level of "viewpoint diversity," and cease "admitting [international] students hostile to … American values"—among many similar demands. AC ¶ 116. After Harvard refused those demands on April 14, *id.* ¶¶ 118-119, the government swiftly retaliated. Since then, there have been "very few days where the Administration did not attack Harvard in some form or another," including by freezing federal grants; declaring Harvard ineligible for future grants; threatening Harvard's tax-exempt status; initiating investigations covering admissions and employment practices; and, as detailed below, making "several … attempts to limit Harvard's ability to host international students and visitors." Op. 32; *see* AC ¶¶ 120-211.

The Administration has made clear in public statements that these actions are part of one "concerted campaign" against Harvard. *Id.* at 33. In the months since April 14, the President has issued numerous public statements targeting Harvard for, *inter alia*, "pushing political" and "ideological[] … '[s]ickness[],'" AC ¶ 122 & Ex. 13 (Apr. 15); "hiring almost all woke, Radical Left, idiots," *id.* ¶ 123 & Ex. 15 (Apr. 16); having too many international students, many of whom are "bad," *id.* ¶ 181 (May 25); and admitting international students who are "troublemakers" and "radicalized lunatics," *id.* ¶ 183 & Ex. 30 (May 26). The President also publicly questioned "where" Harvard's international students "come from" (despite that information being readily available to the government, which approves their visas and maintains DHS's SEVIS database containing students' countries of origin and more). *Id.* ¶ 185 (May 28) (internal marks omitted).

The Administration has made clear throughout that its purpose is to "go after [Harvard] where it hurts" in retaliation for Harvard's "fighting" the Administration's demands. *Id.* ¶¶ 186-187.

### C.    The May 22 Revocation Notice And Harvard's Original Complaint

"[A]ttempts to limit Harvard's ability to host international students and visitors" have been a central feature of the government's "coordinated campaign" against Harvard. Op. 32.

On April 16, just two days after Harvard refused to comply with the Demands Letter, DHS issued an unprecedented press release touting the first of those attempts. AC ¶ 127 & Ex. 17. The press release, which accused Harvard of "bend[ing] the knee to antisemitism" and allowing "anti-American, pro-Hamas ideology [to] poison[] its campus," announced Secretary Noem's issuance of a "scathing letter" seeking broad categories of vaguely defined information about all of Harvard's thousands of F-1 visa students (the "Records Request"). *Id.* (first bracket added); *see id.* ¶ 124 & Ex. 16. The press release tied the issuance of the Records Request to the President's earlier "decision to freeze $2.2 billion in federal funding to Harvard" due to "its radical ideology," *id.*, Ex. 17, an action this Court recently found constituted impermissible retaliation against Harvard in violation of the First Amendment, *see President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Human Servs.*, 2025 WL 2528380, at *21-26 (D. Mass. Sept. 3, 2025) ("*HHS*"). As for the Records Request itself, it purported to invoke 8 C.F.R. § 214.3(g)(1), but most of its requests—like those relating to F-1 students' "obstruction of the school's learning environment"—far exceed the narrow information Harvard is required to report under that provision. AC ¶¶ 124-125. The Request threatened to deem a failure to comply "a voluntary withdrawal" from SEVP. *Id.* ¶ 126(g).

Despite the Records Request's openly retaliatory motives, Harvard collected and produced responsive information covered by 8 C.F.R. § 214.3(g), *see* AC ¶¶ 135-145—the only information it *could* produce consistent with its obligations under the Family Educational Rights and Privacy

Act ("FERPA"), 20 U.S.C. § 1232g. *See* 8 C.F.R. § 214.1(h) (waiving FERPA as to F-1 students "only to the extent that 8 U.S.C. [§] 1372 and [8 C.F.R.] § 214.3(g) … require[] the … institution to report information"). On April 30 and again on May 14, Harvard sent DHS responses to its requests, including thousands of pages of documents about Harvard's F-1 students going back to 2012. *See* AC ¶ 140 & Ex. 19 at 2; *id.* ¶ 155 & Ex. 24. Harvard explained the scope and bases of these responses, offered to supplement its responses if required by law, and asked for a chance to confer with DHS before DHS took any adverse actions. *See id.* ¶¶ 143, 156 & Exs. 19, 24.

Rather than engage with Harvard, Secretary Noem sent Harvard a letter on May 22—just days before Harvard's commencement—revoking Harvard's SEVP certification and stating that "Harvard is prohibited from having any aliens on F- or J- nonimmigrant status."[1] *Id.* ¶¶ 9, 158-160 & Ex. 25. The Revocation Notice put a quarter of Harvard's student body to a Hobson's choice: either immediately secure a transfer to another school—a practical impossibility—or depart the country. *See id.* ¶¶ 7, 222. And it did so while openly trumpeting its retaliatory purpose, declaring its intent "to send a clear signal to Harvard … that the Trump Administration will enforce the law and root out the evils of anti-Americanism[.]" *Id.*, Ex. 25. The Notice did not identify any statutory or regulatory authority, much less any purported noncompliance by Harvard with such authority, and it flouted the mandated administrative process governing revocation of certification. *See id.* ¶¶ 163-164. A press release accompanying the Revocation Notice (the "Revocation Press Release") outrageously labeled Harvard as a "terrorist sympathizer[]" and portrayed the Administration as "holding Harvard accountable for fostering violence, antisemitism, and coordinating with the Chinese Communist Party on its campus." *Id.* ¶¶ 167-170 & Exs. 26-27.

---

[1] The Revocation Notice's reference to the J visa program was an apparent error, since the State Department, not DHS, controls Harvard's EVP designation, *see* AC ¶ 94, and the Records Request did not mention the J program or J visa holders, *see id.*, Ex. 16.

Harvard filed suit on May 23 and moved for a temporary restraining order ("TRO"), arguing that the Revocation Notice violated the First Amendment, the Administrative Procedure Act ("APA"), and the Due Process Clause. Dkts. 1, 9. This Court promptly issued a TRO (the "Revocation TRO") and set a preliminary injunction ("PI") hearing for May 29. Dkts. 11, 13.

### D.    The June 4 Presidential Proclamation And Harvard's Amended Complaint

With the Revocation TRO in place, the government sought other ways to strip Harvard of its ability to host international students. On May 28, the White House convened top officials from nearly a dozen agencies "to brainstorm additional punitive measures" against Harvard. AC ¶ 184 & Ex. 31, at 1. Later that evening, just hours before this Court's scheduled PI hearing on the Revocation Notice, DHS initiated formal proceedings to withdraw Harvard's SEVP certification by issuing a NOIW—a belated nod to the mandatory procedures the Revocation Notice ignored. *See* Dkt. 49. The next morning, the government argued at the PI hearing that, by virtue of the eleventh-hour issuance of the NOIW, Harvard's claims relating to the Revocation Notice were moot. *See* Dkt. 52 at 5-6. But the NOIW's issuance was not paired with the Revocation Notice's rescission. To the contrary, the NOIW largely repackaged the Revocation Notice, citing the same grounds for revocation (Harvard's alleged failure to comply with the Records Request) and containing other allegations drawn verbatim from the Revocation Press Release relating to Harvard's response to antisemitism and asserted connections with China. *See* Dkt. 49.

Even after DHS issued the NOIW, the government's attacks continued. On May 30, for example, the Secretary of State announced a "pilot" program of "[e]nhanced vetting" of foreign students—with Harvard as its sole subject. AC ¶¶ 195-201 & Ex. 33, at 2. The cable announcing the program referenced "information identified by [DHS]" that Harvard purportedly had "failed to maintain a campus environment free from violence and anti-Semitism," *id.*, Ex. 33, at 5, a direct

quote from one of the NOIW's allegations, *see* Dkt. 49 at 4.

Then, on June 4, 2025, the President issued Proclamation 10948, *Enhancing National Security by Addressing Risks at Harvard University*, 90 Fed. Reg. 24493. Relying primarily on 8 U.S.C. § 1182(f), which permits the President to "suspend the entry of … any class of aliens as immigrants or nonimmigrants" if he "finds that the entry of … [such] class of aliens into the United States would be detrimental to the interests of the United States," the Proclamation prohibited foreign nationals from entering the country to attend Harvard—and only Harvard.[2] Like the Revocation Notice and NOIW, the Proclamation asserted that Harvard violated its SEVP reporting obligations by not fully complying with the Records Request. *See* 90 Fed. Reg. at 24493-94. It also parroted false assertions in the Revocation Press Release and NOIW that "[c]rime rates at Harvard … have drastically risen in recent years" and that Harvard has "developed extensive entanglements with foreign countries," including China. *Id.*; *compare* AC, Ex. 27, at 1-2; Dkt. 49 at 3-4. Despite these allegations, the Proclamation stated that its entry bar would last only "[u]ntil such time as [Harvard] shares the information that the Federal Government requires," *i.e.*, the information DHS sought through the Records Request. 90 Fed. Reg. at 24493-94.

On June 5, Harvard filed an Amended Complaint and sought a second TRO, arguing that the Proclamation exceeds the authority conferred by 8 U.S.C. § 1182(f) and is part of the same campaign of First Amendment retaliation and discrimination that led to the Revocation Notice. *See* Dkts. 54, 57. This Court granted the TRO. *See* Dkt. 59.

### E.    This Court's Preliminary Injunction Orders

Both the Revocation Notice and the Proclamation are presently enjoined by order of this

---

[2] The Proclamation also cited 8 U.S.C. § 1185(a)(1), which "'substantially overlap[s]' with § 1182(f)." *Trump v. Hawaii*, 585 U.S. 667, 683 n.1 (2018). The government's motion to dismiss does not argue that § 1185(a)(1) confers any authority on the President that § 1182(f) does not.

Court. On June 20, this Court entered a PI as to the Revocation Notice, having rejected the government's claims of mootness at the May 29 PI hearing. *See* Dkt. 52 at 6-7, 10-12. The PI tracks the language proposed by the government and prevents Defendants and their agents from "giving *any* force or effect" to the Revocation Notice, Dkt. 73 (the "Revocation PI") ¶¶ C-D (emphasis added).

On June 23, the Court preliminarily enjoined the Proclamation (the "Proclamation PI"). The Court held that the Proclamation likely violates the First Amendment by retaliating and discriminating against Harvard, even if (as the government argued) deferential review under *Trump v. Hawaii*, 585 U.S. 667 (2018), or *Kleindienst v. Mandel*, 408 U.S. 753 (1972), applies to the constitutional claims. Op. 21-41 & 23 n.5. As the Court explained, the Proclamation "quite obviously has no 'legitimate grounding' in its stated concerns, … is 'inexplicable by anything but animus'" against Harvard, and is "neither facially legitimate nor bona fide." *Id.* The Court deemed Harvard likely to succeed in demonstrating that its protected conduct in refusing to acquiesce to the Demands Letter caused the President to issue the Proclamation. The Court also found Harvard was likely to succeed on its Petition Clause and viewpoint discrimination claims. *Id.* at 35-41 & n.18. Separately, the Court held that Harvard was likely to succeed on its statutory arguments because the Proclamation's restriction of entry "based solely on the student's purpose of entry"—"to attend Harvard"—was "a perversion of the language and purpose" of § 1182(f). Op. 15-20.

## F.    Subsequent Procedural And Factual Developments

On August 6—two days before its extended deadline to file a responsive pleading—the government again sought to moot the claims related to the Revocation Notice by filing a unilateral stipulation stating it would not rely on the Revocation Notice "to revoke Harvard's SEVP certification or [EVP] designation." Dkt. 84 at 1 (the "Stipulation"). But Secretary Noem has not

rescinded or disavowed the Revocation Notice, and has not committed to not use it for some other purpose. And even after DHS issued the NOIW, Secretary Noem publicly defended the Notice's legality and criticized this Court for enjoining it.[3] Moreover, notwithstanding the PIs, DHS has continued its attacks on Harvard by issuing unprecedented administrative subpoenas seeking, among other documents, the same records the Revocation Notice demanded.[4] The State Department has likewise "open[ed] an investigation into Harvard University's continued eligibility as a sponsor for the Exchange Visitor Program."[5]

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Courts must "accept as true all well-pleaded facts … and indulge all reasonable inferences in favor of the pleader." *Tambone*, 597 F.3d at 441. Because "[t]he plausibility standard is not akin to a 'probability requirement,'" *Iqbal*, 556 U.S. at 678 (citation omitted), a plaintiff on a motion to dismiss need not satisfy the "far more searching" standard for obtaining a preliminary injunction, *Roane v. Barr*, 980 F.3d 123, 134 (D.C. Cir. 2020).

## ARGUMENT

I.    **The Amended Complaint States Claims Under The First Amendment.**

The Proclamation and the Revocation Notice violate Harvard's First Amendment rights. As alleged in the Amended Complaint, both actions form part of the same coordinated government

---

[3] Kristi L. Noem, Opinion, *Harvard flouted the rules. Now, it's getting a hard lesson*, Wash. Post (June 23, 2025), https://www.washingtonpost.com/opinions/2025/06/23/kristi-noem-harvard-foreign-students-dhs-restriction/.

[4] Press Release, DHS, *DHS Sends Administrative Subpoenas to Harvard University* (July 9, 2025), https://perma.cc/QDW7-3Y9Q.

[5] Press Statement, Secretary of State, *Investigation of Harvard University Participation in the Exchange Visitor Program* (July 23, 2025), https://perma.cc/QB4Q-S7AN.

effort to punish Harvard for exercising its First Amendment rights and discriminate against Harvard for its perceived viewpoint. That Harvard engaged in protected conduct cannot be questioned, and the timeline of events and the public statements make clear the causal link between Harvard's protected conduct and the government's adverse actions.

In enjoining the Proclamation's enforcement, this Court has already determined Harvard is likely to *prevail* on its claims that the Proclamation violates the First Amendment. Op. 21-41. The government's arguments give the Court no reason to take the dramatic step of concluding that Harvard has not even plausibly *alleged* those violations.

### A.    Harvard Has Plausibly Alleged Multiple Violations Of The First Amendment.

***Retaliation.*** With respect to Harvard's First Amendment retaliation claim, the government argues that Harvard has not alleged that it engaged in "protected speech" or that "the Proclamation was motivated by … retaliatory animus." Dkt. 86 ("Mot.") 23, 26. Both arguments fail, as before.

On protected speech, the government recasts the Demands Letter as "an offer open to negotiation," asserting that "[r]ejecting that offer is not speech." *Id*. at 26. But as this Court already found, this "disingenuous[]" argument "fails to grapple with the facts as alleged." Op. 30-31. This Court explained in *HHS* that the Demands Letter "purported to require Harvard to overhaul its governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint." 2025 WL 2528380, at *23. "Harvard's ongoing self-governance and academic freedom *underlying* [its] rejection [of that letter], as well as Harvard's public statements refusing to cede its academic freedom, … constitute protected conduct." Op. 31; *see HHS*, 2025 WL 2528380, at *23-24 (explaining that Harvard's "unequivocal expression of core First Amendment values in the face of government overreach constitutes protected speech").

On causation, the government argues that Harvard must plausibly allege that "retaliatory animus … was the 'but-for' cause of the challenged action." Mot. 23. That is wrong. As the

government previously acknowledged, Dkt. 67 at 21, a plaintiff alleging First Amendment retaliation need allege only that "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023) (internal marks omitted); *see HHS*, 2025 WL 2528380, at *22.

Regardless, even if Harvard needed to plead but-for causation (it does not), it easily clears that hurdle. As this Court concluded, "to draw any … conclusion" on causation other than that the Proclamation retaliated against Harvard for its assertions of academic independence "would require the Court to 'blind [itself] to reality.'" Op. 33. The same is true of the Revocation Notice, where "the gap in time" is even smaller, Mot. 27, and the retaliatory purpose is equally apparent, *see, e.g.*, AC, Ex. 27 at 1 (Revocation Press Release citing earlier April 16 press release, *see* AC, Ex. 17, which stated that the Records Request "follow[ed]" the President's retaliatory funding freeze and his proposed "revocation of [Harvard's] tax-exempt status over its radical ideology"); *see HHS*, 2025 WL 2528380, at *21-26 (concluding that the funding freeze was retaliatory).

The government emphasizes that "the Proclamation was issued nearly two months after an April 11, 2025 negotiation letter," Mot. 24-25, but elides everything that happened in between. "Between the April 11 Letter and the Proclamation, there were very few days where the Administration did not attack Harvard in some form or another," with "both the President and his direct advisors ma[king] numerous statements attacking Harvard" in that period. Op. 32 & n.12; *see* AC ¶¶ 120-211. The government tries to write off "actions taken by other agencies," Mot. 24, but the President is responsible for the official actions and statements of the executive officials he has appointed, *see, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 496-97 (2010). At the very least, the reasonable inferences that this Court must draw in Harvard's favor require concluding that the multi-agency effort is coordinated.

*Viewpoint discrimination*. As in its PI briefing, the government betrays "the weakness of [its] argument" on viewpoint discrimination by relegating it to "a scant paragraph." Op. 39 n.18; *see* Mot. 27. The Amended Complaint recounts numerous statements by President Trump and his advisors that make clear their use of "the power of the State to punish or suppress disfavored expression," Op. 41 (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024)), in issuing both the Revocation Notice and the Proclamation (as well as in taking myriad other actions targeting Harvard). These statements have included comments on Harvard's perceived "woke," "Radical Left," and "anti-American" viewpoints. *E.g.*, AC ¶¶ 17, 123, 127. The government responds that the Proclamation is "silent as to speech" and "makes no mention of Harvard's views," Mot. 27, but if the First Amendment were violated only when the government openly declared its discriminatory purpose, the Amendment would be debilitated.

*Petition Clause*. The same goes for Harvard's Petition Clause claim. The government observes that "[t]he Proclamation says nothing about" Harvard's litigation. Mot. 27. That is irrelevant. Harvard's Amended Complaint identifies "a variety of evidence supporting … a connection" between its litigation and the Proclamation, including a timeline "leav[ing] little room for doubt regarding the causal connection" and the President's own assertion that Harvard was "hurting [itself]" by "fighting." Op. 36-37; *see* AC ¶¶ 178-186. These allegations state a claim under the Petition Clause.

### B. *Mandel* And *Hawaii* Do Not Apply And Regardless Do Not Require Dismissal.

Faced with copious allegations of the Proclamation's retaliatory and discriminatory purposes, the government falls back on its claims that *Mandel* and *Hawaii* require this Court to rubber-stamp the Proclamation. *See* Mot. 15-16. But neither *Mandel* nor *Hawaii* applies where the President invokes § 1182(f) to directly target a domestic institution for constitutionally protected speech. The fact that the government has chosen immigration law as its implement of punishment

does not provide it immunity from review—nor even a less exacting standard of review. *See, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (even plenary government power "must be exercised in subordination to the applicable provisions of the Constitution"). In any event, *Mandel* and *Hawaii* would not require dismissal even if they did apply.

*Mandel* and *Hawaii* are far afield from this case. *See* Op. 22 ("[T]he Court … need not do much to distinguish *Hawaii*."). Both were cases in which an immigration policy or decision was "facially neutral"—meaning it lacked any connection to constitutionally protected activity—and instead was alleged to have only downstream consequences for "the constitutional rights of a U.S. citizen." *Hawaii*, 585 U.S. at 702-03. In *Mandel*, the Attorney General exercised his discretion to deny a visa to a foreign professor based on prior noncompliance with visa conditions, and the American professors "who wished to hear [him] speak" asserted that this otherwise-neutral action deprived them of their First Amendment "'right to receive information.'" *Id.* (quoting *Mandel*, 408 U.S. at 764-65). In *Hawaii*, the American plaintiffs claimed a right not to be "separated from certain relatives who seek to enter the country" but were barred from doing so because the proclamation restricted the entry of nationals from particular foreign countries. *Id.* at 698.

Here, by contrast, the Proclamation's sole basis for denial of entry is an individual's association with Harvard, and the reason for the Proclamation, as alleged, is Harvard's First Amendment-protected activity. *See* Op. 18-19; AC ¶¶ 257-260, 267, 290. As alleged, Harvard—a domestic institution—was targeted for retaliation based on its domestic, constitutionally protected conduct: its assertion of academic independence, its perceived viewpoints, and its attempts to vindicate core First Amendment rights through the judicial process. At minimum, even if it were appropriate to deferentially review some of Harvard's claims, it makes no sense to apply *Hawaii* and *Mandel* to Harvard's *retaliation* claims. The First Amendment *per se* "prohibits government

15

officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech," *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (internal marks omitted), even if those retaliatory actions "might well be unexceptionable if taken on other grounds," *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Thus, a Proclamation issued for retaliatory purposes is unlawful *even if* "facially legitimate." *Mandel*, 408 U.S. at 770.

Regardless, the Proclamation is unlawful under *Hawaii* and *Mandel*. *See* Op. 21-22 & n.5.

**Hawaii.** Because the Amended Complaint plausibly alleges that the Proclamation is "inexplicable by anything but animus," it fails rational basis review. *Hawaii*, 585 U.S. at 706 (internal marks omitted). The government asserts that the "key to the Proclamation"—its core purported justification—is that Harvard purportedly failed to "provid[e] required information about its foreign student visa holders" sought by the Records Request. Mot. 23; *see id.* 19-20. But even if the government's factual assertions were cognizable at this stage of litigation (and they are not), the Records Request was *itself* rooted in animus, which makes it an unlawful justification even under rational basis review. *See* AC ¶¶ 266-267. Plus, the Amended Complaint alleges that Harvard *did* comply to the extent legally allowed—which the government ignores, underscoring the Request's pretextual nature. *See id.* ¶¶ 124-125, 135-136; *see, e.g.*, Mot. 21 (asserting, without support and contrary to Harvard's allegations, that the Records Request sought only "information federal law requires"); Mot. 24 (similar). Because the President's summary "determin[ation] that Harvard was not complying with … regulations governing SEVP certification," Mot. 20, cannot be reconciled with the law or the facts, it cannot justify the Proclamation.

Nor can the Proclamation's remaining asserted justifications: "increased crime" on campus, "connections to China," and "issues of egalitarianism." Mot. 22. These allegations are false and unsubstantiated, AC ¶ 203, and the government all but admits as much, asserting that

"Harvard can end the [Proclamation]" by complying with the Records Request, apparently even if it did nothing to address these other purported issues. Mot. 21-22. This acknowledgement makes it "difficult, if not impossible, to conclude that the[se] [additional] reasons … are anything other than pretextual." Op. 27; *see id.* 24-27. And unlike in *Hawaii*, the Proclamation lacks a record demonstrating that it "result[s] from a justification independent of unconstitutional grounds." 585 U.S. at 705. The Proclamation thus fails rational basis review. Op. 24.

> **Mandel.** For much the same reasons, the Proclamation is not "facially legitimate and bona fide." *Mandel*, 408 U.S. at 770; *see* Op. 22 n.5. If a proclamation adopted to perpetuate an ongoing retaliation campaign and based on verifiably false or pretextual justifications qualifies as "bona fide," that term has lost all meaning. On the government's own account, the Proclamation seeks to punish Harvard for refusing to comply with a Records Request that neither Congress (by statute) nor DHS (by regulation) authorized. This is not a facially legitimate and bona fide use of § 1182(f).

## II.    The Amended Complaint States An Equal Protection Claim.

Harvard has also stated a plausible equal protection claim. The government violates equal protection when it treats someone worse than others who are similarly situated without legitimate justification. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 563-64 (2000). Here, the government intentionally singled out Harvard, despite numerous other universities doing the same things for which the Proclamation faults Harvard. AC ¶ 304. Although the Administration has investigated other schools, those investigations are not remotely comparable to the wide-ranging punitive measures the government has taken "to go after [Harvard] where it hurts them." AC ¶ 187. The government's actions confirm what this Court termed the Administration's "irrational prejudice," Op. 26—its "desire to seek retribution" against Harvard for exercising its right to academic freedom. AC ¶¶ 305-306.

The government criticizes Harvard for "fail[ing] to identify any comparator that is similarly

situated in all relevant respects." Mot. 28. But where "animus is readily obvious," a plaintiff need not "show disparate treatment in a near exact, one-to-one comparison to another individual." *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013). And as this Court has already found, the Proclamation was "clearly motivated by viewpoint animus." Op. 38 n.17. The government also urges this Court to approve this disparate treatment under rational basis review, but where differential treatment burdens First Amendment rights, the test is "appreciably more stringent than 'minimum rationality.'" *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988). Regardless, the Proclamation is not justified by a rational basis. *See* pp. 16-17, *supra*; Op. 27.

## III. The Amended Complaint States A Separation-of-Powers Claim.

Harvard has also sufficiently alleged that the Revocation Notice and Proclamation violate separation-of-powers principles by imposing sanctions on Harvard akin to a bill of attainder. AC ¶¶ 364-367. The Executive has unilaterally determined that Harvard merits punishment and has meted out that punishment without process or cause. The Constitution does not permit the Executive to "pronounce[] upon the guilt of [a] party, without any of the forms or safeguards of trial[,] … and [to] fix[] the degree of punishment in accordance with its own notions of the enormity of the offence." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866).

The government's sole retort is that the Bill of Attainder clause sits in Article I. Mot. 29. This is a non-sequitur. Even if not formally a "bill of attainder," the Constitution does not permit the President to "engage in the same tyrannical practices that had made the bill such an odious institution." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring). By singling out Harvard, declaring it a lawbreaker, and imposing punishment without judicial process, the Executive has violated the separation of powers.

## IV. The Amended Complaint States A Claim That The Proclamation Violates The INA.

The Proclamation is also flatly inconsistent with the statute that purports to authorize it.

Harvard's statutory claims are justiciable, and the Proclamation far exceeds the scope of the President's delegated authority under the Immigration and Nationality Act ("INA").

### A.    Harvard's Statutory Claims Are Justiciable.

As an initial matter, Harvard's statutory claims are justiciable. This Court already held that Harvard may seek review of "the Administration's compliance with the statutory scheme." Op. 14. The Supreme Court similarly resolved statutory challenges to § 1182(f) proclamations in both *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 171 (1993), and *Hawaii*, 585 U.S. at 682-83 (assuming without deciding that the claim was reviewable).[6] This approach comports with the bedrock principle that "Executive action under legislatively delegated authority" is "always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review." *INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983).

The government relies chiefly on *Fiallo v. Bell*, 430 U.S. 787, 792 (1977), which concerned the limits on judicial review of "*Congress's* power to regulate the entry of aliens, not the power of the Executive to do so." Op. 14 (emphasis in original). The government's observation that the President here invoked authority delegated from Congress, Mot. 9, is immaterial. Determining whether the *Executive* has complied with the terms of a statutory delegation is a "familiar judicial exercise," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012), including in the immigration context, *see*, *e.g.*, *Chadha*, 462 U.S. at 953 n.16.

The government also invokes consular nonreviewability to argue that "the admission and exclusion of foreign nationals is largely immune from judicial control." Mot. 9-10; *Dep't of State*

---

[6] Courts have continued to deem such challenges justiciable after *Hawaii. See, e.g., RAICES v. Noem*, 2025 WL 1825431 (D.D.C. July 2, 2025) (holding that § 1182(f) proclamation violated the INA), *appeal docketed*, No. 25-5243 (D.C. Cir. July 3, 2025), *stay granted in part on other grounds*, No. 25-5243 (D.C. Cir. Aug. 1, 2025).

*v. Munoz*, 602 U.S. 899, 907 (2024). But that doctrine holds only that discretionary decisions as to whether "to exclude a given alien" are "not within the province of any court … to review." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). By contrast, "consular nonreviewability" does not foreclose "forward-looking challenges to the lawfulness of regulations or policies governing consular decisions." *Pietersen v. U.S. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025). Thus, review is available here, where Harvard challenges a policy *targeting it*, rather than challenging "particular visa determinations by a consular officer." *Id.*[7]

## B.    Harvard Has A Cause Of Action To Challenge The Statutory Violation.

The government is also wrong that Harvard lacks a cause of action. Mot. 10. "[A] claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110 (2024). Courts regularly entertain equitable claims challenging the President's statutory authority to take certain actions, including claims alleging that § 1182(f) proclamations exceed the President's authority. *E.g.*, *RAICES*, 2025 WL 1825431, at *30; *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020); *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329-32 (D.C. Cir. 1996). And like any other litigant, Harvard can bring an equitable cause of action seeking to enjoin "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

The government's reliance on *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) (*NRC*), and related cases is misplaced. Those cases address "nonstatutory …. ultra vires

---

[7] Nor does *Munoz* support the contention that "only the alien—not third parties—may obtain judicial review." Mot. 10. To begin, Harvard is not a third party; it is the *target* of the Proclamation. In any event, *Munoz* rejected the spouse's claim because the substantive right she claimed—"the right to reside with her noncitizen spouse in the United States"—was held not to exist, *Munoz*, 602 U.S. at 909-10, not because third parties could not obtain judicial review.

claims" where judicial review is foreclosed by statute. *Id.* at 680-81. Plaintiffs in such cases can obtain nonstatutory review only by showing that defendants "'exercise[d] power ... specifically withheld' and … violated a 'specific prohibition' in the" statute. *Id.* at 681 (quoting *Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958)); *see also Glob. Health Council v. Trump*, 2025 WL 2480618, at *10-12 (D.C. Cir. Aug. 28, 2025) (same where Impoundment Control Act precluded statutory review). But where (as here) Congress has *not* "preclude[d] review of [an] agency's particular determination," courts retain the "nonstatutory" power "to review agency action that is ultra vires." *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42-43 (1st Cir. 2002).

To the extent the government argues that Harvard should have pleaded APA claims challenging implementation of the Proclamation, that is not a basis for dismissal. The APA does not "displace[]" *ultra vires* challenges to presidential action. *New York v. Nat'l Sci. Found.*, No. 25-CV-4452, 2025 WL 2180478, at *31 (S.D.N.Y. Aug. 1, 2025); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 172 (D.D.C. 2025) (approving *ultra vires* challenge to executive order for this reason). The settled principle—applied by courts both before and after the APA's enactment—is that where "an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Reich*, 74 F.3d at 1328 (collecting cases authorizing equitable challenges to statutory violations by the President).

Finally, if the government means to argue that *both ultra vires and* APA claims are unavailable, that would be an extraordinary assertion irreconcilable with settled law and the cases above examining presidential compliance with statutory authority. *Cf. HHS*, 2025 WL 2528380, at *3 (dismissing *ultra vires* claims where Harvard could obtain judicial review under the APA).[8]

---

[8] If the Court deems it necessary to assert an APA claim instead of an *ultra vires* claim, Harvard requests leave to replead its statutory claims as APA claims against agency action implementing the Proclamation. *See Glob. Health Council*, 2025 WL 2480618, at *8 n.14.

### C.    The Proclamation Violates § 1182(f).

The Proclamation is unlawful under § 1182(f). In authorizing the President to restrict the entry of noncitizens whose entry is detrimental to the United States, Congress did not silently empower the President to target domestic institutions to coerce changes in domestic conduct. The Proclamation has no grounding in the statutory text, context, structure, or purpose, and there is no prior example of a President ever using § 1182(f) in this way—despite nearly 100 proclamations over seven decades. The government's interpretation would give the President limitless power to impose domestic regulations of massive political and economic significance by attacking domestic institutions for their affiliations with noncitizens. This Court has already noted its "skeptic[ism]" that § 1182(f) authorizes the Proclamation "[g]iven its many unprecedented features." Op. 20.

The government does nothing to dispel that skepticism, simply incanting again that the Proclamation is a "facially valid exercise of presidential authority under § 1182(f)." Mot. 10. Repeating this does not make it true. The government does not seriously dispute—nor could it— that the Proclamation is an unprecedented attack on a domestic institution for domestic conduct. The Proclamation's title makes clear that it is intended to "address[] risks *at Harvard University*" only. 90 Fed. Reg. at 24493 (emphasis added). Consistent with that narrow focus, it enumerates supposed harms that *Harvard* purportedly causes *within* the United States, including Harvard's alleged noncompliance with the Records Request, *see* Op. 17, while identifying no risks posed by international students. The government half-heartedly asserts that the Proclamation "does not directly regulate Harvard," Mot. 13, but that assertion is contradicted by the fact that the Proclamation is pegged to *Harvard's* domestic conduct and is focused on supposed risks *at Harvard* rather than risks related to the noncitizens themselves. Indeed, the Proclamation expressly allows the exact same students to enter "to attend *other* universities through the SEVP." 90 Fed.

Reg. at 24495 (emphasis added).

The text, structure, purpose, and history of § 1182(f) all confirm that the President may not use the proclamation power in this way.

***Statutory Text.*** The Proclamation is not a valid restriction on "entry" because it does not restrict any particular person from crossing the border. When the provision was enacted, the INA defined "entry" to mean "any coming of an alien into the United States, from a[ny] foreign port or place or from an outlying possession, whether voluntarily or otherwise." 8 U.S.C. § 1101(a)(13) (West 1996) (repealed); *see RAICES v. Noem*, No. 25-5243, slip op. at 28 (D.C. Cir. Aug. 1, 2025) (Millett, J., concurring) (referencing this definition and noting that § 1182(f) and § 1185(a)(1) "empower[] the President to control who may cross the Nation's borders"). Here, the Proclamation operates only to *condition* entry on the alien's decision not to attend a disfavored *domestic* university that is the Proclamation's real target. Indeed, the Proclamation encourages Harvard students to enter to study at *other* domestic universities, further showing that their "entry" is incidental to the Proclamation's primary aim of punishing Harvard.[9] *See* 90 Fed. Reg. at 24495.

The government claims the Proclamation validly restricts "entry" because its text literally refers to a "suspension of entry" and because in practice it *did* bar some visa holders from entering. Mot. 11-13. But that "unusual reading" misses the point and results in a "perversion of the language and purpose of the statute." Op. 18-19. None of the risks the Proclamation identifies relate to entry. Unlike prior proclamations in which the President identified concerns about a

---

[9] The government argues that in *Hawaii*, the same individuals who would otherwise be barred could theoretically enter on certain other nonimmigrant visas. Mot. 12 (citing 585 U.S. at 685). But the different "range of restrictions" governing the various countries covered by the Proclamation in *Hawaii* "var[ied] *based on the 'distinct circumstances'* in each of the eight countries." 585 U.S. at 679-80 (citation omitted). Thus, that proclamation (unlike the one here) incentivized foreign countries to improve their vetting systems to gain less onerous restrictions. No such foreign policy rationale is discernible here.

foreign country's vetting practices or about particular aliens seeking to enter, the Proclamation here is clear on its face that any purported risks arise only "at Harvard University." 90 Fed. Reg. 24493; *see* Op. 16 (observing the Proclamation "is concerned about what happens *after* the applicants enter"). The government argues that the "public safety" and "national security" threat at issue in *Hawaii* also arose "*within* the United States" or "after entry." Mot. 13-14. But the threat identified in *Hawaii* stemmed from the targeted countries' vetting practices, not a domestic institution's domestic conduct. Here, the government's boundless reading would allow the President to restrict entry based entirely on the domestic conduct of a domestic entity. And although there may be some cases where the line between domestic and foreign concerns is difficult to draw, this is not such a case: The Proclamation on its face is clear that there is nothing about the entering aliens themselves that gives rise to any national-security concern.

Put another way, the Proclamation does not restrict the entry of a valid "class" of aliens under the statute because such classes must be—and until now, have been—defined by characteristics of the aliens or their home countries rather than the aliens' affiliation with a domestic entity whose wholly domestic conduct has drawn the government's ire. The government offers *no* support for its contention that § 1182(f) encompasses "class[es]" defined by members' association with a domestic institution. Indeed, the government's examples of prior proclamations defining a class based on affiliation with a particular group only reinforce the point because those affiliations are connections to foreign entities (the North Korean Workers' Party or the Cuban Communist Party), not to domestic institutions. Mot. 12. Plus, the problem with the Proclamation's "class" is not that it is defined by a particular purpose, but rather what that "purpose" is: an intent to study at a particular domestic institution engaged in First Amendment activity the government disfavors, rather than a characteristic of the foreign national or their country of origin.

For similar reasons, the Proclamation does not satisfy the statutory requirement that the President find the "*entry* … of any class of aliens … [to] be detrimental to the interests of the United States." 8 U.S.C. § 1182(f) (emphasis added). Any purported detriment arises not from "entry" but from Harvard's domestic conduct. *See* Op. 17. As this Court correctly stated, the "President has arguably (and, very specifically) not found that the entry would be detrimental, given that these students are allowed to enter—provided that they do not attend Harvard." *Id.*

**Statutory Context.** The broader statutory context reinforces the Proclamation's illegality. In *Hawaii*, the Court took as given that "§ 1182(f) does not allow the President to expressly override particular provisions of the INA." 585 U.S. at 689. Yet that is what the President did here. 8 U.S.C. § 1372(c) permits DHS to "prescribe *by regulation* reporting requirements" for the SEVP program. 8 U.S.C. § 1372(c)(5) (emphasis added). DHS has done so. *See, e.g.*, 8 C.F.R. § 214.3(g). The Proclamation seeks to compel Harvard to produce information far exceeding what DHS has "prescribe[d] by regulation" in accordance with law. The President cannot invoke § 1182(f) to override by fiat Congress's and DHS's carefully crafted "program to collect … information." 8 U.S.C. § 1372(a)(1).

The government observes that § 1182(f) is "an independent grant of authority" that exists outside the "agency-level reporting frameworks" just discussed. Mot. 15. But that is a non-sequitur. The relevant question is whether the President can use that independent authority to "countermand Congress' considered policy judgments" and "override particular provisions of the INA." *Hawaii*, 585 U.S. at 688-89. That is what the Proclamation seeks to do here: It is crafted to extract by different means precisely the same information that the government has already (impermissibly) requested through channels Congress provided for that purpose.

**Statutory Purpose.** In addition, § 1182(f)'s purpose provides powerful and unrefuted

evidence that the Proclamation exceeds the grant of authority from Congress. The statute's purpose "is to regulate and influence conduct abroad, rather than at home." Op. 19; *see generally Hawaii*, 585 U.S. at 696 (referring to the President's "flexible authority to suspend entry *based on foreign policy interests*"); Op. 16 (describing this conclusion as the "gravamen of the holding in *Hawaii*"). But the Proclamation here does not serve any such foreign-policy interest. There is "no dispute that the students seeking entry can be properly vetted prior to admission"; indeed, such vetting is already taking place. *Id.* at 16 (citing AC ¶ 22). And there is nothing any foreign government is incentivized to do, or could do, to ease the Proclamation's restrictions. Rather, only Harvard can act to lift the Proclamation, and only by changing its domestic conduct in ways the Administration has demanded but no law or regulation requires.

    *Statutory History.* Historical practice confirms this natural reading of the statute. The Proclamation is unprecedented in its invocation of § 1182(f) to target a domestic institution. Prior proclamations restricted entry from certain countries (as in *Hawaii*), of certain foreign government officials, or of certain individuals subject to sanctions.[10] And they have followed § 1182(f)'s language by categorically suspending entry of certain individuals "*as* immigrants or nonimmigrants," rather than based on their decision to enroll at a particular domestic university.[11] By contrast, no President over more than seven decades has ever before wielded § 1182(f) as

---

[10] *See, e.g.*, Proclamation No. 8697, *Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Participate in Serious Human Rights and Humanitarian Law Violations and Other Abuses*, 76 Fed. Reg. 49277 (Aug. 4, 2011); Proclamation No. 8693, *Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions*, 76 Fed. Reg. 44751 (July 24, 2011); Proclamation No. 8342, *To Suspend Entry as Immigrants and Nonimmigrants of Foreign Government Officials Responsible for Failing to Combat Trafficking in Persons*, 74 Fed. Reg. 4093 (Jan. 21, 2009).

[11] *E.g.*, Proclamation No. 10309, *Suspension of Entry as Immigrants and Nonimmigrants of Persons Responsible for Policies or Actions That Threaten Democracy in Nicaragua*, 86 Fed. Reg. 64797 (Nov. 16, 2021); Proclamation No. 9932, *Suspension of Entry as Immigrants and Nonimmigrants of Senior Officials of the Government of Iran*, 84 Fed. Reg. 51935 (Sept. 25, 2019).

leverage against a domestic institution, a strong indication that this "long-extant statute" does not contain the heretofore "unheralded power" the government now asserts. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see, e.g.*, *Kent v. Dulles*, 357 U.S. 116, 127-28 (1958) (looking to historical practice to determine scope of Congress's delegation in immigration context); *see* Op. 19 (quoting *W. Va. v. EPA*, 597 U.S. 697, 725 (2022); *Biden v. Nebraska*, 600 U.S. 477, 501 (2023)). The government brushes aside the lack of a historical parallel as "irrelevant," Mot. 13, but has no answer to the decisive weight accorded to such history, *see* Op. 19.

Finally, principles of constitutional avoidance require rejecting the government's reading. The Supreme Court has "read significant limitations into ... immigration statutes in order to avoid their constitutional invalidation." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001); *Kent*, 357 U.S. at 129. The Court should do the same here. As the Court has recognized, interpreting § 1182(f) to permit the President to coerce the domestic conduct of a domestic entity raises serious separation-of-powers concerns: "[T]here must be some measure of constraint on Presidential authority in the domestic sphere in order not to render the executive an entirely monarchical power in the immigration context, an area within clear legislative prerogative." Op. 20. It also raises serious non-delegation concerns: Under the government's reading, there would be no intelligible limit on the President's use of § 1182(f). *Cf. Kent*, 357 U.S. at 129. At minimum, courts may find that Congress has delegated a question of such great economic and political significance only if the statute contains a clear statement to that effect, and § 1182(f) contains no such clear statement. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000); *West Virginia v. EPA*, 597 U.S. 697, 721-24 (2022).

The government does not grapple with these constitutional difficulties. On its view of § 1182(f), the President's power over entry restrictions is a cudgel to target disfavored institutions

with impunity and coerce alignment with the President's policy or viewpoint preferences. The President could cut off a private company's access to foreign employees, business partners, and customers for any pretextual concern merely invoking national security. Or he could manipulate media coverage by banning foreign correspondents of U.S. media outlets from entering the U.S. unless they portray the President favorably. These hypotheticals are not materially different from what the President has sought to do to Harvard in this case. For this reason and the others discussed above, the Amended Complaint states a valid claim that the Proclamation is unlawful.

## V.     Harvard's Challenge To The May 22 Revocation Notice Is Not Moot.

The government offers no defense of the action that first prompted this lawsuit—the patently unlawful Revocation Notice. Instead, it once again seeks to evade this Court's review, just as it did by issuing the NOIW on the eve of the first PI hearing. But the Stipulation, a unilateral pledge not to use the Revocation Notice to "revoke Harvard's SEVP certification or [EVP] designation," Dkt. 84, does not moot Harvard's claims. *Contra* Mot. 30.

As the party advocating mootness, the government bears a "heavy burden of persuasion." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 142 (1st Cir. 2015). It must show that, were Harvard to prevail on its claims related to the Revocation Notice, it would be "impossible for [the] court to grant 'any effectual relief whatever.'" *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (citations omitted). And because the government's proffered basis for mootness is its own voluntary pledge, it must "show that the [allegedly unlawful conduct] cannot 'reasonably be expected to recur.'" *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (citation omitted)).

The government has not met its formidable burden. DHS has not withdrawn the Revocation Notice and continues to publicly defend its legality. The only thing preventing the Revocation Notice from taking effect—and requiring thousands of students to transfer or leave the country immediately—is this Court's PI. If the government does not want to litigate the Revocation Notice,

it can consent to a *permanent* injunction on the same terms as the PI—terms the government itself proposed. Unless and until permanent relief is entered, however, Harvard remains at risk of the government relying on the Revocation Notice to take adverse action against it.

First, because the Stipulation does not erase the continued risks of the Revocation Notice being used to Harvard's detriment, the Court can still "grant … 'effectual relief'" that the Stipulation does not provide. *Knox*, 567 U.S at 307 (citation omitted). The Revocation PI prevents the government from "giving *any* force or effect" to the Revocation Notice, including by relying on it to take other adverse actions against Harvard. *See* Dkt. 73 ¶¶ C-D (emphasis added). The Stipulation, by contrast, promises only that the Revocation Notice will not be used in one specific way: "to revoke Harvard's SEVP certification or [EVP] designation." Dkt. 84. Meanwhile, Defendants refuse to withdraw the Revocation Notice and continue to invoke it in support of other measures targeting Harvard.[12] *See* nn. 3-4, *supra*. These facts underscore the serious risk that, notwithstanding the Stipulation, the government may still use the Revocation Notice (or unsubstantiated findings purportedly underlying it) to deny visas, terminate funds, or take other action adverse to Harvard. This case is thus unlike *Berge v. School Committee of Gloucester*, *see* Mot. 30, where the court found mootness only after the defendant expressly revoked the challenged action and the court confirmed the action was unlawful. *See* 107 F.4th 33, 38, 44 (1st Cir. 2024).

Second, even if the government had agreed to abide by *all* terms of the Revocation PI, that unenforceable pledge would still not moot Harvard's claims, because the government has not shown its conduct cannot recur. *See Fikre*, 601 U.S. at 242 (case not mooted by government's "sparse declaration" that it would not resume voluntarily ceased conduct). A defendant's voluntary

---

[12] "Because mootness implicates a court's jurisdiction, the court can properly look to facts outside the record" to assess mootness. *Manguriu v. Lynch*, 794 F.3d 119, 121 (1st Cir. 2015).

cessation of challenged conduct "must be viewed with a critical eye," *Knox*, 567 U.S. at 307, with the defendant bearing a "heavy burden of making absolutely clear that it could not revert" to the conduct, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) (internal marks omitted). Otherwise, "a defendant might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *Fikre*, 601 U.S. at 241.

Far from showing that its conduct cannot recur, the government's actions here show the opposite. The government does not claim the Stipulation is enforceable in any way, let alone that it would remain enforceable if (as the government urges) the Court were to dismiss Harvard's claims. Thus, as in *Fikre*, the government asks this Court simply to trust that it will not again revoke Harvard's ability to host international students in the manner it did on May 22. Because the government has left itself "free to return to [its] old ways," *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953), Harvard's revocation-related claims are not moot.

On the merits, the government musters only one cursory sentence that Harvard's retaliation claim as to the Revocation Notice should be dismissed. Mot. 27. But "[a]rguments 'adverted to in a cursory fashion, unaccompanied by developed' explanation are deemed waived" as a basis for a motion to dismiss. *Burke v. Walsh*, 2024 WL 3548759, at *6 (D. Mass. June 5, 2024) (quoting *Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 175-76 (1st Cir. 2011)). In all events, the retaliation claim should not be dismissed for the reasons above. *See* pp. 12-13, *supra*.

## CONCLUSION

The Government's motion to dismiss should be denied.

Dated: September 5, 2025

LEHOTSKY KELLER COHN LLP

Steven P. Lehotsky (BBO # 655908)
Scott A. Keller*
Serena M. Orloff*
Shannon G. Denmark*
Jacob B. Richards (BBO # 712103)
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com
scott@lkcfirm.com
serena@lkcfirm.com
shannon@lkcfirm.com
jacob@lkcfirm.com

Katherine C. Yarger*
700 Colorado Blvd., #407
Denver, CO 80206
katie@lkcfirm.com

Joshua P. Morrow*
408 W. 11th St., 5th Floor
Austin, TX 78701
josh@lkcfirm.com

Danielle K. Goldstein*
3280 Peachtree Rd. NE
Atlanta, GA 30305
danielle@lkcfirm.com

Respectfully submitted,

JENNER & BLOCK LLP

By: */s/* Ian Heath Gershengorn
Ishan Bhabha*
Ian Heath Gershengorn*
Lauren J. Hartz*
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Tel: (202) 639-6000
IBhabha@jenner.com
IGershengorn@jenner.com
LHartz@jenner.com

Andrianna Kastanek*
353 N Clark St.
Chicago, IL 60654
Tel: (312) 222-9350
AKastanek@jenner.com

William A. Burck*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com

*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

Counsel for Plaintiff certify that they have submitted the foregoing document with the Clerk of Court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

By: <u>/s/ Ian Heath Gershengorn</u>

Dated: September 5, 2025