IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

        Plaintiff,

   v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.

       Defendants.

Case No. 1:25-cv-11048

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS MOTION FOR
SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.      This Court lacks jurisdiction over Harvard's claims to enforce its contracts. ................... 3

    A.      The Court of Federal Claims has jurisdiction over claims that the Government failed to pay money due under grant agreements. ................................. 4

        1.      Contract is the source of the rights claims. ................................... 5

        2.      The relief sought is enforcement of contracts. ............................... 7

    B.      The Court of Federal Claims can dispose of all claims. ......................... 9

    C.      *Department of Education v. California* controls. ................................... 10

    D.      Harvard's *ultra vires* claims must also be heard in the Court of Federal Claims. 12

II.     First Amendment Claims ......................................................................................... 13

    A.      The Government identified the correct legal standard governing First Amendment retaliation claims by government contractors. ................................ 14

    B.      The terminations were motivated by Harvard's failure to adequately address antisemitism, not by a retaliatory purpose, thus the same actions would have been taken regardless of Harvard's alleged protected conduct. ........................... 15

III.    Harvard's Title VI Claims ....................................................................................... 18

IV.     The Freeze Orders and Termination Letters do not violate the APA's prohibition on arbitrary and capricious final agency action ................................................. 24

    A.      The Government's non-binding offer letters preceding grant terminations were not final agency action. ................................................................................... 24

    B.      Grant terminations were not arbitrary and capricious. ......................... 25

V.      The Freeze Orders and Termination Letters were within Defendants' statutory and constitutional authorities and are otherwise not reviewable as *ultra vires* ..................... 27

VI.     Harvard is not entitled to injunctive relief. ..................................................... 27

CONCLUSION ............................................................................................................. 28

# TABLE OF AUTHORITIES

## CASES

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015) ................................................................................. 12

*Bd. of Cnty. Commissioners, Wabaunsee Cnty. v. Umbehr*,
    518 U.S. 668 (1996) ....................................................................... 14, 15, 17

*Bd. of Governors, FRS v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) ................................................................................... 13

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................. 24

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) .............................................................................. 8, 9

*Bowman Transp.*, *Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ................................................................................. 26

*California v. U.S. Dep't of Educ.*,
    604 U.S. --- , 145 S. Ct. 966 (2025) .............................................. *passim*

*California v. U.S. Dep't of Educ.,*
    769 F. Supp. 3d 72 (D. Mass. 2025) ...................................................... 10

*California v. U.S. Dep't of Educ.,*
    132 F.4th 92 (1st Cir. 2025), *stayed*, 145 S. Ct. 966 (2025) ................... 9

*Cepero-Rivera v. Fagundo*,
    414 F.3d 124 (1st Cir. 2005) ................................................................... 15

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022) ........................................................ 4, 5, 9

*Department of Commerce v. New York*,
    588 U.S. 752 (2019) ................................................................................. 26

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ..................................................................................... 20

*EOG Res., Inc. v. Lucky Land Mgmt., LLC,*
    134 F.4th 868 (6th Cir. 2025) ................................................................. 28

*Fed. Express Corp. v. United States Dep't of Com.*,
　39 F.4th 756 (D.C. Cir. 2022) ................................................................. 13, 28

*Fisher v. United States*,
　402 F.3d 1167 (Fed. Cir. 2005) ...................................................................... 10

*Garcetti v. Ceballos*,
　547 U.S. 410 (2006) ......................................................................................... 16

*Great-West Life & Annuity Ins. Co. v. Knudson*,
　534 U.S. 204 (2002) ......................................................................... 3, 8, 11, 28

*Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*,
　335 F.3d 607 (7th Cir. 2003) ........................................................................... 26

*Ingersoll-Rand Co. v. United States*,
　780 F.2d 74 (D.C. Cir. 1985) ......................................................................... 6, 7

*JSG Trading Corp. v. Tray–Wrap, Inc.*,
　917 F.2d 75 (2d Cir.1990) ............................................................................... 28

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
　385 U.S. 589 (1967) ......................................................................................... 16

*Kidwell v. Department of Army, Board for Correction of Military Record*,
　56 F.3d 279 (D.C. Cir. 1995) ............................................................................ 4

*Lincoln v. Vigil*,
　508 U.S. 182 (1993) ......................................................................................... 25

*Lowe v. SEC*,
　472 U.S. 181 (1985) ......................................................................................... 18

*Lovely v. FEC*,
　307 F. Supp. 2d 294 (D. Mass. 2004) .............................................................. 29

*Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
　763 F.2d 1441 (D.C. Cir. 1985) ......................................................................... 9

*Megapulse, Inc. v. Lewis*,
　672 F.2d 959 (D.C. Cir. 1982) ........................................................................... 4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ........................................................................................... 26

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   767 F. Supp. 3d 243 (D. Md., 2025),
   *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025) ............................................................ 16

*National Ass'n of Postal Supervisors v. U.S. Postal Svc.*,
   26 F.4th 960 .................................................................................................................... 13

*Nuclear Regul. Comm'n v. Texas*,
   No. 23-1300, 2025 WL 1698781 (U.S. June 18, 2025)................................. 12, 13, 14

*OK's Cascade Co. v. United States*,
   97 Fed. Cl. 635 (2011), *aff'd*, 467 F. App'x 888 (Fed. Cir. 2012) ........................... 28

*Peguero-Moronta v. Santiago*,
   464 F.3d 29 (1st Cir. 2006)...................................................................................... 15

*Peregrine Myanmar Ltd. v. Segal*,
   89 F.3d 41 (2d Cir. 1996)........................................................................................ 29

*Pickering v. Board of Education*,
   391 U.S. 563 (1968)................................................................................................ 15

*Planned Parenthood Ass'n of Utah v. Herbert*,
   828 F.3d 1245 (10th Cir. 2016) .............................................................................. 16

*President & Fellows of Harvard Coll. v. DHS*,
   --- F. Supp.3d ---, 2025 WL 1737493 (D. Mass. June 23, 2025)................................. 14, 16, 18

*Spectrum Leasing Co. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ....................................................................... 4, 5, 6, 8

*Sustainability Inst. v. Trump*,
   No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025)........................................ 12

*Tootle v. Sec'y of the Navy*,
   446 F.3d 167 (D.C. Cir. 2006) .................................................................................. 4

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) .................................................................................. 5

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
   No. 1:25-CV-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ............................... 4

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
   770 F. Supp. 3d 155 (D.D.C. 2025) ...................................................................... 4, 7

*United States v. Mitchell*,
  463 U.S. 206 (1983) ................................................................................................ 10

*United States v. O'Brien*,
  391 U.S. 367 (1968) ................................................................................................ 18

*Waters v. Churchill*,
  511 U.S. 661 (1994) ................................................................................................ 17

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) .................................... 12

**STATUTES**

5 U.S.C. § 702 ........................................................................................................ 4, 9

28 U.S.C. § 1491 ......................................................................................................... 8

31 U.S.C. ch. 63 .......................................................................................................... 2

42 U.S.C. § 2000d ................................................................................................ 22, 23

42 U.S.C. § 2000d-1 .................................................................................................. 23

**REGULATIONS**

2 C.F.R. § 200.340 ............................................................................................ *passim*

2 C.F.R pt. 200 ..................................................................................................... 2, 27

28 C.F.R. § 50.3 ........................................................................................................ 24

Exec. Order No. 11,246, 30 Fed. Reg. 12319 (Sept. 24, 1965) ................................ 24

Exec. Order No. 14,188, 90 Fed. Reg. 8847 (Jan. 29, 2025) ...................................... 1

Guidance for Federal Financial Assistance,
  89 Fed. Reg. 30,046 (Apr. 22, 2024) ................................................................... 23

# INTRODUCTION

This case is a contract dispute. Harvard seeks to enforce government contracts to receive money that it claims it is due. But under the Tucker Act, Harvard must pursue relief in the Court of Federal Claims, the only court with jurisdiction to hear its claims.

In an attempt to circumvent that court's jurisdiction, Harvard frames its claims as violations of regulations, the Administrative Procedure Act (APA), Title VI, and the Constitution. Harvard asserts that it does not seek monetary damages, while simultaneously seeking reinstatement of contracts, the enforcement of which will result in the payment of billions of dollars—*i.e.*, money damages. Pl.'s Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. and In Reply to Defs.' Opp'n to Pl.'s Mot. for Summ. J. 2, ECF No. 211 ("Pl.'s Opp'n"). But Harvard cannot evade the Tucker Act through artful pleading where the underlying rights it seeks to enforce are based in contract and the relief sought would have the effect of compelling the government to pay money.

Even if this Court has jurisdiction, Harvard's arguments fail on the merits. Upon assuming office, President Trump issued Executive Order 14188 which directed federal agencies to employ all available legal tools to address antisemitic harassment and violence in America. 90 Fed. Reg. 8847 (Jan. 29, 2025). Following this directive, agencies have investigated antisemitism on college campuses across America and ceased funding the worst-offending universities. Harvard students, faculty, and administrators all acknowledge that Harvard has failed to take adequate actions to curb antisemitism on campus. These failures even resulted in the resignation of Harvard President Claudine Gay and publication of the Harvard Task Force's report. In this context, Defendants took seriously Harvard's failure to secure a safe learning environment for Jews and appropriately rescinded grants that no longer complied with the President's stated policy of combatting antisemitism. These actions were legitimate exercises of agency authorities and did not violate the First Amendment.

1

Harvard argues that the Government failed to follow Title VI procedures for terminating federal funding. But Title VI is not the only available route through which the Government could terminate its grants and contracts with Harvard University and limiting the Government's actions in this way would ignore the plain text of the contracts at issue here. Each grant or contract identified could be—and was—cancelled pursuant to 2 C.F.R. § 200.340, which is incorporated as a term of each federal award.[1] Pl.'s Opp'n at 10. The existence of Title VI does not foreclose the Government from cancelling its contracts with Harvard where the contracts themselves provide the Government with the authority to cancel them. Harvard's contrary interpretation would produce absurd consequences, effectively providing perpetrators of racial and religious discrimination with heightened protections—the very opposite of what the Civil Rights Act of 1964 sought to accomplish. Yet under Harvard's interpretation, the Government can cancel contracts for any public policy reason at will—just not to address ongoing violations of students' civil rights, which require a much more burdensome process.

Harvard also claims that the funding pause and grant terminations violate the APA as arbitrary and capricious, arguing that Defendants failed to develop an administrative record sufficient to support those decisions. Central to this claim is Harvard's assertion that Defendants' citation of Harvard's Task Force report published after Harvard's federal funding was initially frozen, arguing that doing so constitutes a *post hoc* rationalization for the funding freezes. As stated above, the prevalence of antisemitism and Harvard's leadership's response thereto were a matter of public record long before the Government issued its first funding pause. The record

---

[1] Plaintiff claims that 2 C.F.R. § 200.340 is "not cited in any of the letters freezing Harvard's funding," Pl.'s Opp'n at 1, but it is cited in the Government's letters to Harvard *terminating* funding. *See, e.g.,* HHSHarv_0000473. U.S. Forest Service grants, however, are exempted from 31 U.S.C. chapter 63, and therefore 2 CFR Part 200 (which applies only to grants and cooperative agreements issued pursuant to that chapter). U.S. Forest Service grants were terminated pursuant to a mutual termination provision included in those grant agreements and 2 C.F.R. § 200.340 is not cited in those termination letters.

before this Court demonstrates that Harvard's grants were frozen and terminated due to, in the agencies' estimation, the inadequacy of the measures Harvard had implemented up to that point to address antisemitism. This factual assessment and the subsequent decision to terminate grants are entitled to this Court's deference under well-established APA review principles. Moreover, Harvard's report preceded the contract and grant terminations that are predominantly at issue here—as the "freeze" generally involved funds pursuant to contracts that have now been terminated. *See*, *e.g.,* HHSHarv_00000110 (pausing payments on roughly $2.2 billion in NIH grants); HHSHarv_0005225-29 (terminating roughly $2.2 billion in NIH grants).

This Court should deny Harvard's motion for summary judgment. Should the Court rule in Harvard's favor, the appropriate remedy in this matter is vacatur of the specific termination decisions only.

## ARGUMENT

### I.    This Court lacks jurisdiction over Harvard's claims to enforce its contracts.

Harvard argues that their claims arise from the Government's purported violation of their statutory and constitutional rights, but they articulate no basis *other* than their contracts for their entitlement to federal grant funds in the first instance, and the relief they seek is those federal grant funds. This suit is thus barred because "the APA's limited waiver of immunity does not extend to orders "'to enforce a contractual obligation to pay money,'" rather, the Tucker Act has jurisdiction over such suits. *California v. U.S. Dep't of Educ.*, 604 U.S. --- , 145 S. Ct. 966, 968 (2025) (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Because the remedy Harvard seeks is, ultimately, specific performance of an obligation to pay money and the APA cannot be used to enforce an obligation to pay money, Harvard must seek relief in the Court of Federal Claims.

A.    **The Court of Federal Claims has jurisdiction over claims that the Government failed to pay money due under grant agreements.**

The Court of Federal Claims' jurisdiction over claims based on any express or implied contract with the United States is exclusive. *See California,* 145 S. Ct. at 968; *see also U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465, 2025 WL 763738, at *4 (D.D.C. Mar. 11, 2025). This exclusivity, combined with the APA's limited waiver of immunity, means that if the Court of Federal Claims *can* hear the case, it *must* hear it. *California*, 145 S. Ct. at 968 ("The APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.' 5 U.S.C. § 702.").

As both parties acknowledge, *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), establishes the generally applied two-factor analysis for determining whether a claim falls within the Court of Federal Claims' jurisdiction. Under this test, courts look to both (1) the source of the rights under which Harvard seeks relief and (2) the type of relief sought. *See Spectrum Leasing Co. v. United States*, 764 F.2d 891, 893 (D.C. Cir. 1985).[2] Here, each of Harvard's claims is based on a contract and ultimately seeks money damages in relief. Each of Harvard's claims ultimately resolves to the improper termination of grant funding contracts. "The crux of this inquiry, however, boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit." *Crowley*, 38 F.4th at 1107. Here, each of Harvard's claims is, at base, a claim that the government

---

[2] Somewhat confusingly, Plaintiff adds a third factor requiring that the Court of Federal Claims have jurisdiction before a district court can be deprived of jurisdiction—a somewhat circular addition. *See* Pl.'s Opp'n at 4 (citing *Tootle v. Sec'y of the Navy*, 446 F.3d 167 (D.C. Cir. 2006)). Plaintiff cites *Tootle* as the source of this "third factor," a case which relied primarily on *Kidwell v. Department of Army, Board for Correction of Military Record*, 56 F.3d 279 (D.C. Cir. 1995), and cites *Crowley* as the authority for its inclusion as an additional factor in the *Megapulse* analysis. *See* Pl.'s Opp'n at 4. As the D.C. Circuit notes in *Crowley*, the parties in that case both conceded that the *Kidwell* test and the second factor of the *Megapulse* test were coextensive. *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 n.6 (D.C. Cir. 2022). The Circuit Court in *Crowley* similarly folds in *Kidwell* into the second *Megapulse* prong. *See id.* at 1107-1108. Regardless, Defendants are not arguing that Plaintiff's claims can be heard by neither a district court or the Court of Federal Claims, and Plaintiff is seeking more than $10,000, so the Court of Federal Claims' jurisdiction is exclusive. *Spectrum Leasing Corp. v. U.S.*, 764 F.2d 891,895 (D.C. Cir. 1985)

froze or terminated grant funding for reasons not permitted by the terms of the contract, by law, or by the Constitution. If Harvard is successful on any of their claims, the remedy is the reinstatement of the government's obligation under the contract.

### 1. Contract is the source of the rights claims.

Under the *Megapulse* framework, the court must look to the "source of its right to relief" that the plaintiff is seeking to enforce. *See Spectrum*, 764 F.2d at 261. The source of Harvard's right to funds under each grant that Harvard claims was unlawfully frozen or terminated is found in each original grant and contract agreement between Harvard and the federal agency from which it was awarded. *See* Defs.' Mot. for Summ. J. 19-25, ECF No. 185. Harvard attempts to wave away the fact that their right to each federal grant award is based on an agreement between Harvard and the agency from which it was provided by stating simply that "Harvard does not seek to enforce the terms of any particular grant or contract." Pl.'s Opp'n at 5. But the receipt of funding in exchange for the conduct of research or other activity and compliance with contract terms is precisely the bargained-for exchange Harvard seeks to enforce. The Tucker Act cannot be disregarded by artful pleading.

Harvard argues that, because neither their own brief nor "any of the Government's Freeze Orders cite the terms of any specific grant or contract," Pl.'s Opp'n at 5, their claims are not contractual in nature. But the basis for cancellation for the largest tranche of grants—the NIH Grants Policy Statement and 2 C.F.R. § 200.340(a)(4)—are incorporated as a term and condition of each NIH award and referenced in the NIH's termination letter to Harvard. *See* HHSHarv_00000473. Reference to this regulatory provision is, similarly, incorporated as a term and condition of grants and contracts and the termination letters of other Defendant agencies. *See* HUDHarvAR_00000067; EDHarvAR_0000255; ENERGY AR3932; DoDHarv_00000020; NASA-AR_00001. And, in any event, it is the right to those funds that Harvard is seeking to

enforce here. Proposed Order Granting Pl.'s Mot. for Summ. J. 1-2, ECF No. 69-1. There is no free-standing right to these funds outside contract.

Harvard also argues that their claims "stand wholly apart from the grant agreements" because Title VI, which authorizes APA review for grant termination decisions, provides the exclusive mechanism for review. But this line of argument is foreclosed by *Spectrum Leasing* and *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). In *Spectrum*, the plaintiff's contract was terminated, and it sued arguing that the government had violated the Debt Collection Act in withholding its payments. 764 F.2d at 894. In particular, it "contend[ed] that the source of its right to relief in this case is the Debt Collection Act and not the contract." *Id.* The D.C. Circuit disagreed. It noted that "Spectrum seeks an injunction requiring the government to pay monies owed for computer hardware. The right to these payments is created in the first instance by the contract, not the Debt Collection Act. The DCA, even if it applied, confers no such rights in the absence of the contract itself." *Id.* So too here.

Similarly, in *Ingersoll-Rand*, a contractor alleged that the Government violated the APA by terminating a contract in violation of federal regulations. *See* 780 F.2d at 77-78. The D.C. Circuit found the claim was nonetheless essentially contractual because the contractor could "challenge the termination based solely on contract principles"—*i.e.*, the "question . . . could be phrased as whether the contract forbids termination under these conditions." *Id.* at 78. The same question would aid this Court in answering this jurisdictional quandary before it: whether the grant agreements permit each agency to terminate the contracts for the reasons cited by each. As the D.C. Circuit held in *Ingersoll-Rand*, that question must be posed to, and answered by, the Court of Federal Claims.

**2. The relief sought is enforcement of contracts.**

Harvard's claims also satisfy the second factor of the *Megapulse* analysis because the relief it seeks is the classic contract remedy of specific performance and is essentially a monetary remedy. *See Conference of Catholic Bishops*, 770 F. Supp. 3d at 164 (plaintiffs "ask[] this Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is something the Court lacks the power to do."). This factor can be "dispositive." *Id.* at 163.

Although Harvard argues that it merely "seek[] declaratory and injunctive relief to prevent the Government's ongoing constitutional and statutory violations," Pl.'s Opp'n at 6, courts have generally held that a claimant cannot sidestep Tucker Act jurisdictional limits merely by seeking a declaratory and injunctive order. *Ingersoll-Rand Co.*, 780 F.2d at 79 (collecting cases). Harvard can claim that it does not seek damages or specific performance, Pl.'s Opp'n at 7, but the inescapable reality of the relief Harvard requests is that it would yield only the reinstatement of the individual contractual obligations to pay money that the grants represent. Even the prospective relief that Harvard seeks would enjoin the government from terminating contractually obligated grant funding, which would obviously result in the preservation of Harvard's rights to federal funds based on contract. Harvard's other requests for injunctive relief in their complaint cannot obscure that it seeks the quintessentially contractual remedy of specific performance. *See Spectrum*, 764 F.2d at 894 (describing "an injunction requiring the government to pay monies owed" under a contract as "the classic contractual remedy of specific performance").

Harvard's claims, and the relief requested, are of the type over which the Tucker Act has granted the Court of Federal Claims exclusive jurisdiction. *See* 28 U.S.C. § 1491(a). Harvard cites *Bowen v. Massachusetts* in support of their contention that they seek "specific relief" from an agency action that more appropriately falls within district court jurisdiction under the APA. Pl.'s Opp'n at 7. But the examples of relief that the Supreme Court provided in *Bowen* to illustrate the

difference between "money damages" and "specific relief" support the opposite conclusion. In *Bowen*, the Court explained:

> Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay, or for the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions.

487 U.S. 879, 893 (1988) (quotations omitted)).

Here, Harvard' request for relief falls squarely in the former category (*i.e.*, money for breach of contract under law) and bears no analogy to the examples of equitable relief in *Bowen*. This case is, after all, about the money.

Furthermore, the facts in *Bowen* are distinguishable from this case. *Compare Knudson*, 534 U.S. at 212 (2002) (holding that "*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due" in an action seeking to compel an insurance plan beneficiary to reimburse the plan provider for recoveries from third parties) *with Bowen*, 487 U.S. at 879 (finding that the district court had jurisdiction under the APA because the withholding of funds violated federal law) *and Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441 (D.C. Cir. 1985) (holding that claims related to the withholding of statutorily-mandated grants-in-aid did not lie in contract, but rather federal statute, and was not cognizable under the Tucker Act). As such, Harvard's reliance on *Bowen* is misplaced. *Bowen* concerned states' entitlement to federal funding directly under a statute, so it addressed the APA's exclusion from its waiver of sovereign immunity for suits for "money damages," 5 U.S.C. § 702; *see* 487 U.S. at 891-901. Harvard has no such statutory entitlement to the funds at issue here— their entitlement to funds is only through contract.

Indeed, the Supreme Court itself distinguished between statutorily obligated funds in *Bowen* and contractually obligated funds in *Department of Education v. California*. There, the Court rejected the First Circuit's understanding of *Bowen*, concluding instead that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'" *California*, 145 S. Ct. at 968. That opinion controls.

Harvard also argues that the relief cannot be characterized as "money damages" even if some component of the relief "results in payments to Harvard[.]" Pl.'s Opp'n at 3. But vacating and setting aside the government's freeze orders and termination letters would reinstate billions of dollars in federal grant funding. This is not some beneficial side effect of the equitable relief Harvard seeks—it is the primary purpose of their suit. Just ask: would Harvard still sue if it could not recover these monies? Harvard's addition of requests for declaratory and injunctive relief cannot disguise this fact. *See Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107-09 (D.C. Cir. 2022) ("[A] plaintiff does not in essence seek monetary relief as long as the complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief and as long as the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery." (cleaned up)).

This suit therefore satisfies both prongs of *Megapulse*. The Court of Federal Claims has exclusive jurisdiction over this suit. The Tucker Act and § 702 of the APA's limited waiver of sovereign immunity, in combination, mandate review in Federal Claims court.

**B.    The Court of Federal Claims can dispose of all claims.**

Harvard argues that the Court of Federal Claims cannot adjudicate Harvard's suit because their constitutional and Title VI claims are not "money-mandating." Pl.'s Opp'n at 8. This is wrong. Harvard's *contracts* are the money-mandating instruments. As laid out in *Fisher v. United*

*States*, a plaintiff satisfies the burden of establishing that a source of law is money-mandating by, as a first step, "mak[ing] a non-frivolous allegation that satisfies [this] jurisdictional requirement." 402 F.3d 1167, 1172 (Fed. Cir. 2005). Harvard would easily satisfy this lenient standard were they to allege that the source of law on which their right to funds were the grant agreements. Harvard could also non-frivolously assert that all of their claims are based on money-mandating sources of law. But they choose to artfully plead around the Claims Court's jurisdiction. As the Supreme Court acknowledged in *United States v. Mitchell*, with respect to the Tucker Act's waiver of immunity, "the Act makes absolutely no distinction between claims founded upon contracts and claims founded upon other specified sources of law." 463 U.S. 206, 216 (1983). Because the only source of law entitling Harvard to federal funds are the express contracts between Harvard and the Government, the Tucker Act provides the only waiver of sovereign immunity on which they may rely. And, as noted in Defendants' opening brief, the Court of Federal Claims is certainly capable of resolving statutory and constitutional claims Def. MSJ at 23-25.

## C.    *Department of Education v. California* controls.

Binding Supreme Court precedent from less than three months ago compels this result. In *California*, plaintiffs asserted essentially the same APA claims that Harvard makes here—they also made similar jurisdictional arguments to try to evade the Tucker Act. 145 S. Ct. at 968; *compare California v. U.S. Dep't of Educ.,* 769 F. Supp. 3d 72 (D. Mass. 2025) (Plaintiffs alleged that grant terminations were arbitrary and capricious because "there was no individualized analysis of any of the programs; rather, it appears that all . . . grants were simply terminated . . . and all the programs received the same standardized form letter notifying them of the grant terminations[.]") *with* Pl. Am. Compl. at 4, 28-30, 53 As to this type of claim, the Supreme Court concluded that the government was likely to succeed in showing that the district court "lacked jurisdiction to order

the payment of money under the APA" because the remedy sought was ultimately an order to "enforce [the Government's] contractual obligation to pay money." 145 S. Ct. at 968 (quoting *Knudson*, 534 U.S. at 212).

The similarities between *California* and this case are unmistakable, and Harvard's attempts to distinguish *California* from this case lack merit. Here, as in *California*, "each grant award takes the form of a contract between the recipient and the government." 132 F.4th 92, 96 (1st Cir. 2025), *stayed*, 145 S. Ct. 966 (2025) (per curiam). There, as here, the plaintiffs challenged the agency's "actions as insufficiently explained, insufficiently reasoned, and otherwise contrary to law." *Id.* at 97. There, as here, the plaintiffs sought "to once again make available already-appropriated federal funds for existing grant recipients"—without explicitly pleading damages or a breach of contractual terms. *Id.* And there, as here, the same result should follow: Harvard's APA claims should be dismissed because this Court "lack[s] jurisdiction to order the payment of money under the APA" in this grant termination case. *California*, 145 S. Ct. at 968.

The U.S. Courts of Appeals have heeded this precedent, which binds this Court. *See Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1-2 (4th Cir. June 5, 2025); *cf. Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025). Harvard attempts to distinguish *Sustainability Institute* by arguing that its statutory claims rest on Title VI. But as previously discussed, Title VI is not the money-mandating source of law here. Indeed, that is not Harvard's cause of action. This case, *Sustainability Institute,* and *California* all involve the award of grants by federal agencies from a generalized fund. Harvard cannot plead around the Tucker Act's jurisdictional requirement by alleging that the government should have proceeded through Title VI and it is therefore acting *ultra vires*. *See Sustainability Inst. v. Trump*, No. 25-

11

1575, 2025 WL 1587100, at * 2 (4th Cir. June 5, 2025) (citing *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015)).

    **D.**    **Harvard's *ultra vires* claims must also be heard in the Court of Federal Claims.**

As an alternative to their APA claims, Harvard argues that they have jurisdiction in district court to bring their nonstatutory *ultra vires* claims because individual federal-officer defendants have no immunity to waive when they act beyond their statutory authority. Pl.'s Opp'n at 11. Therefore, according to Harvard, its claims need not rely on either the APA's or the Tucker Act's waiver of immunity to challenge grant terminations undertaken by federal-officer Defendants who had no authority to do so.

Their claims do not fall within what the Supreme Court noted less than a month ago was the exceedingly narrow scope for a nonstatutory *ultra vires* claim, describing it as the judicial equivalent of a "Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, No. 23-1300, 2025 WL 1698781, at *8 (U.S. June 18, 2025) (citation omitted). *Ultra vires* review is only available if "an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Id.* (citation omitted) (emphasis in original).

Neither of these two exceptional circumstances applies here. Harvard merely attempts to "dress up a typical statutory-authority argument as an ultra vires claim." *Id.* There is no allegation that Defendants lacked any authority whatsoever to terminate grant agreements. And Harvard's claim that officials violated Title VI in terminating grants is meritless because federal officials retained the authority to terminate grants by the terms of the grant agreements themselves. Whether that authority was properly exercised is not the subject of *ultra vires* review. *See Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) ("*[U]ltra vires* claims

are confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." (citation omitted)); *National Ass'n of Postal Supervisors v. U.S. Postal Svc.*, 26 F.4th 960, 971.

"*Ultra vires* review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Id.* (citations omitted). Harvard here has a path to judicial review in the Court of Federal Claims as "the [Tucker Act] statute provides . . . clear and convincing evidence that Congress intended to deny the District Court[s] jurisdiction to review" claims which are in essence contractual. *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991). Allowing a breach-of-contract claim to be reframed as an *ultra vires* action against the relevant executive official would allow plaintiffs to easily circumvent the Tucker Act's jurisdictional bar. *See Nuclear Regul. Comm'n*, 2025 WL 1698781, at *8 (explaining that *ultra vires* review is not an "easy end-run around the limitations of the Hobbs Act and other judicial-review statutes"). This Court should reject Harvard's attempted circumvention here.

## II.    First Amendment Claims

Harvard argues that its First Amendment retaliation claim has already been resolved by the Court in separate litigation, *President & Fellows of Harvard Coll. v. DHS*, --- F. Supp.3d ---, 2025 WL 1737493, at *17, *21 (D. Mass. June 23, 2025), when it found that Harvard was likely to succeed on the merits of a First Amendment retaliation claim against different federal agencies that engaged in different actions. *See* Pl.'s Opp'n at 12. To be sure, there are facts in both cases that overlap (in particular, the sending of the Government's Offer Letter), but the two cases are

separate controversies challenging different actions that must be resolved on their own records. Moreover, the Court's decision to issue a preliminary injunction was not a final resolution of the retaliation issue.

The Court should hold that Harvard's retaliation claim in *this* case fails on the merits. That is because even if the Court finds that there was retaliatory motive—though it should not, for the reasons discussed below—the Court must still find that the Government would not have terminated Harvard's grants otherwise. There is ample evidence that the Government already intended to terminate Harvard's grants before the Government's Offer Letter was sent and before Harvard filed suit. Therefore, "the government can escape liability [because] it would have taken the same action even in the absence of the protected conduct." *Bd. of Cnty. Commissioners, Wabaunsee Cnty. v. Umbehr,* 518 U.S. 668, 675 (1996); *see also Peguero-Moronta v. Santiago*, 464 F.3d 29, 46 (1st Cir. 2006)(quoting *Cepero-Rivera v. Fagundo*, 414 F.3d 124, 132 n.1 (1st Cir. 2005)).

### A.    The Government identified the correct legal standard governing First Amendment retaliation claims by government contractors.

Harvard disputes the appropriateness of the legal standard from *Umbehr* for government contractors' retaliation claims, which adopted the balancing test for government employees from *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), and even goes so far as to say that "[t]he Government cites no authority holding that retaliation against any entity receiving federal funds is subject to the *Pickering* balancing test[.]" Pl.'s Opp'n at 14. But the Government's brief did, in fact, cite to *Umbehr, see* Def. Mot. for Summ. J. at 32, which explains that "[t]he similarities between government employees and government contractors with respect to this issue [*i.e.*, First Amendment retaliation] are obvious." *Bd. of Cnty. Commissioners, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996). That is because "[t]he government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and

14

responsiveness of service to the public, and to prevent the appearance of corruption. And, absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all." *Id*.

While the Supreme Court acknowledged that different kinds of independent contractors might have different interests and concerns from one another and from government employees, *see id*. at 677, 689, it ultimately held "all of them can be accommodated by applying our existing framework for government employee cases to independent contractors." *Id*. at 677; *see also Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1256 (10th Cir. 2016) (holding that *Umbehr* provided the appropriate standard to review Planned Parenthood's retaliation claim when Utah cancelled its grant under the Personal Responsibility Education grant program); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243 (D. Md., 2025) (finding that the *Umbehr* standard applied to grant recipients because they are government contractors), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025).

Harvard suggests that *Pickering* is inapplicable when First Amendment concerns are intertwined with questions of "academic freedom," *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967), *see* Pl.'s Opp'n at 15, but the Supreme Court has yet to ever hold as much, stating "[w]e need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006). Therefore, the existing jurisprudence requires the application of *Pickering* to independent contractors like Harvard.

### B.    The terminations were motivated by Harvard's failure to adequately address antisemitism, not by a retaliatory purpose

The Court should reconsider its finding in *DHS* that "it is plain that Harvard's refusal to acquiesce to [the Government Offer Letter's] demands constitutes engagement in protected

conduct," 2025 WL 1737493, at *15, because it does not adequately grapple with the parties' rights in the context of a contractual grant agreement, and in failing to do so, it undercuts the Executive Branch's ability to negotiate terms it finds favorable. Regardless of whether the Court reconsiders that finding, however, the challenged terminations here would still survive judicial scrutiny. Grant terminations, unlike the policy challenged in *DHS*, have affected many institutions that federal agencies have determined failed to adequately address antisemitism, and thus they were assuredly forthcoming unrelated to whatever protected conduct Harvard may have engaged in. Accordingly, the agencies "would have taken the same action even in the absence of the protected conduct." *Umbehr*, 518 U.S. at 675.

When the Government "exercise[s] contractual power . . . its interests as a public service provider, including its interest in being free from intensive judicial supervision of its daily management functions, are potentially implicated. *Id.* at 678. Judicial "[d]eference is therefore due to the government's reasonable assessments of its interests *as contractor*." *Id.* (emphasis in original). When the Task Force approached Harvard with its offer, it did so on behalf of the agencies in their capacity as contractors, not as a sovereign. And the Supreme Court has "concluded that '[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer [or contractor, for the reasons discussed in Section II(A)].'" *Id.* at 676 (quoting *Waters v. Churchill,* 511 U.S. 661, 675 (1994) (plurality op.)). The agencies, in their capacities as contractors, had a contractual right (as opposed to a sovereign right) to terminate their agreements if they no longer aligned with their priorities, *see supra* 5-6 (discussing the language included in the contracts' terms). When approaching Harvard, it was this power, conferred by contract and not sovereign authority, that the Task Force sought to use as negotiating leverage to

tackle the problematic antisemitism it saw taking place at Harvard. The Task Force essentially told Harvard that if it did not agree to the Task Force's proposal, the contract between the parties would not be in alignment with the Government's priorities, therefore, the termination condition of the contract would be triggered.  Harvard rejected the Task Force's offer, and the result was exactly what was envisioned by the terms of the contract agreements. Defendants reiterate that Harvard's rejection of the Government's offer is not protected expression; it is a legal act extinguishing the original offer. *See Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring in the result) ("[O]ffer and acceptance are communications incidental to the regulable transaction called a contract . . ."). The consequences that followed flowed directly from the "noncommunicative impact" of the legal act of rejection. *United States v. O'Brien*, 391 U.S. 367, 382 (1968).

In *DHS*, however, the Court dismissed the above discussion as beside the point and found that regardless of whether there was genuine offer and rejection, "it is also Harvard's ongoing self-governance and academic freedom underlying [its] rejection, as well as Harvard's public statements refusing to cede its academic freedom, that constitute the protected conduct, not simply the actual words of rejection." 2025 WL 1737493, at *15. Defendants do not disagree that such statements are themselves protected by the First Amendment. But there is nothing in the record connecting the statements accompanying the rejection, rather than the rejection itself, to the agencies' termination decision. Harvard does not identify a single instance of an agency terminating funding because they did not like what Harvard and Dr. Garber *said.* If Harvard's Rejection Letter simply read "Harvard rejects these terms," the same consequences would have unfolded, and Harvard offers no evidence to the contrary. The expressive content of Harvard's Rejection Letter was not a factor, let alone a "substantial" factor, *Umbehr*, 518 U.S. at 675, in the

termination decisions. Thus, it is clear that the agencies "would have taken the same action even in the absence of the protected conduct." *Id*. Therefore, Harvard's retaliation claim must fail.

Harvard's constitutional condition's argument is just a different flavor of the same retaliation argument, as the doctrine is one and the same. *See id.* at 680 ("Independent contractors appear to us to lie somewhere between the case of government employees, who have the closest relationship with the government, and *our other unconstitutional conditions precedents*." (emphasis added)). Thus, Harvard's constitutional conditions claim also fails.

## III.    Harvard's Title VI Claims

Harvard mischaracterizes the government's authorities to combat discrimination. According to Harvard, it is Title VI or bust. *See* Pl.'s Opp'n at 22 ("An agency cannot . . . channel discrimination-related terminations away from . . . Title VI procedures."). By Harvard's understanding, entities receiving federal funding should feel free to allow discrimination in their programs right up until the line that it crosses into a Title VI violation notwithstanding contractual terms that allow broad termination rights. Defendants dispute the notion that the framers of the Civil Rights Act intended it to be a ceiling capping the Government's ability to combat discrimination. This Court should not bar the Government from using every tool at its disposal to combat discrimination, including negotiating contract terms that require a contractor to take antidiscrimination efforts seriously.

Harvard raises three arguments: (1) the terminations were not taken pursuant to 2 C.F.R § 200.340, (2) even if they were, 2 C.F.R § 200.340 does not allow the terminations, and (3) Title VI provides the only process available to the government to terminate grant recipients that discriminate. *See* Pl.'s Opp'n at 20-24. Each one fails.

Harvard's first argument, that the terminations were not taken pursuant to the authority the agencies said they were exercising, depends on a logical fallacy. The faulty reasoning goes "[f]rom

the start, the Government claimed to be investigating 'alleged violations of Title VI,'" therefore it must be true that "[t]he Government did not rely on § 200.340." *Id.* at 19-20. Such reasoning neglects to consider that a condition (discrimination) that is necessary for one thing (a Title VI violation) can also be sufficient for a second thing (termination under 2 C.F.R. § 200.340). Indeed, government agencies have numerous separate authorities to combat racial and religious discrimination and may pursue these independently. And it was the contractual authorities that the government exercised in terminating the contracts. *See, e.g.*, NIHHarv_00000473-5; NASA-AR03748-50; EDHarvAR_0001735-36.

To be sure, HHS has provided Harvard with a notice of Title VI violations, which post-dates the contract terminations. *See* Pl.'s Opp'n at 20 (discussing notice Harvard received on June 30, 2025). Harvard tries to frame the notice as an attempt to "save the actions challenged here." *Id*. But Defendants reject the assertion that the actions challenged in this case need saving at all. This is not a case in which the Government is trying to correct a procedural deficiency. The notice Harvard received simply reflects the argument that Defendants have been making all along: Title VI and 2 C.F.R. § 200.340 are two separate tools the Government may use to tackle discrimination.

Harvard further claims that the agencies' reliance upon 2 C.F.R. § 200.340 was post hoc decision-making. This makes little sense, as the agencies invoked that legal authority in the same breath with which they executed the terminations. Thus, it is chronologically impossible for it to have been a "post-hoc" rationalization. Defendants reiterate that the rule against post-hoc decision-making applies to "post hoc justifications [that] are raised in court by those appearing on behalf of the agency or by agency officials themselves," not situations in which there are "contemporaneous explanations." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 591 U.S. 1, 23 (2020).

Harvard suggests that the Court need only look at NIH for proof that the terminations were not executed under 2 C.F.R. § 200.340. Harvard reasons that NIH could not possibly have terminated under 2 C.F.R. § 200.340 because NIH's regulation adopting its provisions did not enter effect until after its grant award to Harvard was made. *See* Pl.'s Opp'n at 21. But the regulation—which mandates the inclusion of the terms of 2 C.F.R. § 200.340 in all awards made after the effective date—is not the relevant authority here. While NIH was not yet required to include the terms of 2 C.F.R. § 200.340 in their contracts when Harvard's awards were made, it did so anyway. *See* HHSHarv_00000473 (explaining each contract's incorporation of 2 C.F.R. § 200.340 as part of NIH's Grants Policy Statement ("GPS")); NIH Grants Policy Statement, NATIONAL INSTITUTES OF HEALTH, https://grants.nih.gov/policy-and-compliance/nihgps (last accessed July 14, 2025) (the GPS "[a]pplies to all NIH grants and cooperative agreements with budget periods beginning on or after October 1, 2023."). Thus, it is the terms of the contracts with Harvard, which refer to 2 C.F.R. § 200.340, that govern.

Turning to Harvard's second argument, that the terminations were not permitted under 2 C.F.R. § 200.340, Harvard contends that "[o]n its own terms, § 200.340(a)(4) does not allow an agency to terminate an award based on institutional concerns disconnected from a specific research program. . . . The singular phrase [in the regulation] 'an award' refers to a specific grant, not an entire institution[.]" This is an overly crabbed reading of the regulatory language. The language of the regulation is broad. *See* 2 C.F.R. § 200.340(a)(4) ("The Federal award may be terminated . . . to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities"). There is no reason to think that an agency could not choose to prioritize ending taxpayer support to institutions that fail to adequately address discrimination. And it only makes sense that such a priority would result in the termination of not just "an award" but all of the

agency's awards to that institution. Harvard also argues that the regulatory language allowing termination if the award no longer "effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4), forbids termination for nonalignment "unrelated to the priority the grant was awarded to further." Pl.'s Opp'n at 22; *but see* Op. and Order Denying Mot. for Prelim. Inj. and Dismissing for Lack of Standing at 29, *Am. Ass'n. Univ. Professors v. U.S. Dep't of Justice*, 1:25-cv-02429-MKV, ECF No. 148 (June 16, 2025) ("Op. & Order") (unable to find "authority for [any] particular limitation" holding that "the Executive Branch may not count repudiating antisemitism among "agency priorities" within the meaning of 2 C.F.R. § 200.340(a)(4)."). If that were the case, then the regulatory text would simply stop at "program goals." Harvard's interpretation reads the phrase "agency priorities" out of the regulation, resulting in needless surplusage and conflicting with the general rule of interpretation that courts attempt to give meaning to every word in the regulation.

Harvard's third argument says to forget "whatever § 200.340 says," Pl.'s Opp'n at 22, Title VI is the only authority that matters. Harvard maintains that if agencies identify inadequate institutional concern for antisemitism as a reason for grant termination, then Title VI's procedures are the only mechanism by which the termination can be effectuated. *See id.* at 23-24. But Title VI's separate procedures do not preclude or abrogate the agencies' separate contract authorities. There is no basis in Title VI to suggest that facts that are relevant to a finding of a violation of that Act cannot also be relevant to the Government's determination that certain uses of funding no longer align with its priorities. Indeed, it is "unlikely that Title VI is the sole and exclusive 'legal tool' available to a President who instructs executive agencies to prioritize 'combat[ting] anti-Semitism . . . on university and college campuses.'" Op. & Order at 30.

Title VI and contract terminations for policy are based on different legal authorities and entail different procedures, different triggers, and different consequences. Title VI of the Civil Rights Act enacted a general requirement for recipients of federal funding that applies to all funding agreements, regardless of whether it is included as a provision of the agreement. 42 U.S.C. § 2000d. It leaves no discretion to agencies to waive its requirements, as it uses mandatory language stating that each agency is "directed to effectuate the provisions of section 2000d of this title." *Id*. § 2000d-1. Agencies are instructed to do so through the implementation of "rules, regulations, or orders of general applicability." *Id*. Contractual provisions are just the opposite. Moreover, 2 C.F.R. § 200.340 is not a rule that was promulgated under the Title VI authority. *See* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30047-48 (Apr. 22, 2024) (citing statutory authorities).

Harvard criticizes the Government for arguing that Title VI requires termination in "certain circumstances" without specifying which circumstances. *See* Pl.'s Opp'n at 23. But the answer is self-evident in the most famous sentence of the Civil Rights Act: the procedures for termination under Title VI must begin when a "person in the United States [has], on the ground of race, color, or national origin, be[en] excluded from participation in, be[en] denied the benefits of, or be[en] subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. 2000d. Harvard asks, why are these not those circumstances? Pl.'s Opp'n at 23. The answer to that question is that they very may well be, but that will depend on the determination of separate Title VI inquiries. All that needed to occur for 2 C.F.R. § 200.340 to be triggered was the agencies' determination that instances of antisemitism were ignored by the institution such that funding for it no longer aligned with their priorities, which is a lower legal threshold than that required for a Title VI action.

Finally, the remedies under Title VI are much broader than just funding termination, which is what 2 C.F.R. § 200.340 authorizes. Indeed, Title VI directs the Government to achieve Civil Rights compliance "by any other means authorized by law[.]" 42 U.S.C. § 2000d-1. Thus, the penalties under Title VI can be much stiffer and include the prospect of an enforcement action brought by the Attorney General. The Attorney General, in accordance with 28 C.F.R. § 50.3, may pursue

> "(1) a suit to obtain specific enforcement of assurances, covenants running with federally provided property, statements of compliance, or desegregation plans filed pursuant to agency regulations; (2) a suit to enforce compliance with other titles of the 1964 Act, other Civil Rights Acts, or constitutional or statutory provisions requiring nondiscrimina-tion; and (3) initiation of or intervention or other participation in, a suit for other relief designed to secure performance."

28 C.F.R. § 50.3.

The implication of Harvard's argument is that prior to the enactment of Title VI, agencies had no authority to Harvard's suggestion that prior to the enactment of Title VI, agencies had no authority to include contract terms that allowed for termination based on nonalignment with antidiscrimination priorities, but history shows that is not so. In 1965, eight years before the enactment of Title VI, President Lyndon B. Johnson issued Executive Order 11,246, which prohibited federal contractors from engaging in employment discrimination on the basis of race, color, religion, sex, or national origin and required the inclusion of a provision in all public contracts stating that "[i]n the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts[.]" Exec. Order No. 11,246, Equal Employment Opportunity, 30 Fed. Reg. 12319, 12320 (Sept. 24, 1965). Under Harvard's legal theory, all of the

termination provisions in contracts entered into pursuant to Executive Order No. 11,246 became void the day the Civil Rights Act of 1964 was signed into law because they did not include the same procedures for termination as Title VI. Such a result would clearly have contradicted Congress's intent at the time, and Harvard's theory should be rejected. Harvard's interpretation would lead to other absurd consequences too. It would require heightened and separate procedures to cancel grants to institutions that fail to address discrimination than it does for other more benign failures to align with government priorities. Thus, a university that allows discrimination would be more protected than one that, say, has a facility with lead paint. Surely that would come as a surprise to the 88th Congress.

Because Title VI does not prohibit the Government from separately contracting to include terms allowing for termination for discrimination, the agencies properly relied upon 2 C.F.R. § 200.340 to terminate Harvard's contracts.

## IV.    The Freeze Orders and Termination Letters do not violate the APA's prohibition on arbitrary and capricious final agency action

Even assuming this Court has jurisdiction to address Harvard's APA claims, and it does not, the Government's Freeze Order and termination letters were not arbitrary and capricious. Moreover, the administrative record reflects that Harvard considered by "concrete evidence of antisemitism" and that the steps Harvard took to address antisemitism.

### A.    The Government's non-binding offer letters preceding grant terminations were not final agency action.

First, Harvard confuses the April 11 Letter and Secretary McMahon's May 5 letter with the Government's separate decisions to freeze and terminate funding. The April 11 Letter is an offer within the context of a negotiation and had no legal effect—as required for an agency's action to be final. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also* Defs.' Mot. for Summ. J. Thus, to the extent Harvard challenges these letters, they fail to constitute final agency action.

24

Second, as to the May 5 Secretary McMahon letter, Defendants reiterate their argument from their opening brief that this letter was not final agency action because (a) the letter pertains only to future grants to which Harvard has no present legal entitlement, *Lincoln v. Vigil*, 508 U.S. 182, 198 (1993), and (b) the Secretary of Education cannot bind the entire federal government and, to the extent it purports to bind the Department of Education, the letter does not, in any event, have any legal effect and is not a final agency action. Harvard takes issue with Defendants' assertion that the letter concerned a matter committed to agency discretion by law and accordingly was not reviewable final action. Pl.'s Opp'n at 26 ("Nor is it clear what [agency discretion] has to do with finality."). But caselaw often describes agency actions as non-final due to being discretionary. *See, e.g., Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 615 (7th Cir. 2003).

**B.  Grant terminations were not arbitrary and capricious.**

The arbitrary and capricious standard is "deferential," *Department of Commerce v. New York*, 588 U.S. 752, 773 (2019), the scope of review "is narrow," and the court is "not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983). The Defendant agencies' grant and contract terminations meet this lenient standard. The ongoing situation with respect to antisemitic violence and harassment on Harvard's campus and Harvard's ongoing response to this situation was widely reported as of the Defendant agencies' first communication with Harvard on March 31, 2025. As demonstrated in the administrative record, Government officials reasoned that "because, upon being made aware of systemic institutional failures to address deeply rooted antisemitism and racial discrimination, the University has refused to take appropriate action" which agency officials interpreted as "the University's unwillingness to take corrective action or implement necessary

reforms." HHSHarv_00000474. Harvard's grants were ultimately terminated because of Harvard's categorical refusal to respond to the Government's concerns. *See* GSAHarv_00000014-5. This reasoning was articulated in each agency's grant termination letters. *See* Def. Br. at 47. This meets the permissive standard that there be, at a minimum, "a rational connection between the facts found and the choice made." *Bowman Transp.*, *Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (citation omitted).

Defendant agencies and federal officials' consideration of aspects of the problem before it was adequate and sufficient to satisfy a deferential standard. In this case, the relevant standard would be the "no longer effectuates program goals or agency policies" provision. *E.g.,* HHSHarv_00000503 (providing that 2 C.F.R, Part 200 is incorporated either directly or by reference for all individual awards by the NIH). The agencies had articulated the relevant policy— fighting antisemitism—and had determined that continuing to provide taxpayer dollars no longer effectuated that policy. *See*, *e.g.*, GSAHarv_00000014-5; HHSHarv_00000473-4; EDHarvAR_0000011-2; ENERGY AR3929-30. The Court may disagree with that decision but it comports with the broad standards applicable here and is explained in the record. *Id.*

Furthermore, Defendants adequately considered reliance interests in light of the very broad language authorizing termination, *i.e.* "if an award no longer effectuates . . . agency priorities." 2 C.F.R. § 200.340(a)(4). Instead, Harvard relies on its bare assertion that federal funding necessarily supports long-term research projects and "there is no conceivable reason to force researchers to throw out experiments in which the Government has already invested considerable sums." Pl. Mem. in Supp. of Mot. For Summ. J. at 30, ECF No. 211. However, the record demonstrates that the Government did, indeed, conceive of such a reason. HHSHarv_00000474. Harvard may not agree with the Government's assessment or its resulting decision, but the Government retained

26

discretion as to both. In the Government's discretion, which is entitled to deference, the overarching academic environment and observable conditions on Harvard's campus served as a sufficient reason for the Government to withdraw its investments.

**V.    The Freeze Orders and Termination Letters were within Defendants' statutory and constitutional authorities and are otherwise not reviewable as *ultra vires***

As explained herein, Harvard's *ultra vires* claims are inapposite both because Harvard cannot point to a specific statute that the terminations violate and because the Court of Federal Claims constitutes an adequate means of resolving their claim. Further, Harvard cannot show that the purported violations of contract provisions could be remedied by relief "traditionally" granted in equity, because "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity." *Knudson*, 534 U.S. at 210-11.

**VI.    Harvard is not entitled to injunctive relief.**

Besides being inappropriate under the APA, Harvard's request for prospective relief is overly broad in seeking to enjoin all agency individually named agency defendants from "issuing any termination, freezing of funds, stop work orders, or withholding of payment on existing grants or other federal funding, or refusal to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights, or on purported grounds of discrimination without compliance with the terms of Title VI." Prop. Order Granting Pl.'s Mot. for Summ. J., ¶ B. This relief is overly broad on its face and fails to adequately circumscribe the order to or describe in reasonable detail the acts to be restrained. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 52 (2d Cir. 1996). Should there be a need for remedy, vacatur of the challenged actions achieves the aims of judicial efficiency and appropriately tailors the relief to the challenged agency actions.

## CONCLUSION

The Government respectfully requests the Court deny Harvard's Motion for Summary Judgment and grant the Government's Cross-Motion for Summary Judgment.

Dated: July 14, 2025                                        Respectfully submitted,

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Director
Federal Programs Branch

/s/ *Ryan M. Underwood*
RYAN M. UNDERWOOD
EITAN R. SIRKOVICH
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 353-5525
E-mail: eitan.r.sirkovich@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

Counsel for Defendants certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Harvard hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

_/s/ Ryan M. Underwood_

RYAN M. UNDERWOOD
Trial Attorney
